IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO,
WESTERN DIVISION

| | | |
|---|---|---|
| Firexo, Inc. | * | Case No.: 3:21-CV-02336 |
| Plaintiff, | * | Judge Jack Zouhary |
| vs. | | |
| | * | **AMENDED COMPLAINT FOR DAMAGES** |
| Firexo Group Limited | | **WITH JURY DEMAND ENDORSED** |
| | * | **THEREON** |
| . Defendant | | |
| | * | Richard R. Malone (0008885) |
| | | Paul T. Belazis (0030356) |
| | * | **Malone, Ault & Farell** |
| | | 7654 W. Bancroft Street |
| | * | Toledo, Ohio  43617 |
| | | Telephone  - (419) 843-1333 |
| | * | Telecopier - (419) 843-3888 |
| | | Malone@maf-law.com |
| | * | Belazis@maf-law.com |
| | | Counsel for Plaintiff |

*****************************

## PARTIES

1. Plaintiff, Firexo, Inc. (hereinafter "Plaintiff" or "Firexo"), is a Florida corporation licensed to do business in the State of Ohio.

2. Firexo's principal place of business is Port Clinton, Ottawa County, Ohio.

3. Plaintiff is in the business of selling fire extinguishers and fire extinguishing products through a sole distributorship agreement with defendant Firexo Group Limited (hereinafter "FGL").

4. Through its agreement with FGL, Firexo has the sole right to sell and/or distribute for sale in the United States fire extinguishers and fire extinguishing products manufactured by FGL.

1

5. Defendant FGL is a British company doing business in Ottawa County, Ohio.

6. Upon information and belief, FGL's principal place of business is Reading, Berkshire, in the United Kingdom.

7. FGL manufactures fire extinguishers and fire extinguishing products that are subsequently sold in the United States through FGL's exclusive distributorship agreement with Firexo.

## STATEMENT OF FACTS

8. In August 2019, Firexo entered into a contractual agreement with FGL, giving Firexo the sole right to distribution and sale of FGL fire extinguishers and fire extinguishing products in the United States.

9. In an effort to induce Firexo to enter into a sole distributorship agreement, FGL represented that its product line was "biodegradable," "nontoxic," and "environmentally friendly" and that it did not contain toxic and/or environmentally harmful chemicals found in all competing fire extinguishing products sold in the United States.

10. In addition, FGL represented that it was in the process of securing UL certification for its products, that it possessed the expertise and capacity to successfully and expeditiously secure such certification within six months, and that it had secured a European certification known as EN3.

11. In the United States, large corporate facilities, industrial facilities, and government entities, including school systems, police and fire agencies, and federal, state and

local government facilities (the "Prospective Customers"), represent the largest market for sale of fire extinguishing products.

12. All such Prospective Customers require UL certification of fire extinguishing products.

13. The purchase of such products for home use constitutes a significantly smaller market for sales which typically occur through distributors or retail sellers.

14. The home market end users typically do not require UL certification but certification is sometimes required by distributors and retailers who sell fire extinguishing products for home use.

15. Based on its distributorship agreement with FGL, and in reliance on FGL's representations, Firexo established relationships with distributors and retail companies throughout the United States for distribution and sale of FGL fire extinguishers.

16. Firexo also invested significant sums of money to develop this distribution business and network.

17. In early 2020, Firexo received its first shipment of fire extinguishers from FGL for distribution and sale in the United States.

18. Firexo thereafter began distribution and sale of FGL products for home use to distributors and retail companies with whom it had established relationships.

19. Firexo also made representations to its distributors, based on FGL's representations and assurances, that UL certification of its fire extinguishing products was imminent and that EN3 certification had already been secured.

20. FGL products not yet distributed or sold by Firexo were stored in its Port Clinton, Ohio warehouse.

21. Starting in August 2020, Firexo detected corrosion on the threaded portion of the top spray assembly which connected to the opening of the fire extinguishing vessel on some of the FGL fire extinguisher in its Port Clinton warehouse.

22. Detailed information related to this corrosion was immediately provided to FGL, including photographs.

23. Firexo thereafter engaged in ongoing verbal and electronic communications with FGL representatives in an effort to resolve concerns related to this corrosion which represented a serious potential defect in FGL's product line, including repeated requests that FGL secure an independent third-party analysis to determine the cause of the corrosion.

