DocuSign Envelope ID: 1FBECBB4-649D-4B77-8184-A795861A428D

## Declaration of Scot Smith

I am an adult resident of Erie County, Ohio. I make this affidavit from personal knowledge.

1. On or about August 8, 2019, I entered into a Shareholder's Agreement with Firexo Group Limited ("FGL"), a company located in England that manufactures fire extinguishing products. A true and correct copy of the Agreement is attached as Attachment 1. Under its terms, I became a majority shareholder and director of Firexo, Inc., an existing Florida company. At the time, Mr. David Breith was the original and sole shareholder of the company. Mr. Breith was also the CEO of FGL.

2. Pursuant to the Shareholder's Agreement, office space located in Port Clinton, Ohio became the registered offices of Firexo, Inc.

3. FGL at the time offered two options to interested parties: 1) An investor option was offered to potential investors who, like myself, would invest funds in exchange for stock of a joint venture company, and 2) A distributor option was offered to potential distributors who would assume responsibility for ordering, warehousing, distribution and sale of FGL products. FGL sought potential distributors with a large warehousing and storage capacity as well as experience with importing goods and delivery of products to customers. These same two options were offered to potential investors and potential distributors around the world. The Shareholder's Agreement that I executed was intended to accomplish the first of the above two objectives. It was aimed solely at securing investment of funds.

4. In mid-August 2019, following the execution of the Shareholder's Agreement, Mr. Breith came to Port Clinton, Ohio where Firexo, Inc. and FGL separately entered into a distribution agreement pursuant to which Firexo, Inc would become an exclusive distributor of

1

DocuSign Envelope ID: 1FBECBB4-649D-4B77-8184-A795861A428D

FGL products in the United States. The essential terms of this separate distribution agreement, including the FGL fire extinguishing products that would be purchased by Firexo, Inc and then warehoused, distributed and sold, the price of these products, and Firexo, Inc.'s plans for ordering, distribution and sale were discussed and agreed upon over the course of Mr. Breith's weeklong trip to Port Clinton and in subsequent communications. In connection with the parties' agreement, and before agreeing to allow Firexo, Inc to become a distributor, Mr. Breith wanted to be satisfied that Firexo, Inc had access to adequate warehouse space for storage and distribution of FGL's fire extinguishing products. He ultimately inspected and agreed that identified warehouse space available to Firexo, Inc was suitable. Over the course of these discussions, I was directly involved but acted solely as a director of Firexo, Inc. I did not act in any individual capacity.

5. Firexo, Inc. secured the available warehouse space, hired employees, and began working to establish relationships around the United States for the distribution and sale of FGL fire extinguishers. Firexo, Inc. also began to order from FGL and to market, distribute and sell a variety of FGL fire extinguishing products throughout the United States starting in late 2019. All of these actions were undertaken solely by Firexo, Inc, using its own available financial resources, for the purpose of carrying out its distributorship agreement with FGL.

6. Throughout the course of this relationship, Mr. Breith made ongoing representations regarding features and certifications of its fire extinguishing products, including those products ultimately purchased by Firexo, Inc. Many critical representations, however, proved to be false or misleading and critical defects in product design and/or manufacturing began emerging that showed FGL products to pose serious safety risks to consumers, as alleged in the Amended Complaint filed by Firexo, Inc in this litigation. As also alleged, Firexo, Inc was forced to recall

2

DocuSign Envelope ID: 1FBECBB4-649D-4B77-8184-A795861A428D

product that had been sold pursuant to U.S. consumer safety laws, and subsequently was forced to discontinue the sale of most FGL products because of FGL's failure to rectify these issues.

7.    The parties to the Shareholder's Agreement between myself and FGL did not intend to bind Firexo, Inc to any provision of the Shareholder's Agreement or to confer any rights on Firexo, Inc under that Agreement.  FGL and Firexo, Inc. instead entered into a separate and independent distribution agreement for the purchase, distribution and sale of FGL's products by Firexo, Inc.

8.    All FGL products purchased by Firexo, Inc were to be sold solely in the United States and were subject to consumer and other federal and state laws of the United States. This included legal and other industry requirements related to product testing, certification, marketing and sale that also differed from state to state.   In addition, relevant government oversight agencies, testing and certification organizations, retailers and local distributors of our fire extinguishing products with whom we developed relationships, and ultimate consumers were all located solely in the United States, as were all Firexo, Inc.'s employees.  Experts retained by Firexo, Inc to independently test FGL fire extinguishers for design defects after product failures began to emerge also are located in the United States. No one envisioned, understood or agreed that a dispute between FGL and Firexo, Inc based on a separate distribution agreement that allows Firexo, Inc to purchase, distribute and sell FGL products would be subject to resolution of disputes by the courts of England and Wales.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____ 8/15/2022 _____.

