## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| FIREXO INC., <br> Plaintiff, <br><br> v. <br><br><br> FIREXO GROUP LIMITED, <br> Defendant. | Case № 3:21-CV-02336 <br><br> Judge Jack Zouhary <br><br> **Hearing Requested** |

## MEMORANDUM OF LAW
## SUPPORTING FIREXO INC.'S MOTION FOR DEFAULT JUDGMENT
## AGAINST FIREXO GROUP LIMITED

Under Fed. R. Civ. P. 55(b)(2), Plaintiff Firexo Inc. ("Firexo") respectfully asks this Court for a judgment by default against Defendant Firexo Group Limited ("FGL") on all Firexo's claims for relief. *See* Pl.'s First Am. Compl. ¶¶ 65–67 (Doc. 9).

### STATEMENT OF FACTS/CASE

1.  Firexo is a Florida corporation with its principal place of business in Ohio. FGL is an English British company, with its principal place of business in the United Kingdom.

2.  On October 29, 2021, Firexo filed a Complaint against FGL in Ohio state court. FGL removed the case to this Court on December 13, 2021 (Doc. 1).

3.  On March 2, 2022, Firexo filed its First Amended Complaint (Doc. 9) against FGL. FGL filed its Answer on March 31, 2022 (Doc. 11).

4.  The Case Management Order (Doc. 29) was entered on June 7, 2024.

5.  On September 19, 2024, all counsel for FGL (Calfee) made a motion for leave to withdraw as counsel (Doc. 31) based on "fundamental difference between Calfee and FGL that require Calfee to move for leave … consistent with Ohio

1

Rule of Professional Conduct 1.16." (Doc. 31 at ¶1). The court granted Calfee's motion on September 20, 2024 via minute order (Doc. 32).

6.     Since September 20, 2024, FGL has been unrepresented. As such, FGL is unable to defend itself.

7.     This Court ordered FGL to obtain replacement counsel twice (Docs. 34 and 35). FGL failed to obtain counsel.

8.     On December 3, 2024, this Court entered an order (Doc. 36) recognizing that over two months have passed since FGL's prior counsel withdrew and that FGL had not obtain new counsel despite this Court giving FGL multiple opportunities to do so. As such, this Court noted that Firexo "may now proceed with any appropriate motions against the current Defendant." (Doc. 36 ¶ 2).

9.     Accordingly, on December 4, 2024, Firexo entered a motion for entry of default against FGL (Doc. 37). On December 16, 2024, the Clerk of Court entered default against FGL (Doc. 38).

10.    Firexo Inc. now seeks damages arising out of:

    10.1    FGL's breach of the oral contract for exclusive distribution of FGL's products in the United States, including but not limited to breach of the duty of good faith;

    10.2    FGL's misrepresentations, fraud in the inducement and knowing or negligent misrepresentation aimed at inducing and continuing a business and contractual relationship with Firexo.

11.    Firexo requests a hearing to present evidence in support to establish the damages arising out of its three claims of relief.

## LEGAL STANDARD

### Default Judgment

12.    Rule 55 governs default judgments. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's

default." Fed. R. Civ. P. 55(a). After the entry of default, the party seeking relief may apply for a default judgment under Rule 55(b).

13. "If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10A Fed. Prac. & Proc. Civ. § 2688.1 (4th ed.) A default on well-pleaded allegations may establish the defendant's liability, but the plaintiff retains the burden of establishing damages. *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F. 4th 393, 403 (6th Cir. 2022) (citing *Antoine v. Atlas Turner, Inc.*, 66 F. 3d 105, 110 (6th Cir. 1995)). The balance of this memorandum addresses the specific allegations of Firexo's Amended Complaint that support its position.

14. Rule 55(b)(2) permits, but does not require, the Court to conduct an evidentiary hearing if needed to effectuate judgment.

**Law Governing this Court's Analysis**

15. **Contract Claims.** The Agreement is an oral contract, where the parties have not expressly chosen which substantive law applies. In a diversity action, district courts must apply the choice of law rules of the state in which it sits. *Nat'l Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150 (6th Cir. 1992). Under Ohio choice of law rules, the law of the state with the most significant relationship to the contract governs disputes arising from it. *Gries Sports Enters., Inc. v. Modell*, 473 N.E.2d 807, 810 (Ohio 1984); *see also Excell Marine Corp. v. Stagg Marine, Inc.*, 1:22-cv-655, 2024 WL 1897660 (S.D. Ohio Apr. 30, 2024) (granting a default judgment on an oral contract).

