## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

FIREXO INC.,

      Plaintiff,

v.

FIREXO GROUP LIMITED,

      Defendant.

Case № 3:21-CV-02336

Judge Jack Zouhary

---

### [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

---

Pending before the Court is Plaintiff Firexo, Inc.'s (hereinafter "Firexo") Motion, under Fed. R. Civ. P. 55(b)(2), for Default Judgment. Plaintiff's motion also requested a hearing to assess damages. An in-person hearing to hear evidence related to Plaintiff's request for assessment of damages was held on March 12, 2025. Upon consideration of the Plaintiff's Motion, together with the evidence adduced at the damages hearing, the Court finds and concludes as follows.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**1.    Procedural Posture of Case**

1.    Firexo is a Florida corporation with its principal place of business in Ohio. FGL is an English limited company, with its principal place of business in the United Kingdom.

2.    On October 29, 2021, Firexo filed a Complaint against FGL in Ohio state court. FGL removed the case to this Court on December 13, 2021 (Doc. 1).

3.      On March 2, 2022, Firexo filed its First Amended Complaint (Doc. 9) against FGL.
FGL filed its Answer on March 31, 2022 (Doc. 11).

4.      A Case Management Order (Doc. 29) was entered on June 7, 2024.

5.      On September 19, 2024, all counsel for Firexo Group Limited (FGL) made a motion
for leave to withdraw as counsel (Doc. 31) based on "fundamental difference
between Calfee and FGL that require Calfee to move for leave … consistent with
Ohio Rule of Professional Conduct 1.16." (Doc. 31 at ¶1). The court granted
Calfee's motion on September 20, 2024 via minute order (Doc. 32).

6.      Since September 20, 2024, FGL has been unrepresented.

7.      This Court made clear to FGL that, as a corporation, it may not maintain its defenses
in this Court without representation of counsel. Although the Court ordered FGL to
obtain replacement counsel twice (Docs. 34 and 35), FGL failed to do so and it
became clear that FGL had no plan to obtain counsel.

8.      On December 3, 2024, this Court entered an order (Doc. 36) recognizing that over
two months had passed since FGL's prior counsel withdrew and that FGL had not
obtained new counsel despite this Court giving FGL multiple opportunities to do
so. As such, this Court noted that Firexo "may now proceed with any appropriate
motions against the current Defendant." (Doc. 36 ¶ 2).

9.      On December 4, 2024, Firexo filed a motion for entry of default against FGL (Doc.
37). On December 16, 2024, the Clerk of Court entered default against FGL (Doc.
38). Accordingly, the factual allegations of the complaint, except those relating to
the proof of damages sought by Plaintiff, will be taken as true.

10. Firexo Inc. now seeks default judgment, including an award of damages arising out of:

    10.1 FGL's breach of an oral contract for exclusive distribution of FGL's products in the United States, including but not limited to breach of the duty of good faith;

    10.2 FGL's misrepresentations, fraud in the inducement and knowing or negligent misrepresentation aimed at inducing and continuing a business and contractual relationship with Firexo.

## 2.    Default Judgment Standard

11. Rule 55 governs default judgments. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). After the entry of default, the party seeking relief may apply for a default judgment under Rule 55(b).

12. "If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10A Fed. Prac. & Proc. Civ. § 2688.1 (4th ed.) A default on well-pleaded allegations may establish the defendant's liability, but the plaintiff retains the burden of establishing damages. *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F. 4th 393, 403 (6th Cir. 2022) (citing *Antoine v. Atlas Turner, Inc.*, 66 F. 3d 105, 110 (6th Cir. 1995)).

13. Based on the foregoing, and for the reasons set forth below, the Court finds that Defendant FGL, upon withdrawal of its counsel, has failed to secure other counsel

to maintain its defenses in this litigation and that judgment by default should be and is hereby entered.

### 3.    Ohio's Choice of Law Rules

14.    **Contract Claims.** The agreement at issue here is an oral contract, where the parties have not expressly chosen which substantive law applies. In a diversity action, district courts must apply the choice of law rules of the state in which it sits. *Nat'l Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150 (6th Cir. 1992). Under Ohio choice of law rules, the law of the state with the most significant relationship to the contract governs disputes arising from it. *Gries Sports Enters., Inc. v. Modell*, 473 N.E.2d 807, 810 (Ohio 1984); *see also Excell Marine Corp. v. Stagg Marine, Inc.*, 1:22-cv-655, 2024 WL 1897660 (S.D. Ohio Apr. 30, 2024) (granting a default judgment on an oral contract).

15.    **Tort Claims**. Under Ohio choice-of-law rules, the law of the place of injury generally controls unless another jurisdiction has more significant relationship to the action. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 341–42 (Ohio 1984); *Mendoza v. J.M. Smucker Co.*, 674 F. Supp. 3d 439 (N.D. Ohio 2023). Here, Firexo has alleged fraud and misrepresentation in the inducement of the parties' distributorship agreement and subsequent ongoing business relationship for sale of FGL fire extinguishing products throughout the United States.

