IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Firexo, Inc.,                                                        Case No. 3:21 CV 2336

          Plaintiff,                             <u>DEFAULT JUDGMENT</u>

    -vs-

                                                         JUDGE JACK ZOUHARY

Firexo Group Limited,

          Defendant.

### INTRODUCTION

Firexo filed a Motion for Entry of Default against Firexo Group Limited ("FGL") (Doc. 37). The Clerk of Court entered default against FGL (Doc. 38). FGL, upon withdrawal of its legal counsel, failed to secure new counsel to maintain its defenses in this litigation (Docs. 31–36). Accordingly, the factual allegations of the Complaint, except those relating to the proof of damages, are taken as true. Firexo now seeks an award of damages arising out of FGL's alleged breach of an oral contract, and its misrepresentations and fraud. This Court held a Record Hearing (Non-Doc. Entry 3/12/25) and Firexo filed post-Hearing briefing, exhibits, and proposed findings of fact (Docs. 42–50).

### DEFAULT JUDGMENT STANDARD

Federal Civil Rule 55(a) governs default judgments. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." After the entry of default, the party seeking relief may apply for a default judgment under Rule 55(b). A default on well-pleaded allegations may establish the defendant's liability, but the plaintiff retains the burden of

establishing damages.  *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F. 4th 393, 403 (6th Cir. 2022).

## CONTRACT CLAIMS

**Governing Law**

The agreement at issue here is an oral contract, where the parties have not expressly chosen which substantive law applies.  In a diversity action, district courts must apply the choice of law rules of the state in which it sits.  *Nat'l Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150 (6th Cir. 1992).  Under Ohio choice of law rules, the law of the state with the most significant relationship to the contract governs.  To determine which place has the most significant relationship, Ohio has adopted § 188 of the Restatement (Second) of Conflicts of Laws.  *Gries Sports Enters., Inc. v. Modell*, 15 Ohio St.3d 284, 286–87 (Ohio 1984).  Under § 188, a court considers five factors to determine which jurisdiction bears the most significant relationship to the contract.  They are:

> **The place of contracting**. Firexo and FGL concluded the Agreement in Port Clinton Ohio during David Breith's weeklong visit to Firexo's warehouse and facility in August 2019 (Doc. 17-1 at ¶ 4).
>
> **The place of negotiating of the contract**. The parties negotiated the Agreement in Port Clinton, Ohio.  "The essential terms of the [Agreement] . . . were discussed and agreed upon over the course of Mr. Breith's weeklong trip to Port Clinton and in subsequent communications" (*id.*).
>
> **The place of performance**.  Firexo's principal place of business, facilities, and base of operations were in Port Clinton, Ohio, where Firexo received product from FGL, and shipped product to its customers (Doc. 9 at ¶¶ 17–21).
>
> **The location of the subject matter of the contract**.  Firexo distributed FGL's products throughout the United States from Firexo's location in Port Clinton, Ohio.  As the Agreement was one for the exclusive right to distribute FGL's products (*see id.* at ¶¶ 3–4), the location of the subject matter is likewise Ohio.
>
> **The domicile, residence, nationality, place of incorporation and place of business of the parties**.  Firexo is a Florida corporation with its principal place of business in Ohio; FGL is a British company organized under the law of England and Wales, with its principal place of business in England (*see id.* at ¶¶ 1–7).

This Court holds that Ohio law governs the oral exclusive distribution agreement ("Agreement") dated August 2019. While FGL is an English company primarily doing business in England, the Agreement's subject matter (sole distribution in the United States), place of performance, and the place of contract origination all support the conclusion that Ohio law governs the Agreement.

In Ohio, "a contract is generally defined as a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3 (Ohio 2002) (citation omitted). There must be a meeting of the minds on the essential elements, which "include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Id.* (citation omitted). A contract need not be in writing: "Terms of an oral contract may be determined from words, deeds, acts, and silence of the parties." *Marco's Franchising, LLC v. Soham, Inc.*, 365 F. Supp. 3d 891, 896 (N.D. Ohio 2019) (citation omitted).

