## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

FIREXO INC.,

    Plaintiff,

        v.

FIREXO GROUP LIMITED,

    Defendant.

Case № 3:21-CV-02336

Judge Jack Zouhary

---

### FIREXO, INC.'S MOTION TO JOIN FIREXO CORPORATION (A DELAWARE CORP.) TO THIS ACTION PURSUANT TO FED. R. CIV. P. 25(c) AND FOR APPOINTMENT OF A RECEIVER PURSUANT TO FED. R. CIV. P. 66, 69 and OHIO REV. CODE § 2735.01

---

Plaintiff Firexo Inc. respectfully moves this Court pursuant to Fed. R. Civ. P. 25(c) for an order substituting Firexo Corporation ("Corp") as the defendant in this action based on a transfer of interest from existing defendant Firexo Group Limited ("FGL") to Corp and thereafter for an order authorizing the appointment of a receiver under Fed. R. Civ. P. 66, 69(a)(1) and Ohio Rev. Code § 2735.01 over Corp's assets. In support of this motion, Firexo Inc. states as follows:

### I.     FACTUAL BACKGROUND

#### A.     The Underlying Judgment

1.     Following the withdrawal of FGL's attorneys from representation in this litigation, and FGL's subsequent failure to retain substitute counsel, this Court entered default against FGL. After a hearing on damages, the Court awarded Plaintiff: $1,738,573 in breach of contract damages; $1,260,229 in compensatory damages for fraud; and $1,000,000

in punitive damages; totaling $3,998,802. *See* Order on Pl.'s Mot. for Default Judgment (Doc. 51).

2.      The Court found that FGL engaged in fraudulent conduct, made knowing misrepresentations about its fire extinguishing products, and acted with conscious disregard for safety. Mr. David Breith was a company director and chief executive of FGL at the time FGL acted or failed to act, thereby rendering itself liable as provided in the Court's judgment.

### B.      The FGL Corporate Structure and Asset Transfers

3.      Until late 2021, FGL was the top-level company within which all Firexo business was conducted. In anticipation of a proposed initial public offering on NASDAQ, Mr. Breith circulated an email dated September 1, 2021 in which he explained the intended structural changes necessary to effectuate the IPO. (Doc. 14-7, Page ID # 104.) Mr. Breith represented to FGL shareholders that the exchange was a share-for-share exchange that "will not alter, in any way, your current rights as a shareholder." *Id.* To conclude the same paragraph, he advised: "Through these share exchange transactions (a) you will at all times retain the same percentage holding, and (b) the entity in which your shares are held will always be the 'TopCo' with the Firexo group of companies." *Id.* The intent by transferring all shareholders, directors, assets and the like from FGL to Corp was a "flip" transaction where the only difference between top-level companies was the jurisdiction in which they were incorporated.

### 1.      November 5, 2021:

4.      Through a drag-along provision, FGL transferred all its stock to Corp, along with FGL's intellectual property, including patented formulas for fire extinguishing products.

This transfer occurred on November 5, 2021, (Doc 14-11, Page ID # 160), after Plaintiff filed its original complaint in state court, which was file-stamped October 29, 2021 (Doc 1-1, Page ID # 9). At that point, Corp became the top-level company for the Firexo group companies. Mr. Breith in his FGL shareholder email confirmed that "[i]f for any reason the IPO transaction becomes abortive, our stake as shareholders in Firexo's business will be 'reversed' out of the temporary vehicle back into the UK." (Doc. 14-7, Page ID # 104). The proposed IPO was "put on hold" sometime in Q1 2022; however, the shareholding and assets were never returned to FGL but have instead thereafter remained in Corp." *See* Exhibit 7 at p. 4 ("Intended IPO Updated and New Investment").

### 2.    October 16, 2024

5.    On October 16, 2024, David Breith, CEO of Corp and director of both entities, sent an email, *see* Ex. 1., to Corp's shareholders advising that FGL would be placed into Voluntary Liquidation.[1] In the email, Mr. Breith revealed that:

- FGL had been "effectively dormant since the share exchange" in November 2021;

---

[1] Creditors' voluntary liquidation in the United Kingdom is a formal insolvency proceeding in which a company elects to participate. In voluntary liquidation, there is no automatic stay on legal proceedings. However, the court can stay actions upon  application by the liquidator, a creditor, or a contributory under section 112 of the UK Insolvency Act. The court's concern is to ensure no creditor obtains an advantage over the general body of creditors and the process of the liquidation is not interfered with. This is because the essential feature of a winding-up is that the company's assets are realized and distributed according to a statutory framework.

*Firexo, Inc. v. Firexo Group Limited*                                      № 3:22-CV-2336

- FGL's "***only function*** [since the share exchange] has been to defend legal proceedings" brought by its joint venture partners (emphasis supplied);

- Corp's "board"—not FGL's board—had decided to place FGL into voluntary liquidation; and,

- Corp, rather than FGL, had become "the ultimate Firexo holding entity" of all Firexo related entities.

FGL thereafter entered Voluntary Liquidation on November 7, 2024.

6.      Mr. Breith's October 16, 2024 email and the subsequent transfer of subsidiary company shares out of FGL and into Corp unequivocally confirm that all substantive business operations had transferred to Corp.