24. Despite repeated efforts to address and resolve concerns related to flaws in the design and/or manufacture of FGL's fire extinguishers, FGL neglected and refused to take any action to determine the cause of the corrosion or to acknowledge that a problem existed.

25. Rather, FGL attempted to minimize the problem and insisted that Firexo should continue selling its products throughout the United States.

26.. On or about November 2, 2020, based on FGL's failure to take corrective action, Firexo suspended the sale of all FGL product lines that had shown evidence of corrosion.

27. Over 6000 fire extinguishing vessels were affected by this suspension in sales activity.

28. Although Firexo immediately notified FGL of the suspension of sales activity, FGL again declined to take any action to determine the cause of the corrosion, insisting instead that Firexo should return the product to the stream of commerce.

29. Efforts to resolve this dispute continued through November and December 2020 but repeated requests for an independent scientific analysis to determine the cause of the corrosion continued to be rejected by FGL

30. On or about January 19, 2021, Firexo received notification that a fire extinguisher sold to an end user had failed, with the customer reporting that the customer heard a "popping" sound during the night and discovered the top assembly handle of the fire extinguisher disconnected from the vessel and embedded in a ceiling tile.

31. The vessel, like those earlier detected by Firexo in its warehouse, showed evidence of corrosion around the threaded portion of the spray assembly where it connects to the opening of the fire extinguishing vessel.

32. FGL was immediately notified of this field failure.

33. On January 20, 2021, immediately after learning of the above referenced field failure, Firexo began notifying all distributors, retailers and other known customers who had purchased the FGL extinguishers that the use of these products should be discontinued and the products should be returned.

34. All customers who could be identified were directed to return the product, and were provided with pre-paid methods of return, and given a full refund.

35. These actions were immediately reported to FGL.

36. Between January 22, 2021 and February 12, 2021, Firexo received four additional reports of field failures in which corrosion of the threads at the top of the extinguisher vessel had appeared to be the cause.

37. These additional field failures again were immediately reported to FGL but FGL again refused to acknowledge the existence of any problem and refused to take steps to

determine the cause of the defect in its extinguishers or otherwise assist in the resolution of this serious and dangerous problem.

38. In addition, FGL declined to assist in any recall effort of the extinguishers that had been sold, or to accept return of the unsold product that remained in Firexo's warehouse.

39. Based on FGL's refusal to conduct an independent investigation of the cause of the product failures, Firexo retained an independent metallurgical engineering firm to conduct a failure analysis of the corroded vessels.

40. The report of the engineers, dated February 12, 2021, confirmed a defect in the design of the vessels, which resulted in the corrosion and failure of the vessels in the field.

41. Firexo also filed a report with the Consumer Product Safety Council (CPSC) pursuant to statutory duty advising of the product recall and the surrounding circumstances. This report was supplied to FGL.

42. Only after Firexo submitted a report of product defect to the CPSC did FGL agree to accept return of the extinguishers subject to the design flaw and to repair and return the flawed extinguishers.

43. None, however, were repaired or returned. Furthermore, FGL has refused to provide any evidence that the cause of the problem has been corrected.

44. Firexo incurred substantial expense to purchase extinguishers from FGL for distribution and sale in the United States.

45. FGL subsequently incurred additional expense to recall and reimburse customers for return of extinguishers found to be defectively designed and unsafe and to carry out its statutory duty to report the defect and otherwise comply with obligations related to protection of consumer safety.

46. FGL has failed to reimburse Firexo for any expense.

47. Although FGL has represented that the design defect has been corrected, it has refused, despite repeated requests, to provide any documentation to support its representations or to permit FGL to contact any of its engineers to discuss these serious design and safety concerns.

48. Further, FGL has failed to supply Firexo with any additional supply of extinguishers for sale in the United States.

49. After making representations to Firexo and to the general public that its fire extinguishing products were "nontoxic," "biodegradable," "made from organic materials" and "environmentally friendly," FGL has now retreated from those initial representations and advised Firexo that the terms initially represented as accurately describing its products can no longer be used in their marketing or sale of the product. In addition, FGL began to offer justifications for use of some of these terms that did not comport with their generally understood meaning.