Scot Smith

Scot Smith

3

Attachment 1 of Scot Smith Declaration

DATED:

3rd August 2019

---

## SHAREHOLDER'S AGREEMENT

BETWEEN

### Firexo Group Limited

AND

### Scot Smith

---

---

**PRIVATE AND CONFIDENTIAL DOCUMENT**

**Notes**

JOINT VENTURE AGREEMENT / FIREXO GROUP LIMITED & SCOT SMITH

# Contents

## Clause

| | | |
|---|---|---|
| 1. | Interpretation | 4 |
| 2. | Business of the JVC | 6 |
| 3. | Forming the JVC | 7 |
| 4. | Matters requiring consent of the Shareholders | 7 |
| 5. | Directors and management | 7 |
| 6. | Finance for the JVC | 8 |
| 7. | Restrictions on the parties | 8 |
| 8. | Business plan | 9 |
| 9. | Accounting | 10 |
| 10. | Dividend policy | 11 |
| 11. | Transfer of shares | 11 |
| 12. | Compulsory transfers | 12 |
| 13. | Valuation | 13 |
| 14. | Conversion of shares for certain events | 14 |
| 15. | Termination and liquidation | 15 |
| 16. | Status of agreement | 15 |
| 17. | Confidentiality | 16 |
| 18. | Announcements | 17 |
| 19. | Warranty | 18 |
| 20. | Further assurance | 18 |
| 21. | Assignment and other dealings | 18 |
| 22. | Entire agreement | 18 |
| 23. | Variation and waiver | 19 |
| 24. | Costs | 19 |
| 25. | No partnership or agency | 19 |
| 26. | Good faith | 19 |
| 27. | Notices | 20 |
| 28. | Severance | 21 |
| 29. | Agreement survives closing | 21 |
| 30. | Third-party rights | 21 |
| 31. | Counterparts | 22 |
| 32. | Rights and remedies | 22 |
| 33. | Governing law and jurisdiciton | 22 |
| SCHEDULE 1 | | 23 |

EXECUTION VERSION

## SHAREHOLDER'S AGREEMENT

This Agreement is made this    day of July 2019 between the following parties:

1. FIREXO GROUP LIMITED (incorporated and registered in England with company number 11085973) which has its registered office at the offices of Coyle White Devine, Bought Business Park, Bell Lane, Amersham, Bucks, HP6 6FA (**"Firexo"**); and,

2. SCOT SMITH, a natural person and citizen of the United States, whose correspondence address is 2435 Gill Rd, Port Clinton Ohio 43452 (**"Investor"**).

**WHEREAS:**

A. Firexo and Investor have agreed to form and jointly own a new company, the Joint Venture Company (the "JVC");

B. The JVC will carry on business in accordance with the terms and conditions of this agreement; and,

C. Firexo and Investor will exercise their rights in relation to the JVC in accordance with the terms and conditions of this Agreement

**NOW IT IS HEREBY AGREED AS FOLLOWS BY THE PARTIES:**

1.    **INTERPRETATION**

1.1    The following definitions apply in this Agreement:

    (a)    **Board**: the board of directors of the JVC as constituted from time to time.

    (b)    **Business**: has the meaning given in Clause 2.

    (c)    **Business Day**: a day (other than a Saturday or Sunday) when banks in New York, NY are open for business.

    (d)    **Business Plan**: has the meaning given in Clause 8.

    (e)    **Closing**: the completion of the formation of the JVC in accordance with Clause 3.

    (f)    **Compulsory Transfer Event**: in relation to a party, any event specified in Clause 12 that happens to that party.

    (g)    **Compulsory Transfer Notice**: has the meaning given in Clause 12.2.

    (h)    **Confidential Information**: has the meaning given in Clause 17.

    (i)    **Continuing Shareholder**: has the meaning given in Clause 11.3.

    (j)    **Encumbrance**: any interest or equity of any person (including any right to acquire, option or right of pre-emption) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or arrangement.

(k) **Fair Value:** in relation to shares, as determined in accordance with Clause 13.

(l) **Financial Year:** in relation to the JVC, means its financial accounting period of 12 months ending on the date given in Clause 3.9 but, in the first year in which the JVC is formed, means the period starting with the day the JVC is formed and ending on the date given in Clause 3.9.

(m) **Group:** in relation to a company (wherever incorporated), that company, any company of which it is a Subsidiary (its holding company) and any other Subsidiaries of any such holding company; and each company in a Group is a member of the Group.

Unless the context otherwise requires, the application of the definition of Group to any company at any time shall apply to the company as it is at that time.

(n) **Reserved Matters:** the matters listed in Schedule 1.

(o) **Shareholders:** the holders of shares in the JVC.

(p) **Subsidiary:** in relation to a company wherever incorporated (the holding company), any other company in which the holding company (or a person acting on its behalf) directly or indirectly holds or controls either:

    (i) a majority of the voting rights exercisable at general meetings of the company; or

    (ii) the right to appoint or remove directors having a majority of the voting rights exercisable at meetings of the board of directors of the company,

and any company which a Subsidiary of another company is also a Subsidiary of that company's holding company.

Unless the context otherwise requires, the application of the definition of Subsidiary to any company at any time shall apply to that company as it is at that time.

(q) **Territory:** shall mean the United States of America, its territories and its possessions.

(r) **Transfer Notice:** has the meaning given in Clause 12.

(s) **Valuer:** a person appointed in accordance with Clause 13 to determine the Fair Value under this agreement.

1.2 Clause, Schedule and paragraph headings do not affect the interpretation of this agreement.

1.3 References to clauses and Schedules are to clauses of and Schedules to this agreement and references to paragraphs are to paragraphs of the relevant Schedule.

1.4 The Schedules form part of this agreement and shall have effect as if set out in full in the body of this agreement. Any reference to this agreement includes the Schedules.

EXECUTION VERSION

1.5   A reference to this agreement or to any other agreement or document referred to in this agreement is a reference to this agreement or such other agreement or document as duly varied or novated in accordance with its terms from time to time.