16. **Tort Claims**. Under Ohio choice-of-law rules, the law of the place of injury generally controls unless another jurisdiction has more significant relationship to the action. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 341–42 (Ohio 1984); *Mendoza v. J.M. Smucker Co.*, 674 F. Supp. 3d 439 (N.D. Ohio 2023). Here, Firexo has alleged fraud and misrepresentation in the inducement of the parties' distributorship agreement and subsequent ongoing business relationship.

## ANALYSIS

**Under Ohio's choice-of-law rules, Ohio law should govern the Agreement.**

17.     Ohio law should govern the Agreement and any claims arising out of it. To determine which place has the most significant relationship, Ohio has adopted Section 188 of the Restatement (Second) of Conflicts of Laws. *Gries*, 473 N.E.2d at 810. Under Section 188, a Court considers five factors to determine which jurisdiction bears the most significant relationship to the contract. *See* Restatement (Second) of Choice of Laws § 188. They are:

17.1    **The place of contracting.** Firexo and FGL concluded the Agreement in Port Clinton Ohio during David Breith's weeklong visit to Firexo's warehouse and facility in August 2019. Decl. of Scot Smith at¶ 4 (Doc. 17-1).

17.2    **The place of negotiating of the contract.** The parties negotiated the Agreement in Port Clinton, Ohio. "The essential terms of the [Agreement] … were discussed and agreed upon over the course of Mr. Breith's weeklong trip to Port Clinton and in subsequent communications." *Id*.

17.3    **The place of performance.** Firexo's facilities were and remain located in Port Clinton, Ohio, where Firexo received product from FGL, shipped product to its customers and still maintains its principal place of business. Pl.'s First Am. Compl. at ¶¶ 17–21 (Doc. 9).

17.4    **The location of the subject matter of the contract.** Firexo distributed FGL's products from Firexo's location in Port Clinton, Ohio. As Agreement was one for the sole, exclusive right to distribute FGL's products, *see* Pl.'s First Am. Compl. at ¶¶ 3–4 (Doc. 9), the location of the subject matter is likewise Ohio.

17.5    **The domicile, residence, nationality, place of incorporation and place of business of the parties.** Firexo is a Florida corporation with its principal place of business in Ohio; FGL is a British company

4

organized under the law of England and Wales, with its principal place of business in England. *See id.* at ¶¶ 1–7.

18. While FGL is an English company primarily doing business in England, the Agreement's subject matter (the sole distribution in the United States), place of performance, and the place of contract origination all support the conclusion that Ohio law governs the Agreement and any dispute arising out of it.

**FGL breached the oral exclusive distribution agreement.**

19. Under Ohio law, a contract need not be in writing. *Marco's Franchising, LLC v. Soham, Inc.*, 365 F. Supp. 3d 891, 896 (N.D. Ohio 2019). "Terms of an oral contract may be determined from words, deeds, acts, and silence of the parties." *Id.* (cleaned up).

20. To establish that FGL breached the oral exclusive distribution agreement, Firexo must show: "(1) the existence of a binding contract or agreement, (2) that the nonbreaching party performed its contractual obligations, (3) that the other party failed to fulfill its contractual obligations without legal excuse, and (4) that the nonbreaching party suffered damages as a result of the breach." *Old Republic Surety Co. v. T&A Constr., Inc.*, 1:24-CV-00194, 2024 WL 4567262, at *3 (N.D. Ohio Oct. 24, 2024) (cleaned up).

21. In Ohio, "a contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration. A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (cleaned up).

22. In August 2019, Firexo and FGL entered an oral agreement giving Firexo the sole right to distribution and sale of FGL fire extinguishers and fire extinguishing products in the United States ("the Agreement"). Pl.'s First Am. Compl. at ¶ 8 (Doc. 9).

23.   Firexo performed its contractual obligations under the Agreement, including establishing a nationwide distribution network for sale of FGL products as well as discharging all invoices that FGL sent. *Id.* at ¶¶ 15–19, 44. FGL did not perform its contractual obligations. *Id.* at ¶¶ 46–54.

24.   FGL breached the Agreement by, among other things:

24.1   failing to address and resolve concerns related to flaws in the design and/or manufacture of FGL's fire extinguishers, resulting in Firexo's decision to suspend sales of all related FGL product lines on or about November 2, 2020. Pl.'s First Am. Compl. at ¶¶ 24–26 (Doc. 9).

24.2   failing to address the cause of corrosion in its fire extinguishing products after Firexo suspended sales in the United States. *Id.* at ¶28.

24.3   failing (again) to address the cause of corrosion after Firexo notified FGL of field failures in early 2021, i.e., where FGL's products had failed after having been purchased by businesses and consumers in the United States. *Id.* at ¶ 37.