### 4.    Firexo's Claim for Breach of Contract

#### 4.1    Under Ohio's Choice of Law Rules, Ohio Contract Law Governs the Parties' Agreement.

16.    The Court holds that Ohio law governs the Agreement and any claims arising out of it. To determine which place has the most significant relationship, Ohio has

adopted Section 188 of the Restatement (Second) of Conflicts of Laws. *Gries*, 473 N.E.2d at 810. Under Section 188, a court considers five factors to determine which jurisdiction bears the most significant relationship to the contract. *See* Restatement (Second) of Choice of Laws § 188. They are:

a) **The place of contracting.** Firexo and FGL concluded the Agreement in Port Clinton Ohio during David Breith's weeklong visit to Firexo's warehouse and facility in August 2019. Decl. of Scot Smith at¶ 4 (Doc. 17-1).

b) **The place of negotiating of the contract.** The parties negotiated the Agreement in Port Clinton, Ohio. "The essential terms of the [Agreement] … were discussed and agreed upon over the course of Mr. Breith's weeklong trip to Port Clinton and in subsequent communications." *Id.*

c) **The place of performance.** Firexo's principal place of business, facilities, and base of operations were in Port Clinton, Ohio, where Firexo received product from FGL, shipped product to its customers. Pl.'s First Am. Compl. at ¶¶ 17–21 (Doc. 9).

d) **The location of the subject matter of the contract.** Firexo distributed FGL's products throughout the United States from Firexo's location in Port Clinton, Ohio. As the parties' Agreement was one for the sole, exclusive right to distribute FGL's products, *see* Pl.'s First Am. Compl. at ¶¶ 3–4 (Doc. 9), the location of the subject matter is likewise Ohio.

e) **The domicile, residence, nationality, place of incorporation and place of business of the parties.** Firexo is a Florida corporation with its principal place of business in Ohio; FGL is a British company organized under the law of England and Wales, with its principal place of business in England. *See id.* at ¶¶ 1–7.

17. While FGL is an English company primarily doing business in England, the Agreement's subject matter (the sole distribution in the United States), place of performance, and the place of contract origination all support the conclusion that Ohio law governs the Agreement and any dispute arising out of it.

18. In Ohio, "a contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer,

acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration. A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (cleaned up).

19. Under Ohio law, a contract need not be in writing. *Marco's Franchising, LLC v. Soham, Inc.*, 365 F. Supp. 3d 891, 896 (N.D. Ohio 2019). "Terms of an oral contract may be determined from words, deeds, acts, and silence of the parties." *Id.* (cleaned up).

20. To establish that FGL breached the oral exclusive distribution agreement, Firexo must show: "(1) the existence of a binding contract or agreement, (2) that the nonbreaching party performed its contractual obligations, (3) that the other party failed to fulfill its contractual obligations without legal excuse, and (4) that the nonbreaching party suffered damages as a result of the breach." *Old Republic Surety Co. v. T&A Constr., Inc.*, 1:24-CV-00194, 2024 WL 4567262, at *3 (N.D. Ohio Oct. 24, 2024) (cleaned up).

**4.2 Findings of Fact Related to Firexo's Breach of Contract Claim Against FGL.**

21. In August 2019, Firexo and FGL entered an oral binding agreement giving Firexo the sole right to distribution and sale of FGL fire extinguishers and fire extinguishing products in the United States ("the Agreement"). Pl.'s First Am. Compl. at ¶ 8 (Doc. 9). *See also* Plaintiff's Hearing Exhibit 1.

22. Firexo performed its contractual obligations under the Agreement, including providing a warehouse for receipt, storage and distribution of FGL fire

extinguishers, establishing a nationwide distribution network for sale of FGL products, purchasing inventory from FGL for the sale of its products, as well as discharging all invoices that FGL sent. Pl.'s First Am. Compl. at ¶¶ 15–19, 44.

23.     FGL did not perform its contractual obligations. *Id.* at ¶¶ 46, 54. Instead, FGL breached the Agreement by, among other things:

23.1    failing to address and resolve repeatedly reported flaws in the design and/or manufacture of FGL's fire extinguishers, resulting in Firexo's decision to suspend sales of all related FGL product lines on or about November 2, 2020. Pl.'s First Am. Compl. at ¶¶ 24–26 (Doc. 9).

23.2    failing to address the cause of corrosion in its fire extinguishing products after Firexo suspended sales in the United States. *Id.* at ¶28.

23.3    failing (again) to address the cause of corrosion after Firexo notified FGL of field failures in early 2021, i.e., where FGL's products had failed after having been purchased by businesses and consumers in the United States. *Id.* at ¶ 37.