To establish that FGL breached the oral exclusive distribution agreement, Firexo must show: "(1) the existence of a binding contract or agreement, (2) that the nonbreaching party performed its contractual obligations, (3) that the other party failed to fulfill its contractual obligations without legal excuse, and (4) that the nonbreaching party suffered damages as a result of the breach." *Old Republic Surety Co. v. T&A Constr., Inc.*, 2024 WL 4567262, at *3 (N.D. Ohio 2024) (cleaned up).

**Firexo's Breach-of-Contract Claim Against FGL**

Firexo performed its contractual obligations under the Agreement, including providing a warehouse for the storage and distribution of FGL fire extinguishers, establishing a nationwide distribution network for sale of FGL products, purchasing inventory from FGL for the sale of its products, as well as discharging all invoices that FGL sent (Doc. 9 at ¶¶ 15–19, 44).

FGL breached the Agreement (*id.* at ¶¶ 46, 54) by, among other things:

3

- failing to address and resolve repeatedly reported flaws in the design and/or manufacture of FGL fire extinguishers, resulting in Firexo's decision to suspend sales of all related FGL product lines around November 2020 (*id.* at ¶¶ 24–26);

- failing to address the cause of corrosion in its fire extinguishing products after Firexo suspended sales in the United States (*id.* at ¶ 28);

- failing (again) to address the cause of corrosion after field failures in early 2021, i.e., where FGL products failed after purchase by businesses and consumers in the United States (*id.* at ¶ 37);

- refusing to assist Firexo in the recall efforts or to accept return of the unsold products with dangerous design defects (*id.* at ¶ 38);

- refusing to repair or replace products sent to FGL after the recall report to the Consumer Products Safety Commission (*id.* at ¶ 43);

- failing to supply Firexo needed FGL products for sale (*id.* at ¶ 48);

- failing to supply Firexo with products safe for distribution and sale (*id*. at ¶ 54);

- failing to secure UL approval of FGL products; and

- causing Firexo to incur substantial related expenses (*id.* at ¶¶ 16, 44).

In short, this Court finds that Firexo and FGL had a valid Agreement; Firexo performed its obligations under that Agreement; FGL breached that Agreement, causing Firexo substantial money damages.

**Damages for Breach of Contract**

Firexo may recover lost profits if: "(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 181 (Ohio 1990). Damages must be reasonably certain and proved by the greater weight of the evidence -- they cannot be "remote" or speculative." *Id.* A new business is not prevented from recovering lost profits if established with reasonable certainty. This includes evidence using expert testimony,

4

economic and financial data, market surveys and analyses, business records of similar enterprises, and other relevant facts. *Id.* at 182–83. The "evidence of lost future profits as an item of compensatory damages need only be reasonable, not specific." *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241, 244 (Ohio 1984).

This Court finds that profits were within the contemplation of the parties at the time the contract was made. *See AGF*, 51 Ohio St. 3d at 181. Lost profits are calculated by deciding what Firexo was entitled to receive had the contract been performed. This Court may then add other damages, if any, suffered because of the breach by FGL. From this sum, this Court should subtract the amount, if any, saved by not having to fully perform the contract. *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.*, 151 Ohio St. 522, 524 (Ohio 1949).

The FGL marketing materials and other evidence presented at the hearing confirm that FGL fire-extinguishing products, as originally represented by FGL, falsely claimed the ability to extinguish all fires. Additionally, the alleged nontoxic, biodegradable and environmentally friendly characteristics of its fire extinguishing fluid, distinguished it from products offered by other competitors in the U.S. market.