7.      This is extraordinary for three reasons:

- First, Mr. Breith indicated that FGL was "dormant" and only existing to defend legal proceedings—a fact FGL has never communicated to Firexo Inc. In contrast, FGL previously represented in the answer filed in this litigation "that it manufactures fire extinguishers and fire extinguishing products and that these products are sometimes sold in the United States." Def.'s Answer to Pl.'s First Am. Compl. at ¶ 7 (Doc. 11) (filed on March 31, 2022). Based on FGL's admission and statements, Firexo Inc. had no reason to believe otherwise—until Mr. Breith's October 2024 email.

- Second, Corp's board of directors—not FGL's directors—decided to put FGL into creditors liquidation.

- Third, Mr. Breith's email makes clear that FGL had no independent corporate personality but has instead functioned as Corp's alter ego, serving the sole purpose of defending litigation and shielding Corp from its associated attorney's fees, including those in the U.S. and the U.K., most of which remain unpaid and serve as the debts associated with FGL's voluntary liquidation. *See* Ex. 2**.** Moreover, both entities (FGL and Corp) have the same directors (Messrs. Breith and Staring) and officers.

8.      Mr. Breith's October 16, 2024 written admissions confirm that Corp acquired FGL's entire interest in the subject matter of this litigation—the exclusive distribution agreement, the fire extinguishing products business, and all associated assets.

### 3.      October 10, 2024 Fraudulent Transfers:

9.      After having received Mr. Breith's email revealing that FGL had been "dormant" since November 2021, Firexo, Inc. examined the records of FGL. In the United Kingdom, records of corporate entities organized under the laws of England and Wales are maintained by "Companies House." Companies House maintains a website (*https://find-and-update.company-information.service.gov.uk/*) on which those records are available to the public.  A search of these records revealed the following:

10.      On October 10, 2024—six days before Mr. Breith's email advising that FGL would be placed in voluntary liquidation—Corp's Directors transferred 8,600 shares of FGL's subsidiary (Firexo Motorsport Limited) out of FGL and into Firexo Holdings Limited—both of which are wholly owned by Corp (the Delaware "holding" corporation referenced in Mr. Breith's email). The shares were transferred without equivalent value. *See* Ex. 4.

11.     Also on October 10, 2024, 9,500 shares of Firexo Limited stock (95% of all shares) held by FGL were transferred by Corp to Firexo Holdings Limited. Firexo Limited is believed to be the operating sales and fulfilment arm for Firexo's business in the United Kingdom. Firexo Holdings Limited is a wholly owned subsidiary of Corp. These shares again were transferred without equivalent value. *See* Ex. 4.

12.     These share transfers stripped FGL of all its remaining operating subsidiaries as well as all its remaining assets, placing them squarely under the direct control of Corp. These actions were taken almost immediately before FGL was placed into voluntary liquidation by Corp's sole officers and directors—Mr. David Breith and Mr. Winfred Staring.

13.     Corp not only replaced FGL as the ultimate Firexo holding entity but maintains the same address, directors and officers as FGL, so that they are fundamentally indistinguishable. Notably, all officers and directors of all Firexo related entities, other than Breith and Staring, resigned, along with FGL's General Counsel, prior to Corp's announced plan to place FGL into liquidation and its subsequent effort to transfer the shares of FGL's subsidiaries for the apparent purpose of evading the claims of creditors.  *See* Ex. 3**,** Termination of Appointment (Peter Coyle, former General Counsel) (July 31, 2024 was the termination date for Mr. Coyle).

### C.     A Complete Transfer of FGL's Assets to Corp

14.     After the filing of Plaintiff's instant lawsuit, Corp has made conveyances of FGL's stock and subsequent conveyance of remaining assets for little or no value in violation of Ohio Rev. Code § 1336.04, the Ohio Fraudulent Transfer Act.

*Firexo, Inc. v. Firexo Group Limited*                                                    № 3:22-CV-2336

15.     Corp has exercised complete control over FGL which, as a result, has no independent corporate personality but instead has functioned, and continues to function, merely as Corp's alter ego.

16.     The stock transfer from FGL to Corp at the end of 2021 was to the exact same shareholders, so that there was exact identity / duplication of shareholders from FGL to Corp, the ultimate holding entity, thereby making Corp a mere continuation of FGL.  As noted, *supra*, officers and directors of FGL and Corp also were identical.

17.     Contrary to FGL's longstanding and repeated assurances that FGL remained the manufacturer and distributor of FGL fire extinguishing products, including its admission in the answer filed by FGL in this litigation, Corp has only now revealed that FGL has effectively been "dormant" since the share exchange, and that during this period FGL's only function has been to defend legal proceedings brought by FGL's former joint venture partners, including the Plaintiff in this litigation, and that all of FGL's functions as manufacturer and distributor were assumed by Corp.

18.     Corp's creation and Corp's control of FGL and all its corporate activities other than defense of litigation makes Corp the alter ego of FGL and the corporate entity responsible for the fraudulent transfer of FGL's stock and assets, warranting the piercing of FGL's corporate veil and imposing liability on Corp for FGL's original acts and omissions as against Plaintiff.

**D.     July 15, 2025: Discovery of Corp's Standing with the Delaware Secretary of State.**

19.     In connection with the preparation of this Motion, Firexo Inc. investigated the status of Corp. This due diligence revealed that Corp is currently *void* under Delaware law

for failure to pay the required annual franchise taxes. *See* Ex. 5 at p. 1; 8 Del. C. § 510 ("If any corporation ... neglects or refuses for 1 year to pay the State any franchise tax or taxes ... the charter of the corporation shall be void, and all powers conferred by law upon the corporation are declared inoperative...."). In addition, it currently appears in the Delaware Secretary of State records that Corp owes $452,636.00 in tax, penalties and interest arising out of its failure to pay annual franchise taxes starting with the 2022 annual assessment. Ex. 5 at p.2. (Penalties and interest stop accruing after a set period. *See* 8 Del. C. § 510.)