50. At all times relevant hereto, FGL knew or should have known that its fire extinguishing products were defectively designed and posed a danger to end users and others in the stream of commerce but failed to advise Firexo of these design defects.

51. FGL knowingly, recklessly and/or negligently misrepresented its expertise and capacity to develop fire extinguishing products capable of securing UL certification within promised timeframes or within any reasonable period of time.

52. After more than a year and a half, UL certification had yet to be secured and FGL represented that another year may lapse before certification is secured. Nor has FGL provided confirmation of EN3 certification.

53. Further, FGL knowingly, recklessly and/or negligently misrepresented the toxicity, environmental impact, and biodegradable characteristics of the chemicals used in its fire extinguishing products.

54. FGL breached its contract with Firexo by failing to provide products safe for distribution and sale in the United States.

55. FGL breached common law and statutory duties to Firexo related to the sale of goods.

56. FGL breached common law and statutory warranties, including the warranties of merchantability and fitness.

57. FGL has breached its duty of good faith and fair dealing in its business and contractual relationship with Firexo.

58. FGL made continuing false and misleading representations, and/or failed to disclose material facts, related to the safety and effectiveness of its products, its professional expertise and ability to develop and manufacture safe and effective fire extinguishing products, its expertise and ability to secure UL certification, its success in securing EN3 certification, and its development of nontoxic, biodegradable, and environmentally friendly fire extinguishing products.

59. FGL's false representations and/or omissions of material facts, evidenced fraud and/or misrepresentation in the inducement of a contractual and ongoing business relationship with Firexo and in the subsequent execution and pursuit of its contractual duties and business relationship.

60. FGL fraudulently and/or negligently induced Firexo to enter into a contractual and ongoing business relationship selling its fire extinguishers and fire extinguishing products in the United States.

61. Firexo relied on the false representations of FGL and its omissions of material fact to its detriment.

62. As a direct and proximate result of FGL's acts and omissions, including its acts and omissions in the design, manufacture, distribution and sale of fire extinguishing products that were defectively designed and unsafe for use, its failure to produce UL certified or other saleable fire extinguishing products as promised, its false representations related to the extent of its expertise, qualifications, and ability to design, manufacture and secure UL certification of its products, its false representations related to EN3 certification, and its false representations related to the toxicity and environmental impact of its products, FGL has breached it common law, contractual and statutory duties to Firexo and caused Firexo to suffer permanent damage to its business relationships, industry wide reputational damage, and monetary damages that include, without limitation, expenses incurred in the initial purchase of extinguishers that proved to be defectively designed, expenses incurred in the recall and return of defectively designed extinguishers, and loss of past, present and future profits.

63. As a direct and proximate result of FGL's acts and omissions, including but not limited to multiple false representations that were knowingly and or negligently made and on which Firexo reasonably relied, including FGL's knowing and/or negligent failure to disclose material facts, Firexo has suffered, without limitation, reputational damage, monetary losses, past, present and future loss of profits, and ongoing incidental and consequential damages.

## CLAIMS FOR RELIEF

64. Plaintiff restates the foregoing allegations as if fully rewritten.

65. FGL's acts and omissions give rise to a claim for breach of contract, including but not limited to breach of the duty of good faith.

66. FGL's acts and omissions give rise to a claim for breach of the warranties of merchantability and fitness.

67. FGL's acts and omissions give rise to claims for misrepresentation, fraud in the inducement, and negligent and/or knowing misrepresentation aimed at inducing and continuing a business and contractual relationship with plaintiff.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays for an award of damages in an amount to be proven at trial, together with punitive damages, attorneys' fees, and the costs of these proceedings.

Respectfully submitted,

/s/ Paul T. Belazis
Richard R. Malone
Paul T. Belazis
Counsel for Plaintiff Firexo, Inc.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues and claims so triable.

/s/ Paul T. Belazis
_____
Paul T. Belazis

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the forgoing Amended Complaint was served on all counsel of record by operation of the Court's electronic filing system this 2nd day of March 2022.

                                                                  **/s/** Paul T. Belazis

                                                                  Paul T. Belazis