1.6   Unless the context otherwise requires, words in the singular shall include the plural and, in the plural, shall include the singular.

1.7   Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

1.8   A person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.9   A reference to writing or written includes faxes but no other electronic form.

1.10   Any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

1.11   Where the context permits, other and otherwise are illustrative and shall not limit the sense of the words preceding them.

1.12   References to a document in agreed form are to that document in the form agreed by the parties and initialled by them, or on their behalf, for identification.

1.13   A reference to a law is a reference to it as amended, extended or re-enacted from time to time, provided that, as between the parties, no such amendment, extension or re-enactment made after the date of this agreement shall apply for the purposes of this agreement to the extent that it would impose any new or extended obligation, liability or restriction on, or otherwise adversely affect the rights of, any party.

1.14   A reference to a law shall include all subordinate legislation made from time to time under that law.

1.15   Any obligation on a person not to do something includes an obligation not to allow that thing to be done.

1.16   References to times of the day are, unless the context requires otherwise, to London time and references to a day are to a period of 24 hours running from midnight on the previous day.

2.   BUSINESS OF THE JVC

2.1   The Business of the JVC is the sale and distribution of FIREXO's fire extinguishing products within the Territory (**Business**).

JOINT VENTURE AGREEMENT / FIREXO GROUP LIMITED & SCOT SMITH

2.2    Each party shall use its reasonable endeavours to promote and develop the Business to the best advantage of the JVC.

**3.**    FORMING THE JVC

3.1    The JVC has been incorporated and is named **Firexo Corporation** and its share capital shall be divided into 100 ordinary shares of $1.00 per share.

3.2    The JVC's constitutional and corporate documents shall be substantially in the form of the draft versions in agreed form.

3.3    The original FIREXO Director for the JVC shall be David Breith.

3.4    The original INVESTOR Director for the JVC shall be Scot Smith.

3.5    The original chairman for the JVC shall be David Breith.

3.6    The original registered office for the JVC shall be 2435 East Gill Road, Port Clinton Ohio 43452 USA.

3.7    The original accountants for the JVC shall be determined by the Directors.

3.8    The original bankers for the JCV shall be KeyBank, 127 Public Square, Cleveland, Ohio 44114 USA.

3.9    The Financial Year for the JVC shall correspond to the calendar year, where possible.

**4.**    MATTERS REQUIRING CONSENT OF THE SHAREHOLDERS

4.1    Each party shall ensure that the JVC shall not, without the prior written approval of all Shareholders, carry out any of the Reserved Matters.

**5.**    DIRECTORS AND MANAGEMENT

5.1    The Board has responsibility for the supervision and management of the JVC and its Business.

5.2    The post of Chairman shall always be held by an Investor Director and, save in relation to any resolution of the Board arising from clause 14 (where a Firexo Director must have the casting vote) the Chairman shall have a casting vote on all other matters conducted by the Board.

5.3    A party may appoint a director, and remove a director whom it appointed, by giving notice in writing to the JVC and the other party, and to the director being removed, in the case of removal of a director. The appointment or removal takes effect on the date on which the notice is received by the JVC or, if a later date is given in the notice, on that date.

5.4    The party removing a director shall indemnify and keep indemnified the JVC against any claim connected with the director's removal from office.

5.5    The parties intend there to be a meeting of directors at least once a month.

5.6    The quorum at any meeting of directors (including adjourned meetings) is one FIREXO Director (or his alternate) and one Investor Director (or his alternate).

5.7    No business shall be conducted at any meeting of directors unless a quorum is present at the beginning of the meeting and at the time when there is to be voting on any business.

5.8    If a quorum is not present within 30 minutes of the time specified for a directors' meeting in the notice of the meeting then it will be adjourned for 7 days at the same time and place.

5.9    Meetings of directors shall make decisions by passing resolutions. A resolution is passed if:

    (a)    more votes are cast for it than against it; and

    (b)    at least one FIREXO Director and one Investor Director have voted in favour of it, but conditional upon and subject to the chairman having a casting vote.

6.    **FINANCE FOR THE JVC**

6.1    The Investor shall invest one million seven hundred thousand British pounds sterling (£1,700,000.00) in consideration for seventy (70) shares of the JVC.

6.2    The parties agree that if it requires any additional finance, the JVC shall be financed, so far as practicable, from external funding sources and on terms to be agreed between the Board, the parties and any relevant third parties, and that any security required in relation to such external funding shall, if possible, be provided by the JVC.

7.    **RESTRICTIONS ON THE PARTIES**

7.1    Neither party nor any of its Subsidiaries shall during the times specified below, carry on or be employed, engaged or interested in any business in the Territory which would be in competition with any part of the Business, including any developments in the Business after the date of this agreement. The times during which the restrictions apply are:

    (a)    any time when the party in question is a Shareholder; and

    (b)    for a period of 36 months after the party in question ceases to be a Shareholder.

7.2    Neither party nor any of its Subsidiaries shall, in the same area of business in which the JVC operates and during the times specified below, deal with or seek the custom of any person that is, or was within the previous 12 months, a client or customer of the JVC. The times during which the restrictions apply are:

    (a)    any time when the party in question is a Shareholder; and

    (b)    for a period of 24 months after the party in question ceases to be a Shareholder.