24.4   refusing to assist Firexo in the recall efforts or to accept return of the unsold, product evidencing dangerous design defects that Firexo held. *Id.* at ¶ 38.

24.5   refusing to repair or replace products that Firexo sent to FGL's point of contact after Firexo submitted its recall report to the Consumer Products Safety Commission. *Id.* at ¶ 43.

24.6   failing to supply Firexo with any additional FGL products for sale in the United States. *Id.* at ¶ 48.

24.7   failing to supply Firexo with products safe for distribution and sale in the United States. *Id.* at ¶ 54.

25.   Firexo incurred substantial expense to purchase FGL's products for distribution and sale in the United States. *Id.* at ¶¶ 16, 44.

26.   Firexo and FGL had a valid, oral distribution agreement. Firexo performed its obligations under that agreement. FGL breached that agreement, without legal excuse, causing Firexo substantial monetary damage.

**Fraud in the inducement**

27.   To prove fraud in the inducement, "a plaintiff must prove that [1] the defendant made a knowing, material misrepresentation [2] with the intent of inducing the plaintiff's reliance, and [3] that the plaintiff relied upon that misrepresentation to his or her detriment. *ABM Farms, Inc. v. Woods.*, 692 N.E.2d 574, 578 (Ohio 1998). Plaintiff's complaint is replete with allegations that support and establish its entitlement to judgment predicated on this claim.

28.   FGL fraudulently induced Firexo to enter the Agreement.

   **Knowing, material misrepresentation.**

   28.1   "FGL represented that its product line was 'biodegradable,' 'nontoxic' and 'environmentally friendly' and that it did not contain toxic and/or environmentally harmful chemicals found in all competing fire extinguishing products sold in the United States." Pl.'s First Am. Compl. at ¶ 9 (Doc. 9).

   28.2   "FGL represented that it was in the process of securing UL certification for its products, that it possessed the expertise and capacity to successfully and expeditiously secure such certification within six months, and that it had secured a European certification known as EN3." *Id.* at ¶ 10.

   28.3   The fire extinguishers manufactured by FGL and purchased by Firexo for distribution throughout the United States subsequently were found to contain "a serious and dangerous" "defect in the design of the [fire extinguishing] vessels which resulted in …corrosion and failure of the vessels in the field." *Id.* at ¶ 40. These failures included:

(a)  "[C]orrosion on the threaded portion of the top spray assembly which connected to the opening of the fire extinguishing vessel," *Id.* at ¶ 21. and

(b)  "Corrosion" related separation of "the top assembly handle of [a] fire extinguisher" which had been "disconnected from the vessel" and became "embedded in a ceiling tile" following a "popping sound during the night." *Id.* at ¶¶ 30–31, 36.

(c)  Multiple additional corrosion related field failures involving "corrosion of the threads at the top of the extinguisher vessels." *Id.* at ¶ 36.

28.4  Even when "detailed information related to the corrosion" and related "field failures" was " brought to the attention of FGL," it "refused to acknowledge the existence of a problem," refused "repeated requests for independent scientific analysis…" "to determine the cause of the defect in its extinguishers," "refused to permit Firexo to contact any of its engineers to discuss these serious design and safety concerns" or to allow Firexo to "discuss the problems encountered with [its] engineers." Instead, FGL insisted that Firexo "return the product to the stream of commerce," *Id.* at ¶¶ 24–25, 28–29, 37–38, 47.

Ultimately, an independent metallurgical testing laboratory retained by Firexo "confirmed a defect in the design of FGL's vessels, which resulted in the corrosion and failure of the [fire extinguishing] vessels." *Id.* at ¶¶ 39–40.

**Intent of inducing Firexo's reliance.**

28.5  FGL made multiple representations as a means of differentiating its products from those of its US-based competitors. FGL represented to Firexo, for example, that its product line was "biodegradable", "nontoxic", and "environmentally friendly". Pl.'s First Am. Compl. at ¶9 (Doc 9). It went further by representing to Firexo that FGL's products "did not contain toxic and/or environmentally harmful chemicals found

8

in all competing fire extinguishing products sold in the United States." *Id.* FGL also represented that the UL process was underway at the time of negotiation and that it would secure UL certification "within six months" and that it had European EN3 certification. *Id.* at ¶ 10. Those statements were intended to induce Firexo to rely on them. *Id.* at ¶¶ 11–14.