23.4    refusing to assist Firexo in the recall efforts or to accept return of the unsold product evidencing dangerous design defects that Firexo held. *Id.* at ¶ 38.

23.5    refusing to repair or replace products that Firexo sent to FGL's point of contact after Firexo submitted its recall report to the Consumer Products Safety Commission. *Id.* at ¶ 43.

23.6    failing to supply Firexo with any additional FGL products for sale in the United States. *Id.* at ¶ 48.

23.7    failing to supply Firexo with products safe for distribution and sale in the United States. *Id.* at ¶ 54.

23.8    failing to secure UL approval of its products.

24.    Firexo incurred substantial expense to purchase FGL's products for distribution and sale in the United States. *Id.* at ¶¶ 16, 44.

25.    The Court finds that Firexo and FGL had a valid, oral distribution agreement; Firexo performed its obligations under that agreement; FGL breached that agreement, without legal excuse, causing Firexo substantial monetary damages that have been properly alleged in its Amended Complaint and quantified at the hearing conducted in this case.

### 4.3    Awarding Damages for Breach of Contract under Ohio Law

26.    This Court, as finder of fact, may only award damages the existence and amount of which are reasonably certain and have been proved by the greater weight of the evidence. The Court may not award damages that are remote or speculative. *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177 (1990). The *AGF* case held that a "new" business is not prevented from recovering lost profits if they are established with reasonable certainty. The *AGF* court noted that "reasonable certainty" may be established using expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts. *Id.*

27.    The Court may only award those damages that were the natural and probable result of the breach of the contract or that were reasonably within the contemplation of the parties as the probable result of the breach of the contract. This does not require that the defendant actually be aware of the damages that will result from the breach

of contract so long as the damages were reasonably foreseeable at the time the parties entered into the contract as a probable result of the breach. *Midvale Coal Co. v. Cardox Corp.*, 152 Ohio St. 437 (1949) (overruled on other grounds in *Fischer Const. Co. v. Stroud*, 175 Ohio St. 31 (1963)); and 1 Restatement of the Law 2d, Contracts, § 351.

28.     To award lost profits claimed by the plaintiff, the Court must find that profits were within the contemplation of the parties at the time the contract was made and that the loss of profits was the probable result of the breach of the contract. *See AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177 (1990); *City of Gahanna v. Eastgate Props.*, 36 Ohio St.3d 65 (1988); *Charles R. Combs Trucking, Inc. v. International Harvester*, Co., 12 Ohio St.3d 241 (1984).

29.     "The plaintiff's evidence of lost future profits as an item of compensatory damages need only be reasonable, not specific." *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241, 244, 466 N.E.2d 883, 887 (1984). Lost profits are calculated by deciding what the plaintiff was entitled to receive had the contract been performed. The Court should then add other damages, if any, suffered by the plaintiff because of the breach by the defendant. From this sum the Court should subtract the amount, if any, that the plaintiff saved by not having to fully perform the contract. *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.*, 151 Ohio St. 522 (1949).

### 4.4 Plaintiff's Well-Pleaded Amended Complaint, and the Evidence Adduced at the Damages Hearing, Support Its Claim for Breach of Contract and an Award of Damages for Lost Profits Caused by FGL's Breach.

30. The Court finds that the well pleaded allegations of the Plaintiff's Amended Complaint, as well as the evidence separately adduced by Plaintiff at the March 12, 2025 damages hearing before this Court, establish FGL's breach of the parties' agreement for distribution of its products in the United States, warranting an award of compensatory damages for the loss of profits reasonably incurred by Firexo in 2020, 2021, 2022, and 2023.

31. The Court notes that both the marketing materials distributed by FGL and the evidence adduced at trial confirm that FGL's fire extinguishing products, as originally represented by FGL, including the product's ability to extinguish all fires and the nontoxic, biodegradable and environmentally friendly characteristics of its fire extinguishing fluid, distinguished it from the products offered by all other competitors in the U.S. market.

32. The Court further finds that plaintiff's evidence, including the testimony of its expert witnesses, demonstrated that the lost profits sought as compensatory damages in 2020, 2021, 2022, and 2023 were reasonably foreseeable to the parties and a probable result of FGL's breach. Indeed, the damages sought by Firexo for its lost profits are a fraction of the profits expressly anticipated and projected by FGL in its marketing materials for this same period of time.  Exhibits 1 and 62.

33. The Court further finds that damages for loss of profit sought by Plaintiff were reasonably certain based on the unique characteristics that FGL's fire extinguishing products were represented to possess, and by testimony of David Long, a CPA and

finance expert, John Mascon, Firexo's Marketing Director who testified based on extensive experience in marketing and sales, and his reliance on relevant and commonly accepted market research pertaining to the fire extinguishing product industry, demonstrating that the US market was growing and, as of 2021, stood at $1.415B. See, also, Exhibits 1 and 62.