Testimony also demonstrated that lost profits sought as compensatory damages were reasonably foreseeable to the parties and a probable result of the FGL breach. The damages sought for lost profits are reasonable given the marketing materials and testimony presented at the hearing (Docs. 42 at 1–17, 46 at 34). This included the unique characteristics that FGL fire-extinguishing products were represented to possess (Testimony of David Long, CPA; John Mascon, Firexo Marketing Director). Lost profits for the years 2020 ($379,487) and 2021 ($1,359,086), for a total of $1,738,573 (*see* Doc. 46 at 35) were within the contemplation of the parties and have been proven with reasonably certainty. This Court declines to award damages for subsequent years.

**FRAUDULENT INDUCEMENT**

To prove fraudulent inducement, Firexo must show FGL made a knowing, material misrepresentation with the intent of inducing Firexo's reliance, and Firexo relied upon that misrepresentation. *ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 502 (Ohio 1998). "[A] party who has been fraudulently induced to enter into a contract has the option of rescinding the contract or retaining the contract and suing for damages based upon the tort of fraudulent inducement." *Eaton Corp. v. Angstrom Auto. Grp., LLC*, 714 F. Supp. 3d 886, 910 (N.D. Ohio 2024) (citation mitted). Damages include "the actual natural losses flowing from the fraud." *Ajibola v. Ohio Med. Career Coll., Ltd.*, 2018-Ohio-4449, ¶ 26 (Ohio Ct. App. 2018) (citation omitted). The injured party is not required, however, to produce evidence as to the exact amount of the damage. *Brewer v. Brothers*, 82 Ohio App. 3d 148, 154 (Ohio Ct. App. 1992). *See also Collins v. Mullinax East, Inc.*, 153 Ohio App. 3d 534, 539 (Ohio Ct. App. 2003) ("Only reasonable certainty as to the amount of damages is required, which is that degree of certainty of which the nature of the case admits.").

Additionally, "fraud damages [must] be limited to the injury actually arising from the fraud, [and] [t]he tort injury must be unique and separate from any injury resulting from a breach of contract." *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir. 2000). While recovery of purely economic loss is permissible with a fraudulent-inducement claim, a plaintiff must seek to "recover damages apart from the mere loss of the bargain reached for a specified payment." *Marine Direct v. Dougherty Marine, Inc.*, 2007 WL 81842, at *2 (S.D. Ohio 2007). A plaintiff may not directly recover the amount owed under the contract based upon a tort theory -- the plaintiff would only be able to recover other damages proximately caused by the fraud.

*See also Medical Billing, Inc.*, 212 F.3d at 338 (noting that damages for fraudulent inducement "must be separate and distinct" from breach-of-contract damages).

This Court finds that Firexo has proven the elements of its fraudulent-inducement claim. As to the first element, FGL made knowing, material representations as follows:

- "FGL represented that its product line was 'biodegradable,' 'nontoxic' and 'environmentally friendly' and that it did not contain toxic and/or environmentally harmful chemicals found in all competing fire extinguishing products sold in the United States" (Doc. 9 at ¶ 9).

- "FGL represented that it was in the process of securing UL certification for its products, that it possessed the expertise and capacity to successfully and expeditiously secure such certification within six months, and that it had secured a European certification known as EN3" (*id.* at ¶ 10).

- The fire extinguishers manufactured by FGL and purchased by Firexo for distribution throughout the United States subsequently were found to contain "a serious and dangerous" "defect in the design of the [fire extinguishing] vessels which resulted in . . . corrosion and failure of the vessels in the field" (*id.* at ¶ 40). These failures included:

    o "[C]orrosion on the threaded portion of the top spray assembly which connected to the opening of the fire extinguishing vessel" (*id.* at ¶ 21);

    o "Corrosion" related separation of "the top assembly handle of [a] fire extinguisher" which had been "disconnected from the vessel" and became "embedded in a ceiling tile" following a "popping sound during the night" (*id.* at ¶¶ 30–31, 36); and

    o Multiple additional corrosion related field failures involving "corrosion of the threads at the top of the extinguisher vessels" (*id.* at ¶ 36).

    o Even when "detailed information related to the corrosion" and related "field failures" was " brought to the attention of FGL," it "refused to acknowledge the existence of a problem," refused "repeated requests for independent scientific analysis . . ." "to determine the cause of the defect in its extinguishers," "refused to permit Firexo to contact any of its engineers to discuss these serious design and safety concerns" or to allow Firexo to "discuss the problems encountered with [its] engineers." Instead, FGL insisted that Firexo "return the product to the stream of commerce" (*id.* at ¶¶ 24–25, 28–29, 37–38, 47).