20.     Once a corporation is declared void under Section 510, it "has thereby ceased to exist and has lost any standing to appeal and be heard, even if represented by counsel." *Transpolymer Industries, Inc. v. Chapel Main Corp.*, 582 A.2d 936 (Del. 1990) (unpublished disposition). In Delaware, a corporation voided for nonpayment of tax is "not completely dead," but "in a state of coma from which it can be easily resuscitated." *Wax v. Riverview Cemetery Co.*, 24 A.2d 431, 436 (Del. Sup. Ct. 1942).

21.     The Delaware Secretary of State has confirmed that Corp has been in void status since March 1, 2025. *See* Ex. 5 at p. 1. As a company director and chief executive, Mr. Breith knew (or should have known) that Corp has been delinquent on its annual franchise tax since 2021 and the legal implications of trading while in that status. Nevertheless, on March 25, 2025, Mr. Breith sent an email to Corp shareholders notifying them of a potential sale, indicating that the corporation has "engaged with an international M&A company to assist" it and to "gain the best possible value", seemingly purporting to offer for sale a void corporation. Ex. 6 at ¶ 3. Even more disturbing, in the same email, Mr. Breith **actively solicits** additional investment in Corp, *see id.* at ¶¶ 8–9, which under Delaware law has "ceased to

exist[.]" *Transpolymer Industries, Inc.*, 582 A.2d 936. In addition, as late as June 25, 2025, Corp continued to move assets among its various Firexo entities. All shares of the UK companies Firexo Motorsport Limited and Firexo Limited were both transferred from Firexo Holdings Limited to Firexo Distribution Limited. *See* Ex. 4 (Companies House records). All these assets, however, flowed up into Corp.  Notably, Delaware law imposes both civil and criminal penalties on corporate officers and directors who continue to illegally conduct business in connection with the operation of a corporation that has been declared void). *See, e.g.*, Del. C. § 102(b)(7)(ii) (not permitting exculpation of director's liability when director commits "a knowing violation of law"); 8 Del. C. § 513 (providing criminal liability for one who acts under a charter that has been proclaimed repealed by Delaware governor.)  Corp's charter was formally repealed by the Governor on June 30, 2025. Ex. 5 at p. 1.

22.     While Corp could rejoin the living by paying the current outstanding tax, penalties and interest ($452,636.00), *see* 8 Del. C. § 312, it currently remains a void corporation due to its failure to pay the outstanding amount due ($452,636.00). *See* 8 Del.  C.  312. Moreover, Corp has not apparently filed annual reports with the Delaware Secretary of State since 2022, as required by Delaware law (8 Del. C. § 502). *See* Ex. 5 at p. 2.

## II.        LEGAL STANDARDS

### A.     Substitution under Rule 25(c).

23.     Fed. R. Civ. P. 25(c) provides: "If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."

24.     Rule 25(c) is a procedural rule and, as such, does not affect the substantive rights of the parties. *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 23 (7th Cir. 1977).   A court must apply the substantive law of successor liability to determine whether it can exercise jurisdiction over a new party via Rule 25(c). Therefore, a "transfer of interest" within the meaning of Rule 25(c) occurs where the applicable substantive law extends liability to a third party. As its language suggests, Rule 25(c) is applicable to the situation where a transfer occurred *during the pendency* of an action. *See* Wright & Miller, Fed. Prac. & Pro. § 1958 (3d ed. 2007). However, the fact that the court may have already rendered judgment does not preclude substitution under Rule 25(c). The Sixth Circuit, in *Blachy v. Butcher*, 221 F.3d 896, 911 (6th Cir. 2000) (cleaned up), noted that "although substitution is usually effected during the course of litigation, substitution has been upheld even after litigation has ended as long as the transfer of interest occurred during the pendency of the case." *See also Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 153–54 (6th Cir. 1992) (affirming substitution in the context of proceeding to enforce a settlement agreement); *Luxlinger P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir. 1993); *Rodríguez-Miranda v. Benin*, 829 F.3d 29, 40–41 (1st Cir. 2016) ("Rule 25(c) applies to actions that are 'pending,' but this does not preclude substitution during subsequent proceedings brought to enforce a judgment."); *Panther Pump & Equip v. Hydrocraft, Inc*, 566 F.2d at 23. ("Rule 25 has application only to actions pending in the district courts. But this should not preclude substitution after judgment has been rendered in the district court … for the purpose of subsequent proceedings to enforce … a judgment.").

25.     Using Rule 25 substitution *after* a court renders default judgment is not unusual. In *Minnesota Mining & Manufacturing Co. [3M] v. ECO Chem, Inc.*, 757 F.2d 1256 (Fed.