7.3    Neither party nor any of its Subsidiaries shall, during the times specified below, offer employment to, enter into a contract for the services of, or attempt to solicit or seek to entice away from the JVC any individual who is, at the time of the offer or attempt a director, officer or employee with the JVC, or procure or facilitate the making of any such offer or attempt by any other person. The times during which the restrictions apply are:

    (a)    any time when the party in question is a Shareholder; and

    (b)    for a period of 24 months after the party in question ceases to be a Shareholder.

7.4    Neither party nor any of its Subsidiaries shall, during the times specified below, solicit or endeavour to entice away from the JVC any supplier who supplies, or has supplied within the previous 12 months, goods to the JVC or, where the party is no longer a Shareholder, any supplier who has supplied goods to the JVC at any time during the period of 12 months immediately preceding the party in question ceasing to be a Shareholder if that solicitation or enticement causes or would cause such supplier to cease supplying, or materially reduce its supply of, those goods to the JVC. The times during which the restrictions apply are:

    (a)    any time when the party in question is a Shareholder; and

    (b)    for a period of 12 months after the party in question ceases to be a Shareholder.

7.5    Nothing prevents a party or any of its Subsidiaries:

    (a)    from holding for investment purposes only any units of any authorised unit trust; or

    (b)    from holding for investment purposes only not more than 5% of any class of shares or securities of any company traded on any public stock exchange.

7.6    Each of the covenants in Clause 7 is considered fair and reasonable by the parties.

7.7    Each party shall, to the extent that it is able to do so, exercise all voting rights and other powers in relation to its Subsidiaries to procure that its Subsidiaries comply with the terms of Clause 7.

8.    BUSINESS PLAN

8.1    The Business Plan is an annual business plan for the JVC prepared by the Board, and it shall include in relation to the Financial Year to which it relates:

    (a)    a schedule of management responsibilities as between FIREXO and INVESTOR.

    (b)    a cashflow statement giving:

        (i)    an estimate of the working capital requirements; and

        (ii)    an indication of the amount (if any) that it is considered prudent to retain, for the purpose of meeting those requirements, out of those

profits of the previous Financial Year that are available under the laws of England for distribution to Shareholders;

(c)  a monthly projected profit and loss account;

(d)  an operating budget (including capital expenditure requirements) and balance sheet forecast;

(e)  a management report giving business objectives for the Financial Year; and

(f)  a financial report which shall include an analysis of the estimated results of the JVC for the previous Financial Year compared with the Business Plan for that year, identifying variations in sales revenues, costs and other material items.

8.2  The Business Plan for the Financial Year in which the JVC is formed shall be in agreed form and adopted by the parties at Closing.

8.3  The Business Plan for every other Financial Year shall be:

(a)  prepared by the Board at least 30 days before the end of the preceding Financial Year; and

(b)  adopted and approved by the parties as soon as possible after it has been prepared.

## 9.  ACCOUNTING

9.1  The parties shall procure that the JVC shall at all times maintain accurate and complete accounting and other financial records in accordance with the requirements of all applicable laws and generally accepted accounting principles applicable in the United States of America.

9.2  Each party and its authorised representatives shall be allowed access at all reasonable times to examine the books and records of the JVC.

9.3  The parties shall procure that the JVC shall supply each party with the financial information necessary to keep the party informed about how effectively the Business is performing and in particular shall supply each party with:

(a)  a copy of each year's Business Plan for approval;

(b)  a copy of the audited accounts of the JVC prepared in accordance with the laws applicable in, and the accounting standards, principles and practices generally accepted in, the United States of America, within 6 months of the end of the year to which the audited accounts relate; and

(c)  monthly management accounts of the JVC to be supplied within 21 days of the end of the month to which they relate, and the accounts shall include a profit and loss account, a balance sheet and a cashflow statement.

**10.    DIVIDEND POLICY**

10.1    The parties shall use reasonable endeavours to procure that the JVC shall distribute by way of dividend at least 60% of the profit of the JVC in relation to each Financial Year but after making all necessary, reasonable and prudent provisions and reserves for taxation, for the repayment of borrowings by the JVC (if any), minority interests and extraordinary items as shown in the audited accounts for that year the parties agree that the JVC shall not declare, pay or make any dividend or other distribution until all loans made to the JVC by the parties have been repaid in full.

10.2    The parties further agree that seventy percent (70%) of any distribution by way of dividend shall be apportioned to the Investor.

**11.    TRANSFER OF SHARES**

11.1    No party shall create any Encumbrance over, transfer or otherwise dispose of or give any person any rights in or over any share or interest in any share in the JVC unless it is permitted or required to do so under this agreement and carried out in accordance with the terms of this Agreement.

11.2    A party may transfer all of its shares in the JVC to a member of its Group if, at the time of the transfer and in relation to all the shares being transferred, the transferring party:

　　(a)    procures that the transferee executes a deed of adherence agreeing to be bound by this agreement as if it were a party to the agreement; and

　　(b)    guarantees all the obligations and any liabilities of the transferee under the agreement.

11.3    The party (Seller) wishing to transfer its shares (Sale Shares) must give an irrevocable notice in writing (Transfer Notice) to the other party (Continuing Shareholder) giving details of the proposed transfer including:

　　(a)    if it wishes to sell the Sale Shares to a third party, the name of the proposed buyer; and

　　(b)    the price (in cash) at which it wishes to transfer the Sale Shares (Proposed Sale Price).