28.6    After inducing Firexo to become its exclusive distributor in the United States, and following Firexo's extensive investment of financial resources to develop a distribution capacity, FGL proved unable "to provide confirmation that it had secured EN3 certification." In addition, FGL "advised Firexo that it could no longer use "biodegradable," "nontoxic," or "environmentally friendly" in its marketing or sale of FGL fire extinguishing products. Id. at ¶ 49.

28.7    "FGL knowingly…misrepresented the toxicity, environmental impact, and biodegradable characteristics of the chemicals used in its fire extinguishing product." *Id.* at ¶ 53. In addition, "FGL knew" "at all times relevant" "that its fire extinguishing products were defectively designed and posed a danger to end users and others in the stream of commerce but failed to advise Firexo of these design defects." *Id.* at ¶ 50. Furthermore, "FGL made continuing false and misleading representations…related to the safety and effectiveness of its products, its professional expertise and ability to develop and manufacture safe and effective fire extinguishing products, its expertise and ability to secure UL certification, its success in securing EN3 certification, and its development of nontoxic, biodegradable, and environmentally friendly fire extinguishing products" *Id.* at ¶ 58.

28.8    FGL's "false representations and/or omissions of material fact evidenced fraud and/or misrepresentation in the inducement of a contractual and ongoing business relationship with Firexo and in the subsequent execution and pursuit of its contractual duties and business relationship." *Id.* at ¶¶59–60.

**Firexo relied on FGL's fraudulent misrepresentation to its detriment.**

28.9    Following FGL's statements during negotiation on which Firexo relied, Firexo "establish relationships with distributors and retail companies through the United States" to channel FGL's product for distribution and sale. Pl.'s First Am. Compl. at ¶15 (Doc 9). Firexo invested "significant sums of money to develop this distribution business and network." *Id.* at ¶ 16. Firexo also notified its distributors that UL certification was imminent and that the products already had EN3 certification "based on FGL's representations and assurances". *Id.* at ¶ 19.

**Damages**

28.10   As a direct and proximate result of FGL's fraud, Firexo suffered damages that it can demonstrate at an evidentiary hearing.

**FGL's continuing fraud during the business relationship**

29.     A case for common law fraud requires proof of the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment and (6) a resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.,* 462 N.E.2d 407 (Ohio 1984).

30.     FGL committed fraud to induce Firexo's continued business relationship with FGL:

**FGL's Representations:**

30.1    FGL represented to Firexo that:

(a)     FGL's product line was "biodegradable", "nontoxic" and "environmentally friendly", Pl.'s First Am. Compl. at ¶ 9 (Doc. 9);

(b)     FGL was in the process, i.e., already started UL certification, critical for the commercial US market, *Id.* at ¶ 10;

(c)     FGL had the "expertise and capacity" to secure UL certification, *Id.*; and,

(d)     FGL had EN3 certification before Firexo entered into the Agreement and during the business relationship, *Id.*;

(e)      That its fire extinguishing vessels had no design defect and should be returned to the stream of commerce. *Id.* at ¶¶ 24–25, 28–29, 37–38, 47, 50.

**FGL's representations were material to Firexo entering and continuing the business relationship.**

30.2    Firexo relied on FGL's representations, spending large sums of money and expending time and effort to secure a distribution network in the United States. *See* Pl.'s First Am. Compl. at ¶¶ 15–19 (Doc. 9). But for those representations, Firexo would not have entered the business relationship.

**FGL made those representation falsely, with knowledge of their falsity:**

30.3    FGL controlled the design and manufacture of its products. *Id.* at ¶¶ 7, 58, 62. As the designer and manufacturer of  its fire extinguishing liquids, FGL had  intimate knowledge of the contents and their effects. It is also verifiably objective to know whether FGL had or had not EN3 certification; it represented it did but never provided confirmation. *See* Pl.'s First Am. Compl. at ¶ 52 (Doc. 9) ("Nor has FGL provided confirmation of EN3 certification."). At best, it made those representations "with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred." *Cohen*, 462 N.E.2d at 409.

**Firexo justifiably relied on FGL's misrepresentations:**

30.4    Firexo "established relationships with distributors and retail companies through the United States" to channel FGL's product for distribution and sale. Pl's First Am. Compl. at ¶ 15 (Doc. 9). Firexo invested

"significant sums of money to develop this distribution business and network." *Id.* at ¶ 16. Firexo also notified its distributors that UL certification was imminent and that the products already had EN3 certification "based on FGL's representations and assurances". *Id.* at ¶ 19. All this based on the FGL's misrepresentations—on which Firexo justifiably relied because FGL was the patent-holder of the fire extinguishing liquid, the designer and manufacturer of FGL's products. *Id.* at ¶¶ 7, 58, 62. "Firexo relied on the false representations of FGL and its omissions of material to its detriment." *Id.* at ¶ 61.