34. As such, the Court awards to plaintiff compensatory damages for lost profits, reduced to present value, in the amount of Three Million Five Hundred Seven Thousand Dollars ($3,507,000.00).

## 5. Firexo's Claims for Fraudulent Inducement

### 5.1 Ohio law governs Firexo's Claims.

35. Under Ohio choice-of-law rules, the law of the place of injury generally controls unless another jurisdiction has more significant relationship to the action. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 341–42 (Ohio 1984). Firexo's First Amended Complaint establishes that the injuries it sustained as a result of FGL's conduct occurred in Ohio without alleging any other jurisdiction where an injury would have occurred. *See* Pl.'s First Am. Compl. ¶¶ 15–30. Therefore, Ohio law applies to its claims for fraudulent inducement.

### 5.2 Fraudulent Inducement under Ohio Law.

36. To prove fraud in the inducement, "a plaintiff must prove that [1] the defendant made a knowing, material misrepresentation [2] with the intent of inducing the plaintiff's reliance, and [3] that the plaintiff relied upon that misrepresentation to his or her detriment. *ABM Farms, Inc. v. Woods.*, 692 N.E.2d 574, 578 (Ohio 1998) (numbering added).

37.    A party who has been fraudulently induced to enter into a contract has the option
       of rescinding the contract or seeking damages based upon the tort of fraudulent
       inducement." *Ajibola v. Ohio Med. Career Coll., Ltd.*, 2018-Ohio-4449, ¶ 26, 122
       N.E.3d 660, 669 (Ct. App. 2018); *Eaton Corp. v. Angstrom Auto. Grp., LLC*, 714
       F. Supp. 3d 886, 910–11 (N.D. Ohio 2024). The measure of damages for fraudulent
       inducement would be "the actual natural losses flowing from the fraud." *Id.*

38.    "In a fraud action, a plaintiff is entitled to recover as compensatory damages such
       damages as will fairly compensate him for the wrong suffered, that is, the damages
       sustained by reasons of the fraud or deceit and which have naturally and
       proximately resulted therefrom." *Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*,
       947 F. Supp. 2d 841, 862 (S.D. Ohio 2013) (citing *Danial v. Lancaster*, No. 92462,
       2009 WL 2186762, at *2 (Ohio Ct. App. July 23, 2009)); *see also Ramjet Aviation,
       Inc. v. My Parts Locator, Inc.*, No. 4:22-CV-01245, 2023 WL 166009, at *7–*8
       (N.D. Ohio Jan. 12, 2023). The injured party is not required, however, to produce
       evidence as to the exact amount of the damage. *Brewer v. Brothers*, 611 N.E.2d
       492, 496–97 (Ohio Ct. App. 1992) It is only required that the evidence tend to show
       a basis for the computation of damages to a fair degree of probability. *Collins v.
       Mullinax East, Inc.*, 795 N.E. 2d 68, 71 (Ohio Ct. App. 2003) ("Only reasonable
       certainty as to the amount of damages is required, which is that degree of certainty
       of which the nature of the case admits.").

39.    Additionally, "fraud damages [must] be limited to the injury actually arising from
       the fraud. The tort injury must be unique and separate from any injury resulting
       from a breach of contract." *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.*,

212 F.3d 332, 338 (6th Cir.2000). While recovery of purely economic loss is permissible with a fraudulent inducement claim, a plaintiff must seek to "[] recover damages apart from the mere loss of the bargain reached for a specified payment." *Marine Direct v. Dougherty Marine, Inc.*, 2007 WL 81842 at *2 (Jan. 8, 2007 S.D. Ohio). A plaintiff may not directly recover the amount owed under the contract based upon a tort theory—the plaintiff would only be able to recover other damages proximately caused by the fraud. *See also Medical Billing, Inc. v. Medical Management Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir.2000) (any award of damages arising from fraudulent inducement claim must be separate and distinct from the damages awarded on claim for breach of the contract); *PLC Corp. v. Brandywine Recovery Inc.*, No. 1:13 CV 2421, 2015 WL 5852829, at *7 (N.D. Ohio Oct. 6, 2015).

### 5.3 Findings of Fact related to Firexo's Fraud in the Inducement Claim against FGL.

40. The Court finds that Firexo has proven the elements of its fraud in the inducement claim.

41. As to the first element, FGL made knowing, material representations as follows:

41.1 "FGL represented that its product line was 'biodegradable,' 'nontoxic' and 'environmentally friendly' and that it did not contain toxic and/or environmentally harmful chemicals found in all competing fire extinguishing products sold in the United States." Pl.'s First Am. Compl. at ¶ 9 (Doc. 9).

41.2 "FGL represented that it was in the process of securing UL certification for its products, that it possessed the expertise and capacity to successfully and

expeditiously secure such certification within six months, and that it had secured a European certification known as EN3." *Id.* at ¶ 10.