7

- Ultimately, an independent metallurgical testing laboratory retained by Firexo "confirmed a defect in the design of FGL's vessels, which resulted in the corrosion and failure of the [fire extinguishing] vessels" (*id.* at ¶¶ 39–40).

As to the second element, FGL intended to induce Firexo's reliance on its representations:

- FGL made multiple representations as a means of differentiating its products from those of its US-based competitors. FGL represented to Firexo, for example, that its product line was "biodegradable," "nontoxic", and "environmentally friendly" (*id.* ¶ 9). It went further by representing to Firexo that FGL's products "did not contain toxic and/or environmentally harmful chemicals found in all competing fire extinguishing products sold in the United States." *Id*. FGL also represented that the UL process was underway at the time of negotiation and that it would secure UL certification "within six months" and that it had already secured European EN3 certification (*id.* at ¶ 10). Those statements were intended to induce Firexo to rely on them (*id.* at ¶¶ 11– 14).

- After inducing Firexo to become its exclusive distributor in the United States, and following Firexo's extensive investment of financial resources to develop a distribution capacity, FGL proved unable "to provide confirmation that it had secured EN3 certification." Rather, evidence at the Hearing confirmed that no such certification had been secured. This knowingly false representation is significant as an EN3 certification constitutes a European-wide confirmation that a fire extinguishing product has been tested and certified to be sufficiently durable, safe and effective for its intended purposes, which in the case of a fire extinguisher includes saving lives in the event of a fire emergency. All parties knew that FGL fire extinguishers in the United States would ultimately be placed in corporate facilities, industrial facilities, and government entities, including school buildings.

- Not only did Firexo products carry no such certification, but its products demonstrated repeated failures both in its warehouse in Port Clinton and at customer locations -- failures that included corrosion and weakening of the valve connecting the extinguisher vessel and top assembly, vessel explosions, top handle separations, loss of vessel pressure, and leaking extinguisher fluids. These were dramatic and dangerous product failures that FGL minimized or entirely brushed aside, while at the same time insisting that its products should be returned to the stream of commerce. Indeed, a senior FGL product compliance executive who voiced concerns about the safety of its extinguishers was excluded from FGL's meetings discussing product failures (Doc. 43 at 2).

- In addition, after making repeated written and verbal representations that its fire extinguishing products were "nontoxic," "biodegradable," "made from natural ingredients," "environmentally friendly" and suitable for use on plants as "fertilizer" -- qualities that distinguished it from all other competitors -- FGL subsequently "advised Firexo that it could no longer use "biodegradable" or "nontoxic," in its marketing or sale of FGL fire extinguishing products (Doc. 9 at ¶ 49). Instead, to

8

avoid being placed in a position in which it would be forced to prove its claims, FGL advised Firexo in March 2021 that it could no longer use the term "biodegradable" and that it should instead inform customers that its product would cause "less leakage of toxins into the environment" (Doc. 43 at 39–41).

- "FGL knowingly . . . misrepresented the toxicity, environmental impact, and biodegradable characteristics of the chemicals used in its fire extinguishing product" (Doc. 9 at ¶ 53). In addition, "FGL knew" "at all times relevant" "that its fire extinguishing products were defectively designed and posed a danger to end users and others in the stream of commerce but failed to advise Firexo of these design defects" (*id.* at ¶ 50). Furthermore, "FGL made continuing false and misleading representations . . . related to the safety and effectiveness of its products, its professional expertise and ability to develop and manufacture safe and effective fire extinguishing products, its expertise and ability to secure UL certification, its success in securing EN3 certification, and its development of nontoxic, biodegradable, and environmentally friendly fire extinguishing products" (*id.* at ¶ 58).