Cir. 1985), the Federal Circuit dealt with a similar set of facts. 3M obtained a default judgment as a sanction for ECO Chem's discovery violations. *Id.* at 1258. While that action was pending, the directors of ECO Chem, Inc. (ECI) formed ECO Chem LLC (ECL, a Georgia LLC. *Id.* The directors and shareholders then "converted all of ECI's assets to ECL, including the formulae, customer lists, trademarks, and inventory." *Id.* at 1258–59. Discovering this LLC after it obtained a default judgment against ECI, 3M moved to add ECL and the directors as "successors in interest and alter egos" of ECI, which the district court granted. *Id.* The Federal Circuit affirmed this ruling, noting that "ECL became in effect a new corporate name for the same corporate body", *Id.* at 1262, and that the directors "purposely manipulated ECI so as to thwart 3M's recovery of its judgment." *Id.* at 1265. Whether as a successor-in-interest or an alter ego, the parties were properly added to the post-judgment proceedings. *See 3M*, 757 F.2d at 1264 (noting that the newly created company, ECL, did not even exist when the significant events took place and thus was "joined, not to determine its own liability, but merely because it succeeded to the assets from which 3M may satisfy its judgment.").

### B. Ohio law on Third Party Liability.

26. Rule 25(c) is the procedural device through which this Court must apply the substantive law relating to successor liability.

27. Under Ohio law, "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1132 (Ohio 1993). Ohio courts have recognized, however, four exceptions to this general rule. A corporation that purchases the assets of another may be liable for its predecessor's contractual liabilities when:

1.    "the buyer expressly or impliedly agrees to assume such liability [not relevant here];

2.    "the transaction amounts to a de facto consolidation or merger;

3.    "the buyer corporation is merely a continuation of the seller corporation; or

4.    "the transaction is entered into fraudulently for the purpose of escaping liability." *Id.* at 1132.

   **1.    De facto Consolidation or Merger.**

28.    "A de facto merger is a merger in fact without an official declaration of such." *Welco*, 617 N.E.2d at 1134. The Ohio Supreme Court has outlined "the hallmarks" of a de facto merger:

   a.    "the continuation of the previous business activity and personnel,

   b.    "a continuity of shareholders resulting from a sale of assets in exchange for stock,

   c.    "the immediate or rapid dissolution of the predecessor corporation, and,

   d.    "the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations." *Id.*

29.    The Court also noted that "a transfer of assets for stock is the *sine qua non* of de factor merger." *Id.* (citing *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977)). Not all hallmarks must be present to determine that a de facto merger exists. *Eberhard Architects, LLC v. Schottenstein, Zox & Dunn Co., LPA*, 2015-Ohio-2519, 2015 WL 3899367, ¶ 23 (Ohio Ct.

App.). The touchstone is whether the predecessor corporation has in effect been totally absorbed into the successor corporation. See *Welco*, 617 N.E.2d 1129.

### 2.    Mere Continuation.

30.    As the Ohio Supreme Court has explained, commonality of ownership is also an important consideration in determining whether one business entity is merely the continuation of another. *Welco,* 617 N.E.2d at 1133–34. Where there is common ownership, the successor corporation is merely a "new hat" or "reincarnation" of its predecessor. *Id.* Typically, this type of transaction is used to defeat or escape liabilities of the predecessor corporation. *Id.* Thus, inadequacy of consideration is one of the indicia of the mere continuation exception to the bar on successor liability. *Id.*

31.    Factors to consider in reviewing whether a successor corporation merely continues the business of a previous corporation are whether the new corporation shares common owners or directors, whether the new corporation consists solely of the assets of the old corporation, and whether the old corporation continued to exist as a viable business after the asset transfer. *Kuwatch v. Klimat Master Contrs.*, 1993 WL 488795, *3 (Ohio Ct. App. 1st Dist. Oct. 27, 1993) (citing *Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60, 507 N.E.2d 331 (1987)).

32.    Mere continuation exists when "one corporation sells its assets to another corporation with the same people owning both corporations." *Welco,* 617 N.E.2d at 1134 (quotation marks and citations omitted). Because one of the goals of this type of transaction is to "escape liabilities of the predecessor corporation," "inadequacy of consideration is one of the indicia of mere continuation." *Id.* (citation omitted). However, the "key element" is "a

common identity of stockholders, directors, and stock." *Mickowski v. Visi-Trak Worldwide LLC*, 415 F.3d 501, 510 (6th Cir. 2005) (quotation marks and citation omitted).

### 3.  Piercing the Corporate Veil: Fraudulent Transfer.

33.    When a shareholder exercises such control over a corporation that the corporation becomes the shareholder's alter ego, and when the shareholder misuses his control of a corporation to commit specific, egregious acts that injure a third party, then it is unjust to allow the shareholder to use the corporate form as a shield to escape the consequences of those wrongful acts. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1086 (Ohio 1993).

34.    To pierce the corporate veil and hold an individual shareholder liable, one must show: "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id.* The *Belvedere* test for piercing the corporate veil has also been applied to ascertain whether a parent corporation could be held liable for its subsidiary corporation's misconduct. *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 543 (Ohio 2008).

35.    The first prong of the *Belvedere* test has been referred to as the "alter ego doctrine." To succeed under this prong, "a plaintiff must show that [the two corporations] are fundamentally indistinguishable." *Siva v. 1138 LLC*, No. 06AP–959, 2007 WL 2634007, *2 (Ohio Ct. App. Sept. 11, 2007) (internal citation omitted). In assessing whether the first prong has been satisfied, Ohio courts consider several factors, such as: "(a) grossly inadequate

capitalization; (b) failure to observe corporate formalities; (c) insolvency of the debtor corporation at the time the debt was incurred; (d) the parent holding itself out as personally liable for certain subsidiary obligations; (e) diversion of funds or other property of the subsidiary for the parent's use; (f) the absence of corporate records; and (g) the fact that the subsidiary was a mere facade for the operations of the parent." *Corrigan v. U.S. Steel Corp*, 478 F.3d 718 at 724–26 (6th Cir. 2007) (citing *LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App. 1991)). The Sixth Circuit has noted, however, that "none of these factors is a prerequisite to a finding that the corporate form has been violated." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 705 (6th Cir. 1988); *see also Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005) ("[B]ecause of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." (internal citation omitted)).