11.4    If the Continuing Shareholder gives notice to the Seller within 14 days of receiving the Transfer Notice that it wishes to buy all the Seller's shares in the JVC, the Continuing Shareholder shall have the right to do so at the Proposed Sale Price.

11.5    The Continuing Shareholder is bound to buy all the Seller's Sale Shares when it gives notice to the Seller that it wishes to do so.

11.6    If, at the expiry of the period specified the Continuing Shareholder has not notified the Seller that it wants to buy the Sale Shares, the Seller may transfer all its Sale Shares to the buyer identified in the Transfer Notice at a price not less than the Proposed Sale Price.

11.7    Each party undertakes (in respect of the shares that it holds) to give, and to use its reasonable efforts to procure that shareholders in its Group give, the approvals required for any transfer of shares made in accordance with this agreement.

11.8    The Seller shall procure that any buyer of the Sale Shares who is not a party to this agreement shall execute a deed of adherence at closing of the sale and purchase of the Sale Shares, agreeing to be bound by this agreement as if it were a party to it.

## 12.    COMPULSORY TRANSFERS

12.1    If anything referred to in this Clause 12.1 happens to a party it is a Compulsory Transfer Event in respect of that party and the provisions of this Clause 12 and Clause 13 shall apply:

(a)    the party becomes insolvent or is unable to pay its debts within the meaning of the insolvency legislation applicable to that party and has stopped paying its debts as they fall due;

(b)    a step is taken to initiate any process by or under which:

(i)    the ability of the creditors of the party to take any action to enforce their debts is suspended, restricted or prevented; or

(ii)    some or all of the creditors of the party accept, by agreement or in pursuance of a court order, an amount of less than the sums owing to them in satisfaction of those sums with a view to preventing the dissolution of the party; or

(iii)    a person is appointed to manage the affairs, business and assets of the party on behalf of the party's creditors; or

(iv)    the holder of a charge over assets of the party is appointed to control the business and assets of the party.

(c)    a process has been instituted that could lead to the party being dissolved and its assets being distributed among the party's creditors, shareholders or other contributors; or

(d)    the party commits a material or persistent breach of this agreement which if capable of remedy has not been so remedied within 20 Business Days of the other party requiring such remedy.

12.2    If a Compulsory Transfer Event happens to a party (in this clause the Seller), it shall give notice of it to the other party (in this clause the Buyer) as soon as possible and, if it does not, it is deemed to have given notice of it on the date on which the Buyer becomes aware of such Compulsory Transfer Event (Compulsory Transfer Notice).

12.3    As soon as practicable after service, or deemed service, of the Compulsory Transfer Notice, the parties shall appoint the Valuer to determine the Fair Value of the Seller's shares in the JVC (Sale Shares) in accordance with Clause 14.

12.4   The Buyer has the right, within fourteen days of receiving notification of the Fair Value determined by the Valuer, to serve a notice on the Seller to buy all of the Sale Shares at the Fair Value.

12.5   The service of a notice to buy under Clause 12.4 shall bind the parties to buy and sell the shares, as the case may be.

12.6   If at the end of the period specified in Clause 12.4 the Buyer has not served a notice to buy the Sale Shares, the Buyer may elect by written notice served on the Seller for the JVC to be wound up in accordance with Clause 15.

## 13.   VALUATION

13.1   The parties shall endeavour to agree on the appointment of an independent Valuer and to agree the terms of appointment with the Valuer, if the parties do not agree on the appointment of the valuer then Firexo will appoint a valuer at its sole discretion.

13.2   The Valuer shall be requested to determine the Fair Value within 30 Business Days of his appointment and to notify the parties in writing of his determination.

13.3   All matters under this Clause 13 shall be conducted, and the Valuer's decision shall be written, in the English language.

13.4   The Fair Value for any Sale Share shall be the price per share determined by the Valuer on the following bases and assumptions:

(a)   valuing each of the Sale Shares as a proportion of the total value of all the issued shares in the capital of the JVC without any premium or discount being attributable to the percentage of the issued share capital of the JVC which they represent or for the rights or restrictions applying to the Sale Shares; and

(b)   taking into consideration of the value of the JVC against the Firexo global business;

(c)   if the JVC is then carrying on business as a going concern, on the assumption that it will continue to do so;

(d)   the sale is to be on arms' length terms between a willing buyer and a willing seller;

(e)   the Sale Shares are sold free of all Encumbrances;

(f)   the sale is taking place on the date the Valuer was requested to determine the Fair Value; and

(g)   to take account of any other factors that the Valuer reasonably believes should be taken into account.

13.5   The parties are entitled to make submissions to the Valuer and will provide (or procure that the JVC provides) the Valuer with such assistance and documents as the Valuer

reasonably requires for the purpose of reaching a decision, subject to the Valuer agreeing to give such confidentiality undertakings as the parties may reasonably require.

13.6   To the extent not provided for by this Clause 13, the Valuer may, in his reasonable discretion, determine such other procedures to assist with the valuation as he considers just or appropriate, including (to the extent he considers necessary) instructing professional advisers to assist him in reaching his valuation.

13.7   The Valuer shall act as expert and not as arbitrator and his written determination shall be final and binding on the parties (in the absence of manifest error or fraud).