**Firexo's subsequent injury was proximately caused by FGL's misrepresentations:**

30.5   "As a direct and proximate result of FGL's acts and omissions, … Firexo has suffered, without limitation, reputational damage, monetary losses, past, present and future loss of profits, and ongoing incidental and consequential damages." Pl.'s First Am. Compl. at ¶ 63.

**Firexo is entitled to punitive damages against FGL for its fraud during the continuing business relationship.**

31.   Under to Ohio Rev. Code § 2315.21(C), punitive damages are recoverable from a defendant in a tort action where both of the following apply:

31.1   The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

31.2   The trier of fact has returned a verdict or has made a determination of the total compensatory damages recoverable by the plaintiff from that defendant.

32.   "In a tort action, the burden of proof shall be upon a plaintiff in question, by clear and convincing evidence, to establish that the plaintiff is entitled to recover punitive or exemplary damages." Ohio Rev. Code § 2305.21(D)(4).

33.  Malice is defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1174 (Ohio 1987) (syllabus). Under a conscious-disregard theory, Firexo must show "a positive element of conscious wrongdoing. This element has been termed conscious, deliberate[,] or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Malone v. Courtyard by Marriott, L.P.*, 659 N.E.2d 1242, 1247–48 (Ohio 1996) (quoting *Preston*, 512 N.E.2d at 1176). There must be proof of the defendant's "subjective knowledge of the danger posed to another." Malone, 659 N.E.2d at 1248; *see also Bell v. Zurich Amer. Ins. Co.*, 156 F. Supp. 3d 884, 891–92 (N.D. Ohio 2015) (awarding punitive damages in the context of a default judgment motion).

34.  FGL's fraudulent misrepresentations demonstrate malice. Here, as deemed admitted by its default, *see* Fed. R. Civ. P. 8(b)(6); 10A Fed. Prac. & Proc. Civ. § 2688.1, FGL "knowingly, recklessly and/or negligently misrepresented the toxicity, environmental impact, and biodegradable characteristics of the chemicals used in its fire extinguishing products." Pl.'s First Am. Compl. ¶ 53; *see also id.* at ¶58. "FGL knew or should have known that its fire extinguishing products were defectively designed and posed a danger to end users and others in the stream of commerce but failed to advise Firexo of these design defects." *Id.* at ¶ 50. FGL acted with a "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston*, 512 N.E.2d at 1174.

35.  Second, an evidentiary hearing will allow this Court to determine "the total compensatory damages recoverable by the plaintiff from that defendant." Ohio Rev. Code § 2315.21(C).

**Firexo is entitled to its attorney fees incurred in bringing this case.**

36.  Under Ohio law, Firexo may recover its attorney fees if this Court makes an award for punitive damages. *See Columbus Finance, Inc. v. Howard*, 327

N.E.2d 654, 658 (Ohio 1975); *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 402 (Ohio 1994) ("Attorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.").

## CONCLUSION

Wherefore, Firexo Inc. respectfully asks this Court to grant this motion and render a default judgment against Firexo Group Limited for the compensatory and punitive damages proven at a hearing, plus costs, attorney fees and interest.

Respectfully submitted,

*/S/ Paul T. Belazis*

Paul T. Belazis (0030356)

Malone, Ault & Farrell
7654 W. Bancroft Street
Toledo, Ohio 43617
(419) 843–1333 tel.
(419) 843–3888 fax
*belazis@maf-law.com*

Joseph P. Dawson (0003354)
7779 South Branch
Monclova, Ohio 43542
(419) 266–1808 tel.
*jpwdawson655@gmail.com*

Counsel for Firexo, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2025 a copy of this memorandum was served on counsel of record for all parties through the Court's CM/ECF system, on Firexo Group Limited by ordinary U.S. mail at its registered address, 6th Floor, 2 London Wall Place, London, England, EC2Y 5AU, and on Harry Sanders, the appointed Liquidator for Firexo Group Limited, by email at Harry.Sanders@mha.co.uk.

*/S/ Paul T. Belazis*

Paul T. Belazis (0030356)

Malone, Ault & Farrell

7654 W. Bancroft Street

Toledo, Ohio 43617

(419) 843–1333 tel.

(419) 843–3888 fax

*belazis@maf-law.com*

Joseph P. Dawson (0003354)

7779 South Branch

Monclova, Ohio 43542

(419) 266–1808 tel.

*jpwdawson655@gmail.com*

Counsel for Firexo, Inc.