41.3    The fire extinguishers manufactured by FGL and purchased by Firexo for distribution throughout the United States subsequently were found to contain "a serious and dangerous" "defect in the design of the [fire extinguishing] vessels which resulted in …corrosion and failure of the vessels in the field." *Id.* at ¶ 40. These failures included:

a)    "[C]orrosion on the threaded portion of the top spray assembly which connected to the opening of the fire extinguishing vessel," *Id.* at ¶ 21;

b)    "Corrosion" related separation of "the top assembly handle of [a] fire extinguisher" which had been "disconnected from the vessel" and became "embedded in a ceiling tile" following a "popping sound during the night." *Id.* at ¶¶ 30–31, 36; and,

c)    Multiple additional corrosion related field failures involving "corrosion of the threads at the top of the extinguisher vessels." *Id.* at ¶ 36.

d)    Even when "detailed information related to the corrosion" and related "field failures" was " brought to the attention of FGL," it "refused to acknowledge the existence of a problem," refused "repeated requests for independent scientific analysis…" "to determine the cause of the defect in its extinguishers," "refused to permit Firexo to contact any of its engineers to discuss these serious design and safety concerns" or to allow Firexo to "discuss the problems encountered with [its] engineers."

Instead, FGL insisted that Firexo "return the product to the stream of commerce," *Id.* at ¶¶ 24–25, 28–29, 37–38, 47.

42.   Ultimately, an independent metallurgical testing laboratory retained by Firexo "confirmed a defect in the design of FGL's vessels, which resulted in the corrosion and failure of the [fire extinguishing] vessels." *Id.* at ¶¶ 39–40.

43.   As to the second element, FGL intended to induce Firexo's reliance on its representations.

43.1   FGL made multiple representations as a means of differentiating its products from those of its US-based competitors. FGL represented to Firexo, for example, that its product line was "biodegradable", "nontoxic", and "environmentally friendly". Pl.'s First Am. Compl. at ¶9 (Doc 9). It went further by representing to Firexo that FGL's products "did not contain toxic and/or environmentally harmful chemicals found in all competing fire extinguishing products sold in the United States." Id. FGL also represented that the UL process was underway at the time of negotiation and that it would secure UL certification "within six months" and that it had already secured European EN3 certification. Id. at ¶ 10. Those statements were intended to induce Firexo to rely on them. Id. at ¶¶ 11– 14.

43.2   After inducing Firexo to become its exclusive distributor in the United States, and following Firexo's extensive investment of financial resources to develop a distribution capacity, FGL proved unable "to provide confirmation that it had secured EN3 certification" Rather, evidence at the hearing in this case confirmed that no such certification had been secured.

The importance of this knowingly false representation cannot be overstated inasmuch as an EN3 certification constitutes a European-wide confirmation that a fire extinguishing product has been tested and certified to be sufficiently durable, safe and effective for its intended purposes, which in the case of a fire extinguisher includes saving lives in the event of a fire emergency. As the allegations of the Amended Complaint asserted, and as the evidence at hearing confirmed, all parties anticipated that FGL's fire extinguishers in the United States would ultimately be placed in corporate facilities, industrial facilities, and government entities, including school buildings.

43.3 Not only did Firexo products carry no such certification but its products demonstrated repeated failures both in the plaintiff's warehouse in Port Clinton and at customer locations – failures that included corrosion and weakening of the valve connecting the extinguisher vessel and top assembly, vessel explosions, top handle separations, loss of vessel pressure, and leaking extinguisher fluids. These were dramatic and dangerous products failures that FGL minimized or entirely brushed aside, while at the same time insisting that its products should be returned to the stream of commerce. Indeed, evidence indicated that a senior FGL product compliance executive who voiced concerns about the safety of its extinguishers was excluded from FGL's meetings related to its product failures. See, also, Exhibit 14.

43.4    In addition, after making repeated written and verbal representations that its fire extinguishing products were "nontoxic," "biodegradable," "made from natural ingredients," "environmentally friendly" and suitable for use on plants as "fertilizer -- qualities that distinguished it from all other competitors -- FGL subsequently "advised Firexo that it could no longer use "biodegradable" or "nontoxic," in its marketing or sale of FGL fire extinguishing products. *Id.* at ¶ 49. Instead, to avoid being placed in a position in which it would be forced to prove its claims, FGL advised Firexo in March 2021 that it could no longer use the term "biodegradable" and that it should henceforth inform its customers that its product would cause "less leakage of toxins into the environment." Plaintiff's Exh. 18.

43.5    As alleged by Firexo in its Amended Complaint, "FGL knowingly … misrepresented the toxicity, environmental impact, and biodegradable characteristics of the chemicals used in its fire extinguishing product." Pl.'s First Am. Compl. at ¶ 53 (Doc 9). In addition, "FGL knew" "at all times relevant" "that its fire extinguishing products were defectively designed and posed a danger to end users and others in the stream of commerce but failed to advise Firexo of these design defects." *Id.* at ¶ 50. Furthermore, "FGL made continuing false and misleading representations … related to the safety and effectiveness of its products, its professional expertise and ability to develop and manufacture safe and effective fire extinguishing products, its expertise and ability to secure UL certification, its success in securing

EN3 certification, and its development of nontoxic, biodegradable, and environmentally friendly fire extinguishing products" *Id.* at ¶ 58.