- FGL's "false representations and/or omissions of material fact evidenced fraud and/or misrepresentation in the inducement of a contractual and ongoing business relationship with Firexo and in the subsequent execution and pursuit of its contractual duties and business relationship" (*id.* at ¶¶ 59–60).

As to the third element, Firexo relied on FGL's fraudulent misrepresentations to its detriment.

- In reliance on FGL's representations Firexo "established relationships with distributors and retail companies throughout the United States" to channel FGL's product for distribution and sale (*id.* at ¶ 15). Firexo invested "significant sums of money to develop this distribution business and network" (*id.* at ¶ 16). Firexo also notified its distributors that European EN3 certification had already been secured and that UL certification was imminent "based on FGL's representations and assurances" (*id.* at ¶ 19).

**Continuing Fraud During the Business Relationship**

A case for common law fraud requires proof of: (1) "a representation or, where there is a duty to disclose, concealment of a fact," (2) "which is material to the transaction at hand," (3) "made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred," (4) "with the intent of misleading another into relying upon it," (5) "justifiable reliance upon the representation or concealment," and (6) "a resulting injury proximately caused by the reliance." *Cohen v. Lamko, Inc.*, 10 Ohio St.3d

9

167, 169 (Ohio 1984) (citation omitted). This Court finds that FGL committed fraud to induce Firexo's continued business relationship with FGL.

First, FGL represented to Firexo that:

- FGL's product line was "biodegradable", "nontoxic "environmentally friendly," (Doc. 9 at ¶ 9), that it was made from natural ingredients, and displayed the characteristics of fertilizer which would enhance rather than pollute the environment;

- FGL was in the process, i.e., already started UL certification, critical for the commercial US market (*id.* at ¶ 10);

- FGL had the "expertise and capacity" to secure UL certification (*id.*);

- FGL had secured EN3 certification before Firexo entered into the Agreement and during the business relationship (*id.*); and

- Its fire extinguishing vessels had no design defect and should be returned to the stream of commerce (*id.* at ¶¶ 24–25, 28–29, 37–38, 47, 50).

Second, these representations were material to Firexo continuing the business relationship:

- The characteristics of FGL products represented to Firexo, including representations that its fire-extinguishing fluid was nontoxic, biodegradable, environmentally friendly, made from all natural ingredients, displayed characteristics of fertilizer, and had successfully secured the European EN3 certification which verified its safety, durability, and effectiveness for its intended purposes distinguished Firexo products from all other fire extinguishing products on the market, along with its ability to extinguish all types of fires. Evidence confirmed that most online searches for fire-extinguishing products included the types of non-toxic and related environmental qualities represented by FGL. Evidence confirmed that in reliance on FGL's representations, Firexo, Inc. spent large sums of money, and expended time and effort, to establish a distribution network in the United States for the sale of these products (*id.* at ¶¶ 15–19).

- FGL's representations induced Firexo to enter into the business relationship.

Third, FGL made those representations falsely, with knowledge of their falsity:

- FGL controlled the design and manufacture of its products (*id.* at ¶¶ 7, 58, 62). As the designer and manufacturer of its fire extinguishing liquids, FGL had intimate knowledge of the contents and their effects. It is also verifiably objective to know whether FGL had or had not EN3 certification (*id.* at ¶ 52) ("Nor has FGL provided confirmation of EN3 certification.").