36.     To meet the second prong of the *Belvedere* test, a plaintiff must prove commission of "fraud, an illegal act, or a similarly unlawful act." *Taylor Steel*, 417 F.3d at 605. *See also Hitachi Med. Sys. Am., Inc. v. Branch*, 2010 WL 816344, at *8–11 (N.D. Ohio Mar. 4, 2010) (holding that a violation of the Fraudulent Transfer Act is generally a sufficient predicate act under the second element of the *Belvedere* test).

Finally, the plaintiff must prove an injury or loss flowing from such control and wrong. *Belvedere*, 617 N.E.2d at 1086.

### III.     ARGUMENT

### A.     Corp Has Acquired FGL's Entire Interest

37.     The undisputed evidence demonstrates a complete transfer of interest from FGL to Corp:

- *Corporate Control*: Corp owns 100% of FGL's shares and controlled all corporate decisions before it entered administration, as evidenced by Mr. Breith's admission that Corp's board decided that FGL would enter voluntary administration. *See* Ex. 1.

- *Business Operations*: All substantive business operations transferred to Corp in November 2021, leaving FGL as merely a shell to defend litigation as David Breith's email confirms. *See* Ex. 1

- *Intellectual Property*: The patented formulas and intellectual property central to this dispute were directly transferred to Corp or indirectly to Corp via wholly owned subsidiaries. *See* Ex. 8

- *Operating Assets*: FGL's remaining operating subsidiaries were transferred to Corp's wholly-owned subsidiary days before the liquidation announcement, including those subsidiaries that held FGL's IP assets. *See* Ex. 4.

38.    The chart below, prepared based on review of public documents available through Companies House (all in Exhibit 8), reflects the current corporate structure of Corp, demonstrating that all corporate assets that at one time flowed through FGL are now flowing to Corp, where Mr. Breith is one of two directors and the chief executive:

*Firexo, Inc. v. Firexo Group Limited*                          № 3:22-CV-2336



39.    All the independent bases recognized by Ohio law for joining Corp are applicable here: Corp resulted from a *de facto* merger with FGL; Corp is a new corporate body for the same corporate name; Corp, as the sole shareholder of FGL before administration, exercised dominating control over FGL such that it effectively had no independent corporate existence; FGL fraudulently transferred its assets to Corp justifying this Court in piercing FGL's corporate veil.

40. ***De Facto Merger.*** The touchstone of a *de facto* merger is whether the predecessor corporation has in effect been totally absorbed into the successor corporation. See *Welco*, 617 N.E.2d 1129. By his email putting FGL into liquidation, Mr. Breith admitted that very fact. FGL was an empty husk since its shareholding and assets were transferred years earlier. *See* Ex. 1. Corp acts as the ultimate Firexo holding entity and maintains the same address, directors and officers as FGL, so that they are fundamentally indistinguishable. As noted, *supra*, all officers and directors of all Firexo related entities, other than Breith and Staring, resigned, along with FGL's General Counsel, prior to Corp's announced plan to place FGL into liquidation and its subsequent apparent effort to fraudulently transfer the shares of FGL's subsidiaries for the purpose of evading the claims of creditors.

41. ***Mere Continuation.*** The key element here is "a common identity of stockholders, directors, and stock." *Mickowski*, 415 F.3d at 510. The transaction between FGL and Corp resulted in Corp being FGL's mirror image with the same shareholders, directors and stock. *See Ex. 1.* Moreover, the transaction meets all the factors the Ohio Supreme Court outlined in *Flaugher*, 30 Ohio St. 3d 60: whether (1) the successor corporation merely continues the business of the previous corporation; (2) the new corporation shares common owners or directors, and (3) the old corporation continued to exist as a viable business after the transfer. The evidence demonstrates that Corp undertook the identical trade of FGL; that the like-for-like commonality existed in shareholders, directors and officers; and, unknown to Firexo Inc until October 16, 2024, that FGL's "only function [after the transaction between FGL and Corp] has been to defend legal proceedings brought by [FGL's] former joint venture partners…". (Doc 33, Page ID # 635).

*Firexo, Inc. v. Firexo Group Limited*                                     № 3:22-CV-2336

42.     Contrary to FGL's longstanding and repeated assurances that FGL remained the manufacturer and distributor of FGL fire extinguishing products, including its admission in the answer filed by FGL in this litigation, Corp has only now revealed, by virtue of a clear and unequivocal written admission, that 1) FGL has been effectively  "dormant" since the share exchange,  2) during this period FGL's **only** function has been to defend and divert the costs of legal proceedings brought by FGL's former joint venture partners, including the Plaintiff in this litigation, and 3)  all of FGL's functions as manufacturer and distributor were assumed by Corp.

43.     Corp is merely a "new hat" or "reincarnation" of FGL. *See Welco,* 617 N.E.2d at 1133–34.

44.     ***Piercing the Corporate Veil.*** Firexo Inc. can satisfy all three *Belvedere/Dombrowski* factors justifying looking beyond FGL and holding Corp liable as a shareholder.