13.8   Firexo shall bear the costs in relation to the Valuer. The Valuer's fees and any costs properly incurred by him in arriving at his valuation (including any fees and costs of any advisers appointed by the Valuer)] shall be charged proportionally to JVC(s).

14.   **CONVERSION OF SHARES FOR CERTAIN EVENTS**

14.1   If the global business of Firexo is subject to an acquisition bid which requires the entire shareholding of the JVC to be sold to a third party acquirer (and such sale is in the best interests of Firexo's shareholders as a whole, as determined exclusively by Firexo's board of directors, albeit after consultation with Investor) then Investor will transfer its shares at the direction of Firexo to the third party acquirer for the price agreed by Firexo, provided always that there shall be no differential between the agreed price for Firexo's shares in the JVC and the agreed price for Investor's shares in the JVC.

14.2   Subject to any opportunities for a global business sale arising under clause 14.1, the parties acknowledge the likelihood that Firexo, its subsidiaries and associated companies, will pursue an initial public offering of its shares (IPO) at a future time.

14.3   In exchange for receiving the shares contemplated in clause 14.4, the Investor shall cooperate with Firexo in facilitating any intended IPO transactions, including converting its shares of the JVC.

14.4   If Firexo pursues an IPO, it shall transfer to Investor a percentage of shares in such a transaction according to the following formula:

$$\frac{GM_{USA}}{GM_{ALL}} * .44 = \text{X.XX\% of shares transferred to Investor by Firexo}$$

Where:

$GM$ = an entity's net sales revenue minus its cost of goods sold;

$GM_{USA}$ = the gross margin of the JVC in the financial year immediately preceding any intended IPO;

$GM_{ALL}$ = the combined gross margin of all joint venture relationships in the financial year immediately preceding any intended IPO.

**15.    TERMINATION AND LIQUIDATION**

15.1    Subject to Clause 15.2, this agreement shall terminate:

(a)    when one party ceases to hold any shares in the JVC; or

(b)    when a resolution is passed by shareholders or creditors, or an order is made by a court or other competent body or person instituting a process that will lead to the JVC being wound up and its assets being distributed among the JVC's creditors, shareholders or other contributors; or

15.2    Termination of this agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination, including the right to claim damages in respect of any breach of the agreement which existed at or before the date of termination.

15.3    Where, following an event referred to in Clause 12.1(b), the JVC is to be wound up and its assets distributed, the parties shall agree a suitable basis for dealing with the interests and assets of the JVC and shall endeavour to ensure that, before dissolution:

(a)    all existing contracts of the JVC are performed to the extent that there are sufficient resources;

(b)    the JVC shall not enter into any new contractual obligations;

(c)    the JVC's assets are distributed as soon as practicable; and

(d)    any assets transferred to the JVC pursuant to the FIREXO Agreement shall be returned to FIREXO or as FIREXO directs, and any assets transferred to the JVC pursuant to the INVESTOR Agreement shall be returned to Investor or as Investor directs.

**16.    STATUS OF AGREEMENT**

16.1    Each party shall, to the extent that it is able to do so, exercise all its voting rights and other powers in relation to the JVC to procure that the provisions of this agreement are properly and promptly observed and given full force and effect according to the spirit and intention of this agreement.

16.2    If there is an inconsistency between any of the provisions in this agreement and the provisions of the constitutional documents of the JVC, the provisions of this agreement shall prevail as between the parties.

16.3    The parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the constitutional documents of the JVC to the extent necessary to permit the JVC and its Business to be administered as provided in this agreement.

**17.   CONFIDENTIALITY**

17.1   In this clause Confidential Information means any information (however recorded or preserved) which:

    (a)   either party may have or acquire (whether before or after the date of this agreement) in relation to the customers, suppliers, business, assets or affairs or plans, intentions or market opportunities and the operations, processes, product information, know-how, designs, trade secrets or software of the JVC; or

    (b)   either party or any member of its Group may have or acquire (whether before or after the date of this agreement) in relation to the customers, suppliers, business, assets or affairs or plans, intentions or market opportunities and the operations, processes, product information, know-how, designs, trade secrets or software of the other party or any member of the other party's Group, as a consequence of the negotiations relating to this agreement or any other agreement or document referred to in this agreement or the performance of this agreement or any other agreement or document referred to in this agreement; or

    (c)   relates to the contents of this agreement (or any agreement or arrangement entered into pursuant to this agreement),

but excludes the information in Clause 17.2.

17.2   Information is not Confidential Information if:

    (a)   it is or becomes generally available to the public (other than as a result of its disclosure in breach of this agreement); or

    (b)   a party can establish to the reasonable satisfaction of the other party that it found out the information from a person not connected with the other party or its Group and that such person is not under any obligation of confidence in respect of the information; or

    (c)   a party can establish to the reasonable satisfaction of the other party that the information was known to the first party before the date of this agreement and that it was not under any obligation of confidence in respect of the information; or

    (d)   the parties agree in writing that it is not confidential.