43.6    FGL's "false representations and/or omissions of material fact evidenced fraud and/or misrepresentation in the inducement of a contractual and ongoing business relationship with Firexo and in the subsequent execution and pursuit of its contractual duties and business relationship." *Id.* at ¶¶59–60.

44.    As to the third element, Firexo relied on FGL's fraudulent misrepresentations to its detriment.

44.1    In reliance on FGL's representations Firexo "established relationships with distributors and retail companies throughout the United States" to channel FGL's product for distribution and sale. Pl.'s First Am. Compl. at ¶15 (Doc 9). Firexo invested "significant sums of money to develop this distribution business and network." *Id.* at ¶ 16. Firexo also notified its distributors that European EN3 certification had already been secured and that UL certification was imminent "based on FGL's representations and assurances". *Id.* at ¶ 19.

## 5.4    Ohio Law Applies to Firexo's Claim for Continuing Fraud During the Business Relationship.

45.    A case for common law fraud requires proof of the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying

upon it, (5) justifiable reliance upon the representation or concealment and (6) a resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.,* 462 N.E.2d 407 (Ohio 1984).

46.    The Court finds that FGL committed fraud to induce Firexo's continued business relationship with FGL.

47.    First, FGL represented to Firexo that:

47.1    FGL's product line was "biodegradable", "nontoxic "environmentally friendly," Pl.'s First Am. Compl. at ¶ 9 (Doc. 9), that it was made from natural ingredients, and displayed the characteristics of fertilizer which would enhance rather than pollute the environment;

47.2    FGL was in the process, i.e., already started UL certification, critical for the commercial US market, *Id.* at ¶ 10;

47.3    FGL had the "expertise and capacity" to secure UL certification, *Id.*;

47.4    FGL had secured EN3 certification before Firexo entered into the Agreement and during the business relationship, *Id.*; and,

47.5    Its fire extinguishing vessels had no design defect and should be returned to the stream of commerce. *Id.* at ¶¶ 24–25, 28–29, 37–38, 47, 50.

48.    Second, these representations were material to Firexo continuing the business relationship.

48.1    The characteristics of FGL products represented to Plaintiff, including representations that its fire extinguishing fluid was nontoxic, biodegradable, environmentally friendly, made from all natural ingredients, displayed characteristics of fertilizer, and had successfully secured the European EN3

certification which verified its safety, durability, and effectiveness for its intended purposes distinguished Firexo products from all other fire extinguishing products on the market, along with its ability to extinguish all types of fires. Indeed, evidence confirmed that the vast majority of online searches for fire extinguishing products included the types of non-toxic and related environmental qualities represented by FGL. The allegations of the Amended Complaint and corresponding evidence adduced at hearing confirm that in reliance on FGL's representations, Firexo, Inc. spent large sums of money and expend time and effort to establish a distribution network in the United States for the sale of these products. *See* Pl.'s First Am. Compl. at ¶¶ 15–19 (Doc. 9).

48.2   FGL's representations induced Firexo, Inc to enter into the business relationship.

49.   Third, FGL made those representations falsely, with knowledge of their falsity.

49.1   FGL controlled the design and manufacture of its products. *Id.* at ¶¶ 7, 58, 62. As the designer and manufacturer of its fire extinguishing liquids, FGL had intimate knowledge of the contents and their effects. It is also verifiably objective to know whether FGL had or had not EN3 certification. *See* Pl.'s First Am. Compl. at ¶ 52 (Doc. 9) ("Nor has FGL provided confirmation of EN3 certification.").

49.2   Evidence at the hearing in this case demonstrated that FGL repeatedly sidestep requests for confirmation of its environmental claims as well as its representations related to EN3 certification. Moreover, its contents

eventually were shown to include florousurfactants, which are man-made chemicals, also known as forever chemicals, that are neither biodegradable nor natural and widely believed to be harmful to the environment and to pose health risks for humans. Exhibit 15.  Evidence also confirmed that EN3 certification had not been secured and that the design of FGL's fire extinguishing vessel instead had multiple design related defects that not only rendered it unsuitable and unsafe for any intended purpose but caused it to fail virtually every UL test related to its durability and safety. FGL's representations related to the extent of its expertise, qualifications, and ability to design, manufacture and secure UL certification were likewise abjectly false. At best, FGL made those representations "with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred." *Cohen*, 462 N.E.2d at 409.