- Evidence demonstrated that FGL did repeatedly sidestep requests for confirmation of its environmental claims as well as its representations related to EN3 certification. Moreover, its contents eventually were shown to include florousurfactants, which are man-made chemicals, also known as forever chemicals, that are neither biodegradable nor natural and widely believed to be harmful to the environment and to pose health risks for humans (Doc. 43 at 3–24). Evidence also confirmed that EN3 certification had not been secured and that the design of FGL's fire extinguishing vessel instead had multiple design related defects that not only rendered it unsuitable and unsafe for any intended purpose but caused it to fail virtually every UL test related to its durability and safety. FGL's representations related to the extent of its expertise, qualifications, and ability to design, manufacture and secure UL certification were likewise abjectly false. At best, FGL made those representations "with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred." *Cohen*, 10 Ohio St.3d at 169.

Fourth, FGL made its representations with an intent to mislead FGL into relying upon those representations:

- The intent to deceive may be inferred. *Drake Medicine Co. v. Glessner*, 68 Ohio St. 337, 358 (Ohio 1903). In fact, to prove a fraud claim under Ohio law, "a person's intent to mislead another into relying on a misrepresentation or concealment of a material fact generally must be inferred from the totality of the circumstances since a person's intent is rarely provable by direct evidence." *See Mulch Mfg., Inc. v. Advanced Polymer Solutions, LLC*, 947 F. Supp. 2d 841, 862 (S.D. Ohio 2013) (citation omitted).

Fifth, Firexo justifiably relied on FGL's misrepresentations. Firexo "established relationships with distributors and retail companies throughout the United States" to channel FGL products for distribution and sale (Doc. 9 at ¶ 15):

- Firexo invested "significant sums of money to develop this distribution business and network" (*id.* at ¶ 16). Firexo also notified its distributors that UL certification was imminent and that the products already had secured a similar EN3 European certification "based on FGL's representations and assurances" (*id.* at ¶ 19). Firexo justifiably relied on FGL's misrepresentations because FGL was the designer and manufacturer of its products (*id.* at ¶¶ 7, 58, 62). "Firexo relied on the false representations of FGL and its omissions of material fact to its detriment" (*id.* at ¶ 61). This included Firexo's assumption of the costs associated with securing UL approval, ultimately failing as a result of inherent flaws in the design of FGL's fire extinguishing vessels. FGL never reimbursed Firexo for those costs, nor did FGL reimburse or refund Firexo the cost of the defective products Firexo returned to FGL.

Sixth, Firexo's subsequent injury was proximately caused by FGL's misrepresentations. This Court finds that Firexo suffered reputational and monetary damages, separate and apart from damages caused by the breach of contract.

**Fraud Damages**

This Court finds that the Amended Complaint, as well as the evidence separately presented at the Hearing, establish that FGL fraudulently induced Firexo to enter into, and then to continue the business relationship for the distribution of Firexo products. Firexo is entitled compensatory damages for business expenses reasonably incurred by Firexo in 2020–2023 (*see* Doc. 50 at 4–5) as a direct and proximate result of FGL's fraudulent representations on which Firexo reasonably relied. This includes startup inventory costs of $297,374 for GFL products (Doc. 50 at 5), and business losses for the years 2019 ($44,619), 2020 ($431,457), 2021 ($407,823), and 2022 ($78,956) (Doc. 44 at 38), for a total of $1,260,229 in fraud damages.

This Court further finds that these damages, incurred to establish a nationwide distribution network for FGL products, were reasonably foreseeable to the parties and reasonably incurred by Firexo. Further, the damages were more modest than those anticipated by FGL in its marketing materials for this same period of time (Doc. 42 at 1–17). In addition, Firexo established that it made good-faith efforts to minimize its losses by ongoing efforts to sell remaining inventory of product purchased from FGL. Firexo exhausted those efforts by the end of 2023.

**Punitive Damages**

Under Ohio Rev. Code ("R.C.") § 2315.21(C), punitive damages are recoverable from a defendant in a tort action where both of the following apply: (1) "The actions or omissions of defendant demonstrate malice or aggravated or egregious fraud, or that defendant, as principal or master, knowingly authorized, participated in, or ratified actions or omissions of an agent or servant," and (2) "[t]he trier of fact returned a verdict or made a determination of the total

compensatory damages recoverable by the plaintiff from that defendant." A plaintiff must show, by clear and convincing evidence, that punitive damages are appropriate. R.C. § 2315.21(D)(4).