- **1. Alter Ego**. To succeed under this prong, "a plaintiff must show that [the two corporations] are fundamentally indistinguishable." Siva v. 1138 LLC, No. 06AP–959, 2007 WL 2634007, *2 (Ohio Ct. App. Sept. 11, 2007). As shown, Corp. is the mirror image of FGL. FGL has grossly inadequate capitalization given the decision to enter voluntary administration; FGL and Corp both have failed to observe corporate formalities; Corp has diverted FGL's shareholding assets before putting FGL into voluntary administration; FGL was a mere facade for the operations of the Corp and existed solely as a vehicle through which Corp could separate this action from the assets that were once FGL's. Corp is FGL's alter ego.

- **2. Fraudulent Act**. The October 10, 2024 transfer of FGL's shares in Firexo Motorsport Limited and Firexo Limited from FGL to Corp constitutes a fraudulent transfer under R.C. § 1336.04(A)(1) where FGL had an "actual intent to hinder, delay or defraud" Firexo Inc. *Id.* Section 1336.04(B) directs courts to consider a list of factors to determine actual intent, recognizing that proving intent by circumstantial evidence is permissible.

The transfer of shares meets the majority of § 1336.04(B) factors, demonstrating an actual intent to undertake a fraudulent transfer:

§ 1336.04(B)(1): it was to an insider, FGL's sole shareholder; § 1336.04(B)(3): the share transfer was never communicated before or after FGL was put into voluntary administration by Corp's identical directors (Messrs. Breith and Staring); § 1336.04(B)(4): this action was pending when the transfer occurred and FGL, despite Mr. Breith's representations to this court, lacked any apparent intent to seek substitute counsel after its initial counsel withdrew; § 1336.04(B)(5): the transfer of these remaining shares was substantially all the assets of FGL, as confirmed by Mr. Breith's October 16, 2024 email; § 1336.04(B)(8): upon information and belief, FGL did not receive consideration reasonably equivalent to the value of the shares transferred out; and § 1336.04(B)(9): FGL was put into insolvency proceedings six days after FGL transferred out its shares in the two limited companies.

This Court has held that an "alleged violation of the Fraudulent Transfer Act suffices as conduct 'in such a manner as to commit fraud, an illegal act, or a similarly unlawful act.'" *Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09-CV-

01575, 2010 WL 816344, at *7 (N.D. Ohio Mar. 4, 2010) (quoting *Dombroski*, 119 Ohio St. at 513, 164 N.E. 755); *see also Fortress Value Recovery Fund I, LLC v. Columbus Components Grp. LLC*, No. 1:11-CV-00200, 2011 WL 1130442, at *3–6 (N.D. Ohio Mar. 28, 2011) (citing *Hitachi*); *Clinical Components Inc. v. Leffler Indus., Inc.*, No. 95CA0085, 1997 WL 28246, *4–5 (6th Cir. Jan. 22, 1997) (plaintiff presented sufficient evidence to survive summary judgment on *Belvedere*'s second prong by showing that assets were systematically transferred to parent company to detriment of creditors.).

- **3. Injury or Loss to Firexo Inc.** The transfer of shares from FGL to Corp reduced the assets which directly injures Firexo Inc. in that FGL no longer has appreciable assets from which Firexo Inc. could satisfy the outstanding judgment.

45.     Firexo Inc. has satisfied all three *Belvedere* factors, which justifies disregard of the corporate form and holding Corp liable for the misdeeds of FGL. Indeed, this case is one of the extraordinary ones where the corporate form was being used for wrongful purposes, amply justifying and allowing this Court to pierce the corporate veil, by disregarding the corporate entity and treating Corp and FGL as a single entity. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *LeRoux's Billyle Supper Club v. Ma*, 602 N.E. 2d 685, 688 (Ohio Ct. App. 1991).

### B.     Substitution Is Necessary to Prevent Injustice

46.     Without substitution, Plaintiff will be unable to enforce its judgment despite Corp's orchestrated scheme to strip FGL of assets while maintaining the business operations and benefits of FGL's wrongful conduct.

47. Here, Corp has:

- acquired all FGL's interests in the subject matter of this litigation;

- continued the fire extinguishing products business;

- stripped FGL of assets to avoid this judgment; and,

- admitted FGL exists solely to defend litigation while Corp operates the business

48. These circumstances warrant substitution to prevent Corp from benefiting from FGL's fraud while avoiding liability through corporate manipulation.

**C.    Corp Is the Real Party in Interest**

49. As this Court previously recognized, an entity may be liable not only through "direct participation" but also "from the entity's legal relationship to the alleged wrongdoer." *Dottore v. National Staffing Services*, LLC, 2007 WL 2114668, at *5.

50. Corp is the real party in interest because it:

- Owns and controls FGL completely;

- Acquired all business operations and intellectual property;

- Made all decisions regarding FGL's assets and liabilities, including putting the company into voluntary administration under UK law; and,

- Continues to operate the business that was the subject of this litigation, including the solicitation of new investors and the continued sale of fire extinguishers in in the UK, Europe and the U.S, even while under suspension imposed by Delaware law.

**D.    Procedural Considerations and Fairness**

51. Corp has actual notice of this litigation, as evidenced by:

- Service on David Breith as CEO and director of both entities,

- Mr. Breith's emails to this Court acknowledging this litigation,

- The identical directors and officers of both entities.