17.3   Each party shall at all times keep confidential (and ensure that its employees, agents, Subsidiaries and the employees and agents of such Subsidiaries, and the JVC shall keep confidential) any Confidential Information and shall not use such Confidential Information except for the purpose of exercising or performing its rights and obligations under this agreement, and shall not disclose such Confidential Information except:

    (a)   to another member of the FIREXO Group or INVESTOR Group, as the case may be, or to a party's professional advisers where such disclosure is for a purpose related to the operation of this agreement; or

(b)    with the written consent of such of the JVC or the party or any member of its Group that the information relates to; or

(c)    as may be required by law or by the rules of any recognised stock exchange, or governmental or other regulatory body or by a court or other authority of competent jurisdiction, provided that, to the extent it is legally permitted to do so, it gives the other party as much notice of such disclosure as possible and, where notice of disclosure is not prohibited and is given in accordance with this clause, it takes into account the reasonable requests of the other party in relation to the content of such disclosure or

(d)    to any tax authority to the extent reasonably required for the purposes of the tax affairs of the party concerned or any member of its Group.

17.4    Each party shall inform (and shall use all reasonable endeavours to procure that any Subsidiary and the JVC shall inform) any officer, employee or agent or any professional adviser advising it in relation to the matters referred to in this agreement, or to whom it provides Confidential Information, that such information is confidential and shall require them:

(a)    to keep it confidential; and

(b)    not to disclose it to any third party (other than those persons to whom it has already been disclosed in accordance with the terms of this agreement).

17.5    On termination of this agreement, each party shall (and shall use all reasonable endeavours to procure that its Subsidiaries, and its officers and employees and those of its Subsidiaries and the JVC shall):

(a)    return to the other party all documents and materials (and any copies) containing, reflecting, incorporating or based on the other party's Confidential Information; and

(b)    erase all the other party's Confidential Information from computer and communications systems and devices used by it, including such systems and data storage services provided by third parties (to the extent technically practicable),

provided that a recipient party (and/or the JVC, as the case may be) may retain documents and materials containing, reflecting, incorporating or based on the other party's Confidential Information to the extent required by law or any applicable governmental or regulatory authority.

17.6    The provisions of this Clause 17 shall continue to apply after termination of this agreement for any cause.

**18.    ANNOUNCEMENTS**

18.1    Subject to Clause 18.2 and Clause 18.3, neither party shall make, or permit any person to make, any public announcement, communication or circular (Announcement) concerning

this agreement without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed).

18.2 Where an Announcement is required by law or any governmental or regulatory authority (including, without limitation, any relevant securities exchange), or by any court or other authority of competent jurisdiction, the party required to make the Announcement shall promptly notify the other party. The party concerned shall make all reasonable attempts to agree the contents of the Announcement with the other party before making it.

18.3 On the signing of this agreement the parties shall issue a joint Announcement about the formation of the JVC in agreed form.

**19.  WARRANTY**

19.1 Each party warrants and represents to the other that, at the date of this agreement, the JVC has not carried on any business, has no assets or liabilities, has no employees and is not a party to any contracts.

**20.  FURTHER ASSURANCE**

20.1 Each party shall and shall use all reasonable endeavours to procure that any necessary third party shall, promptly execute and deliver such documents and perform such acts as the other party may reasonably require from time to time for the purpose of giving full effect to this agreement.

**21.  ASSIGNMENT AND OTHER DEALINGS**

21.1 Neither party shall assign, transfer, mortgage, charge, sub-contract, declare a trust over or deal in any other manner with any or all of its rights and obligations under this agreement (or any other document referred to in it) without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed).

21.2 Each party confirms that it is acting on its own behalf and not for the benefit of any other person.

**22.  ENTIRE AGREEMENT**

22.1 This agreement constitutes the entire agreement between the parties and supersedes and extinguishes all previous arrangements, understandings or agreements between them relating to its subject matter.

22.2 Each party acknowledges that in entering into this agreement it does not rely on, and shall have no remedies in respect of, any statement, representation, assurance or warranty that is not set out in this agreement.

22.3 Nothing in this clause shall limit or exclude any liability for fraud.

**23.   VARIATION AND WAIVER**

23.1   No variation of this agreement shall be effective unless it is in writing and signed by the parties (or their authorised representatives).

23.2   A waiver of any right or remedy under this agreement or by law is only effective if it is given in writing and is signed by the person waiving such right or remedy. Any such waiver shall apply only to the circumstances for which it is given and shall not be deemed a waiver of any subsequent breach or default.

23.3   A failure or delay by any person to exercise any right or remedy provided under this agreement or by law shall not constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict any further exercise of that or any other right or remedy.

23.4   No single or partial exercise of any right or remedy provided under this agreement or by law shall prevent or restrict the further exercise of that or any other right or remedy.

23.5   A person that waives any right or remedy provided under this agreement or by law in relation to one person or takes or fails to take any action against that person, does not affect its rights or remedies in relation to any other person.

**24.   COSTS**

24.1   Except as expressly provided in this agreement, each party shall pay its own costs and expenses incurred in connection with the negotiation, preparation, execution and performance of this agreement.

**25.   NO PARTNERSHIP OR AGENCY**

25.1   Nothing in this agreement is intended to, or shall be deemed to, establish any partnership between the parties or constitute any party the agent of another party.

**26.   GOOD FAITH**

26.1   All transactions entered into between either party and the JVC shall be conducted in good faith and on the basis set out or referred to in this agreement or, if not provided for in this agreement, as may be agreed by the parties and, in the absence of such agreement, on an arm's length basis.

26.2   Each party shall at all times act in good faith towards the other and shall use all reasonable endeavours to ensure that this agreement is observed.

26.3   Each party shall do all things necessary and desirable to give effect to the spirit and intention of this agreement.