50.     Fourth, FGL made its representations with an intent to mislead FGL into relying upon those representations.

50.1     The intent to deceive may be inferred. *Drake Medicine Co. v. Glessner*, 67 N.E. 722 (Ohio 1903). In fact, to prove a fraud claim under Ohio law, "a person's intent to mislead another into relying on a misrepresentation or concealment of a material fact generally must be inferred from the totality of the circumstances since a person's intent is rarely provable by direct evidence." *See Mulch Mfg., Inc. v. Advanced Polymer Solutions, LLC*, 974 F. Supp. 2d 841, 862 (S.D. Ohio 2013) (quoting *Aztec Int'l Foods, Inc. v.*

*Duenas*, No. CA2012-01-002, 2013 WL 501734, at *11 (Ohio Ct. App. Feb. 11, 2013).

50.2   With that in mind, the Court finds that from the totality of the circumstances FGL made its representation with an intent to mislead FGL into relying on those misrepresentation. This follows from the well-pleaded allegations contained in the First Amended Complaint and the testimony offered at the motion hearing.

51.   Fifth, Firexo justifiably relied on FGL's misrepresentations. Firexo "established relationships with distributors and retail companies through the United States" to channel FGL's product for distribution and sale. Pl's First Am. Compl. at ¶ 15.

51.1   As alleged in the Amended Complaint, Firexo invested "significant sums of money to develop this distribution business and network." *Id.* at ¶ 16. As also alleged, and as confirmed at the damages hearing, Firexo also notified its distributors that UL certification was imminent and that the products already had secured a similar EN3 European certification "based on FGL's representations and assurances". *Id.* at ¶ 19. All this based on the FGL's misrepresentations—on which Firexo justifiably relied because FGL was the designer and manufacturer of its products. *Id.* at ¶¶ 7, 58, 62. "Firexo relied on the false representations of FGL and its omissions of material fact to its detriment." *Id.* at ¶ 61. This included Firexo's assumption of the costs associated with securing UL approval, ultimately failing as a result of inherent flaws in the design of FGL's fire extinguishing vessels. FGL never

reimbursed Firexo for those costs, nor did FGL reimburse or refund Firexo the cost of the defective products Firexo returned to FGL.

52.   Sixth, Firexo's subsequent injury was proximately caused by FGL's misrepresentations. "As a direct and proximate result of FGL's acts and omissions on which Firexo reasonably relied, … Firexo has suffered, without limitation, reputational damage, monetary losses, and ongoing incidental and consequential damages." Pl.'s First Am. Compl. at ¶ 63.

### 5.5   Firexo's Damages for FGL's Fraud in the Inducement and to Induce Firexo to Continue the Business Relationship.

53.   The Court finds that the well pleaded allegations of the Plaintiff's Amended Complaint, as well as the evidence separately adduced by Plaintiff at the March 12, 2025 damages hearing before this Court, establish that FGL fraudulently induced Firexo to enter into, and thereafter to continue, the parties' business relationship for the distribution of Firexo fire extinguishing products in the United States, warranting an award of compensatory damages for business expenses reasonably incurred by Firexo in 2020, 2021, 2022, and 2023 as a direct and proximate result of FGL's fraudulent representations on which Firexo reasonably relied.

54.   The Court further finds that these expenditures, all of which were incurred to establish a nationwide distribution network to distribute FGL's fire extinguishing products, were reasonably foreseeable to the parties and reasonably incurred by Firexo. Further, the expenses incurred by Firexo and now sought as damages were considerably more modest than those anticipated by FGL in its marketing materials for this same period of time. Hearing Exhibit 1.

55. As a direct and proximate result of FGL's fraudulent inducement, Firexo incurred losses reflected in tax returns for 2020 through 2023 amounting to One Million Four Hundred One Thousand Five Hundred and Eighty-Nine Dollars ($1,401,589.00). Exhibit 28. In addition, at the damages hearing, Firexo established that it made good-faith efforts to minimize its losses by ongoing efforts to sell remaining inventory of product purchased from FGL. The evidence established that Firexo exhausted those efforts by the end of 2023 and suspended further operations thereafter. Firexo reasonably sustained losses in 2020, 2021, 2022 and 2023 and terminated its claimed losses ending in 2023.

56. As such, the Court awards to plaintiff compensatory damages related to Firexo's fraudulent inducement claims and its proximately caused losses incurred in the establishment and operation of a distribution network for the distribution and sale of FGL products in 2020, 2021, 2022 and 2023 in the amount of One Million Four Hundred One Thousand Five Hundred and Eighty-Nine Dollars ($1,401,589.00).

## 6. Punitive Damages for FGL's Tortious Conduct

### 6.1 Ohio Law on Punitive Damages

57. Under Ohio Rev. Code § 2315.21(C), punitive damages are recoverable from a defendant in a tort action where both of the following apply:

57.1 The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

57.2    The trier of fact has returned a verdict or has made a determination of the total compensatory damages recoverable by the plaintiff from that defendant.