Malice is defined as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 334 (Ohio 1987) (syllabus). Under a conscious-disregard theory, Firexo must show "a positive element of conscious wrongdoing, [which] has been termed conscious, deliberate[,] or intentional, [and] requires the party to possess knowledge of the harm that might be caused by his behavior." *Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 446 (Ohio 1996) (quoting *id.* at 335). There must be proof of the defendant's "subjective knowledge of the danger posed to another." *Id.* See also *Bell v. Zurich Amer. Ins. Co.*, 156 F. Supp. 3d 884, 891–92 (N.D. Ohio 2015) (awarding punitive damages in the context of a default judgment motion).

FGL has clearly and convincingly established that: FGL intentionally refused to disclose what it knew or should have known about FGL's products' defects; FGL intentionally refused to take any remedial action regarding those defects despite actual knowledge of property damage and bodily injury; and FGL intentionally refused to correct the misrepresentations set forth in its product literature despite actual knowledge of the products' toxicity and compromised biodegradability.

This Court finds FGL made knowing, false, material representations related to the fire extinguishing products that it sought to place into the stream of commerce for the purpose of serving homes as well as government and commercial buildings. The record confirms that FGL knew or should have known that these extinguishers not only did not possess the characteristics represented, but also displayed serious design defects that rendered them dangerous and unsuitable

for their intended uses. These actions were taken with conscious disregard for the serious, dangerous, and potentially lethal consequences of its actions.

The obvious purpose of a fire extinguisher is to prevent serious injury or death in the event of a sudden fire emergency. Yet even after obvious defects in the design and function of its fire extinguishers that posed a clear danger to end users came to light, FGL continued to deny that any problem existed, continued to blame product defects on improper handling and storage by Firexo, and insisted on return of its products to the stream of commerce. Further, FGL subsequently made the same false representations to a distributor of its products outside the United States, then offered the same false and misleading explanations for identical product failures, and likewise insisted on return of its products to the stream of commerce. This conduct is particularly disturbing considering that these products were intended for, and in many cased had already been placed in, residential and public buildings, including school buildings (*see, e.g.*, Doc. 45 at 40).

This Court finds that FGL's conduct, amounting to a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm, meets the definition of "malice" as used in Revised Code § 2315.21(D)(4). *Preston*, 32 Ohio St. 3d at 334. Based on that finding, and the compensatory damages awarded to Firexo for its fraud claim, this Court awards Firexo punitive damages for FGL's fraudulent inducement of a business relationship, including its ongoing fraudulent misrepresentations to induce the continuation of the business relationship, in the amount of One Million Dollars ($1,000,000).

A final point. Under Ohio law, Firexo may recover its attorney fees if this Court makes an award for punitive damages. *See Columbus Finance, Inc. v. Howard*, 42 Ohio St. 2d 178, 183 (Ohio 1975). As this Court has awarded Firexo punitive damages on the fraud claims, Firexo may recover reasonable attorney fees -- as an element of its compensatory damages. This Court reserves judgment on the amount to allow Firexo an opportunity to decide if it wishes to pursue this damages

claim, and, if so, to submit an accounting within 30 days for this Court's consideration in setting the amount.

## CONCLUSION

This Court finds for Firexo and awards damages as follows:

- Breach of contract (lost profits 2020–21)     $1,738,573

- Fraud:

    - Compensatory damages (losses 2019–22)     $1,260,229

    - Punitive damages (R.C.§ 2315.21)     $1,000,000

- Total Damages     $3,998,802

IT IS SO ORDERED.

                                                s/ *Jack Zouhary*
                                                JACK ZOUHARY
                                                U. S. DISTRICT JUDGE

                                                May 14, 2025