52.    No prejudice will result from substitution as Corp has been aware of and effectively controlling this litigation since acquiring FGL's interests.

### E.    If Corp is Substituted for FGL, this Court Should Appoint a Receiver for Corp

#### 1.    Appointing a receiver under Rules 66, 69(a)(1) and this Court's inherent authority in equity.

53.    The normal flow of relief for Firexo, Inc. would be seeking to substitute Corp for FGL and then, if successful, proceeding to post-judgment enforcement via attachment, garnishment and similar methods. That breaks down here because Corp is void under Delaware law.

54.    If this Court grants Firexo Inc.'s request to substitute Corp, the normal process of enforcing this Court's judgment is derailed by virtue of Corp's Board and management failing to observe basic corporate governance and pay statutory taxes due Delaware. As noted above, Corp is not dead, but comatose. And, while in a coma, proceeding against it is inequitably complicated. especially since we believe it still has assets and, contrary to Delaware law, has been trading actively. Given the peculiar circumstances of this case, judicial efficiency, equity and fairness, and the need to effectuate this Court's judgment, proceeding directly to the equitable remedy of receivership is warranted. With that preface, one turns to the legal standard for appointing a receiver.

55.    Rule 66 allows for appointing receivers under traditional rules of equity. *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). This court enjoys broad

equitable powers to appoint a receiver over assets disputed in litigation before the court, with the receiver's role and the court's purpose being to safeguard disputed assets, administer the property suitably and achieve an equitable distribution. *Id.* Because Firexo, Inc. seeks to appoint a receiver post-judgment, Fed. R. Civ. P. 69 also applies: "The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution— must accord with the procedures of the state where the court is located…." Fed. R. Civ. P. 69(a)(1). In turn, then, the request to appoint a receiver also proceeds under Ohio Revised Code § 2735.01(A)(4) where a trial court may appoint a receiver "[a]fter judgment, to carry the judgment into effect[.]"

56.     "[T]he appointment of a receiver is a procedure that is the exercise of an extraordinary, drastic, and sometimes harsh power which equity possesses and is only to be exercised where the failure to do so would place the petitioning party in danger of suffering irreparable loss or injury." *Mehwald v. Atl. Tool & Die Co.*, 2023-Ohio-2778, ¶ 19, 223 N.E.3d 138, 148 (Ct. App.) (cleaned up).

57.     The decision to appoint a receiver lies within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *State ex rel. Celebrezze v. Gibbs*, 60 Ohio St.3d 69, 73, 573 N.E.2d 62 (1991). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 187 N.E.3d 463, ¶ 35 (2021). In other words, "[a] trial court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 172 N.E.3d 75, ¶ 19 (2020). The Ohio Supreme Court "has consistently stated that an abuse of discretion is more

than an error of law; it implies an unreasonable, arbitrary or unconscionable attitude on the part of a trial court." *Gibbs*, 60 Ohio St. at 74, 573 N.E.2d at 68.

58.     In considering whether to appoint a receiver, Ohio courts consider the factors the Ohio Supreme Court outlined in *Gibbs*, namely:

   a.     all the circumstances and facts of the case,

   b.     the presence of conditions and grounds justifying the relief,

   c.     the ends of justice,

   d.     the rights of all the parties interested in the controversy and subject matter, and

   e.     the adequacy and effectiveness of other remedies, and

   f.     set forth its rationale in making its decision.

*Gibbs*, 60 Ohio St. 3d at 73, 615 N.E.2d at 67.

59.     In addition, "receivership may be an appropriate remedy for a judgment creditor who seeks to set aside allegedly fraudulent conveyances by the judgment debtor, or who has had execution issued and returned unsatisfied, or who proceeds through supplementary proceedings pursuant to Rule 69, or who seeks to subject equitable assets to the payment of his judgment, or who otherwise is attempting to have the debtor's property preserved from dissipation until his claim can be satisfied." 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed.) (citing *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491 (1923)).

60.     "The form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997). "Factors that courts have considered as indicating the

need for a receivership include the following: 'a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm.'" *Santibanez,* 105 F.3d at 242, (*citing Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993); *see also Meyer Jewelry Co. v. Meyer Holdings, Inc.*, 906 F. Supp. 428, 432 (E.D. Mich. 1995) (holding same).

61.     Finally, "[i]t is well settled that proof of fraud is not required to support a district court's discretionary decision to appoint a receiver." *Aviation Supply Corp.*, 999 F.2d at 317. *See Citronelle–Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1184 (11th Cir.1991) (transfers to related entities and funneling money out of the country); *Chase Manhattan Bank v. Turabo Shopping Ctr., Inc.*, 683 F.2d 25, 26–27 (1st Cir.1982) ("evidence [of] unfair and arguably fraudulent dealing"); *New York Life Ins. Co. v. Watt West Inv. Corp.*, 755 F.Supp. 287, 292–93 (E.D. Cal. 1991) (diversion of assets to pay unrelated obligations).

## 2.     A Receiver Should Be Appointed

62.     The failure of its directors and officers to adhere to Delaware law and discharge its annual taxes rendered Corp's corporate status "void." Despite this, Corp's chief executive and director solicited additional investment, engaged a M&A firm to pursue a sale, and seemingly carried on as normal. All of which is evidenced in Mr. Breith's March 2025 email. Trading in conscious disregard of its statutory obligations and consequent effect on corporate status, longstanding misrepresentations of FGL's actual status as a shell to defend litigation, and more recent transfer of assets prior to entering liquidation leaves little, if any,

hope that Mr. Breith would accept or abide by this Court's judgment if Corp were substituted for FGL. In fact, all evidence supports this Court using its equity powers to appoint a receiver because "the failure to do so would place the petitioning party in danger of suffering irreparable loss or injury." *Mehwald v. Atl. Tool & Die Co.*, 2023-Ohio-2778, ¶ 19, 223 N.E.3d 138, 148 (Ct. App.) (cleaned up).