**27.    NOTICES**

27.1    A notice given to a party under or in connection with this agreement:

(a)    shall be in writing in the English language;

(b)    shall be signed by or on behalf of the party giving it;

(c)    shall be sent to the relevant party for the attention of the contact and to the address specified in Clause 27.2, or such other address, or person as that party may notify to the other in accordance with the provisions of this Clause 27; and

(d)    shall be:

(i)    delivered by hand; or

(ii)    sent by pre-paid first-class post, recorded delivery or special delivery; or

(iii)    sent by airmail or by reputable international overnight courier (if the notice is to be served by post to an address outside the country from which it is sent).

unless proved otherwise is deemed received as set out in Clause 27.4.

27.2    The addresses for service of notices are:

(a)    Firexo Group Limited:

(i)    address: Coyle White Devine Boughton Business Park, Bell Lane, Amersham, Buckinghamshire, England, HP6 6FA

(ii)    for the attention of: Dave Breith

(b)    Scot Smith:

(i)    address: 2435 Gill Rd, Port Clinton Ohio 43452.

(ii)    for the attention of: Scot Smith

27.3    A party may change its details for service of notices as specified in Clause 27.2 by giving notice to the other party. Any change notified pursuant to this clause shall take effect at 9.00 am on the later of:

(a)    the date (if any) specified in the notice as the effective date for the change; or

(b)    five Business Days after deemed receipt of the notice.

27.4    Delivery of a notice is deemed to have taken place (provided that all other requirements in this clause have been satisfied):

(a)    if delivered by hand, on signature of a delivery receipt or at the time the notice is left at the address; or

(b)    if sent by pre-paid first-class post, recorded delivery or special delivery to an address in the United States of America, at 9.00 am on the seventh Business Day after posting; or

JOINT VENTURE AGREEMENT / FIREXO GROUP LIMITED & SCOT SMITH

(c)  if sent by pre-paid airmail to an address outside the country from which it is sent, at 9.00 am on the fifth Business Day after posting; or

(d)  if sent by reputable international overnight courier to an address outside the country from which it is sent, on signature of a delivery receipt [or at the time the notice is left at the address]; and

(e)  if deemed receipt under the previous paragraphs of this Clause 27.4 would occur outside business hours (meaning 9.00 am to 5.30 pm Monday to Friday on a day that is not a public holiday in the place of deemed receipt), at 9.00 am on the day when business next starts in the place of deemed receipt. For the purposes of this clause, all references to time are to local time in the place of deemed receipt.

27.5  To prove service, it is sufficient to prove that:

(a)  if delivered by hand or by reputable international overnight courier, the notice was delivered to the correct address; or

(b)  if sent by post or by airmail, the envelope containing the notice was properly addressed, paid for and posted.

27.6  This Clause 27 does not apply to the service of any proceedings or other documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

**28.  SEVERANCE**

28.1  If any provision or part-provision of this agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this agreement.

28.2  If one party gives notice to the other of the possibility that any provision or part-provision of this agreement is invalid, illegal or unenforceable, the parties shall negotiate in good faith to amend such provision so that, as amended, it is legal, valid and enforceable, and, to the greatest extent possible, achieves the intended commercial result of the original provision.

**29.  AGREEMENT SURVIVES CLOSING**

29.1  This agreement (other than obligations that have already been fully performed) remains in full force after Closing.

**30.  THIRD-PARTY RIGHTS**

30.1  This agreement is made for the benefit of the parties and their successors and permitted assigns and is not intended to benefit, or be enforceable by, anyone else.

EXECUTION VERSION

30.2    The rights of the parties to terminate, rescind or agree any variation, waiver or settlement under this agreement are not subject to the consent of any other person.

**31.    COUNTERPARTS**

31.1    This agreement may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

31.2    No counterpart shall be effective until each party has executed at least one counterpart.

**32.    RIGHTS AND REMEDIES**

32.1    Except as expressly provided in this agreement, the rights and remedies provided under this agreement are in addition to, and not exclusive of, any rights or remedies provided by law.

**33.    GOVERNING LAW AND JURISDICITON**

33.1    This agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of England and Wales.

33.2    Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this agreement or its subject matter or formation.

This agreement has been entered into on the date stated at the beginning of it.

*        *        *

JOINT VENTURE AGREEMENT / FIREXO GROUP LIMITED & SCOT SMITH

# SCHEDULE 1

### Matters Reserved for Shareholder Approval

The following matters are reserved for shareholder approval:

1. Permitting the registration of any person as a member of the JVC other than FIREXO and Investor in relation to their initial investment and any of their transferees, provided that the transfer has been carried out in accordance with the terms of this agreement.

2. Altering the name of the JVC.

3. Altering in any respect any constitutional documents of the JVC or the rights attaching to any of the shares in the JVC.

4. Adopting or amending the Business Plan in respect of each Financial Year.

5. Changing the nature of the JVC's Business or commencing any new business by the JVC which is not ancillary or incidental to the Business.

6. Making any acquisition or disposal by the JVC of any material asset(s) otherwise than in the ordinary course of business.

7. Creating or granting any Encumbrance over the whole or any part of the Business, undertaking or assets of the JVC or over any shares in the JVC or agreeing to do so.

# EXECUTION

Signed by Scot SMITH,
for and on behalf of Investor
on

Signed by DAVID BREITH,
for and on behalf of Firexo
on

03/08/2019

\*

\*    \*