58.    "In a tort action, the burden of proof shall be upon a plaintiff in question, by clear and convincing evidence, to establish that the plaintiff is entitled to recover punitive or exemplary damages." Ohio Rev. Code § 2305.21(D)(4).

59.    Malice is defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1174 (Ohio 1987) (syllabus). Under a conscious-disregard theory, Firexo must show "a positive element of conscious wrongdoing. This element has been termed conscious, deliberate[,] or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Malone v. Courtyard by Marriott, L.P.*, 659 N.E.2d 1242, 1247–48 (Ohio 1996) (quoting *Preston*, 512 N.E.2d at 1176). There must be proof of the defendant's "subjective knowledge of the danger posed to another." *Malone*, 659 N.E.2d at 1248; see also *Bell v. Zurich Amer. Ins. Co.*, 156 F. Supp. 3d 884, 891–92 (N.D. Ohio 2015) (awarding punitive damages in the context of a default judgment motion).

60.    Finally, under Ohio law, Firexo may recover its attorney fees if this Court makes an award for punitive damages. See *Columbus Finance, Inc. v. Howard*, 327 N.E.2d 654, 658 (Ohio 1975); *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 402 (Ohio

1994) ("Attorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.").

### 6.2    Findings of Fact Relating to an Award of Punitive Damages for FGL's Tortious Conduct

61.    FGL has clearly and convincingly established that FGL intentionally refused to disclose what it knew or should have known about FGL's products' defects, that FGL intentionally refused to take any remedial action regarding those defects despite actual knowledge of property damage and bodily injury, and FGL intentionally refused to correct the misrepresentations set forth in its product literature despite actual knowledge of the products' toxicity and compromised biodegradability.

62.    The Plaintiff's Amended Complaint alleges, and the evidence adduced at the damages hearing confirmed, that FGL made knowing, false, material representations related to the fire extinguishing products that it sought to place into the stream of commerce for the purpose of serving homes as well as government and commercial buildings. The allegations of the Amended Complaint and evidence adduced at hearing also confirm that FGL knew or should have known that these extinguishers not only did not possess the characteristics represented but also displayed serious design defects that rendered them dangerous and unsuitable for their intended uses. These actions were taken with conscious disregard for the serious, dangerous, and potentially lethal consequences of its actions.

63.    The obvious purpose of a fire extinguisher is to prevent serious injury or death in the event of a sudden fire emergency. Yet even after obvious defects in the design and function of its fire extinguishers that posed a clear danger to end users came to

light, FGL continued to deny that any problem existed, continued to blame product defects on improper handling and storage by Firexo, and insisted on return of its products to the stream of commerce. Furthermore, evidence at hearing made clear that FGL subsequently made the same false representations to a distributor of its products outside the United States, then offered the same false and misleading explanations for identical product failures, and likewise insisted on return of its products to the stream of commerce. This conduct is particularly disturbing considering evidence that its products were intended for and in many cased had already been placed in residential and public buildings, including school buildings. See, e.g., Exhibit 49.  FGL's knowing disregard for the rights and safety of others cannot be denied.

64.   The Court finds that FGL's conduct, through the allegations deemed admitted in Firexo's Amended Complaint and adduced via testimony and exhibits at the motion hearing, amounted to a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. And, therefore, meets the definition of "malice" as used in Revised Code § 2305.21(D)(4). *Preston v. Murty*, 512 N.E.2d 1174, 1174 (Ohio 1987) (syllabus).

65.   Based on that finding and the compensatory damages awarded to Firexo for its fraud claim, the Court awards Firexo punitive damages for FGL's fraudulent inducement of a business relationship, including its ongoing fraudulent misrepresentations to induce the continuation of the business relationship, in the amount of Two Million Eight Hundred Three Thousand One Hundred Seventy-Eight Dollars ($2,803,178.00).

**6.3    Attorneys' Fees**

66.    As the Court has found for Firexo on its fraud-related claims and awarded punitive

damages, the Court will also award Firexo its reasonable attorneys' fees related to

this case—as an element of its compensatory damages. The Court reserves its

judgment on the quantum to allow Firexo's counsel an opportunity to submit an

accounting to the Court for its consideration in setting the amount of attorneys' fees

that will be integrated into Firexo's compensatory damages.

**7.    Conclusion**

67.    The Court finds for the plaintiff, Firexo, Inc., and awards damages as follows:

67.1    On its breach of contract claim  ..............................................$3,507,000.00

67.2    On its fraud claim:

Compensatory damages  ........................................................$1,401,589.00

Punitive damages under R.C.§ 2305.22 ................................$2,803,178.00

67.3    Attorneys' Fees  ............................................................To Be Determined

**67.4    Total Damages ....................................................................$7,711,767.00**

68.    A judgment entry conforming to these findings of fact and conclusions of law shall

issue contemporaneously.

 

 

Jack Zouhary
United States District Judge