63.     Under Ohio's *Gibbs* factors and the Fifth Circuit's persuasive *Santibanez* factors, this Court can comfortably exercise its equitable discretion to appoint a receiver for Corp assets.

- **_Gibbs_ Factors**. Firexo Inc. has already outlined all the circumstances and facts of the case and the presence of conditions and grounds justifying the relief. Here, it would note that adequacy and effectiveness of other remedies is wanting. Given its status and the prior acts of its directors and officers, Corp is likely to resist by untoward means Firexo Inc's attempts to enforcement this Court's judgment. Those means could include moving assets between the United States (its place of incorporation) and the United Kingdom (its principal place of business), making Firexo Inc. conduct a coordinated, global campaign to enforce the judgment. Corp and its directors and officers have already demonstrated a willingness to flout statutory obligations. The normal remedies and procedures at law would not suffice in satisfying the ends of justice or this Court's judgment.

- **_Santibanez_ Factors.** Firexo Inc. also satisfies all the persuasive *Santibanez* factors:

(1) **a valid claim by the party seeking the appointment** — Firexo Inc. has a valid judgment against Corp if this Court permits substitution under Rule 25(c);

(2) **the probability that fraudulent conduct has occurred or will occur to frustrate that claim** — the October 10, 2024 share transfers are fraudulent under Rev. Code § 1336.04.  Likewise, Corps' disregard of Delaware law by continuing to trading and solicitation of investors for a void corporation demonstrate that the balance of probability, calculated from the actions of Corp's two remaining directors and officers, suggests a strong probability that fraudulent conduct could occur to frustrate enforcement proceedings; In addition, this Court has already found that FGL engaged in fraudulent conduct through the same officers and directors controlling Corp.

(3) **imminent danger that property will be concealed, lost, or diminished in value** — the disregard of statutory tax obligations and the conduct thus far (like the October 10, 2024 transfer) strongly suggest that Corp's assets could be, at least, diminished in value if not concealed;

(4) **inadequacy of legal remedies** — ordinary enforcement proceedings at law will neither efficiently nor justly provide a mechanism through which Firexo Inc could meet the ends of justice;

(5) **lack of a less drastic equitable remedy** — given the conduct thus far, it is likely that any less drastic remedy (one where the current directors and officers retain control over Corp's assets) would present a stage for a war of attrition where Firexo Inc's efforts would be met with delay, obfuscation and

possible concealment. Only a receiver, with his or her independent obligations to effect this Court's judgment, could preserve Corp's assets until Firexo Inc could satisfy the judgment; and

(6) **likelihood that appointing the receiver will do more good than harm** — allowing Corp to become void sets a low bar for a receiver to hurdle. Given the apparent disarray in Corp's internal governance and the actions of its two-person Board and its chief executive / director, a receiver would bring the necessary disinfectant: transparency. Corp needs cleansing, for which a receiver, in lieu of its current board and officer, would do more good than harm.

64.     If this Court allows substituting Corp for FGL and decides to exercise its discretion and appoint a receiver, Firexo Inc. can quickly present suitable receiver candidates for this Court's consideration so that it can craft an order appointing the receiver.

## IV.        CONCLUSION

65.     **WHEREFORE**, Plaintiff respectfully requests that this Court enter an order:

A.      Substituting Firexo Corporation as defendant in place of Firexo Group Limited pursuant to Fed. R. Civ. P. 25(c);

B.      Declaring that the May 14, 2025 judgment entered against Firexo Group Limited is enforceable against Firexo Corporation as successor-in-interest;

C.      Authorizing Plaintiff to execute on the judgment against Firexo Corporation;

*Firexo, Inc. v. Firexo Group Limited*                                № 3:22-CV-2336

D.     Authorizing the appointment of a receiver over the property and interests of Firexo Corporation subject to a subsequent order of appointment; and

E.     Granting such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ Paul T. Belazis

Paul T. Belazis (0030356)
Malone, Ault & Farrell
7654 W. Bancroft Street
Toledo, Ohio 43617
(419) 843–1333 tel
(419) 843–3888 fax
belazis@maf-law.com

Joseph P. Dawson (0003354)
7779 South Branch
Monclova, Ohio 43542
(419) 266–1808 tel
jpwdawson655@gmail.com

*Counsel for Firexo, Inc.*

*Firexo, Inc. v. Firexo Group Limited*                                              № 3:22-CV-2336

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2025 a copy of this motion was served on counsel of record for all parties through the Court's CM/ECF system; on unrepresented defendant Firexo Group Limited via email to its Liquidator, Harry Sanders, at harry.sanders@mha.co.uk; and on Firexo Corporation as provided under Fed. R. Civ. P. 4.

/s/ Paul T. Belazis

Paul T. Belazis (0030356)
Malone, Ault & Farrell
7654 W. Bancroft Street
Toledo, Ohio 43617
(419) 843–1333 tel
(419) 843–3888 fax
belazis@maf-law.com
*Counsel for Firexo, Inc.*