## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| FIREXO INC., | Case No. 3:21-cv-02336 |
| Plaintiff, | Hon. Jack Zouhary |
| v. | |
| FIREXO GROUP LIMITED, | |
| Defendant. | |

## DECLARATION OF DAVID BRIETH

I, David Brieth,  swear and attest that I have personal knowledge of the matters contained in this Declaration and am competent to testify to the matters stated herein.

1.      I am CEO of Firexo Corp. ("Corp."). Corp. is a holding company that has never traded or carried out business operation. Until it was placed into creditors voluntary liquidation on 7 November 2024, I was  a director of Firexo Group Limited ("FGL"). As prescribed by United Kingdom insolvency law, I ceased to be a director of  FGL on 7 November 2024, with all management functions being taken over by the joint liquidators appointed by FGL's creditors; namely Michael Sanders and David Hudson. I am also a director of Plaintiff. FGL has a 30% interest in Plaintiff although that interest has been treated by the joint liquidators as having no value.

2.      FGL is a United Kingdom company and was incorporated on 28 November 2017.

EXHIBIT 1

3.      In large part due to the cost of litigation brought by Plaintiff (and by Plaintiff's majority shareholder, Mr. Scot Smith) in this Court and in England, FGL was forced to file for Creditors Voluntary Liquidation. Company directors in the UK are duty bound to place companies into liquidation when such companies *"cannot pay its debts as they fall due." This became the case in the summer/fall of 2024 when very significant legal bills from FGL's lawyers in Ohio and in London could not be met.* Failing to file for liquidation would have been a violation of United Kingdom law.

4.      Plaintiff has asserted its claims as a creditor in FGL's Voluntary Liquidation in the United Kingdom. Plaintiff has not opposed the Voluntary Liquidation in the United Kingdom. The Voluntary Liquidation is ongoing. The rights of all creditors, including Plaintiff, are protected and regimented under the Voluntary Liquidation process of FGL.

5.      Plaintiff is seeking to circumvent the Voluntary Liquidation process in the United Kingdom. Although Plaintiff claims that FGL assets were transferred without any (or any proper) consideration for the true value of the assets, that issue is already being reviewed by the joint liquidators in the United Kingdom as part of their statutory duties. The market value of these assets realized by the joint liquidators will in due course be distributed to all creditors, including Plaintiff.

6.      It is anticipated that the UK liquidators may re-evaluate whether Plaintiff has any assets that should be realized for the benefit of FGL's creditors but, as I have said in paragraph 1, the current assessment by the joint liquidators is that FGL's 30% stake in Plaintiff has zero value.

7.      Corp. has no assets that were transferred fraudulently or without value from FGL. In fact, Corp. has no assets that were transferred from FGL.

8.      As this Court is aware, I sent an email objecting to Corp. being added as defendant on November 18, 2024.  This Court subsequently issued an Order on December 3, 2024, allowing Plaintiff to amend its Complaint to add Corp. as a defendant. The Court noted that at that time counsel for Corp. could argue whether it was a proper defendant. Plaintiff did not amend its complaint, instead it filed a motion for default judgment.

9.      As such, Corp. did not have the opportunity during the litigation to object to it being named as a defendant or defend the merits of the claim. Instead, Plaintiff was able to obtain an unopposed judgment against a company in liquidation and now seeks to have the judgment apply to Corp. which has not had the opportunity to defend itself.

10.      FGL is under the control of joint liquidators, not under the control of Corp. Although there has been no wrongful transfer of assets from FGL to any entity, the liquidators will evaluate the truth of that claim.

11.      I have attached the corporate minutes of Corp. as **Exhibit A**. These minutes show the considerations taken by Corp. regarding FGL. Attached as **Exhibit B** is the independent asset valuation of FGL.

12.      At the October 10, 2024 meeting, it was stated that a solvency review was conducted for the whole Firexo group of companies. Two licensed insolvency practitioners assisted the Board in its decision-making process. It was determined that the best interests of creditors of any insolvent subsidiaries should be the priority of the Board. The Board commissioned an independent valuation of key group assets. It was determined that FGL could not meet the legal costs of defending litigation going forward which would harm FGL creditors. The Board considered the best interests of FGL creditors.

13.     Also at the meeting, the Board evaluated the assets of FGL based upon the independent valuation. The Board determined that an Intellectual Property Deed of Assignment dated 8 September 2021 had not yet generated consideration for FGL. Based upon an independent valuation Firexo Holdings Limited agreed to pay £225,000 to the joint liquidators of FGL in consideration for the IP. Further Firexo Holdings Limited agreed to pay €3,000 to the joint liquidators of FGL for the share in Firexo S.R.L. Again, this was based on an independent valuation of the shares. It was also determined by the independent valuer that shares owned by FGL in Firexo Limited and Firexo Motorsports Limited could be transferred for no consideration. These share transfers were then duly executed in favor of Firexo Holdings Limited. All of these transfers were run by the proposed liquidators (Messrs. Sanders and Hudson) prior to their formal appointment on 7 November 2024.

14.     Lastly, at the October 10, 2024 meeting, it was determined that the board of FGL should pass the necessary resolutions to place FGL into Creditors Voluntary Liquidation under the Insolvency Act of 1986.

15.     As I have said above, prior to the October 2024 Board meeting, Corp. engaged licensed insolvency practitioners to ensure that proposed liquidation of FGL would properly protect the lawful interests of FGL's creditors to the full extent prescribed by UK insolvency law. Corp. also engaged a firm to conduct an independent valuation of FGL assets to ensure that FGL received fair value for any assets prior to it being placed in Voluntary Liquidation. All steps were taken to preserve the rights of creditors of FGL. Those rights have been protected. If the liquidators of FGL believe that fair value was not provided to FGL, they will investigate those values and, if necessary, take steps to remedy any perceived under-value through legal action against the directors personally.

16.    The corporate identities of Corp. and FGL are distinct. Corp. has raised investment from a significant new stakeholder pursuant to a subscription agreement attached as **Exhibit C**. Plaintiff is fully aware of Sir Clive Cowdery's investment into Corp. as its solicitors in London have made repeated approaches to interview Sir Clive for the purpose of adducing evidence to the High Court in London. Those proceedings are ongoing in London, but now only against me, personally, as the claim against FGL has been stayed by agreement between Scot Smith, Mr. Smith's co-claimants and FGL's joint liquidators.

17.    In paragraph 8 of Plaintiff's motion to join Corp., it is alleged that Corp. took over Plaintiff's exclusive distribution agreement. This is not true. The contract remained in the names of Plaintiff and FGL until it was terminated by FGL in December 2021.

18.    In paragraphs 10-12 of Plaintiff's motion to join Corp., it is alleged that FGL assets were transferred without value. This is false. As shown in the board minutes and the valuation report, the assets were transferred for fair value. The consideration due to FGL (now managed by the joint liquidators) under the valuation has been paid for the benefit of FGL creditors, including Plaintiff. Significantly, Plaintiff has not filed the proof of the judgment in this case. Instead, Plaintiff appears by this motion to be seeking to bypass and take priority over all other FGL creditors.

19.    In paragraph 13 of Plaintiff's motion to join Corp., it is alleged that FGL and Corp. had the same officers. This is not true. Paula Ward (a nominee for the said Sir Clive Cowdery) was a director of Corp. but not FGL.

20.    Since 7 November, 2024, FGL has not been operated by the board of directors as it is being wound down completely by independent insolvency practitioners;

Mark Hudson and Steven Illes (who replaced Michael Sanders when he retired in March 2025).

21.     In paragraph 16 of Plaintiff's motion to join Corp., it is alleged that Corp. was a mere continuation of FGL. This is not true. Corp. was directed in large part by a new investor whose representative is Paula Ward.

22.     In paragraph 17 of Plaintiff's motion to join Corp., it is alleged that Corp. assumed FGL's manufacturing role. This is not true. FGL was the group company that originally raised purchase orders for Firexo extinguishers manufactured in China. That relationship with the independent manufacturer moved to Firexo Limited and Firexo Sp. Zoo approximately three years ago.

23.     Neither I nor other directors of Corp. were aware that Corp. became a void corporation under Delaware law in March of 2025. Corp. did not receive notice that it was delinquent in franchise taxes and that as a result its status was that of a void corporation. The first I knew of this development was when I received Plaintiff's motion.

24.     Corp. is formed under the laws of Delaware. It conducts no business in the United States, much less Ohio. It has not entered any contractual relationship with any Ohio company, entity, partnership, or corporation.

25.     Corp. has no offices in Ohio. Corp. owns no property in Ohio. Corp. does not have any employees or maintain any bank accounts in Ohio.

26.     Corp. had no business relationship with Plaintiff.

27.     As noted above, Corp. denies that it resulted from a de facto merger with FGL, that Corp. is a mere continuation of FGL, or that there were any fraudulent transactions between FGL and Corp. Even if those allegations were true, which they are

not, none of those actions would have occurred in Ohio. Corp. is a void Delaware corporation and FGL is a United Kingdom company that is in liquidation.

David Breith

779014

| No. | Description | Date |
|-----|-------------|------|
| 1. | Action by unanimous written consent of the board of directors of Firexo Corporation | 10.10.24 |
| 2. | Minutes of Board meeting – Firexo Holdings Limited | 10.10.24 |
| 3. | Minutes of Board meeting – Firexo Group Limited | 10.10.24 |
| 4. | Minutes of Board meeting  Firexo COTM | 10.10.24 |
| 5. | Board minutes Firexo Limited – Approving share transfer FGL to FHL | 10.10.24 |
| 6. | Board minutes Firexo Motorsport – approving share transfer FGL to FHL | 10.10.24 |
| 7. | Board Minutes SRL | 10.10.24 |
| 8. | Stock Transfer Form – Firexo Limited (Firexo Group Limited to Firexo Holdings Limited) | undated |
| 9. | Stock Transfer Form – Firexo Motorsport Limited (Firexo Group Limited to Firexo Holdings Limited) | undated |
| 10. | Liquidation resolution FGL | 10.10.24 |



EXHIBIT

A

**ACTION BY UNANIMOUS WRITTEN CONSENT**
**OF THE**
**BOARD OF DIRECTORS**
**OF**
**FIREXO CORPORATION**
a Delaware corporation

October 10, 2024 at a meeting commencing at 11am

The undersigned, being the directors of Firexo Corporation, a Delaware corporation (the **"Corporation"**), acting pursuant to the authority vested in the undersigned by Section 141(f) of the Delaware General Corporation Law and the Bylaws of the Corporation, hereby consent to and adopt the following recitals and resolutions by written consent in lieu of a special meeting of the Board of Directors of the Corporation (the **"Board"**), which recitals and resolutions shall be valid and effective as if adopted at a duly called, noticed and held special meeting:

**WHEREAS:**

A. The Board has conducted a solvency review across the whole Firexo group of companies;

B. The review has been necessitated by some specific cashflow issues; namely, meeting the legal costs being incurred on litigation in the UK and the USA being defended by Firexo Group Limited (**"FGL"**); plus some general cashflow issues arising in the UK for Firexo Limited;

C. The Board has been assisted in its decision making by taking advice from two licensed insolvency practitioners;

D. Central to the external advice received by the Board is that the best interests of creditors should be the Board's priority for any insolvent subsidiaries, but otherwise the Board should always act in the best interest of its shareholders;

E. The Board has commissioned an independent valuation of key group assets (a copy of which is appended hereto) to inform its decision making, in line with the external professional advice recited at C above;

F. The Board considers (notwithstanding very positive advice from its legal advisors on the merits of FGL's litigation defences) that (a) FGL cannot meet the legal costs of defending the litigation going forward, as those costs fall due, so (b) the position of FGL's creditors is therefore likely to deteriorate rather than improve if FGL continues to operate;

1

G.  The Board considers that the current cashflow difficulties facing Firexo Limited can be managed with reasonable (and realistic) financial support either from within the Firexo group of through some modest third party borrowing;

G.  In considering the best interests of FGL's creditors, the Board also reviewed the terms of the Intellectual Property Deed of Assignment dated 8 September 2021 which, to date, has generated no consideration for FGL under the terms of deferred consideration agreed between the parties under that Deed;

H. The Board has considered and accepted the valuations identified in the attached valuation report - being £225,000 for the Intellectual Property assigned to Firexo COTM Limited under the Deed recited at G above, £0 for the shares in Firexo Limited and £0 for the shares in Firexo Motorsport Limited and €3,000 for the shares of Firexo S.R.L.

**NOW, THEREFORE, BE IT RESOLVED,** that the Board finds that it is in the best interests of the Corporation and its shareholders to facilitate and implement the following inter-company transactions with immediate effect:

1.  Firexo Holdings Limited shall pay (or cause to be paid) £225,000 to Firexo Group Limited in consideration for the Intellectual Property assigned by Deed on 1 September 2021, with such consideration to be paid over a maximum of 24 months;

2.  Firexo Holdings Limited shall pay (or cause to be paid) €3,000 to Firexo Group Limited for the shares in Firexo S.R.L.

3.  The shares owned by FGL in Firexo Limited and Firexo Motorsport Limited shall be transferred (for nil consideration) to Firexo Holdings Limited;

4.  The board of FGL should then pass the necessary resolutions to place FGL into Creditors Voluntary Liquidation under the Insolvency Act 1986.


## GENERAL AUTHORITY

**RESOLVED FURTHER,** that the officers of the Corporation are, and each of them hereby is, authorized, directed and empowered in the name and on behalf of the Corporation to execute all certificates, agreements or any other instrument or document or amendment or supplement thereto, and to do and to cause to be done all other acts and things as such officers in their discretion may deem necessary or appropriate, in order to carry out the purposes and intentions of all of the foregoing resolutions;

**RESOLVED FURTHER,** that every act, action, agreement, document or instrument done, performed, made, executed or delivered by, on behalf of or in the name of the

2

Corporation in order to carry out the purposes and intentions of the foregoing resolutions is hereby authorized, approved and ratified in all respects;

**RESOLVED FURTHER,** that the Secretary of the Corporation is authorized to certify and deliver a copy of these resolutions, or any one or more of them, to such persons, corporations, entities or firms as the Secretary may deem necessary or advisable; and

**RESOLVED FURTHER,** that the Secretary of the Corporation hereby is authorized and directed to file this Action by Unanimous Written Consent with the minutes of the proceedings of the Board.

## COUNTERPART EXECUTION, FACSIMILE TRANSMISSION

**RESOLVED,** that this Action by Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same original.

**RESOLVED FURTHER,** that the director of the Corporation may deliver his executed counterpart of this Action by Unanimous Written Consent to the Secretary of the Corporation by facsimile transmission, and no confirmation of such delivery by the mailing or personal delivery of an executed original of this Action by Unanimous Written Consent to the Secretary of the Corporation shall be required in order for this Action by Unanimous Written Consent to be effective.

*[Signature Page Follows]*

3

**IN WITNESS WHEREOF**, the undersigned, being the sole director of the Corporation, has executed this Action by Unanimous Written Consent of the Board of Directors of Firexo Corporation, to be effective as of the date first set forth above.


_____
David Breith, Director


_____
Winand Staring, Director

4

## EXHIBIT

## FRP VALUATION

**FIREXO HOLDINGS LIMITED**

**Company registration number 13592954**

**Minutes of Board meeting**

**Date:**       10 October 2024
**Time:**       11.30am
**At:**         By Zoom

**Present:**    Dave Breith (CEO
               Winand Staring (Director)

1. **Opening and Chairman**

    (a) Dave Breith was appointed as Chairman of the meeting and acknowledged the persons on the call.

    (b) Dave reported that due notice has been given and that a quorum was present and declared the meeting open.

2. **Declaration of interests**

    (a) Dave noted that directors are required to disclose any conflict of interest in any proposed transactions under consideration.

    (b) The Board members all confirmed that they had an interest in the proposed arrangements to be considered at the meeting as directors and shareholders of Firexo Corporation (the Parent Company of the Company) and Firexo Group Limited which they were required by section 177 of the Companies Act 2006 and the Company's articles of association to disclose. Dave Breith also disclosed that he is a director of Firexo Limited and a director and minority shareholder in Firexo Motorsport Limited.

    (c) It was noted that pursuant to article 14 of the Company's articles of association, a director may vote and form part of the quorum in relation to any proposed transaction or arrangement in which they are interested if the director's interest cannot reasonably be regarded as likely to give rise to a conflict of interest. It was agreed that no conflicts of interest arose.

3. **Business of the Meeting:**

    (a) Dave reported that the business of the meeting was to consider the valuation prepared by FRP Advisory, annexed to these minutes, (the"Valuation") and in particular (i) the value of the intellectual property transferred by Firexo Group Limited to Firexo COTM Limited by deed dated 8 September 2021 ("the Deed of Assignment") (ii) the value of the shares held by Firexo Group Limited in its Italian subsidiary, Firexo S.R.L., in Firexo Limited (company no. 11984806) and in Firexo Motorsport Limited (company no. 12841902) (the "Shares").   The minutes of the earlier meeting of the board of Firexo Corporation (being the sole shareholder of the Company) was also tabled.

    (b) Having considered the documentation identified in paragraph 3 (a) the Board discussed the implementation of the resolutions already passed by the Company's parent company, Firexo Corporation.

(c) Given the contents of the Valuation, the Board agreed to accept and adopt the £225,000 valuation of intellectual property within the Valuation and determined that the Shares should be received from Firexo Group Limited for the total consideration of €3,000, again in line with the Valuation.

**4.  Board Resolutions:**

Having carefully considered his obligations pursuant to section 172 of the CA 2006, it was resolved that:

(a) The shares held by the Company in Firexo Limited (company no. 11984806) and Firexo Motorsport Limited (company no. 12841902) should be acquired and held by the Company for NIL consideration.

(b) The shares held by the Company in Firexo S.R.L. should be acquired and held by the Company upon payment of consideration totalling €3,000.

(c) The Company should accept and adopt the sum of £225,000 as fair consideration payable for the acquisition of intellectual property (as identified within the Deed of Assignment) by Firexo COTM Limited from Firexo Group Limited and to make arrangements for the payment of that sum to Firexo Group Limited over the next 24 months, in full and final satisfaction of the payment obligations set out within the Deed of Assignment.

**5.  Filing:**

**IT WAS RESOLVED TO:**

a) Type up and circulate these board minutes.
b) Prepare and sign the necessary stock transfer forms to effect the share transfers.
c) Arrange for the immediate payment of €3,000 to Firexo Group Limited
d) Instruct the Company's accountants to record the £225,000 intellectual property transaction referenced in paragraph 4 (b) within the Company's book-keeping records.

**7.   Close:**

There being no other business, Dave Breith declared the meeting closed.

.......................................
**David Breith (CEO)**

Date:

**FIREXO GROUP LIMITED**

**Company registration number 11085973**

**Minutes of Board meeting**

| | |
|---|---|
| **Date:** | 10 October 2024 |
| **Time:** | 11.45am |
| **At:** | By Zoom |

**Present:**    Dave Breith (CEO
                     Winand Staring (Director)

1.  **Opening and Chairman**

    (a) Dave Breith was appointed as Chairman of the meeting and acknowledged the persons on the call.

    (b) Dave reported that due notice has been given and that a quorum was present and declared the meeting open.

2.  **Declaration of interests**

    (a) Dave noted that directors are required to disclose any conflict of interest in any proposed transactions under consideration.

    (b) The Board members all confirmed that they had an interest in the proposed arrangements to be considered at the meeting as directors and shareholders of Firexo Corporation (the parent company of the Company and Firexo Holdings Limited) which they were required by section 177 of the Companies Act 2006 and the Company's articles of association to disclose. Dave Breith also disclosed that he is a director of Firexo Limited, a director of Firexo Holdings Limited, a director of Firexo S.R.L and a director and minority shareholder in Firexo Motorsport Limited.

    (c) It was noted that pursuant to article 14 of the Company's articles of association, a director may vote and form part of the quorum in relation to any proposed transaction or arrangement in which they are interested if the director's interest cannot reasonably be regarded as likely to give rise to a conflict of interest.  It was agreed that no conflict of interest arose.

3.  **Business of the Meeting:**

    (a) Dave reported that the business of the meeting was to consider the valuation of the Company's assets prepared by FRP Advisory, annexed to these minutes, (the"Valuation") and in particular (i) the value of the intellectual property transferred to Firexo COTM Limited by deed dated 8 September 2021 ("the Deed of Assignment") (ii) the value of the shares the Company holds in Firexo Limited (company no. 11984806) (iii) the value of the shares the Company holds in its Italian subsidiary, Firexo S.R.L. and (iv) the value of the shares the Company holds in Firexo Motorsport Limited (company no. 12841902) (the "Shares").   The minutes of the earlier meeting of the board of Firexo Corporation (being the sole shareholder of the Company) was also tabled.

(b) Having considered the documentation identified in paragraph 3 (a) the Board discussed the implementation of the resolutions already passed by the Company's parent company, Firexo Corporation.

(c) Given the contents of the Valuation, the Board agreed to accept and adopt the £225,000 valuation of intellectual property within the Valuation and determined that the Shares should be transferred for total consideration of €3,000 (relating to Firexo S.R.L only), again in line with the Valuation.

## 4.  **Board Resolutions:**

Having carefully considered his obligations pursuant to section 172 of the CA 2006, it was resolved that:

(a) The shares held by the Company in Firexo Limited (company no. 11984806) and Firexo Motorsport Limited (company no. 12841902) shall be transferred to Firexo Holdings Limited (company no. 13592954).

(b) In consideration for a payment of €3,000 the shares held by the Company in Firexo S.R.L. shall be transferred to Firex Holdings Limited (company no. 13592954)

(c) The Company should accept and adopt the sum of £225,000 as consideration for the intellectual property transferred to Firexo COTM Limited, as an amendment to (or in substitution for) the payment terms of the Deed of Assignment, which shall be paid (or shall be caused to be paid) by Firexo Holdings Limited over the next 24 months, in full and final satisfaction of the payment obligations set out in the Deed of Assignment.

## 5.  **Filing:**

**IT WAS RESOLVED TO:**

a) Type up and circulate these board minutes.
b) Prepare and sign the necessary stock transfer forms to effect the share transfers.
c) Instruct the Company's accountants to record the £225,000 intellectual property transaction referenced in paragraph 4 (b) within the Company's book-keeping records.

## 7.  **Close:**

There being no other business, Dave Breith declared the meeting closed.


......................................
**David Breith (CEO)**

Date:

**FIREXO COTM LIMITED**

**Company registration number 13603649**

**Minutes of Board meeting**

**Date:**        10 October 2024
**Time:**        Midday
**At:**          By Zoom

**Present:**     Dave Breith (CEO)
                 Winand Staring – by invitation as director of associated Firexo companies

1. **Opening and Chairman**

   (a) Dave Breith was appointed as Chairman of the meeting and acknowledged the persons on the call.

   (b) Dave reported that due notice has been given and that a quorum was present and declared the meeting open.

2. **Declaration of interests**

   (a) Dave noted that directors are required to disclose any conflict of interest in any proposed transactions being considered at a board meeting.

   (b) Dave declared an interest in the proposed arrangements to be considered at the meeting as a director and shareholder of Firexo Corporation (the Company's ultimate parent company) as a director of Firexo Holdings Limited (the Company's immediate parent company) and as a director Firexo Group Limited.  Dave noted his obligation to make such disclosure under section 177 of the Companies Act 2006 and the Company's articles of association.

   (c) It was noted that pursuant to article 14 of the Company's articles of association, a director may vote and form part of the quorum in relation to any proposed transaction or arrangement in which they are interested if the director's interest cannot reasonably be regarded as likely to give rise to a conflict of interest.  It was declared that no conflict of interest arose.

3. **Business of the Meeting:**

   (a) Dave reported that the business of the meeting was to consider the valuation prepared by FRP Advisory, annexed to these minutes, (the "Valuation") and in particular the value of the intellectual property transferred by Firexo Group Limited to the Company  by deed dated 8 September 2021 ("the Deed of Assignment").  The minutes of the earlier meetings of the boards of Firexo Corporation, Firexo Holdings Limited and Firexo Group Limited were also tabled.

   (b) Having considered the documentation identified in paragraph 3 (a) the Board agreed to record its agreement to the implementation of the resolutions already passed by Firexo Corporation, Firexo Holdings Limited and Firexo Group Limited.

(c) Specifically, given the detailed analysis given within the Valuation, the Board agreed to reciprocate the board resolution of Firexo Group Limited by adopting the £225,000 value of intellectual property within the Valuation as the price to pay Firexo Group Limited (over the next 24 months) in full and final satisfaction of the payment obligations within the Deed of Assignment.

## 4. **Board Resolutions:**

Having carefully considered his obligations pursuant to section 172 of the CA 2006, it was resolved that:

(a) The Company should accept and adopt the sum of £225,000 as the consideration payable (or facilitated) by its parent company, Firexo Holdings Limited, for the intellectual property identified within the Deed of Assignment and in full and final satisfaction of the payment obligations set out within the Deed of Assignment.

## 5. **Filing:**

**IT WAS RESOLVED TO:**

a) Type up and circulate these board minutes.

b) Instruct the Company's accountants to record the £225,000 intellectual property transaction referenced in paragraph 4 (a) within the Company's book-keeping records.

## 7. **Close:**

There being no other business, Dave Breith declared the meeting closed.

.......................................
**David Breith (CEO)**

Date:

**FIREXO LIMITED**

**Company registration number 11984806**

**Minutes of Board meeting**

| | |
|---|---|
| **Date:** | 10 October 2024 |
| **Time:** | 12.15 pm |
| **At:** | By Zoom |

**Present:** Dave Breith
Winand Staring – by invitation as director of associated Firexo companies

1. **Opening and Chairman**

    (a) Dave Breith was appointed as Chairman of the meeting.

    (b) Dave reported that due notice has been given and that a quorum was present and declared the meeting open.

2. **Declaration of interests**

    (a) Dave noted that directors are required to disclose any conflict of interest in any of the proposed transactions under consideration.

    (b) Dave declared in accordance with the requirements of section 177 of the Companies Act 2006,that he had a personal interest in the proposed transactions to be considered at the meeting; namely (a) as director and shareholder of Firexo Corporation (the parent company of Firexo Holdings Limited) and (b) as director of Firexo Limited, and (c) as director of Firexo Group Limited.

    (c) Dave noted that pursuant to article 14 of the Company's articles of association, a director may vote and form part of the quorum in relation to any proposed transaction or arrangement in which they are interested as the director's interest cannot reasonably be regarded to give rise to a conflict of interest.

    (d) As sole shareholder and director of the Company Dave acknowledged that there was no conflict of interest.

3. **Business of the Meeting:**

    3.1. Share Transfers

    **(a)** Dave reported that the business of the meeting was to consider whether the board should approve the transfer as follows:

    - 9,500 shares from Firexo Group Limited. (11085973) to Firexo Holdings Limited (13592954)

    **(b)** Dave noted that the transfer would be for nil consideration (in line with the share valuation carried out by FRP Advisory) and so no stamp duty was required to be paid to HMRC.

4. **Passing of the Resolutions:**

    Having carefully considered his obligations pursuant to section 172 of the CA 2006, it was resolved that:

4.1. The transfer to Firexo Holdings Limited be approved.

**5.** **<u>Company Filing:</u>**

Dave Breith resolved to update the company records and registers and make the following required updates at Companies House:

1.  Type up the board minutes.

In relation to the Share Transfer:

2.  Update the register of Members of the Company.
3.  Update the persons of significant control register of the Company.
4.  Issue share certificates to the new member.
5.  File confirmation Statement at Companies House.
6.  Notify the Registrar of Companies that Firexo Holdings Limited is a company with significant control.

**<u>Close:</u>**

There being no other business, Dave Breith declared the meeting closed.


.................................................
**David Breith**

**FIREXO MOTORSPORT LIMITED**

**Company registration number 12841902**

**Minutes of Board meeting**

**Date:**       10 October 2024
**Time:**       12.20 pm
**At:**         By Zoom

**Present:**    Dave Breith
               Winand Staring – by invitation as director of associated Firexo companies

1. **Opening and Chairman**

   (a) Dave Breith was appointed as Chairman of the meeting.

   (b) Dave reported that due notice has been given and that a quorum was present and declared the meeting open.

2. **Declaration of interests**

   (a) Dave noted that directors are required to disclose any conflict of interest in any of the proposed transactions under consideration.

   (b) Dave declared in accordance with the requirements of section 177 of the Companies Act 2006,that he had a personal interest in the proposed transactions to be considered at the meeting; namely (a) as director and shareholder of Firexo Corporation (the parent company of Firexo Holdings Limited) (b) as a director of Firexo Holdings Limited and (c) as a minority shareholder in Firexo Motorsport Limited.

   (c) Dave noted that pursuant to article 14 of the Company's articles of association, a director may vote and form part of the quorum in relation to any proposed transaction or arrangement in which they are interested as the director's interest cannot reasonably be regarded to give rise to a conflict of interest.  It was declared that no conflict of interests arose.

3. **Business of the Meeting:**

   3.1. Share Transfers

   **(a)** Dave reported that the business of the meeting was to consider whether the board should approve the transfer as follows:

   - 8,600 shares from Firexo Group Limited. (11085973) to Firexo Holdings Limited (13592954)

   **(b)** Dave further noted that the transfer would be for nil consideration (in line with the share valuation carried out by FRP Advisory) and so no stamp duty was required to be paid to HMRC.

**4.** **Passing of the Resolutions:**

Having carefully considered his obligations pursuant to section 172 of the CA 2006, it was resolved that:

4.1. The transfer to Firexo Holdings Limited be approved.

**5.** **Company Filing:**

Dave Breith resolved to update the company records and registers and make the following required updates at Companies House:

1.   Type up the board minutes.

In relation to the Share Transfer:

2.   Update the register of Members of the Company.
3.   Update the persons of significant control register of the Company.
4.   Issue share certificates to the new member.
5.   File confirmation Statement at Companies House.
6.   Notify the Registrar of Companies that Firexo Holdings Limited is a company with significant control.

**Close:**

There being no other business, Dave Breith declared the meeting closed.

..................................................
**David Breith**

**FIREXO S.R.L.**

**(THE COMPANY)**

**Minutes of Board meeting**

**Date:**    10 October 2024
**Time:**    12.25 pm
**At:**    By Zoom

**Present:**    Dave Breith - director
    Winand Staring – by invitation as director of associated Firexo companies

1. **Opening and Chairman**

   (a) Dave Breith was appointed as Chairman of the meeting.

   (b) Dave reported that due notice has been given and that a quorum was present and declared the meeting open.

2. **Declaration of interests**

   (a) Dave noted that directors are required to disclose any conflict of interest in any of the proposed transactions.

   (b) Dave declared that he had a personal interest in the proposed transaction to be considered at the meeting; namely (a) as director and shareholder of Firexo Corporation (the parent company of Firexo Holdings Limited) (b) as a director of Firexo Holdings Limited and (c) as a director of Firexo Group Limited

   (c) Dave noted and adopted the English law position under the Model Articles of Association that a director may vote and form part of the quorum in relation to any proposed transaction or arrangement in which they are interested as the director's interest cannot reasonably be regarded to give rise to a conflict of interest.

   (d) As director of the Company and majority shareholder in the Firexo group of companies, Dave confirmed that there was no conflict of interest which prevented him from voting on the business of the meeting.

3. **Business of the Meeting:**

   3.1. Share Transfers

   **(a)** Dave reported that the business of the meeting was to consider whether the board should approve the transfer of its shares from Firexo Group Limited (11085973) to Firexo Holdings Limited (13592954)

   **(b)** Dave further noted that the transfer would be for consideration of three thousand Euros (€3,000) in line with the share valuation carried out by FRP Advisory and appended hereto.

4.  **Passing of the Resolutions:**

   After careful consideration, it was duly resolved that:

   4.1. The transfer to Firexo Holdings Limited be approved.

5.  **Company Filing:**

Dave Breith resolved to have board minutes typed up and recorded within the Company's records and to instruct the Company's accountant in Italy to give effect to the resolution at 4.1 by making immediate arrangements for the share transfer to be effected and for all appropriate corporate filings in Italy to be made to reflect the transfer.

**Close:**

There being no other business, Dave Breith declared the meeting closed.

...................................................
**David Breith**

| STOCK TRANSFER FORM | | | |
|---|---|---|---|
| | **Consideration Money: £**<br>NIL | | **Certificate lodged with the Registrar**<br>**(For completion by the Registrar/Stock Exchange)** |
| | Full name of Undertaking | FIREXO LIMITED  (11984806) | |
| | Description of Security | Ordinary Shares with a nominal value of £0.01 each | |

| | Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | Words<br><br>Nine Thousand, Five hundred | Figures<br><br>9,500 |
|---|---|---|---|

| | Name(s) of registered holder(s) should be given in full: the address should be given where there is only one holder.<br><br>If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g., Executor(s)) of the person(s) making the transfer. | In the name(s) of<br><br>FIREXO GROUP LIMITED<br>Coyle White Devine Boughton<br>Business Park<br>Bell Lane<br>Amersham<br>Buckinghamshire<br>England<br>HP6 6FA<br><br>(COMPANY NUMBER 11085973) | |
|---|---|---|---|

| | (Delete words in italics except for stock exchange transactions) | I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below *or to the several persons named in Parts 2 of Brokers Transfer Forms relating to the above security:*<br>Signature(s) of transferor(s):<br><br><br>..................................................<br>David Breith (Director)<br><br>A body corporate should execute this transfer under its common seal or otherwise in accordance with applicable statutory requirements. | Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s). |
|---|---|---|---|

| | Date | | |
|---|---|---|---|
| | Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred. Please state title, if any, or whether Mr., Mrs. or Miss. Please complete in typewriting or in Block Capitals. | FIREXO HOLDINGS LIMITED<br>Coyle White Devine Boughton<br>Business Park<br>Bell Lane<br>Amersham<br>Buckinghamshire<br>England<br>HP6 6FA<br><br>(Company No. 13592954) | |
| | I/We request that such entries be made in the register as are necessary to give effect to this transfer. | | |
| | Stamp of Buying Broker(s) (if any). | | Stamp or name and address of person lodging this form (if other than the Buying Broker(s)). |

| STOCK TRANSFER FORM | | |
|---|---|---|
| | **Consideration Money: £** NIL | **Certificate lodged with the Registrar (For completion by the Registrar/Stock Exchange)** |
| | Full name of Undertaking | FIREXO MOTORSPORT LIMITED (12841902) |
| | Description of Security | Ordinary Shares with a nominal value of £0.01 each |
| | Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | **Words** Eight thousand, six hundred |

**Figures**

8,600

| | Name(s) of registered holder(s) should be given in full: the address should be given where there is only one holder.<br><br>If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g., Executor(s)) of the person(s) making the transfer. | In the name(s) of<br><br>FIREXO GROUP LIMITED<br>Coyle White Devine Boughton<br>Business Park<br>Bell Lane<br>Amersham<br>Buckinghamshire<br>England<br>HP6 6FA<br><br>(COMPANY NUMBER 11085973) |
|---|---|---|
| | (Delete words in italics except for stock exchange transactions) | I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below *or to the several persons named in Parts 2 of Brokers Transfer Forms relating to the above security:*<br>Signature(s) of transferor(s):<br><br>..................................................<br>David Breith (Director) | Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s). |
| | A body corporate should execute this transfer under its common seal or otherwise in accordance with applicable statutory requirements. | | |
| | Date | | |
| | Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred. Please state title, if any, or whether Mr., Mrs. or Miss. Please complete in typewriting or in Block Capitals. | FIREXO HOLDINGS LIMITED<br>Coyle White Devine Boughton<br>Business Park<br>Bell Lane<br>Amersham<br>Buckinghamshire<br>England<br>HP6 6FA<br><br>(Company No. 13592954) | |
| | I/We request that such entries be made in the register as are necessary to give effect to this transfer. | | |
| | Stamp of Buying Broker(s) (if any). | | Stamp or name and address of person lodging this form (if other than the Buying Broker(s)). |

**Minutes of the Board of Directors of**

**Firexo Group Limited**

**("the Company")**

Company Registration Number: 11085973

Held at: by Zoom

On: 10 October 2024 at 12.30pm

At:  by Zoom

Present:  David Breith (Director) and Winand Staring (Director)

**Business of the Meeting**

The financial position of the Company was discussed and it was confirmed to the satisfaction of the Board that the Company was insolvent.

It was therefore resolved that a general meeting of the Members of the Company be convened, to be held at Coyle White Devine, Boughton Business Park, Bell Lane, Amersham, Bucks, HP6 6FA on Friday 25 October at 10.30am.  The purpose of the general meeting of the Members of the Company is to consider, and if thought fit, pass the following resolutions, number 1 as a Special resolution and number 2, as an Ordinary resolution:

**Resolutions**

1.      "That the Company be wound up voluntarily" and

2.      "That Michael Colin John Sanders of Macintyre Hudson LLP, 6th Floor, 2 London Wall Place, London, EC2Y 5AU and David Hudson of FRP Advisory Group PLC of 110 Cannon Street, London EC4N 6EU be appointed Joint Liquidators of the Company and that they be authorised to act either jointly or separately".

It was also resolved that Macintyre Hudson LLP and FRP Advisory Group PLC be instructed, and are hereby authorised:

1.   to assist the Directors in convening the meeting of the Members of the Company, and to issue notices of the meeting on behalf of the Company Secretary;

2.   to send notice of the general meeting of the Members of the Company at which the winding up resolution is to be considered to HSBC UK Bank PLC a holder of a qualifying floating charge at least five business days before the date of the meeting;

3.   to assist the Directors in complying with sections 99, 100 and 101 of the Insolvency Act 1986, including arranging to seek a decision from the creditors on the nomination of a Liquidator, and to issue notices to comply with those sections on behalf of the Company Secretary, with Macintyre Hudson LLP and FRP Advisory Group PLC being authorised by the Directors to email such notices to creditors on their behalf;

4.   to assist the Board of Directors in preparing a Statement of Affairs of the Company and the Directors' report to Creditors;

5.  The split of duties is to be agreed in due course, however the total fee will be £20,000 plus expenses and VAT and seeking a decision from the creditors on the nomination of a Liquidator. MacIntyre Hudson LLP and FRP Advisory Group PLC  are hereby authorised to draw such fees and expenses prior to the liquidation of the Company from any Company monies received by them.

6.  to open a designated clients' account at Macintyre Hudson LLP for the receipt of monies on behalf of the Company prior to the liquidation;

7.  to change the Registered Office of the Company to 6th Floor, 2 London Wall Place, London, EC2Y 5AU.

It was further resolved that:

8.  David Breith be authorised to chair the general meeting of the Members of the Company and any meeting of Creditors, and is authorised to sign the appropriate notices and resolutions.

9.  David Breith be authorised to sign the statement of truth in respect of the Statement of Affairs.


There being no further matters the meeting concluded.



David Breith
Chairman

# Firexo Group Limited & Firexo COTM Limited

Valuation of Firexo Limited, Firexo Motorsport Limited, Firexo Srl
and certain intellectual property assets as at 30 September 2024

10 October 2024

**FRP**

frpadvisory.com



EXHIBIT

B

tabbies®

# Contents

| | |
|---|---|
| Executive Summary | 4 |
| Introduction | 6 |
| Company Overview | 10 |
| Financial Information | 12 |
| Valuation Approach | 18 |
| Valuation Analysis | 21 |
| Valuation Conclusion | 26 |
| Appendices | 28 |

# Glossary

| | | | |
|---|---|---|---|
| Client | Firexo Group Limited and Firexo COTM Limited | NWC | Net Working Capital |
| DCF | Discounted Cash Flow | PFAS | Per- and polyfluoroalkyl substances |
| EBITDA | Earnings before interest, taxation, depreciation and amortisation | Purpose | Independent valuation of the IP and three subsidiaries of Firexo Group Limited (Firexo Limited, Firexo Motorsport Limited and Firexo Srl) |
| EBIT | Earnings before interest and taxation | | |
| Engagement Letter | Our engagement letter dated 2 February 2024 | RFR Approach | Relief-from-Royalty Approach |
| EV | Enterprise Value | Valuation Date | 30 September 2024 |
| Financial Projections | Financial projections for FY24 and FY25 | WACC | Weighted average cost of capital |
| Firexo Ltd | Firexo Limited | 3 Subsidiaries | Firexo Ltd, Firexo Motorsport and Firexo Srl |
| Firexo Group | Firexo Group Limited | | |
| Firexo Motorsport | Firexo Motorsport Limited | | |
| FRP | FRP Advisory Trading Limited | | |
| FY2X | Year ending 31 December 20XX | | |
| Group | Firexo Corporation and its subsidiaries | | |
| IP | Intellectual property | | |
| Management | Management of Firexo | | |

# Transmittal letter

Firexo Group Limited and Firexo COTM Limited,
Coyle White Devine,
Boughton Business Park,
Bell Lane, Amersham,
HP6 6FA
United Kingdom

**For the attention of David Breith and Peter Coyle**

In accordance with our engagement letter dated 2 February 2024 (the "Engagement Letter") and subsequent correspondence and calls, we have conducted the agreed scope of work relating to the valuation of Firexo Limited ("Firexo Ltd"), Firexo Motorsport Limited ("Firexo Motorsport") and Firexo Srl (collectively "the 3 Subsidiaries"), and the patents and related intellectual property (collectively the "IP Assets") owned by Firexo Corporation, as at 30 September 2024 (the "Valuation Date"). Firexo Group and Firexo COTM Limited are collectively "the Client".

In connection with the potential re-evaluation of previous inter-group transactions, the Client requires an independent valuation of the 3 Subsidiaries and the IP Assets at the Valuation Date.

This report should not be relied upon for any other purpose. Because others may seek to use it for different purposes, this report may not be quoted, referred to or shown to any other parties (except the Client's professional advisers acting in connection with the matters covered in this report, provided they accept that we assume no responsibility or liability whatsoever to them in respect of the contents) unless so required by court order or a regulatory authority, without our prior consent in writing.

FRP Advisory Trading Limited ("FRP") assumes no responsibility whatsoever in respect of or arising out of or in connection with the contents of this report to parties other than the above addressee. If others choose to rely in any way on the contents of this report, they do so entirely at their own risk.

Our work has focused on the matters set out in our engagement letter and is summarised in this report.

We have not, except to such extent as you requested and we agreed to undertake, sought to verify the accuracy of the data or the information and explanations provided by the Client or management of the Group ("Management").

Our work in connection with this assignment is of a different nature to that of an audit in accordance with auditing standards. Our report to you is based on enquiries of and discussions with Management, financial forecasts and other information and documents made available to us and analytical procedures applied to data provided.

Financial forecasts for Firexo Ltd and Firexo Corporation, which were prepared by Management, show their forecast cash flows. The forecasts are based on Management's assumptions regarding the future performance of the business. This report comments on the assumptions underlying Management's forecasts, but the actual future performance of the business is dependent on uncertain internal and external future events and we can provide no certainty as to their future trading.

Yours faithfully

Jim Davies, Partner

# Executive Summary

# Executive Summary

## Summary

› FRP has completed its independent assessment of value as at the Valuation Date, in respect of the following:

1. The market value of 100% of the equity of the 3 Subsidiaries;

2. The market value of the IP Assets.

› Our valuation analysis was conducted based on information provided to us by Management, calls and discussions with Management, and research and analysis conducted by FRP.

› In order to estimate the value of the 3 Subsidiaries and the IP we adopted the valuation methodologies outlined below:

**Firexo Ltd**

– Income Approach: Discounted Cash Flow ("DCF") based on Management financial projections and extrapolated forecasts.

– Net Assets Approach: based on the latest available balance sheet as a sense-check to the above.

**Firexo Motorsport & Firexo Srl**

– Net Asset Approach: based on the latest balance sheet. The income approach was not applied as Firexo Motorsport and Firexo Srl are non-trading entities.

**IP Assets**

– Income Approach: Relief-from-Royalty ("RFR") approach based on management financial projections for Firexo Corporation and extrapolated forecasts, which Management advised us represent revenue underpinned by the FX51 All Fires IP. We understand that Management currently forecasts no revenue to be generated by the FX73 Wildfire IP.

## Valuation Conclusion

› Based on the information provided and our valuation analysis, we estimate the following as at the Valuation Date:

– **Firexo Ltd:** Equity Value: nil.

– **Firexo Motorsport:** Equity Value: nil.

– **Firexo Srl:** Equity Value: €3k.

– **IP Assets:** Value attributed to the FX51 All Fires IP: £225k.

› On the basis that Management forecasts no revenue to be generated by the FX73 Wildfire IP, we have attributed no value to it. However, we consider this conclusion to be illustrative only as we have not conducted a full valuation exercise in respect of the FX73 Wildfire IP.

# Introduction

## Introduction and Limitations

### Introduction

› The details of the scope of our engagement and terms of business are detailed in the Engagement Letter.

### Basis of Value

› The basis of value adopted in this Report is Market Value, which is defined by the International Valuation Standards Council as:

> *"the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion".*

### Limitations

› Our Report and/or analysis should not be relied upon for any purpose other than the Purpose and should not be shared with any party other than the Client without our written consent. FRP assumes no responsibility whatsoever in respect of or arising out of or in connection with the contents of this Report to parties other than the Client.

› Our analysis with respect to the preparation of this Report included the use of and reliance upon certain non-public financial information and other data relating to the historical, current and future operations, financial performance and prospects of the Group.

› In performing its analysis, FRP relied upon the accuracy and completeness of all information, data, opinions and representations obtained from public sources or provided to it by the Client or Management or from private sources deemed appropriate by FRP, and did not independently verify such information.

› We have assumed that summarised accounts provided to us covering historical financial reporting periods are a complete and accurate representation of the financial performance and position of Firexo Ltd, Firexo Motorsport and Firexo Corporation over the relevant time periods.

› FRP assumed that any estimates, evaluations, forecasts and projections furnished to FRP were reasonably prepared and based upon the best currently available information as of the Valuation Date and good faith judgement of the persons furnishing it.

› We have commented on the value of the FX73 Wildfire IP in this report but we have not conducted a full valuation exercise in respect of it. On the basis that Management advise us that they do not forecast generating any revenue from the FX73 Wildfire IP, we refer to an illustrative value of nil. However we have not conducted a full valuation exercise in respect of the FX73 Wildfire IP and as such this conclusion is illustrative only.

› For the avoidance of doubt, our Services do not include the following: Any form of tax advice or a tax opinion; An audit, examination of internal controls, or other attestation or review services; feasibility analysis or deal structuring negotiations; fairness opinion; solvency opinion; or investment recommendation.

› The conclusions within this report are based on our understanding that there is an industry-wide expectation that Per- and polyfluoroalkyl substances ("PFAS")-based firefighting formulations will be banned in developed economies in the near future. Whilst we have conducted independent research in this regard, we have relied on Management's representation that this is the case as being an honestly held view, and their best understanding of the view held by the wider market.

› FRP provided the Client with a final draft version of this report before issuing this final report, in doing so requesting that the Client and/or Management review the final draft report from a perspective of factual accuracy. This final report reflects any corrections to fact-based points raised by the Client and/or Management in their review of the final draft report.



# Sources of Information

## Sources of Information

› In providing our valuation report, we have relied upon:

  – Information provided to us by Management in respect of the Group and the industry in which it operates;

  – Historical and forecast financial information (the "Financial Projections") provided to us in respect of the Firexo Ltd, Firexo Motorsport, Firexo Srl and Firexo Corporation in a file titled *"Forecast Model – MASTER – Limited Only vf"* (date received, 17.05.2024);

  – A question-and-answer process with Management conducted via email and calls;

  – Information provided by Management and publicly available information on the industry, including information regarding PFAS;

  – Publicly available information on the Firexo Ltd business, including Firexo Ltd's website;

  – RoyaltySource (https://royaltysource.com) for royalty rate research; and

  – FRP analysis: where specified we have undertaken certain analytical activities on the underlying data provided to us.

## The IP Assets

› We understand that the Group has developed two patent protected chemical formulations which have application in extinguishing fires. These two formulations, the IP of which is legally owned by Firexo COTM Ltd, are:

  – FX51 All Fires liquid which has the ability to extinguish all fire types, but has a PFAS chemical as an active ingredient in the formulation. We refer to the underlying patents and related IP collectively as the "FX51 All Fires IP".

  – FX73 Wildfire liquid which is designed to treat wildfires only, and has not yet been commercialized. We understand that this does not have PFAS in the formulation. We refer to the underlying patents and related IP collectively as the "FX73 Wildfires IP".

› Management advised us that the FX51 All Fires liquid has a finite life as firefighting products which include PFAS are widely expected to be banned in most or all developed economies in the near future.

› As discussed in further sections of this report, the length of the remaining economic life is unclear however, we consider it necessary to assume a gradual run-off of product sales volumes for valuation purposes.

› We understand that the Group has made significant attempts in R&D to find alternative formulations without PFAS, which are comparably effective (of sufficiently effective for broad commercial use), but without success.

› In any event, Management has advised us that if the Group were to develop such a formulation:

  1. It would require different patent protection, and hence the FX51 All Fires IP would not be relevant or provide protection against duplication by competitors; and

  2. It would be a fundamentally different chemical formulation and would not be built upon the formulation with the FX51 All Fires liquid hence no meaningful benefit would transfer.

› As such, we consider the value of the FX51 All Fires to be based on forecast sales over a finite, run-off period only.



## Organisational Structure

The group organizational structure is presented below:



Source: *Management information*
Note: *Organisational structure does not include companies that are in the process of being closed and joint venture partnerships*



# Company Overview



# Company & PFAS Overview

## Company Overview

We understand that:

›   The group's overarching goal is to develop and commercialise a range of fire-extinguishing solutions that would improve fire extinguishing capabilities and make them available to the market via a range of different products and retailers. The group has developed two patent protected chemical formulations – the FX51 All Fires liquid, which is currently available for sale, and the FX73 Wildfire liquid, which has not yet been commercialized.

›   The FX51 All fires liquid contains many chemical components including PFAS which constitute a group of thousands of man-made chemicals that are widely used in various consumer products, including firefighting foam. This is discussed opposite.

›   The group has blended over 500 tonnes of fire extinguishing liquid to date, which has been provided to over 300 independent distributors, 5 major retailers and made available in over 20 countries.

### Firexo Ltd

›   Firexo Ltd sells fire extinguishers and related products in the UK, which are used across various sectors including residential, commercial, government and fire fighting organizations. The majority of Firexo Ltd revenue is generated from products containing the FX51 All Fires liquid.

### Firexo Motorsport & Firexo Srl

›   Firexo Motorsport is a non-trading entity within Firexo Group which was established as a sales entity in the motorsport industry. Firexo Srl, an Italian incorporated company, is a non-trading entity within Firexo Group.

### PFAS Overview

›   PFAS is a group environmentally damaging substances referred to as 'forever chemicals' as they are resistant to breaking down in the environment. We understand that government organizations in developed economies have been moving towards banning PFAS in various applications, including firefighting, for a number of years.

›   In June 2023, the European Chemicals Agency's Committee for Socio-Economic Analysis (SEAC) adopted its final opinion supporting a gradual ban on PFAS in firefighting foams in an attempt to reduce PFAS emissions in the environment. The SEAC concluded that feasible fluorine-free alternatives for firefighting foams are available and can be implemented in most sectors.

›   To minimise the adverse socio-economic impacts associated with the phase out of PFAS-containing foams, including any potential to compromise fire safety, specific transitional periods are proposed for each type of use and user sector where alternatives are not yet readily implementable. The restriction proposal includes an obligation for users to prepare 'PFAS-foam management plans' and apply best-practice risk management measures to continue to use PFAS-containing foams during applicable transitional period.

›   The table below outlines the proposed transitional periods for PFAS in firefighting applications, which would be applied across the EU.

| Sector/type of use or placing on the market | Transitional period from the entry into force |
|---|---|
| Training and testing | 18 months |
| Municipal fire services | 18 months |
| Civilian ships | 3 years |
| Other industries | 5 years |
| Civilian aviation | 5 years |
| Defence | 5 years[12] |
| Ready-to-use applications | Placing on the market: 6 months Use: 5 years |
| Seveso establishments | 10 years[13] |
| Formulation | 10 years |

*Source: ECHA's committee for SEAC proposal*

›   There is a noticeable appetite for increasing regulation of PFAS in the UK in line with the above EU movement against PFAS. The UK Health and Safety Executive (HSE) has said that further restrictions on PFAS in the UK should be considered, including limiting the use of PFAS in firefighting foams. We were not able to determine a proposed timeline in respect of the UK but consider it reasonable to assume it would be broadly in line with the EU.

# Financial Information

# Financial Performance and Position

Overview - Historical & Forecast Financial Performance

> Firexo Ltd, Firexo Corporation and Firexo Motorsport's historical and forecast financial performance and position for FY23 (actual), FY24 (actual + forecast) and FY25 (forecast) are set out on the following pages.

Historical and Forecast Financial Performance

**Firexo Ltd**

> In FY23, Firexo Ltd generated £1.4m in revenue driven by sales via Amazon (60%) and distributor / retail sales (40%). The business made a gross profit of c.£0.3m.

> However, operating costs outweighed the gross margin, largely due to consulting and marketing fees resulting in earnings before interest, tax, deprecation and amortization ("EBITDA") of -£1.3m.

> Firexo Ltd is projected to deliver a revenue increase to £2.4m in FY24 and £2.5m in FY25. Gross margin increases across the forecast period from 24% in FY23 to 37% in FY25.

> EBITDA is forecast to increase however remain negative, from -£1.3m in FY23 to -£0.1m in FY25.

**Firexo Motorsport**

> We understand that Firexo Motorsport has not historically generated any revenue and is not forecast to.

> Management provided the FY22 Balance Sheet which reflects a net asset value of £0.09m comprising of £6 of cash and £0.09m of debtors relating to an intercompany loan between Firexo Motorsport and Firexo Group.

> Management advised that there has not been any material movement in the Balance Sheet between FY22 and the Valuation Date.

**Firexo Srl**

> We understand that Firexo Srl has not historically generated any revenue and is not forecast to.

**Firexo Srl (continued)**

> Management provided the FY22 Balance Sheet which reflects a net asset value of €0.003m comprising of fixed assets amounting to €0.001m, current assets amounting to €0.004m and current liabilities amounting to €0.002m .

> Management advised that there has not been any material movement in the Balance Sheet between FY22 and the Valuation Date.

**Firexo Corporation**

> In FY23, Firexo Corporation generated £3.2m in revenue which is driven by sales via Amazon (78%) and distributor / retail sales (22%). This includes Firexo Ltd sales and also sales by other Group entities in other jurisdictions.

> The business made a gross profit of c.£0.7m.

> However, operating costs outweighed the gross margin, largely due to consulting and marketing fees. This resulted in EBITDA of -£2.2m.

> Firexo Corporation is projected to deliver a revenue increase to £6.8m in FY24 and £7.9m in FY25. Gross margin increases across the forecast period from 23% in FY23 to 34% in FY25.

> We understand that all forecast revenue for Firexo Corporation relates to products that contain the FX51 All Fires liquid.

> EBITDA is forecast to increase to a positive level, from -£2.2m in FY23 to £0.5m in FY25 (EBITDA margin improving from -69% in FY23 to 7% in FY25).

Extrapolated forecasts (beyond FY25)

> As both Firexo Ltd and Firexo Corporation's forecasts are based on sales of products that contain the FX51 All Fires liquid, extrapolated forecasts must factor in the expectation that the FX51 All Fires liquid will be phased out in the coming years due the expected PFAS ban in firefighting formulations.

> Our analysis of extrapolated forecasts is presented on the following page, and results in an estimated gradual phase out of sales volumes over a 10-year period, reflecting that the product range has an expected finite life and an expected gradual decline in sales.



# Financial Performance and Position

## Extrapolated forecasts based on expected PFAS ban

Based on information provided by Management and research conducted we understand that:

> The general understanding in the market is that the use of PFAS chemicals within firefighting applications is likely to be banned in the EU, the UK and potentially other core markets over the coming years.

> Whilst there is no certainty regarding the timelines of such bans, the European Chemicals Agency's Committee for Socio-Economic Analysis has published the table on page 11, which represents the transitional period from entry into force – which we understand to mean the timeline within which product sales will be banned across the EU once the ban in each respective category is put into force. The transitional period ranges from:

> – 6 months (sale) to 5 years (use) for ready-to-use applications – which we understand to represent the Group's principal current product range.

> – Between 18 months and 10 years for other applications.

> We understand that bans could come into force at any time.

> As noted on page 7, the IVSC definition of market value is: "*the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion*".

> We consider it necessary to assume that a willing buyer of the FX51 All Fires IP, acting knowledgeably and prudently, would factor in the expectation of a PFAS ban within firefighting applications in all key markets when assessing the value of the IP, thus assuming a gradual run-off of revenue which may commence at any time. We consider a balanced perspective to be to assume the following:

> No adjustment to forecast revenues for the remainder of FY24 and FY25.

> Retention of 75% of forecast revenues in FY26.

> The revenue retention rate being reduced by half each year thereafter, i.e. retention of 37.5% of forecast revenues in FY27, 18.75% in FY28 and so on. We consider this to represent a balanced perspective of how a willing buyer and willing seller may approach financial projections when determining a mutually agreeable set of assumptions upon which to base valuation.

> This run-off is depicted below and is applied to the forecasts of both Firexo Ltd and Firexo Corporation (which reflects the FX51 All Fires IP).

**Extrapolated revenue profile**



*Source: FRP analysis*

# Financial Performance and Position – Firexo Ltd

## Profit & Loss Statement

| Year Ending | FY23 Act | FY24 3 mth Act + 9mth Fcst | FY25 Fcst |
|---|---|---|---|
| £ | | | |
| Revenue | 1,429,021 | 2,348,745 | 2,472,649 |
| Cost of Sales | (1,081,729) | (1,522,296) | (1,547,734) |
| **Gross Margin** | **347,292** | **826,450** | **924,915** |
| Operating Costs | (1,685,516) | (1,079,362) | (1,047,432) |
| | | | |
| **EBITDA** | **(1,338,224)** | **(252,912)** | **(122,517)** |
| | | | |
| Interest | (74,063) | (127,796) | (128,388) |
| Depreciation | (32,085) | (30,282) | (30,251) |
| Exceptional | (661,210) | (5,016) | - |
| Tax | 1,009 | - | - |
| Forex | 25,497 | (763) | - |
| | | | |
| **Profit After Tax** | **(2,079,075)** | **(416,768)** | **(281,157)** |
| | | | |
| *Revenue Growth* | *n/a* | *64%* | *5%* |
| *Gross Margin* | *24%* | *35%* | *37%* |
| *EBITDA Margin* | *-94%* | *-11%* | *-5%* |

*Source: Management Information*

## Balance Sheet

| Year Ending | FY23 Act | FY24 Fcst | FY25 Fcst |
|---|---|---|---|
| £ | | | |
| **Non-Current Assets** | | | |
| Tangible Assets | 197,147 | 178,159 | 147,907 |
| Intangible Assets | 24,778 | 22,863 | 22,863 |
| **Total Non-Current Assets** | **221,925** | **201,021** | **170,770** |
| | | | |
| **Current Assets** | | | |
| Cash | (149,034) | (135,357) | (380,432) |
| Trade Debtors | 232,537 | 193,048 | 203,231 |
| Inventory | 129,972 | 142,068 | 141,489 |
| Prepayments | 24,325 | 25,542 | 26,819 |
| Other Current Assets | 391,498 | 372,777 | 365,350 |
| **Total Current Assets** | **629,298** | **598,078** | **356,458** |
| | | | |
| **Current Liabilties** | | | |
| Trade Creditors | (421,841) | (308,766) | (308,306) |
| Invoice Finance | - | (152,920) | (126,829) |
| Trade Finance | - | (250,000) | (250,000) |
| Accruals | (15,879) | (46,957) | (46,957) |
| Other Current Liabilities | (1,233) | (72,529) | (72,529) |
| **Total Current Liabilties** | **(438,953)** | **(831,171)** | **(804,620)** |
| | | | |
| **Non-Current Liabilities** | | | |
| Bounce Back Loan | (28,910) | (18,255) | (7,600) |
| Intercompany Loan | (2,107,779) | (2,054,609) | (2,054,609) |
| Convertible Loan ( A Hiller) | (50,000) | (50,000) | - |
| Loan | (62,458) | (2,748) | - |
| Accrued Interest | (41,893) | (137,795) | (237,035) |
| **Total Non-Current Liabilties** | **(2,291,041)** | **(2,263,408)** | **(2,299,245)** |
| | | | |
| **Net Assets** | **(1,878,771)** | **(2,295,480)** | **(2,576,637)** |

*Source: Management Information*



© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024     frpadvisory.com | 15

# Financial Performance and Position – Firexo Corporation

## Profit & Loss Statement

| Year Ending | FY23 Act | FY24 3 mth Act + 9mth Fcst | FY25 Fcst |
|---|---|---|---|
| £ | | | |
| Revenue | 3,215,007 | 6,802,684 | 7,908,524 |
| Cost of Sales | (2,470,994) | (4,788,905) | (5,201,753) |
| **Gross Margin** | **744,013** | **2,013,779** | **2,706,771** |
| Operating Costs | (2,971,370) | (2,411,769) | (2,171,460) |
| **EBITDA** | **(2,227,357)** | **(397,990)** | **535,310** |
| Interest | (153,236) | (210,646) | (211,250) |
| Depreciation | (9,553) | (79,072) | (79,042) |
| Ammortbation | (71,015) | (6,567) | (1,763) |
| Exceptional | (895,817) | - | - |
| Tax | 59,433 | - | - |
| Forex | (83,010) | (2,151) | - |
| **Profit After Tax** | **(3,380,554)** | **(696,426)** | **243,256** |
| *Revenue Growth* | *n/a* | *112%* | *16%* |
| *Gross Margin* | *23%* | *30%* | *34%* |
| *EBITDA Margin* | *-69%* | *-6%* | *7%* |

*Source: Management information*

## Balance Sheet

| Year Ending | FY23 Act | FY24 Fcst | FY25 Fcst |
|---|---|---|---|
| £ | | | |
| **Non-Current Assets** | | | |
| Tangible Assets | 31,494 | (30,375) | (109,417) |
| Intangible Assets | 568,989 | 559,842 | 558,079 |
| Investments | 100 | 100 | 100 |
| **Total Non-Current Assets** | **600,583** | **529,567** | **448,762** |
| **Current Assets** | | | |
| Cash | (25,305) | 232,532 | 657,158 |
| Trade Debtors | 388,515 | 1,025,062 | 1,191,695 |
| Inventory | 1,121,805 | 957,296 | 1,005,161 |
| Prepayments | 138,816 | 145,757 | 153,044 |
| Other Current Assets | 717,428 | 511,137 | 534,938 |
| **Total Current Assets** | **2,341,259** | **2,871,784** | **3,541,997** |
| **Current Liabilities** | | | |
| Trade Creditors | (1,244,541) | (1,191,347) | (1,216,799) |
| Invoice Finance | - | (400,000) | (600,000) |
| Trade Finance | - | (600,000) | (600,000) |
| Accruals | (127,837) | (162,840) | (162,840) |
| Other Current Liabilities | (115,372) | (200,337) | (200,340) |
| **Total Current Liabilities** | **(1,498,871)** | **(2,554,524)** | **(2,781,979)** |
| **Non-Current Liabilities** | | | |
| Directors Loan DB | (1,198,685) | (1,198,685) | (1,198,685) |
| Bounce Back Loan | (28,910) | (18,256) | (7,600) |
| Convertible Loan ( A Hillier) | (50,000) | (50,000) | - |
| Loan | (62,458) | (2,748) | - |
| Accrued Interest | (118,562) | (289,518) | (471,619) |
| **Total Non-Current Liabilities** | **(2,233,515)** | **(2,334,106)** | **(2,452,804)** |
| **Net Assets** | **(790,544)** | **(1,487,280)** | **(1,244,024)** |

*Source: Management information*



© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024

## Financial Performance – Firexo Motorsport

Balance Sheet

| Year Ending | FY21 | FY22 |
|---|---|---|
| £ | | |
| **Current Assets** | | |
| Cash | 50 | 6 |
| Trade Debtors | 90,186 | 90,067 |
| **Total Current Assets** | **90,236** | **90,073** |
| | | |
| **Net Assets** | **90,236** | **90,073** |

*Source: Statutory financial accounts*

## Financial Performance – Firexo SRL

| Year Ending | FY21 | FY22 |
|---|---|---|
| € | | |
| **Fixed Assets** | | |
| Intangible fixed assets | 1,736 | 1,302 |
| **Current Assets** | | |
| Receivables | 1,647 | 2,172 |
| Liquid funds | 7,636 | 1,975 |
| Accrued income and prepayments | 3 | 6 |
| **Total Current Assets** | **9,286** | **4,153** |
| | | |
| **Total Current Assets** | **11,022** | **5,455** |
| | | |
| Payables | (6,342) | (2,218) |
| **Total Current Liabilities** | **(6,342)** | **(2,218)** |
| | | |
| **Net Assets** | **4,680** | **3,237** |

*Source: Statutory financial accounts*

# Valuation Approach

© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024

# Valuation Approaches

**Valuation Approaches – Firexo Ltd, Firexo Motorsport & Firexo Srl**

> The primary approaches to the valuation of a business are outlined below:

### Income Approach

> The income approach provides an indication of value by converting future cash flows to a single current value. Under the DCF method, the value of a business or asset is determined by reference to the value of cash flow generated by the business or asset from the valuation date onwards. The DCF method is based on making reasonable assumptions and estimations of expected future cash flows and discounting them to the valuation date by applying an appropriate discount rate that captures the risk inherent in the projections and the time value of money.

### Market Approach

> The market approach provides an indication of value by comparing a business or asset to similar businesses or assets for which pricing information is available. The "Market Multiples" methodology involves the application of an observable pricing multiple to a financial performance measure (such as EBITDA or revenue) of the business or asset in order to derive an estimated value. Application of the multiples approach requires the calculation of pricing metrics from comparable businesses or assets such as those of listed companies, or observable pricing information from M&A transactions.

### Cost Approach / Net Asset Approach

> Generally, the cost approach relies on estimation of the replacement cost of a business or asset to help ascertain the price that a market participant may pay, hence indicating value. The Net Asset Approach is a valuation technique that involves deriving the value of a business by reference to the value of its net assets. This approach is generally considered appropriate for businesses whose value derives mainly from the underlying value of its assets, rather than its earnings, such as certain asset intensive, holding or investment companies, or businesses facing the prospect of liquidation.

**Valuation Approaches – IP**

> The primary approaches to the valuation of IP assets are outlined below:

### RFR Approach

> Under the RFR approach, the fair value of an IP asset is determined by reference to the capitalised value of the real or hypothetical royalty payments that would be saved through owning the asset, as compared with licensing the asset from a third party. The future royalty payments are capitalised either through use of present value techniques and a suitable discount factor, or a suitable capitalisation multiple.

### Cost to Recreate Approach

> Generally, the cost approach relies on estimation of the replacement cost of a business or asset to help ascertain the price that a market participant may pay, hence indicating value. In respect of intangible assets or intellectual property, the Cost to Recreate approach measures the total cost to develop a new intangible asset that is the same as the actual intangible asset being valued in terms of both functionality and performance.

> The cost approach is generally not applied in situations where it would not be economically sensible to recreate an IP asset, such as for example, if the asset is expected to have a finite life which would not provide the commercial opportunity to generate a return on the cost to recreate it.



# Selected Methodologies

**Selected approaches to estimating value**

Firexo Ltd

Income Approach (DCF)

›   Under the DCF method, the value of a business or asset is determined by
    reference to the value of cash flow generated by the business or asset from
    the valuation date onwards. This approach discounts forecast cash-flows to
    the valuation date in two parts, as follows:

    –   Cash flows over an interim forecast period based on financial projections
        over that period; and

    –   A "Terminal Value" which reflects the estimated value of cash flows from
        the end of the interim forecast period into perpetuity based on a
        "Perpetuity Growth Multiplier", which provides an estimate of future value
        based on the estimated cost of capital and an assumed annual growth
        rate.

›   We consider this approach to be an appropriate methodology to estimate the
    value of Firexo Ltd, for the following reasons:

    –   Financial projections from the Valuation Date to FY25 were provided to us
        by Management and;

    –   Based on information provided by Management and our own research we
        were able to estimate a run-off of sales based on the transitional phase-
        out of PFAS firefighting products in key markets.

›   We note that the Income Approach for Firexo Ltd is supported by the Net
    Asset Approach and a sense-check.

Market Approach

›   The Market Approach was not used as Firexo Ltd is forecast to deliver
    negative earnings and therefore we do not consider it appropriate to value
    Firexo Ltd using a multiples approach.

Firexo Motorsport & Firexo Srl

Net Asset Approach

›   The Net Asset Approach is a valuation technique that involves deriving the
    value of a business by reference to the value of its net assets.

›   We consider that this approach is suitable to estimate the value of Firexo
    Motorsport and Firexo Srl as Firexo Motorsport is a non-trading entity and
    does not have any earnings and is not projected to generate earnings in the
    future.

IP Assets: RFR

›   Under the RFR approach, the fair value of an intangible asset is determined
    by reference to the capitalised value of the hypothetical royalty payments that
    would be saved through owning the asset, as compared with licensing the
    asset from a third party. The key inputs under this approach are:

    –   The royalty rate that would be paid in an arm's length transaction by a
        willing lessee to a willing lessor to lease the rights to use the subject IP;

    –   Projections for the financial parameter (e.g. revenue) that the royalty rate
        would be applied to over the life of the asset;

    –   An appropriate tax rate and discount rate to apply to the royalty payments
        to determine a present value

›   We consider that this approach is suitable to estimate the value of the IP
    Assets as it is based on a representation of the commercial benefit of a
    revenue generating IP asset (via the royalty rate) and can directly incorporate
    the value implication of a finite lived asset, by modeling the royalties
    generated during the run-off period.



# Valuation Analysis

© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024

# Valuation Analysis – Firexo Ltd

## Overview

› We set out the basis of our DCF valuation and key inputs and assumptions below. The underlying DCF calculations are included in Appendix 1.1.

## Key inputs and assumptions: Explicit forecast period

› We were provided with financial projections to FY25, as prepared by Management and we held discussions with Management in order to understand the drivers of the forecast revenue, EBITDA and cashflow. We then applied assumptions to forecast Management's financial projects to FY28 to establish a 5-year forecast period. The following assumptions were adopted;

  – Revenue growth rates: FY26 is grown at 10%, FY27 at 5.0% and FY28 at 2.0%.

  – Revenue run-off: Reduction in revenue based on the run-off profile presented on page 14.

  – EBITDA margin: EBITDA margins are held at -5.0% from FY26 to FY28 to remain in line with Management's EBITDA margin in FY25.

› We applied a tax rate of 25% based on the UK corporate tax rate.

› The historical investment in working capital as a % of annual revenue is used to forecast net working capital beyond FY25. The % is based on the average of the FY23, FY24 and FY25 balances as per the historical and forecast Balance Sheet provided by Management. This results in a net working capital as a % of revenue of 7.1% over the forecast period (see Appendix 1.4)

› No capital expenditure is assumed over the forecast period based on discussions with Management.

## Key inputs and assumptions: Discount rate

› We applied a Weighted Average Cost of Capital ("WACC") range between of 13.6% and 19.3% to our DCF calculation (see Appendix 1.3).

## Income Approach: Results

› As shown in Appendix 1.1, using the DCF Approach results in an Enterprise Value ("EV") range of -£0.25m to -£0.22m.

› As per the FY23 Balance Sheet, the net debt position of £0.13m is deducted from EV range, resulting in an equity value range of -£0.47m to -£0.38m.

This indicates the market value of 100% of the equity of Firexo Ltd is nil as at the Valuation Date.

## Net Assets Approach: Sense check

The Firexo Ltd balance sheet shows a negative net asset value for both FY23 (actual) and FY24 (forecast) which support the nil equity value concluded by the income approach.



# Firexo Motorsport

### Overview

› Under the Net Assets Approach, a business' value is derived from the underlying value of its assets rather than its earnings and is used to value businesses that are not expected to generate positive cash flow in the near future.

› Firexo Motorsport is a non-trading entity and therefore we have applied the Net Assets Approach.

### Net Assets Approach – Results

› As shown on page 17, Firexo Motorsport has net assets of £0.09m as per the FY22 Balance Sheet comprising of cash and debtors. Management has advised that the debtor balance amounting to £0.09m relates to an intercompany loan between Firexo Motorsport and Firexo Group which is not recoverable and will be written off.

› Therefore the 100% equity value of Firexo Motorsport is estimated to be £6, effectively nil.

# Firexo Srl

### Overview

› Under the Net Assets Approach, a business' value is derived from the underlying value of its assets rather than its earnings and is used to value businesses that are not expected to generate positive cash flow in the near future.

› Firexo Srl is a non-trading entity and therefore we have applied the Net Assets Approach.

### Net Assets Approach – Results

› As shown on page 17, Firexo Motorsport has net assets of €3k as per the FY22 Balance Sheet comprising of fixed assets, current assets and current liabilities.

› Therefore the 100% equity value of Firexo Motorsport is estimated to be €3k.

# IP Assets

## IP Valuation (notes on the following page)

> Under the RFR Approach, an IP's value is derived from discounting hypothetical royalty payments that would be made between a willing lessee and a willing lessor.

> As shown in the table below, after discounting the after-tax royalty savings to a present value, the value of the IP is £225k. Updated forecasts have been provided following our valuation work which show a reduction in forecast group revenue meaning there is potential downside to the IP value we conclude on.

> We note that the IP valuation does not include value relating to the FX73 Wildfire IP, as referred to in the Company Overview, as no forecast revenue relating to this product are contained within the forecasts provided.

| IP Valuation £ | | | | | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Valuation** | | | | | | | | | | | | |
| Period end date | **Sep-24** | Dec-24 | Dec-25 | Dec-26 | Dec-27 | Dec-28 | Dec-29 | Dec-30 | Dec-31 | Dec-32 | Dec-33 | |
| Year frac | | 0.25 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Cumulative year frac | | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | 6.25 | 7.25 | 8.25 | 9.25 | [1] |
| Mid-period year frac | | 0.13 | 0.63 | 1.13 | 1.63 | 2.13 | 2.63 | 3.13 | 3.63 | 4.13 | 4.63 | |
| Revenue | | 2,487,001 | 7,908,524 | 8,699,376 | 9,134,345 | 9,317,032 | 9,503,373 | 9,693,440 | 9,887,309 | 10,085,055 | 10,286,756 | [2] |
| Growth rate | | n/a | 218% | 10% | 5% | 2% | 2% | 2% | 2% | 2% | 2% | |
| Probability adjusted revenue | | 2,487,001 | 7,908,524 | 6,524,532 | 3,425,379 | 1,746,944 | 890,941 | 454,380 | 231,734 | 118,184 | 60,274 | [3] |
| Pre-tax royalty savings | | 111,915 | 355,884 | 293,604 | 154,142 | 78,612 | 40,092 | 20,447 | 10,428 | 5,318 | 2,712 | [4] |
| Less: taxes | | (83,936) | (266,913) | (220,203) | (115,607) | (58,959) | (30,069) | (15,335) | (7,821) | (3,989) | (2,034) | [5] |
| After-tax royalty savings | | 27,979 | 88,971 | 73,401 | 38,536 | 19,653 | 10,023 | 5,112 | 2,607 | 1,330 | 678 | |
| Discount factor | | 0.98 | 0.90 | 0.83 | 0.77 | 0.71 | 0.65 | 0.60 | 0.56 | 0.51 | 0.47 | [6] |
| PV of after-tax royalty savings | | 27,420 | 80,440 | 61,222 | 29,652 | 13,951 | 6,564 | 3,088 | 1,453 | 684 | 322 | |
| Sum of PV savings | 224,796 | | | | | | | | | | | |

*Source: FRP analysis based on Management information*



# Intellectual Property - Assumptions

| Assumptions | | Amount | Comments |
|---|---|---|---|
| 1 | Estimated life | 10 years | We have modelled the economic life of cashflows derived from the IP over a 10-year period, at which point the forecast cashflows become immaterial. |
| 2 | Revenue growth rates | FY26: 10.0%<br>FY27: 5.0%<br>FY28 to FY33: 2.0% | Revenue growth rates are assumed to decline from FY25's growth of 16% to 10% in FY26, 5% in FY27 and then grow at a steady growth of 2% to FY33. This is prior to adjusting for the expected PFAS bans. |
| 3 | Revenue run-off profile | FY24: 100%<br>FY25: 100%<br>FY26: 75%<br>FY27: 37.5%<br>FY28: 18.8%<br>FY29: 9.4%<br>FY30: 4.7%<br>FY31: 2.3%<br>FY32: 1.2%<br>FY33: 0.6% | FY24 and FY25 revenue has no adjustment as Management's forecasts these revenues to occur prior to direct impact from PFAS regulation. The run-off profile we have adopted assumes that the risk of PFAS ban begins to have an impact in FY26, with 75% of revenue being retained in that (year (i.e. assuming a 25% reduction).<br><br>Thereafter, the revenue retention rate reduces by half each year, i.e. retention of 37.5% of forecast revenues in FY27, 18.75% in FY28 and so on.<br><br>We consider this to represent a balanced perspective of how a willing buyer and willing seller may approach financial projections when determining a mutually agreeable set of assumptions upon which to base valuation. |
| 4 | Royalty rate | 4.5% | Based on the mid-point between the average 1st quartile and median royalty rates found through royalty research undertaken. See Appendix 1.2 for more detail. |
| 5 | Tax | 25% | UK corporate tax rate of 25% is applied. |
| 6 | Cost of equity | 17.5% | A 17.5% cost of equity is used to discount the hypothetical royalty payments. See Appendix 1.3 for more detail on the cost of equity build up. |

# Valuation Conclusion

© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024

## Valuation Conclusion

Valuation Conclusion

› Based on the information provided and our valuation analysis, we estimate
the following as at the Valuation Date:

- **Firexo Ltd:** Equity Value: nil.

- **Firexo Motorsport:** Equity Value: nil.

- **Firexo Srl:** Equity Value: €3k.

- **IP:** Value attributed to the FX51 IP: £225k.

# Appendices

© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024

## Appendix 1.1 – Firexo Ltd Valuation

| Firexo Ltd Valuation | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Assumptions** | | | | | | | |
| Valuation Date | 30/09/2024 | Period end date | Sep-24 | Dec-24 | Dec-25 | Dec-26 | Dec-27 | Dec-28 |
| | | Year frac | | 0.25 | 1.00 | 1.00 | 1.00 | 1.00 |
| | | Cumulative year frac | | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 |
| *Revenue growth rates* | | Mid-period year frac | | 0.13 | 0.75 | 1.75 | 2.75 | 3.75 |
| FY26 | 10.6% | | | | | | | |
| FY27 | 6.9% | Revenue | | 589,164 | 2,472,649 | 2,719,914 | 2,855,910 | 2,913,028 |
| FY28 | 2.0% | Growth rate | | n/a | 320% | 10% | 5% | 2% |
| *EBITDA margin rates* | | | | | | | | |
| FY26 | -5.0% | EBITDA | | (40,841) | (122,517) | (134,769) | (141,508) | (144,338) |
| FY27 | -5.0% | Growth rate | | n/a | 200% | 10% | 5% | 2% |
| FY28 | -5.0% | | | | | | | |
| *EBITDA probability* | | Probability adjusted EBITDA | | (40,841) | (122,517) | (101,077) | (53,065) | (27,063) |
| FY24 | 100.0% | | | | | | | |
| FY25 | 100.0% | Less: capex | | - | - | - | - | - |
| FY26 | 75.0% | less: change in net working capital | | 20,553 | 241,160 | (240,909) | (9,692) | (4,070) |
| FY27 | 37.5% | Less: taxes | | - | - | - | - | - |
| FY28 | 16.8% | Free cash flow to firm | | (20,288) | 118,643 | (341,986) | (62,757) | (31,134) |
| *Other assumptions* | | | | | | | | |
| Tax rate | 25.0% | Discount factor (high value) | | 0.98 | 0.91 | 0.80 | 0.70 | 0.62 |
| WACC (high value) | 13.6% | Discount factor (low value) | | 0.98 | 0.88 | 0.73 | 0.62 | 0.52 |
| WACC (low value) | 19.3% | | | | | | | |
| NWC as a % of revenue (average of FY23 to FY25) for FY26 onwards | 7.1% | PV of cash flows (high value) | | (19,967) | 107,822 | (273,587) | (44,195) | (19,300) |
| | | PV of cash flows (low value) | | (19,845) | 103,835 | (251,123) | (38,628) | (16,063) |
| | | | | | | | | |
| | | Enterprise value (high value) | | (249,227) | | | | |
| | | Enterprise value (high value) | | (221,724) | | | | |
| | | less net debt | | (132,558) | | | | |
| | | Equity value (high value) | | (381,785) | | | | |
| | | Equity value (low value) | | (470,951) | | | | |
| | | | | | | | | |
| | | **Concluded Equity Value** | nil | | | | | |

*Source: Management information, FRP analysis*

# Appendix 1.2 – Royalty Rates

| # | Year | Licensee | Description | Low | High | Mid |
|---|------|----------|-------------|-----|------|-----|
| **Royalty rates** | | | | | | |
| 1 | 1997 | Summit Environmental Corp Inc | FirePower 911(TM) and FlameOut(TM). These products are fire suppressants developed and manufactured by the Licensor. | 7.0% | 7.0% | 7.0% |
| 2 | 2017 | Wood Protection Technologies Inc | The Parent is a manufacturer of proprietary, environmentally conscientious chemistry utilizing patent pending ECOB WoodSurfaceFilm and FRC technology (Fire Retardant Coating).  The products protect against fire, mold/mycotoxins, fungal-decay, wood ingesting insects and termites. | 6.0% | 6.0% | 6.0% |
| 3 | n/a | Flamemaster Corp | The Japanese Licensor produces the Registrants flame retardant coating in Japan under a nonexclusive license agreement. | 3.0% | 6.0% | 4.5% |
| 4 | 1995 | Yuanchen Inc | UFTC products include environmentally-safe fire extinguishing products, substantially superior to current products, for all four classes of fire. | 3.0% | 3.0% | 3.0% |
| 5 | 1905 | Tyco Fire & Building Products | A license agreement (signed 18 months ago -- early 2006) that allows licensee to put FireMist into its extinguishing unit. | 15.0% | 15.0% | 15.0% |
| 6 | 2002 | Just-In Case Fire | In the first quarter of 2002, the licensor executed a bilateral exclusive agreement with a company from Alberta, Canada who manufactures and markets a series of patented mobile fire extinguishing systems. | 3.5% | 5.0% | 4.3% |
| 7 | n/a | Tianfa Corporation And The Tianyang Gr | The company markets fire suppression materials, environmentally safe cleaning chemicals, and natural, botanical cosmetic products. | 5.0% | 5.0% | 5.0% |
| 8 | 1977 | Central Sprinkler Corp | The Licensor hereby grants to the Licensee the sole and exclusive right and license, to the exclusion of Licensor and all others, to manufacture, cause to be manufactured, use, market or sell or cause to be marketed or sold on behalf of the Licensee, any and all Licensed Products which are the subject matter of this Agreement, throughout the world. technical information and know-how in the field of fire protection equipment and sprinkler systems. | 5.0% | 5.0% | 5.0% |
| 9 | 1982 | Central Sprinkler Corp | Licensor and Licensee entered into an Exclusive Patent Licensing Agreement for Straight-On sprinkler. | 5.0% | 5.0% | 5.0% |
| 10 | 2009 | Flameret, Inc. | The Licensor hereby grants to Licensee, an exclusive, worldwide License, with the right to sublicense, under the Patent Rights to make, have made, use, offer for sale and sell Licensed Products.<br>The Licensee acquired the rights to market and sell three products 1. Flamex, a textile FR treatment.  2. Ultra Flamex, a fire extinguishing product and 3. Impex. | 1.5% | 1.5% | 1.5% |
| **Quartile 1** | | | | 3.0% | 4.5% | 3.8% |
| **Median** | | | | 5.0% | 5.0% | 5.0% |
| **Average of Q1 and Median** | | | | 4.0% | 4.8% | 4.4% |
| **Selected Royalty Rate** | | | | | | 4.5% |

*Source: RoyaltySource, FRP analysis*



# Appendix 1.3 – Discount Rates

Discount Rates

**Firexo Ltd**

> We applied a WACC range between of 13.6% and 19.3% to our Firexo Ltd DCF calculation.

**IP Assets**

> The cost of equity range is 15.6% to 22.4%. This range was rounded to 15% to 20% and therefore a mid-point cost of equity of 17.5% was selected to value the IP Assets.

| Firexo Ltd WACC | WACC | |
|---|---|---|
| | Low | High |
| Risk free rate (Rf) | 4.6% | 4.6% |
| | | |
| Equity market risk premium (EMRP) | 5.5% | 5.5% |
| Total EMRP | 5.5% | 5.5% |
| | | |
| Unlevered beta (βU) | 0.95 | 1.05 |
| Leverage (D/E) | 25.0% | 25.0% |
| Tax rate (T) | 25.0% | 25.0% |
| Levered beta (βL) | 1.13 | 1.25 |
| | | |
| Size premium | 4.8% | 11.0% |
| Cost of Equity (Ke) | 15.6% | 22.4% |
| | | |
| Pre-tax cost of debt | 7.2% | 8.6% |
| Tax rate | 25.0% | 25.0% |
| Post-tax cost of debt | 5.4% | 6.5% |
| | | |
| Weighted Average Cost Of Capital Calculation: | | |
| Debt % of Capital | 20.0% | 20.0% |
| Cost of Debt | 5.4% | 6.5% |
| Weighted Cost of Debt | 1.1% | 1.3% |
| Equity % of Capital | 80.0% | 80.0% |
| Cost of Equity | 15.6% | 22.4% |
| Weighted Cost of Equity | 12.5% | 17.9% |
| | | |
| WACC | 13.6% | 19.2% |
| Average (rounded to nearest 50bps) | 16.50% | |

*Source: S&P CapIQ, FRP analysis*



# Appendix 1.4 – Firexo Ltd Net Working Capital

| Net Working Capital | FY23 | FY24 | FY25 |
|---|---|---|---|
| Cash | (149,034) | (135,357) | (380,432) |
| Trade Debtors | 232,537 | 193,048 | 203,231 |
| Inventory | 129,972 | 142,068 | 141,489 |
| Prepayments | 24,325 | 25,542 | 26,819 |
| Other Current Assets (excl Directors Loan) | 415,754 | 397,033 | 389,606 |
| Trade Creditors | (421,841) | (308,766) | (308,306) |
| Accruals | (15,879) | (46,957) | (46,957) |
| Deferred Income | (1,198) | (72,529) | (72,529) |
| Net Working Capital | 214,636 | 194,082 | (47,078) |
| % of Revenue | 15% | 8.3% | -2% |
| Change in Net Working Capital | n/a | 20,553 | 241,160 |

*Source: Management Information, FRP analysis*

› We note that Invoice Finance and Trade Finance are not included in net working capital as they are treated to be included in net debt.



© FRP | Firexo Group Limited & Firexo COTM Limited | 10 October 2024

**SUBSCRIPTION AGREEMENT**

March 9, 2022

Firexo Corporation
_____
_____

Attention:  David Breith, President

     I (the "Subscriber") understand that Firexo Corporation, a Delaware corporation (together with its direct and indirect subsidiaries, the "Company"), is offering for sale (the "Offering") a total of 3,209,709 shares of common stock, par value $0.0017125 per share (the "Common Stock"), at a price of sterling £0.934664170490222 per share (or an aggregate price of sterling £3,000,000) in three tranches as provided herein.

    1.     **Subscription and Closing**.

        a.    Subject to the terms and conditions of this Agreement, the Subscriber hereby purchases from the Company, and the Company hereby issues and sells to the Subscriber, 1,818,664 shares of Common Stock (the "First Tranche Shares") for a total purchase price of sterling £1,699,840 (the "First Tranche Purchase Price") on the date hereof.

        b.    Subject to the terms and conditions of this Agreement, on April _7__, 2022 (the "Second Closing Date"), the Subscriber will purchase from the Company, and the Company will issue and sell to the Subscriber, 1,069,903 shares of Common Stock (the "Second Tranche Shares") for a total purchase price of sterling £1,000,000 (the "Second Tranche Purchase Price").

        c.    Subject to the terms and conditions of this Agreement, on April 8___, 2022 (the "Third Closing Date"), the Subscriber will purchase from the Company, and the Company will issue and sell to the Subscriber, 321,142 shares of Common Stock (the "Third Tranche Shares" and collectively with the First Tranche Shares and the Second Tranche Shares, the "Purchased Shares") for a total purchase price of sterling £300,160 (the "Third Tranche Purchase Price" and collectively with the First Tranche Purchase Price and the Second Tranche Purchase Price, the "Purchase Price").

        d.    Notwithstanding the terms of Sections 1.b. and c. hereof, if the Subscriber has not received evidence reasonably acceptable to him of the consummation of the Interim Sale (as defined in Section 4.a.) prior to the Second Closing Date, the Second Closing Date will be delayed until the next business day immediately following Subscriber's receipt of such evidence and the Third Closing Date will be delayed until the next business day immediately following the Second Closing Date.

        e.    Concurrently with the execution and delivery of this Agreement (i) the Subscriber has paid the First Tranche Purchase Price by wire transfer of immediately available funds to a separate client trust fund account maintained for the Company's sole and exclusive benefit with Coyle White Devine, the Company's United Kingdom legal advisors (the "Company



EXHIBIT

C

Account") and (ii) the Subscriber, the Company, and the "Key Holders" listed on the signature page thereof have executed and delivered a Voting Agreement, in a form reasonably acceptable to Subscriber and the Company.  The Company has provided the details of the Company account to Subscriber previously in writing.

        f.      On the Second Closing Date, the Subscriber will, without the need for any further action from either party, pay the Second Tranche Purchase Price by wire transfer of immediately available funds to the Company Account.

        g.      On the Third Closing Date, the Subscriber will, without the need for any further action from either party, pay the Third Tranche Purchase Price by wire transfer of immediately available funds to the Company Account.

        h.      Together with this executed Subscription Agreement, the Subscriber has delivered to the Company a completed and executed Investor Questionnaire in the form of <u>Exhibit A</u> hereto (the "<u>Investor Questionnaire</u>").

        i.      As soon as practical after the date hereof, the Company will deliver to the Subscriber: (i) a fully executed counterpart of this Agreement and (ii) a stock certificate for the First Tranche Shares.

        j.      As soon as practical after the Second Closing Date and payment of the Second Tranche Purchase Price as provided above, the Company will deliver to the Subscriber a stock certificate for the Second Tranche Shares.

        k.      As soon as practical after the Third Closing Date and payment of the Third Tranche Purchase Price as provided above, the Company will deliver to the Subscriber a stock certificate for the Third Tranche Shares.

    2.    <u>**Representations and Warranties of the Subscriber**</u>.  As of the date hereof (and as of the Second Closing Date and the Third Closing Date) the Subscriber represents and warrants to the Company as follows.

        a.      The Subscriber is a resident of the <u>United Kingdom</u>, is of full legal age in United Kingdom, is legally competent to execute this Agreement and perform all of his obligations hereunder, and has his principal residence in the United Kingdom.

        b.      All of the information in the Investor Questionnaire is true, correct and complete.

        c.      The Subscriber, together with his representatives, if any, has been furnished with and has carefully read the Company's Risk Factors attached hereto as <u>Exhibit B</u>.

        d.      The Subscriber, together with his representatives, if any, has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment in the Company and has confirmed to his satisfaction that an investment in the Company meets his individual needs.  **The Subscriber is not relying on**

2

**representations of the Company or any agent of the Company for tax or other economic considerations relating to his investment in the Purchased Shares.**

        e.     During the course of this transaction and at a reasonable time prior to the issuance and sale to the Subscriber of the Purchased Shares, the Subscriber has had the opportunity to ask questions of, and receive answers from, management of the Company concerning the terms and conditions of this investment and to obtain any additional information of the same kind that is specified in Rule 502 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"), or that is necessary to verify the accuracy of the other information obtained by the Subscriber in connection herewith. The Subscriber acknowledges having received such information as he deems necessary to enable him to make his investment decision in the Purchased Shares. All questions raised by the Subscriber have been answered to the full satisfaction of the Subscriber.

        f.     Other than as set forth in this Agreement, no representations have been made to the Subscriber or the Subscriber's representative concerning the Purchased Shares, the Offering, or the Company.

        g.     The Subscriber is acquiring the Purchased Shares for his own account for investment only and not with a view to the distribution, resale or transfer thereof and as the sole record and beneficial holder thereof.

        h.     The Subscriber has not received, nor is the Subscriber aware of, any general solicitation or general advertising for the offer or sale of the Purchased Shares, including, without limitation, any advertisement, article, notice or other communication published in any newspaper or magazine or similar media, or broadcast over television or radio, or any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

        i.     The Subscriber: (i) has adequate means of providing for his current and future anticipated financial needs and contingencies; (ii) has no need for liquidity in his investment in the Purchased Shares; and (iii) is able to bear the economic risk of said investment, including the risk of loss of the entire investment, for an indefinite period of time.

        j.     The Subscriber understands and acknowledges that: (i) the Purchased Shares are being offered and sold in reliance upon an exemption from registration under the Act; (ii) the reliance of the Company upon that exemption is predicated, in part, on the representations and warranties made by the Subscriber in this Agreement; and (iii) such exemption may not be available if any of those representations or warranties is not true and accurate.

        k.     This Agreement and the Investor Questionnaire have been duly executed and delivered by the Subscriber and constitute the valid, legal and binding obligations of the Subscriber, enforceable against the Subscriber in accordance with their terms, except as enforceability may be limited by laws relating to debtor relief and general principles of equity.

3

3. **Representations and Warranties of the Company**. As of the date hereof (and as of the Second Closing and the Third Closing) the Company represents and warrants to the Subscriber as follows.

      a.     The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all corporate power and corporate authority required to execute, deliver and perform its obligations under this Agreement.

      b.     The authorized capital of the Company consists, immediately prior to the issuance of any of the Purchased Shares, of the following:

      (i)     The Common Stock, of which 100,000,000 shares are authorized and 7,143,200 shares are issued and outstanding as of the date hereof, and 9,521,964 shares will be issued and outstanding prior to the Second Closing Date;

      (ii)     10,000,000 shares of "blank check" preferred stock, par value $0.001725 per share (the "Preferred Stock"), none of which are issued and outstanding.

      c.     There are no outstanding preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock or Preferred Stock. There are no outstanding equity appreciation, phantom equity, profit participation or similar rights held by any person with respect to the Company.

      d.     All corporate action has been taken on the part of the Board of Directors of the Company that is necessary for the authorization, execution and delivery of this Agreement by the Company and the performance by the Company of its obligations hereunder. This Agreement, when executed and delivered by the Company, will constitute the valid, legal and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by laws relating to debtor relief and general principles of equity.

      e.     The Purchased Shares, when issued and sold in accordance with the terms of this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under applicable United States federal and state securities laws and liens or encumbrances created by or imposed by Subscriber. Based in part on the accuracy of the representations of the Subscriber in Section 2 of this Agreement, the offer, sale and issuance of the Purchased Shares will be in compliance with all applicable United States federal and state securities laws.

4. **Covenants of the Company**.

      a.     After the date hereof but prior to the Second Closing Date, the Company will sell 560,100 shares of Common Stock to a third party (or to third parties) acceptable to the Board at a price no lower than sterling £0.934664170490222 per share (the "Interim Sale"). The

Company promptly will confirm consummation of the Interim Sale in writing to the Subscriber and deliver to the Subscriber such other evidence relating thereto as the Subscriber reasonably may request.  Subscriber hereby consents to the Interim Sale notwithstanding anything to the contrary contained on Exhibit C hereto.

b.      At any time when the Subscriber holds any shares of Common Stock, the Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, take any of the acts listed on Exhibit C hereto without (in addition to any other vote required by law) the written consent of the Subscriber, given in writing or by vote at a meeting, consenting, or voting (as the case may be).

5.      **Acknowledgements**.  As of the date hereof (and as of the Second Closing Date and the Third Closing Date), the Subscriber understands and acknowledges that he is aware of the following:

a.      No federal or state agency has passed on or has made a recommendation or endorsement of the Purchased Shares or has made any finding or determination as to the fairness, accuracy or completeness of the terms of the Offering.

b.      The Purchased Shares have not been registered under the Act or under any state securities law and may not be sold, pledged, hypothecated, donated or otherwise transferred unless subsequently registered under the Act and such state laws or an exemption from such registration is available.

c.      The Purchased Shares are a speculative investment involving a high degree of risk, including the possibility of the loss of all or a substantial portion of the Purchaser Price, and there is no assurance the Subscriber will receive any benefit of any type from investing in the Purchased Shares.

d.      The Subscriber acknowledges that the Purchased Shares are being offered only to "accredited investors," as such term is defined in the Act, and the regulations promulgated thereunder.

e.      A notation will be made on the records of the Company regarding the restrictions on transferability of the Purchased Interest.

6.      **Miscellaneous**.

a.      This Subscription Agreement shall be governed by the internal laws of the State of Delaware, exclusive of its conflict of law provisions.

b.      This Agreement, together with the Exhibits attached hereto, constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and may be amended only by a writing executed by such parties.

c.      From time to time, the parties each will execute and deliver to the other any and all documents and instruments that the other party reasonably requests to consummate more effectively the transactions contemplated hereby.

      d.     The representations, warranties and acknowledgments of the Subscriber in this Agreement shall survive the issuance and purchase of the Purchased Shares.

      e.     This Subscription Agreement may be executed in multiple counterparts which, taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Subscription Agreement or any Exhibit hereto by facsimile or by electronic mail in .pdf or other electronic format shall be effective as delivery of a manually executed original counterpart to this Subscription Agreement or such other document.

      f.     No waiver hereunder shall be valid unless the same shall be in writing and signed by the party giving the waiver. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

      g.     The Subscriber may not assign any of his rights, or delegate any of his obligations under this Agreement, without the prior written consent of the Company.

[Remainder of Page Intentionally Left Blank]

6

IN WITNESS WHEREOF, the Subscriber has hereby executed this Subscription Agreement as of the date set forth above.

Sir Clive Cowdery

(Signature of Subscriber

C.COWDERY_____
_____ (Type or print name(s) as it should appear, on Company records and if applicable any certificates)

2 Queen Anne's Gate

London SW1H 9AA

(Principle Residence)

NI Number:_____NB021418B

Telephone No.:07901 205846

EmailAddress:clive.cowdery@gmail.com with copy to paula.ward@resolution.co.uk
[Remainder of Page Intentionally Left Blank.]

7

**<u>Acceptance by Company</u>**

Subject to the above terms and conditions, and in reliance on the representations, warranties and undertakings of the Subscriber set forth above, the foregoing subscription and agreement to purchase shares of Common Stock in Firexo Corporation is accepted as of the <u>9</u> day March, 2022

Firexo Corporation

By: _____

Name: <u>David Breith</u>

Title: <u>President</u>

8

## EXHIBIT A

## INVESTOR QUESTIONNAIRE

<u>Sir Clive Cowdery</u>
Name of Purchaser (Please Print or Type)

Firexo Corporation

_____

_____

Attention:  David Breith, President

Ladies and Gentlemen:

The following information is furnished to you in connection with the undersigned's subscription to purchase shares of Common Stock (the "Securities") in Firexo Corporation, a Delaware corporation (the "Company"), pursuant to the terms and conditions set forth in a certain Subscription Agreement between the Company and the undersigned (the "Subscription Agreement").  Capitalized terms not otherwise defined herein will have the meaning given to them in the Subscription Agreement.

**SUBJECT TO THE IMMEDIATELY FOLLOWING PARAGRAPH, ALL INFORMATION CONTAINED IN THIS QUESTIONNAIRE WILL BE TREATED CONFIDENTIALLY.**

The Company may present this Questionnaire to its counsel, and to such other parties as it deems appropriate if called upon to establish that the proposed offer and sale of the Securities is exempt from registration under the Act or meets the requirements of applicable state securities laws.

This Questionnaire is merely a request for information and this Questionnaire is not an offer to sell or a sale of the Securities and that a sale will occur, if ever, only after the execution of the Subscription Agreement by the Company.

A-1

## SECTION A

## GENERAL INFORMATION

1.    Name of Purchaser(s):      ___C.COWDERY_____

2.    Principal Residence:

        2 Queen Anne's Gate

        London SW1H 9AA

5.    Telephone Number:      _____0790125846_____

7.    NI Number:      _____NB021418B_____

A-2

4857-9817-9597, v.8

## SECTION B

## ACCREDITED INVESTOR QUALIFICATION

Please read and initial the following line:

_CvcCng_ The undersigned understands that the representations contained in this Section B are made for the purpose of qualifying him as an "accredited investor" as that term is defined pursuant to Regulation D promulgated under the Securities Act of 1933, as amended, for the purpose of inducing a sale of the Securities to the undersigned. The undersigned hereby represents that the statement or statements initialed below are true and complete in all respects.

Please read and initial the line to the left of *all* applicable statements.

_____ The undersigned is an investment company registered under the Investment Company Act of 1940.

_____ The undersigned is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

_____ The undersigned is an organization described in Section 501(c)(3) of the Internal Revenue Code, as amended, or a corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Purchased Shares, with total assets in excess of $5,000,000.

_____ The undersigned is a director or executive officer the Company.

_CvcCng_ The undersigned is a natural person whose individual net worth, or joint net worth with his spouse at the time of his purchase, exceeds $1,000,000.  For purposes of this item, "net worth" means the excess of total assets at fair market value (including personal and real property, but excluding the estimated fair market value of a person's primary home) over total liabilities. "Total liabilities" excludes any mortgage on the primary home in an amount of up to the home's estimated fair market value as long as the mortgage was incurred more than 60 days before the date hereof, but includes (i) any mortgage amount in excess of the home's fair market value and (ii) any mortgage amount that was borrowed during the 60-day period prior to the date hereof for the purpose of investing in the Securities.

_CvcCng_ The undersigned is a natural person who had an individual income (exclusive of any income attributable to my spouse) in excess of $200,000 in each of the two (2) most recent years or joint income with my spouse in excess of $300,000 in each of those years, and in either case has a reasonable expectation of reaching the same income level in the current year.

_____ The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Purchased Shares, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D promulgated under the Act.

A-3

_____ The undersigned is an entity in which all of the equity owners are accredited investors.

The undersigned represents and warrants that the information contained herein is true, complete and accurate as of the date hereof, and will remain true, complete and accurate as of the Second Closing Date and the Third Closing Date, and may be relied upon, and is given by him in connection with and as part of the Subscription Agreement.

This Questionnaire and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware, exclusive of its conflict of law provisions.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

A-4

IN WITNESS WHEREOF, the undersigned hereby acknowledges and represents that he has initialed the applicable statements above and has executed this Questionnaire this 9 day of March, 2022.

_____ _____
Signature

Sir Clive Cowdery _____
Print Name

A-5

## EXHIBIT B

## RISK FACTORS

*Investment in Firexo Corporation ("we," "our" or the "Company") involves a substantial degree of risk and should be regarded as highly speculative.  As a result, the purchase of the Common Stock of the Company should be considered only by persons who can reasonably afford a loss of their entire investment.  Prospective investors should carefully consider, in addition to matters set forth elsewhere in this Subscription Agreement and its Exhibits, the following factors relating to the Company's business and this Offering.  The order in which risk factors appear is not intended as an indication of the relative weight or importance thereof.  Prospective investors should carefully review all risk factors.  Such information is presented as of the date hereof and is subject to change, completion or amendment without notice.*

*Capitalized terms used but not otherwise defined herein will have the meaning given to them elsewhere in this Subscription Agreement.*

**Risk Factors Summary**

The following is a summary of some of the principal risks we face:

- We have a limited operating history and a history of operating losses, and we may not be able to sustain profitability.
- Because we have a limiting operating history with positive revenues, Subscriber may not be able to accurately evaluate our operations.
- High margins for the fire control business will attract more businesses to enter this field. Our business could suffer as a result of more competition.
- If we cannot compete successfully for market share against other fire control products companies, we may not achieve sufficient product revenues, and our business will suffer.
- Risks associated with our non-U.S. operations could adversely affect our business, financial condition and results of operations.
- Our business operates in a regulated industry and is subject to a variety of complex and continually changing standards, certifications, laws, and regulations.
- Our future growth is dependent upon our ability to develop or acquire new products and technologies that achieve market acceptance with acceptable margins.
- We design and manufacture products that incorporate advanced technologies. The introduction of new products and technologies involves risks, and we may not realize the degree or timing of benefits initially anticipated.
- We may be unable to successfully execute or effectively integrate acquisitions or joint ventures.
- We are subject to a variety of litigation in the course of our business that could cause a material adverse effect on our results of operations and financial condition.

- We use a variety of raw materials, supplier-provided parts, and third-party service providers in our business. Significant shortages, supplier capacity constraints or production disruptions, price increases, or tariffs could increase our operating costs and adversely impact the competitive positions of our products.
- Our executive officers and directors collectively have the power to control our management and operations and have a significant majority in voting power on all matters submitted to the shareholders of the Company.
- We are substantially dependent upon our senior management and key research and development personnel. The loss of any one of them would have a material adverse effect on our business operations.
- There is no active, liquid trading market for our shares.
- Our business, financial condition, and results of operations have been and may continue to be adversely affected by COVID-19.

## RISK FACTORS

The risks described below are not the only ones facing us. The occurrence of any of the following risks or additional risks and uncertainties not presently known to us, or that we currently believe to be immaterial, could materially and adversely affect our business, financial condition, or results of operations. In such cases, the value of our shares of Common Stock could decline, and Subscriber may lose all or part of Subscriber's original investment.

### RISKS RELATED TO OUR BUSINESS AND THE INDUSTRY IN WHICH WE OPERATE

### WE HAVE A LIMITED OPERATING HISTORY AND A HISTORY OF OPERATING LOSSES, AND WE MAY NOT BE ABLE TO SUSTAIN PROFITABILITY.

We were originally formed as a UK private company limited by shares on November 28, 2017; and as of September 30, 2021, we had an accumulated deficit of $4,614,721. We have a limited operating history upon which an evaluation of our future success or failure can be made. Additionally, if we are not successful in growing revenues and controlling costs, we will not maintain profitable operations or positive cash flow, and even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods.

B-2

**BECAUSE WE HAVE A LIMITING OPERATING HISTORY WITH POSITIVE REVENUES, SUBSCRIBER MAY NOT BE ABLE TO ACCURATELY EVALUATE OUR OPERATIONS.**

We were originally formed on November 28, 2017 and have had limited profitable operations to date. Therefore, we have a limited profitable operating history upon which to evaluate the merits of investing in our Company. The likelihood of success must be considered in light of the problems, expenses, difficulties, complications and delays encountered in connection with the operations that we plan to undertake. These potential problems include, but are not limited to, unanticipated problems relating to the ability to generate sufficient cash flow to operate our business, and additional costs and expenses that may exceed current estimates. Additionally, we recognize that if the effectiveness of our business plan is not forthcoming, we will not be able to continue business operations. If we are unsuccessful in addressing these risks, our business will most likely fail.

**OUR BUSINESS, FINANCIAL CONDITION, AND RESULTS OF OPERATIONS HAVE BEEN AND MAY CONTINUE TO BE ADVERSELY AFFECTED BY COVID-19.**

The global outbreak of COVID-19 has severely constrained economic activity and, as a result, has caused a significant contraction in the global economy. In response to this outbreak, governments have taken preventive or protective actions, including imposing restrictions on business operations and travel. Governments have also implemented economic stabilization efforts and other measures to mitigate the economic effects of the outbreak; however, the effectiveness and continuation of those measures remains uncertain. The COVID-19 pandemic has had an adverse effect on our business, financial condition and results of operations. The pandemic continues to result in widespread and extended or partial shutdowns and other restrictions on the operations of non-essential businesses, including construction, hospitality venues, offices and travel. The nature and extent of the continuing impact of COVID-19 on our business, financial condition and results of operations is uncertain and will depend on future developments, including the recent and pending approvals of vaccines, the wide-spread distribution of vaccines and the effectiveness of such vaccines in preventing COVID-19, and the time it takes to vaccinate a sufficient percentage of the U.S. and global populations. Nonetheless, further prolonged closures and restrictions throughout the world or the rollback of reopening measures due to a resurgence of COVID-19 cases and continued decreases in the general level of economic activity may again disrupt our operations and the operations of our suppliers, distributors, and customers.

As a result of the foregoing, the pandemic and its impact have also affected and could continue to affect the ability of our customers to pay for our products and services and to obtain financing for significant purchases and operations, which has resulted in, and could further result in, a decrease and/or cancellation of orders and/or payment delays or defaults. Such conditions may also adversely affect our supply base and increase the potential for one or more of our suppliers to experience financial distress or bankruptcy, which could impact our ability to fulfill orders on time or at the anticipated cost. We also may be required to raise additional capital in the future, and our access to and cost of financing will depend on, among other things, global economic conditions, conditions in the global financing markets, the availability of sufficient amounts of financing, our results of operations, and our credit ratings. There is no guarantee that financing will be available in the future to fund our obligations or that it will be available on terms consistent with our expectations. Any of these factors could have a material adverse effect on our business, results of operations, cash flows, and financial condition.

**HIGH MARGINS FOR THE FIRE CONTROL BUSINESS WILL ATTRACT MORE BUSINESSES TO ENTER THIS FIELD. OUR BUSINESS COULD SUFFER AS A RESULT OF MORE COMPETITION.**

Our business has enjoyed relatively high profit margins to date due to the fact that we have concentrated in the fire safety industry. If existing competitors become more successful and new competitors enter the market because of the prospect of high margins, our industry may become more price competitive, resulting in pressure on our sales and profit margins, with adverse effects on our results of operations.

**SOME OF THE INDUSTRIES TO WHICH WE SELL A SUBSTANTIAL AMOUNT OF OUR PRODUCTS ARE CYCLICAL AND, ACCORDINGLY, DEMAND FOR OUR PRODUCTS COULD BE ADVERSELY AFFECTED BY DOWNTURNS IN THESE INDUSTRIES.**

Much of the demand for fire suppression solutions is driven by commercial and residential construction and industrial facility expansion and maintenance projects. Commercial and residential construction projects are heavily dependent on general economic conditions, localized demand for commercial and residential real estate, and availability of credit. Commercial and residential real estate markets are prone to significant fluctuations in supply and demand. In addition, most commercial and residential real estate developers rely heavily on project financing in order to initiate and complete projects. Declines in real estate values could lead to significant reductions in the availability of project financing, even in markets where demand may otherwise be sufficient to support new construction. These factors could in turn temper demand for new fire detection and suppression installations.

**LEVELS OF INDUSTRIAL CAPITAL EXPENDITURES FOR FACILITY EXPANSIONS AND MAINTENANCE ARE DEPENDENT ON GENERAL ECONOMIC CONDITIONS. ADDITIONALLY, VOLATILITY IN COMMODITY PRICES CAN NEGATIVELY AFFECT THE LEVEL OF THESE ACTIVITIES AND CAN RESULT IN POSTPONEMENT OF CAPITAL SPENDING DECISIONS OR THE DELAY OR CANCELLATION OF EXISTING ORDERS.**

The businesses of many of our industrial customers are to varying degrees cyclical and have experienced periodic downturns. During such economic downturns, including the current economic downturn caused by COVID-19, customers in these industries tend to delay major capital projects, including construction, maintenance projects, and upgrades. Additionally, demand for our products may be affected by volatility in energy and commodity prices and fluctuating demand forecasts, as our customers may be more conservative in their capital planning, which may reduce demand for our products. Although our industrial customers tend to be less dependent on project financing than real estate developers, disruptions in financial markets and banking systems could make credit and capital markets difficult for our customers to access and could significantly raise the cost of new debt for our customers. Any difficulty in accessing these markets and the increased associated costs can have a negative effect on investment in large capital projects, including necessary maintenance and upgrades, even during periods of favorable end-market conditions.

Many of our customers inside and outside of the industrial and commercial sectors, including governmental and institutional customers, have experienced budgetary constraints as sources of revenue have been negatively impacted by adverse or stagnant economic conditions. These budgetary constraints have in the past and may in the future reduce demand for our products among governmental and institutional customers.

Reduced demand for our products could result in the delay or cancellation of existing orders, which unfavorably impacts our absorption of fixed costs. This reduced demand may also erode average selling prices in the industry in which we operate. Any of these results could materially and adversely affect our business, financial condition, results of operations, and cash flows.

**RISKS ASSOCIATED WITH OUR NON-U.S. OPERATIONS COULD ADVERSELY AFFECT OUR BUSINESS, FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

We have significant operations in a number of countries outside the U.S. Economic uncertainty in some of the regions of the world in which we operate could result in the disruption of markets and negatively affect cash flows from our operations to cover our capital needs and debt service requirements.

In addition, as a result of our international presence, a significant portion of our revenues and expenses are denominated in British pounds, U.S. dollars and euros. We are therefore subject to non-U.S. currency risks and non-U.S. exchange exposure. Exchange rates can be volatile, and a substantial weakening of foreign currencies against the U.S. dollar could reduce our profit margin in various locations outside of the U.S. and adversely impact the comparability of results from period to period.

There are other risks that are inherent in our non-U.S. operations, including the potential for changes in socio-economic conditions, laws, and regulations, including anti-trust, import, export, labor and environmental laws and monetary and fiscal policies; protectionist measures that may prohibit acquisitions or joint ventures or impact trade volumes; unsettled or unstable political conditions;

B-4

government-imposed plant or other operational shutdowns; corruption; natural and man-made disasters, hazards, and losses; violence, civil and labor unrest, and possible terrorist attacks; etc

These and other factors may have a material adverse effect on our business and results of operations.

**OUR BUSINESS OPERATES IN A REGULATED INDUSTRY AND IS SUBJECT TO A VARIETY OF COMPLEX AND CONTINUALLY CHANGING STANDARDS, CERTIFICATIONS, LAWS, AND REGULATIONS.**

Our operations are subject to various UK, European and U.S. federal, state, and local licensing laws, codes, certifications, and standards. Changes in laws, regulations, certifications, or industry standards for fire suppressants could require us to change our formulation or the way in which we operate and/or to utilize additional resources to maintain compliance, which could increase costs or otherwise disrupt operations. In addition, failure to comply with any applicable laws or regulations could result in substantial fines or revocation of our certifications, operating permits, and licenses. Competition or other regulatory investigations can continue for several years, be costly to defend, and result in substantial fines. If laws and regulations were to change or if we or our products fail to comply, our business, financial condition, and results of operations could be adversely affected.

Due to the international scope of our operations, the system of laws and regulations to which we are subject is complex and includes applicable export controls, anti-trust laws, customs, currency exchange control and transfer pricing regulations, laws regulating the foreign ownership of assets, and laws governing certain materials that may be in our products. No assurances can be made that we will continue to be found to be operating in compliance with, or be able to detect violations of, any such laws or regulations. For example, our business has a significant legal presence in the UK, where the success of the Brexit referendum in 2016 has continued to cause political and economic uncertainty. Although it is unknown what the full terms of the UK's future relationship with the European Union ("EU") will be, it is possible that the UK may be at risk of losing access to free trade agreements for goods and services with the EU and with other countries with which the EU has existing trade agreements, which may result in increased tariffs on UK imports and exports that could have an adverse effect on our profitability.

**WE CANNOT PREDICT THE NATURE, SCOPE, OR EFFECT OF FUTURE REGULATORY REQUIREMENTS TO WHICH OUR OPERATIONS MIGHT BE SUBJECT OR THE MANNER IN WHICH EXISTING LAWS MIGHT BE ADMINISTERED OR INTERPRETED.**

We are subject to requirements relating to environmental and safety regulations and environmental remediation matters which could adversely affect our business, results of operation, and reputation.

We are subject to numerous UK, European and U.S. federal, state, and local environmental laws and regulations governing, among other things, solid and hazardous waste storage, treatment, and disposal and remediation of hazardous materials releases. There are significant capital, operating, and other costs associated with compliance with these environmental laws and regulations. Environmental laws and regulations may become more stringent in the future, which could increase costs of compliance or require us to manufacture with alternative technologies and materials. Proposed federal and state legislative action concerning the use and clean-up of fire-fighting foam products could negatively impact our business and our results of operations, thereby enhancing risks to our business.

UK, European and U.S. federal, state, and local authorities also regulate a variety of matters, including, but not limited to, health and safety laws governing employee injuries, permitting requirements, and the environmental matters discussed above. If we are unable to adequately comply with applicable health and safety regulations and provide our employees with a safe working environment, we may be subject to litigation and regulatory action in addition to negatively impacting our ability to attract and retain talented employees. New legislation and regulations may require the Company to make material changes to its operations, resulting in significant increases to the cost of production.

**OUR PRODUCTS COULD FAIL TO GAIN TRACTION IN THE MARKETPLACE FOR A NUMBER OF REASONS THAT WOULD ADVERSELY IMPACT OUR FINANCIAL RESULTS AND CAUSE OUR INVESTORS TO LOSE MONEY.**

The future rollout of our products entails numerous risks such as:

- • Any lack of market acceptance of the design or formulation of our products;
- • Failure to maintain acceptable arrangements with product suppliers, particularly in light of lower than anticipated volumes;
- • Manufacturing, technical, supplier, or quality-related delays, issues or concerns, including the loss of any key supplier or failure of any key supplier to deliver high quality products on time;
- • Competition;
- • Potential declines in demand for our products; and
- • Risks that third parties may assert intellectual property claims against our products.

In order to compete successfully, we must accurately forecast demand, closely monitor inventory levels, secure quality products, continuously drive down costs, meet aggressive product price and performance targets, create market demand for our brand and hold sufficient, but not excess, inventory.

## OUR FUTURE GROWTH IS DEPENDENT UPON OUR ABILITY TO DEVELOP OR ACQUIRE NEW PRODUCTS AND TECHNOLOGIES THAT ACHIEVE MARKET ACCEPTANCE WITH ACCEPTABLE MARGINS.

Our future success depends on our ability to develop/manufacture or acquire competitive, and increasingly complex, products and to take such products to market in a quick and cost-effective manner. Our ability to develop or acquire new products and technologies requires the investment of significant resources. These acquisitions and development efforts divert resources from other potential investments in our businesses, and they may not lead to the development of new technologies or products on a timely basis. Moreover, as we introduce new products, we may be unable to detect and correct defects in the design or formulation of a product or in its application to a specified use, which could result in loss of sales or delays in market acceptance. Even after introduction, new or enhanced products may not satisfy customer preferences and product failures may cause customers to reject our products. As a result, these products may not achieve market acceptance and our brand image could suffer. We must also attract, develop and retain individuals with the requisite technical expertise and understanding of customers' needs to develop new technologies and introduce new products. The laws and regulations applicable to our products, and our customers' product and service needs, change from time to time, and regulatory changes may render our products and technologies non-compliant. We must also monitor disruptive technologies and business models. In addition, the markets for our products may not develop or grow as we anticipate. The failure of our technology or products to gain market acceptance due to more attractive offerings by our competitors, the introduction of new competitors to the market with new or innovative product offerings, or the failure to address any of the above factors could significantly reduce our revenues, increase our operating costs, or otherwise materially and adversely affect our business, financial condition, results of operations, and cash flows.

## CYBERSECURITY INCIDENTS COULD DISRUPT BUSINESS OPERATIONS, RESULT IN THE LOSS OF CRITICAL AND CONFIDENTIAL INFORMATION, AND ADVERSELY IMPACT OUR REPUTATION AND RESULTS OF OPERATIONS.

We rely upon the capacity, reliability, and security of our information technology ("IT") and data security infrastructure and our ability to expand and continually update this infrastructure in response to the changing needs of our business. As we implement new systems or integrate existing systems, they may not perform as expected. We also face the challenge of supporting our older systems and implementing necessary upgrades. In addition, we are increasingly relying on our IT infrastructure to support our operations as we manage the impact of COVID-19, including through initiating remote-work protocols for a substantial number of our employees. If we experience a problem with the functioning of an important IT system as a result of the increased burden placed on our IT infrastructure or a security breach of our IT systems, including during system upgrades and/or new system implementations, the resulting disruptions could have an adverse effect on our business.

Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to IT systems to sophisticated and targeted measures known as advanced persistent threats, which may be directed at the Company, its products, its customers, and/or its third-party service providers. We seek to deploy comprehensive measures to deter, prevent, detect, respond to, and mitigate

B-6

these threats, including identity and access controls, data protection, vulnerability assessments, product software designs that we believe are less susceptible to cyber-attacks, continuous monitoring of our IT networks and systems, maintenance of backup and protective systems, and the incorporation of cybersecurity design throughout the lifecycle of our products. Despite these efforts, cybersecurity incidents, depending on their nature and scope, could potentially result in the misappropriation, destruction, corruption, or unavailability of critical data and confidential or proprietary information (our own or that of third parties) and the disruption of business operations. The potential consequences of a material cybersecurity incident include financial loss; reputational damage; litigation with third parties; theft of intellectual property; fines levied by the Federal Trade Commission; diminution in the value of our investment in research, development, and engineering; and increased cybersecurity protection and remediation costs due to the increasing sophistication and proliferation of threats, which in turn could adversely affect our competitiveness and results of operations.

### INFRINGEMENT OR EXPIRATION OF OUR INTELLECTUAL PROPERTY RIGHTS, OR ALLEGATIONS THAT WE HAVE INFRINGED UPON THE INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES, COULD NEGATIVELY AFFECT US.

We rely on a combination of trademarks, trade secrets, patents, copyrights, know-how, confidentiality provisions, and licensing arrangements to establish and protect our proprietary rights. We cannot guarantee, however, that the steps we have taken to protect our intellectual property will be adequate to prevent infringement of our rights or misappropriation or theft of our formulation, manufacturing process, technology, trade secrets, or know-how. For example, effective patent, trademark, copyright, and trade secret protection may be unavailable or limited in some of the countries in which we operate. In addition, while we generally enter into confidentiality agreements with our employees and third parties to protect our trade secrets, know-how, business strategy, and other proprietary information, such confidentiality agreements could be breached or otherwise may not provide meaningful protection for our trade secrets and know-how related to the formulation, design, or manufacture of our products. Resorting to litigation to protect our intellectual property rights can be burdensome and costly, and we may not prevail. Further, adequate remedies may not be available in the event of an unauthorized use or disclosure of our trade secrets and manufacturing expertise. Finally, our products rely on patent protection; once a patent has expired, the product is generally open to competition. Products under patent protection usually generate significantly higher revenues than those not protected by patents. If we fail to successfully enforce our intellectual property rights, our competitive position could suffer, which could harm our business, financial condition, results of operations, and cash flows.

There may not be adequate protection for intellectual property in every country in which our products are sold, and policing unauthorized use of proprietary information is difficult and expensive. We cannot guarantee that we will be able to detect and prevent infringement of our intellectual property, but we will rigorously defend our intellectual property if we believe it is or was being infringed.

In addition, we may become, from time to time, subject to claims of intellectual property infringement by third parties. Regardless of the merit of such claims, responding to infringement claims can be expensive and time-consuming. The litigation process is subject to inherent uncertainties, and we may not prevail in litigation matters regardless of the merits of our position. Intellectual property lawsuits or claims may become extremely disruptive if the plaintiffs succeed in blocking the trade of our products and services and they may have a material adverse effect on our business, financial condition, results of operations, and cash flows.

### A MATERIAL DISRUPTION OF OUR OPERATIONS, PARTICULARLY AT OUR MANUFACTURING FACILITIES, COULD ADVERSELY AFFECT OUR BUSINESS.

If operations, particularly at our manufacturing facility in the UK or at the bottling, labeling, and distribution facility in China, were to be disrupted as a result of significant equipment failures, natural disasters, power outages, fires, explosions, terrorism, sabotage, adverse weather conditions, public health crises, labor disputes, or other reasons, we may be unable to effectively fill customer orders and otherwise meet obligations to or demands from our customers, which could adversely affect our financial performance.

Interruptions in production could increase our costs and reduce our sales. Any interruption in production capability could require us to make substantial capital expenditures or purchase alternative material at

B-7

higher costs to fill customer orders, which could negatively affect our profitability and financial condition. We maintain property damage insurance that we believe to be adequate to provide for reconstruction of facilities and equipment, as well as business interruption insurance to mitigate losses resulting from significant production interruption or shutdown caused by an insured loss. However, any recovery under our insurance policies may not offset the lost sales or increased costs that we may experience during the disruption of operations, which could adversely affect our business, financial condition, results of operations, and cash flows.

## OUR REVENUE DEPENDS PRIMARILY ON SALES BY VARIOUS RETAILERS AND DISTRIBUTORS, SOME OF WHICH ACCOUNT FOR A SIGNIFICANT PORTION OF OUR SALES.

Our revenue depends on our sales through various retailers and online merchants. Our sales could become increasingly dependent on purchases by several large retail customers. Consolidation in the retail industry could also adversely affect our business. If our sales were to become increasingly dependent on business with several large retailers, we could be adversely affected by the loss or a significant decline in sales to one or more of these customers. In addition, our dependence on a smaller group of retailers could result in their increased bargaining position and pressures on the prices we charge.

The loss of any one or more of our retail customers or significant or numerous cancellations, reductions, delays in purchases or changes in business practices by our retail customers could have an adverse effect on our business, operating results, and financial condition.

We have one customer that accounted for approximately 65% of our revenue in fiscal year 2019 and another customer that accounted for approximately 63% of our revenue in fiscal year 2020. Although we intend to expand our customer base, our revenue would likely decline if we lost any major customers or if one of these sizable customers were to significantly reduce its orders for any reason. We cannot assure Subscriber that our customers will continue to purchase our products at current levels, or at all.

## WE MAY BE UNABLE TO SUCCESSFULLY EXECUTE OR EFFECTIVELY INTEGRATE ACQUISITIONS OR JOINT VENTURES.

We expect acquisitions of businesses and assets, as well as joint ventures and other strategic arrangements, to play a role in our future growth. We cannot be certain that we will be able to identify attractive acquisition or joint venture targets, obtain financing for acquisitions on satisfactory terms, successfully acquire identified targets, or form joint ventures.

Acquisitions and investments may involve significant cash expenditures, incurrence of debt, equity issuances, operating losses, and expenses. Acquisitions involve numerous other risks, including:

- the diversion of management attention to integration matters;
- difficulties in integrating operations and systems;
- challenges in conforming standards, controls, procedures, accounting and other policies, business cultures, and compensation structures;
- difficulties in assimilating employees and in attracting and retaining key personnel;
- challenges in keeping existing customers and obtaining new customers;
- difficulties in achieving anticipated cost savings, synergies, business opportunities, and growth prospects;
- contingent liabilities (including contingent tax liabilities) that are larger than expected; and
- potential unknown liabilities, adverse consequences, and unforeseen increased expenses associated with acquired companies.

Many of these factors are outside of our control; and any one of them could result in increased costs, decreased expected revenues, and diversion of management time and energy, which could materially impact our business, financial condition, and results of operations.

## RISKS ASSOCIATED WITH JOINT VENTURE INVESTMENTS MAY ADVERSELY AFFECT OUR BUSINESS AND FINANCIAL RESULTS.

B-8

We have entered into joint ventures in the past, and we may enter into additional joint ventures in the future. Our joint venture partners may at any time have economic, business, or legal interests or goals that are inconsistent with our goals or with the goals of the joint venture. In addition, we may compete against our joint venture partners in other markets. Disagreements with our business partners may impede our ability to maximize the benefits of our partnerships or impair the planned expansion of our business. Our joint venture arrangements may require us, among other matters, to pay certain costs or to make certain capital investments or to seek our joint venture partners' consent to take certain actions. In addition, our joint venture partners may be unable or unwilling to meet their economic or other obligations under the operative documents, and we may be required to either fulfill those obligations alone to ensure the ongoing success of a joint venture or to dissolve and liquidate a joint venture. These risks could result in a material adverse effect on our business and financial results.

**OUR OPERATIONS EXPOSE US TO THE RISK OF MATERIAL ENVIRONMENTAL LIABILITIES, LITIGATION, AND VIOLATIONS.**

We are subject to numerous foreign, federal, state, and local environmental protection and health and safety laws governing, among other things, the generation, storage, use, and transportation of hazardous materials; emissions or discharges of substances into the environment; and the health and safety of our employees. There can be no assurances that we have been or will be at all times in compliance with environmental laws. If we violate these laws, we could be fined, criminally charged, or otherwise sanctioned by regulators.

Certain environmental laws assess liability on current or previous owners or operators of real property for the cost of removal or remediation of hazardous substances at their properties or at properties at which they have disposed of hazardous substances and the costs to restore damage to natural resources. In addition to cleanup costs resulting from violations of environmental laws, private parties could bring personal injury or other claims due to the presence of, or exposure to, hazardous substances used, stored, or disposed of by us or contained in our products.

Environmental laws are complex, change frequently and have tended to become more stringent over time. While we have budgeted for future capital and operating expenditures to maintain compliance with such laws, we cannot assure Subscriber that our costs of complying with current or future environmental protection and health and safety laws, or our liabilities arising from past or future releases of, or exposures to, hazardous substances, will not exceed our estimates or adversely affect our financial condition and annual results of operations or that we will not be subject to environmental claims for personal injury or cleanup in the future based on our past, present, or future business activities.

**WE ARE SUBJECT TO A VARIETY OF LITIGATION IN THE COURSE OF OUR BUSINESS THAT COULD CAUSE A MATERIAL ADVERSE EFFECT ON OUR RESULTS OF OPERATIONS AND FINANCIAL CONDITION.**

In the ordinary course of business, we are subject to a significant amount of litigation, including litigation alleging the infringement of intellectual property rights and product liability litigation. The defense of these lawsuits may divert our management's attention, and we may incur significant expenses in defending these lawsuits. In addition, we may be required to pay awards or settlements that could cause a material adverse effect on our financial condition and annual results of operations.

**WE USE A VARIETY OF RAW MATERIALS, SUPPLIER-PROVIDED PARTS, AND THIRD-PARTY SERVICE PROVIDERS IN OUR BUSINESS. SIGNIFICANT SHORTAGES, SUPPLIER CAPACITY CONSTRAINTS OR PRODUCTION DISRUPTIONS, PRICE INCREASES, OR TARIFFS COULD INCREASE OUR OPERATING COSTS AND ADVERSELY IMPACT THE COMPETITIVE POSITIONS OF OUR PRODUCTS.**

Our reliance on suppliers and commodity markets to secure components and raw materials (such as copper, aluminum and steel) and on service providers to deliver our products, exposes us to volatility in the prices and availability of these materials and services. That potential volatility is particularly acute in certain instances where we depend upon a single source. Issues with suppliers (such as delivery or production disruptions, capacity constraints, quality issues, consolidations, closings, or bankruptcies), price increases, raw material shortages, or the decreased availability of trucks and other delivery services

B-9

could have a material adverse effect on our ability to meet our commitments to customers or increase our operating costs.

We use various strategies to lock in prices of expected purchases of certain raw materials; however, these efforts could cause us to pay higher prices for a commodity when compared with the market price at the time the commodity is actually purchased or delivered. Tariffs can also increase our costs, the impact of which is difficult to predict. However, we believe that our supply management and production practices appropriately balance the foreseeable risks and the costs of alternative practices. Nonetheless, these risks may have a material adverse effect on our competitive position, results of operations, cash flows, or financial condition.

**WE DESIGN AND MANUFACTURE PRODUCTS THAT INCORPORATE ADVANCED TECHNOLOGIES. THE INTRODUCTION OF NEW PRODUCTS AND TECHNOLOGIES INVOLVES RISKS, AND WE MAY NOT REALIZE THE DEGREE OR TIMING OF BENEFITS INITIALLY ANTICIPATED.**

Our future success depends on designing, developing, producing, selling, and supporting innovative products that incorporate advanced technologies. The regulations applicable to our products may change from time to time. Moreover, regulatory changes may render our products and technologies non-compliant. Our ability to realize the anticipated benefits of our technological advancements or product improvements – including those associated with regulatory changes – depends on a variety of factors, including: meeting development, production, testing, and regulatory approval schedules; meeting performance plans and expectations; the availability of raw materials and parts; our suppliers' performance; the hiring, training, and deployment of qualified personnel; achieving efficiencies; identifying emerging regulatory and technological trends; validating innovative technologies; the level of customer interest in new technologies and products; the costs; and customer acceptance of our new or improved products.

Our products also may incorporate technologies developed or manufactured by third parties, which, when combined with our technology or products, creates additional risks and uncertainties. As a result, the performance and market acceptance of these third-party products and services could affect the level of customer interest and acceptance of our own products in the marketplace.

Our research and development efforts may not culminate in new technologies or timely products, or may not meet the needs of our customers as effectively as competitive offerings. Our competitors may develop competing technologies that gain market acceptance before or instead of our products. In addition, we may not be successful in anticipating or reacting to changes in the regulatory environments in which our products are sold, and the markets for our products may not develop or grow as we anticipate.

**FAILURE TO ACHIEVE AND MAINTAIN A HIGH LEVEL OF PRODUCT AND SERVICE QUALITY COULD DAMAGE OUR REPUTATION WITH CUSTOMERS AND NEGATIVELY IMPACT OUR RESULTS.**

Product and service quality issues could harm customer confidence in our Company and our brand. If our products do not meet applicable safety standards or our customers' expectations regarding safety or quality, we may experience lost sales and increased costs and be exposed to legal, financial, and reputational risks. Actual, potential, or perceived product safety concerns could expose us to litigation as well as government enforcement actions. In addition, when our products fail to perform as expected, we are exposed to warranty claims, product liability claims, personal injury claims, and other claims.

We maintain strict quality controls and procedures. However, we cannot be certain that these controls and procedures will reveal defects in our products or their raw materials, which may not become apparent until after the products have been placed in use in the market. Accordingly, there is a risk that products will have defects, which could require a product recall. Product recalls can be expensive to implement and may damage our reputation, customer relationships, and market share.

In many jurisdictions, product liability claims are not limited to any specified amount of recovery. If any such claims or contribution requests or requirements exceed our available insurance or if there is a product recall, there could be an adverse impact on our results of operations. In addition, a recall or claim could require us to review our entire product portfolio to assess whether similar issues are present in

B-10

other products, which could result in a significant disruption to our business and which could have a further adverse impact on our business, financial condition, results of operations, and cash flows. There can be no assurance that we will not experience any material warranty or product liability claim losses in the future, that we will not incur significant costs to defend such claims, or that we will have adequate reserves to cover any recalls, repair, and replacement costs.

**DUE TO THE NATURE AND USE OF THE PRODUCTS THAT WE MANUFACTURE, WE MAY IN THE FUTURE FACE LARGE LIABILITY CLAIMS.**

We are subject to litigation in the ordinary course of our business, which could be costly to us and which may arise in the future. We are exposed to possible claims for personal injury, death, or property damage from the failure of a product manufactured by us. For example, improperly manufactured gas cylinders could explode at high pressure, which can cause substantial personal and property damage. This risk may be increased through the use of new technologies, materials, and innovations.

Many factors beyond our control could lead to liability claims, including:

- the reliability and skills of persons using our products; and
- the use by customers of materials or products that we produced for applications for which the material or product was not designed.

If we cannot successfully defend ourselves against claims, we may incur substantial liabilities. Even a successful defense would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims may result in:

- decreased demand for our products;
- reputational injury;
- initiation of investigation by regulators;
- costs to defend related litigation;
- diversion of management time and resources;
- compensatory damages and fines;
- product recalls or withdrawals or labeling, marketing, or promotional restrictions;
- loss of revenue;
- exhaustion of any available insurance and our capital resources; and
- a decline in our stock price.

We could be required to pay a material amount if a claim is made against us that is not covered by insurance or otherwise subject to indemnification or that exceeds the insurance coverage that we maintain. Moreover, we do not currently carry insurance to cover the expense of product recalls, and litigation involving significant product recalls or product liability could have a material adverse effect on our results of operations, financial position, and cash flows.

**IF WE CANNOT COMPETE SUCCESSFULLY FOR MARKET SHARE AGAINST OTHER FIRE CONTROL PRODUCTS COMPANIES, WE MAY NOT ACHIEVE SUFFICIENT PRODUCT REVENUES, AND OUR BUSINESS WILL SUFFER.**

The market for our products is characterized by intense competition and rapid technological advances. Our products compete with a multitude of products and services developed, manufactured, and marketed by others; and we expect competition from new market entrants in the future, specifically due to the high profit margin that characterizes our industry. Existing or future products from competitors may provide improved quality, technology, or ease of use; greater utility; lower cost; or other benefits from their intended uses than our products, or may offer comparable performance at a lower cost. If our products fail to capture and maintain market share, or have low adoption rates for any reason, we may not achieve sufficient product revenues, and our business could suffer.

**WE COMPETE FOR QUALIFIED PERSONNEL WITH OTHER FIRE PRODUCTS COMPANIES AND RESEARCH INSTITUTIONS. IF WE ARE UNABLE TO ATTRACT AND RETAIN QUALIFIED EMPLOYEES, WE MAY BE UNABLE TO MEET OUR BUSINESS AND FINANCIAL GOALS.**

4882-3846-5293, v.5

We compete for qualified personnel with managerial, engineering, and technical skills with other fire products companies and research institutions. Intense competition for these personnel could cause our compensation costs to increase, which could have a material adverse effect on our results of operations. Our future success and ability to grow our business will depend in part on the continued service of these individuals and our ability to identify, hire, and retain additional qualified personnel. If we are unable to attract and retain qualified employees, we may be unable to meet our business and financial goals.

**OUR EXECUTIVE OFFICERS AND DIRECTORS COLLECTIVELY HAVE SIGNIFICANT VOTING POWER ON ALL MATTERS SUBMITTED TO THE SHAREHOLDERS OF THE COMPANY.**

Our CEO and current director, David Breith, owns 63.48% of the outstanding shares of our Common Stock as of the date of the Subscription Agreement and after a fully subscribed Offering will own 44.52%. Accordingly, Mr. Breith has a significant influence in determining the outcome of all corporate transactions or other matters, including mergers, consolidations and the sale of all or substantially all of our assets. The interests of Mr. Breith may differ from the interests of the other shareholders and thus result in corporate decisions that are disadvantageous to other shareholders.  Accordingly, this concentration of ownership by itself may have the effect of impeding a merger, consolidation, takeover or other business consolidation, or discouraging a potential acquirer from making a tender offer for our Common Stock.

**WE ARE SUBSTANTIALLY DEPENDENT UPON OUR SENIOR MANAGEMENT AND KEY RESEARCH AND DEVELOPMENT PERSONNEL. THE LOSS OF ANY ONE OF THEM WOULD HAVE A MATERIAL ADVERSE EFFECT ON OUR BUSINESS OPERATIONS.**

We are highly dependent on our senior management to manage our business and operations. We also depend on our key research personnel for the development and refinement of new technology and products. We do not maintain key man life or disability insurance on any of our senior management or key personnel. The loss of any one of them would have a material adverse effect on our business and operations. Competition for senior management and our other key personnel is intense, and the pool of suitable candidates is limited. We may be unable to locate a suitable replacement for any senior management or key personnel that we lose. In addition, if any member of our senior management or key personnel joins a competitor or forms a competing company, he or she may compete with us for customers, business partners, and other key professionals and staff members of our Company. Although each of our senior management and key personnel has signed a confidentiality agreement in connection with his or her employment with us, we cannot assure Subscriber that we will be able to successfully enforce these provisions in the event of a dispute between us and any member of our senior management or key personnel.

**WE MAY NOT BE ABLE TO DIVERSIFY OUR SUPPLIERS AND THEREFORE MAY BE SUBJECT TO RISKS ASSOCIATED WITH A SOLE OR LIMITED SOURCES OF SUPPLY.**

Due to the high complexity and certification requirements of our products, it is not practical to multisource production across a number of suppliers. This weakens our negotiating position with our existing suppliers and increases the concentration risk associated with a sole source of supply, including the risks that our existing suppliers could become subject to bankruptcy or insolvency. There is also a heightened risk in the short term of supply disruption and higher prices with single-source supplier relationships.

**THE NATURE OF THE PRODUCTS WE SELL EXPOSES US TO WARRANTY RISK.**

Each year, the number of our products in the market increases and it is inevitable, given the technology-content of our products, that despite best efforts to produce a product with zero defects, from time to time we will experience product warranty issues. If a product fails, our liability is governed by the contractual agreement with our immediate customer, which may include the provision of a replacement product. If the defect relates to the design of the product, we have insurance in place against potential claims but not the cost of replacing products in the marketplace. A manufacturing defect may not be covered by our supplier's insurance in all circumstances. The cost to us of any product issued with a design defect would extend beyond the cost of any specific claims brought against it, including potentially swapping products out in the marketplace or, in the worst case, a product recall. The cost of potentially replacing defective

B-12

units already distributed and the reputational impact that could occur at the product, brand, and Company level could be significant.

**OUR DISTRIBUTOR RELATIONSHIPS MAY EXPOSE US TO FINANCIAL RISK.**

We work with third-party distributors in myriad territories. Each of our distributors own the key customer relationships and undertake marketing support activities to drive revenue in the markets they serve. We are dependent upon these distributors to fulfil these roles in an effective and efficient manner to continue to grow sales in these jurisdictions. Given the significant concentration of sales through a small number of distributors, we closely monitor sales by the third-party distributors. We may on occasion financially support our distribution partners with extensions to payment terms. From time to time, overstocking in the distribution channel may cause financial pressures on our Company depending on the sales conditions in the relevant market, and this could affect our future revenues and profits.

**MANY OF OUR PRODUCTS REQUIRE COMPLIANCE WITH INDUSTRY CERTIFICATION STANDARDS.**

Many of our products are required to comply with the appropriate certification standards. If products do not comply, certification bodies could insist on quarantining the product for further testing, rework, or, in extreme situations, a recall. This quarantining could affect our future revenues and profits.

**OUR INTERNATIONAL ACTIVITIES EXPOSE US TO RISKS ASSOCIATED WITH DOING BUSINESS IN JURISDICTIONS SUBJECT TO CHANGING REGULATORY REQUIREMENTS AND RESTRICTIONS.**

Our activities involve the import and export of products. Any changes in the regulations covering such movements might impact our trading activities. Increasing geographical reach and continual expansion of our customer base, particularly into Europe, exposes us to a potentially wider set of regulatory restrictions. If we are unable to comply with, or react quickly enough to, any new regulation introduced or changes made to existing regulations, we may lose customers, find it more difficult to win new customers, or, in the worst case, lose the ability to distribute our products into certain jurisdictions, resulting in lost sales and profits.

**OUR DEPENDENCE UPON INTERNATIONAL SHIPPING MAY IMPEDE OUR ABILITY TO SUPPLY PRODUCTS; AND IF OUR PRODUCTS ARE NOT DELIVERED ON TIME, IN PROPER CONDITION, OR AT ALL, OUR BUSINESS AND REPUTATION COULD SUFFER.**

During the fiscal year 2021, approximately 90% of our products were sold internationally outside of the country in which they were manufactured. As a result, we are subject to risks associated with shipping products across borders and with sourcing raw material and goods from other countries, including shipping delays. A number of factors that are beyond our control may contribute to shipping delays, including, but not limited to, inclement weather, natural disasters, transportation disruptions, delays in customs inspections, terrorism, acts of piracy, public health crises such as the COVID-19 pandemic, human error, labor unrest, industry consolidation, supplier insolvency, and government shutdowns.

If we do not receive raw materials and other goods from our suppliers or we cannot deliver our products on a competitive and timely basis, our relationships with international customers will be damaged and our financial condition could also be harmed.

**RISKS OF MANUFACTURING OUR PRODUCTS IN CHINA**

**IF CHINESE GOVERNMENT REGULATIONS CHANGE, IT MAY NEGATIVELY AFFECT OUR BUSINESS.**

The bottling, labeling, and distribution of our products is subject to various governmental regulations in China. We intend to streamline our manufacturing process by mixing our products in China in the future. Government regulation includes inspection of, and controls over, manufacturing, safety, and environmental controls. Government regulation substantially increases the cost of sourcing these activities in China. All of our products are bottled and labeled in, and distributed to our buyers from,

B-13

China. Accordingly, our operations are subject, to a significant degree, to the laws of the People's Republic of China ("PRC").

**WE ARE SUBJECT TO COMPLEX CHINESE BUSINESS REGULATIONS, WHICH COULD PREVENT OUR PLANNED MANUFACTURING EXPANSION.**

As China changes its economy to be more market-oriented, uncertainties arise regarding governmental policies and measures. Although in recent years the Chinese government has implemented measures emphasizing the use of market forces for economic reform, reduction of state ownership of productive assets, and establishment of sound corporate governance practices, a substantial portion of productive assets in China are still owned by the Chinese government. The Chinese government also exercises significant control over China's economic growth through allocation of resources, foreign currency control, and preferential treatment of particular industries or companies.

**CHANGES IN TARIFFS, IMPORT OR EXPORT RESTRICTIONS, CHINESE REGULATIONS OR OTHER TRADE BARRIERS MAY REDUCE GROSS MARGINS.**

We currently bottle, label and distribute our products from China, making us subject to various governmental regulations in China. Thus, we may incur increases in costs due to changes in tariffs, import or export restrictions, other trade barriers, or unexpected changes in regulatory requirements, any of which could reduce our gross margins.

Since the beginning of 2018, there has been increasing rhetoric, in some cases coupled with legislative or executive action, from several U.S. and foreign leaders regarding tariffs against foreign imports of certain materials. It is difficult to anticipate the impact on our business caused by the proposed tariffs or whether the proposed changes in tariffs will materialize in the future. Given the relatively fluid regulatory environment in China and the United States, there could be additional tax, tariffs or other regulatory changes in the future. Any such changes could directly and materially adversely impact our business, financial condition, and operating results.

**CERTAIN POLITICAL AND ECONOMIC CONSIDERATIONS RELATING TO THE PRC COULD ADVERSELY AFFECT OUR COMPANY.**

The PRC is still transitioning from a planned economy to a market economy. While the PRC government has pursued economic reforms since its adoption of the open-door policy in 1978, a large portion of the PRC economy is still operating under five-year plans and annual state plans. Through these plans and other economic measures, such as control on foreign exchange, taxation, and restrictions on foreign participation in the domestic market of various industries, the PRC government exerts considerable direct and indirect influence on the economy. Many of the economic reforms carried out by the PRC government are unprecedented or experimental and are expected to be refined and improved. Other political, economic, and social factors can also lead to further readjustment of such reforms. This refining and readjustment process may not necessarily have a positive effect on our operations or future business development. Our operating results may be adversely affected by changes in the PRC's economic and social conditions as well as by changes in the policies of the PRC government, such as changes in laws and regulations (or the official interpretation thereof), measures which may be introduced to control inflation, changes in the interest rate or method of taxation, and the imposition of additional restrictions on currency conversion.

**THE COMPANY'S PROJECTED FINANCIAL INFORMATION IS SUBJECT TO A NUMBER OF ASSUMPTIONS AND THERE IS NO ASSURANCE THAT SUCH PROJECTED FINANCIAL INFORMATION ACCURATELY PREDICTS ITS FUTURE RESULTS.**

The operating and financial information contained in the Company's projected financial data has been prepared by management based upon its current estimates of the Company's future performance which estimates are currently believed by management to be appropriate. In addition, the projected results are dependent on the successful implementation of management's growth strategies and are based on assumptions and events over which the Company has only partial or no control. The selection of assumptions underlying such projected information required the exercise of judgment, and the projections are subject to uncertainty due to the effects that economic or other changes may have on future events. Changes in the facts or circumstances underlying such assumptions may materially affect

B-14

the projections.  To the extent that assumed events do not materialize, actual results may vary substantially from the projected results.  As a result, no assurance can be made that the Company will achieve the operating or financial results set forth in its financial projections.

**RISKS ASSOCIATED WITH THIS OFFERING**

**THE OFFERING PRICE OF THE COMMON STOCK IS BASED UPON A NUMBER OF FACTORS, AND SHOULD NOT BE REGARDED AS AN INDICATION OF ANY CURRENT OR FUTURE MARKET PRICE FOR THE COMMON STOCK.**

The Offering price of the Common Stock offered hereby is based on a number of factors, such as the prospects of the Company's business and the industry in which it competes, an assessment of its management, present operations and earnings prospects, the present state of its development, and the general condition of the securities markets at the time of this Offering.  The price of the Common Stock offered hereby should not be regarded as an indication of any current or future market price for the Common Stock.

**THE COMMON STOCK IS ILLIQUID.**

The Common Stock being offered will not be registered with the Securities and Exchange Commission nor with any state securities commission, and in offering such Common Stock the Company may rely upon one or more exemptions from registration.  As such, the Common Stock will be restricted and may not be sold without registration under the Act unless such resale is made pursuant to exemption thereunder.  Accordingly, the Subscriber should carefully consider the potentially illiquid and long-term nature of its investment in the Company.

**THE MARKET PRICE FOR OUR SHARES MAY BE VOLATILE, WHICH COULD RESULT IN SUBSTANTIAL LOSSES TO INVESTORS.**

The market price for our shares is likely to be volatile and subject to wide fluctuations in response to factors including the following:

- actual or anticipated fluctuations in our quarterly operating results;
- announcements by our competitors of acquisitions, strategic partnerships, joint ventures, or capital commitments;
- additions or departures of key personnel; or
- potential litigation.

**OUR INTERNAL CONTROLS MAY BE INADEQUATE, WHICH COULD CAUSE OUR FINANCIAL REPORTING TO BE UNRELIABLE AND LEAD TO MISINFORMATION BEING DISSEMINATED TO THE PUBLIC.**

It is important for us to maintain effective internal control over financial reporting, which is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

A material weakness in our internal control over financial reporting could adversely impact our ability to provide timely and accurate financial information. If we are unsuccessful in implementing effective internal controls, we may not be able to timely or accurately report our financial condition, results of operations or cash flows or maintain effective disclosure controls and procedures. If we are unable to report financial information timely and accurately or to maintain effective disclosure controls and

B-15

procedures, we could be subject to, among other things, regulatory or enforcement actions by the SEC, any one of which could adversely affect our business prospects.

**SUBSCRIBER COULD BE DILUTED FROM OUR FUTURE ISSUANCE OF CAPITAL STOCK AND DERIVATIVE SECURITIES.**

Immediately prior to the issuance of the First Tranche Shares, we had 7,143,200 shares of Common Stock outstanding and no shares of preferred stock outstanding. We are authorized to issue up to 100,000,000 shares of Common Stock and 10,000,000 shares of preferred stock. To the extent of such authorization, our Board of Directors will have the ability, without seeking stockholder approval, to issue additional shares of Common Stock or preferred stock in the future for such consideration as the Board of Directors may consider sufficient. The issuance of additional Common Stock or Preferred Stock in the future may reduce the Subscriber's proportionate ownership and voting power.

**WE HAVE NOT DETERMINED A SPECIFIC USE FOR THE PROCEEDS FROM THIS OFFERING, AND WE MAY USE THE PROCEEDS IN WAYS WITH WHICH SUBSCRIBER MAY NOT AGREE.**

Our management will have considerable discretion in the application of the net proceeds received by us in this Offering. Subscriber will not have the opportunity, as part of Subscriber's investment decision, to assess whether the proceeds are being used appropriately. Subscriber must rely on the judgment of our management regarding the application of the net proceeds of this Offering. The net proceeds may be used for corporate purposes that do not improve our efforts to achieve profitability or increase our stock price. The net proceeds from this Offering may be placed in investments that do not produce income or that lose value.

**WE DO NOT INTEND TO PAY DIVIDENDS ON OUR COMMON STOCK.**

We intend to retain all of our earnings, if any, for the foreseeable future to finance the operation and expansion of our business and do not anticipate paying dividends. Any future determination to pay dividends will be at the discretion of our Board of Directors, subject to compliance with applicable law and any contractual provisions, and will depend on, among other factors, our results of operations, financial condition, capital requirements and other factors that our Board of Directors deems relevant. As a result, Subscriber should expect to receive a return on Subscriber's investment in our Common Stock only if the Company is sold or a public market develops for the Common Stock, neither of which may ever.

B-16

## EXHIBIT C

## SCHEDULE OF RESERVED MATTERS

**March 9, 2022**

**FIREXO:- Interpretation**

"Company"      means Firexo Corporation, a Delaware corporation number  and any other Group Company.

"Managers"      as defined in Schedule 1

"Directors"      as defined in Schedule 1 -

"Employees"      as defined in Schedule 1

"Business"      means the business carried on by the Company being the innovation in fire safety and sale of related products.

"Encumbrance"      means any option, mortgage, charge (whether fixed or floating), restriction, pledge, lien, security interest, or other third party right of interest (legal or equitable) over or in respect of the relevant asset, security or rights.

"Group Company"      means any direct or indirect subsidiary of the Company.


**FIREXO :- List of consents.**

**It is agreed this list can be varied by mutual written consent at any time.**

1.      Variation of  the Amended and Restated Certificate of Incorporation of the Company.

2.      Variation of any of the voting rights attaching to shares of the Company.

3.      Increase or reduce the amount of the Company's issued share capital.

4.      Grant of any option or other interest over or in the Company's share capital

5.      Redeem or purchase any of its own shares or otherwise alter, or effect any reorganisation of, its share capital.

6.      Alter the Company's name or registered office.

7.      Change the Company's place of establishment/tax domicile.

8.      Enter into any arrangement which is outside the normal course of the Business.

9.      Create or grant any Encumbrance over the whole or any part of the Business, its undertaking or assets or over any of the shares in its issued share capital.

10.      Grant any rights (by licence or otherwise) in or over any intellectual property owned or used by the Company.

C-2

11. Incur any borrowings; other than from its bankers (not in excess of £100,000) for the ordinary and usual course of business.

12. Make any loan or grant any credit (other than in the normal course of trading) or give any guarantee (other than in the normal course of trading) or indemnity.

13. Amalgamate or merge with any other company or business undertaking, form or acquire any subsidiary, directly or indirectly acquire shares in any other company or directly or indirectly participate in any partnership or joint venture.

14. Apply for the listing or trading of any shares or debt securities on any stock exchange or market.

15. The sale, transfer, lease, licence, assignment, or disposal of (or agreement so to do) the whole or any part of the Company's undertaking or assets (or any other Group Company) other than trading stock in the ordinary course of business.

16. Pass any resolution for its winding up or present any petition for its administration (unless it has become insolvent).

17. The acquisition of the whole or any significant part of a business or undertaking or any shares, debentures, loan stock or other securities or interest in any company, partnership or other body.

18. The entry into any new hire purchasing or leasing arrangements such that such arrangements exceed £100,000 at any one time.

19. Any material change in the nature of its business so as to endanger the Company's Enterprise Investment Scheme qualifying status.

20. Any expansion, development, or evolution of its business otherwise than through another Group Company.

21. Sell all its shares.

22. The creation of any mortgage, charge, lien (except any lien arising in the ordinary course of trading) or other Encumbrance over the whole or any part of its assets, property or undertaking or acquisition by any means of any assets which are already subject to any mortgage, charge, other Encumbrance or any such lien.

23. The incurring of capital expenditure in respect of a single item more than £60,000 or in aggregate in excess of £150,000 in any financial year.

24. The variation of the terms of any service agreements or increase in the emoluments payable to any of the Managers or Directors or Employees of the Company other than in accordance with their respective service agreements or contracts of appointment (as appropriate). appropriate meaning i) market rate and ii) in the company's best interests (financial, commercial etc.)

C-3

25. The establishment or adoption of any new share incentive share option, pension or retirement benefits scheme or arrangements for its employees or directors generally (excluding the statutory minimum requirements) or the making or payment of benefits (other than commissions and bonuses for target performance) to any of the Managers or Directors or Employees of the Company (current or former) under any such schemes or arrangements.

26. The payment of any compensation for loss of office to a director, manager or employee other than statutory or already in existing contracts, save pursuant to a decision or order of a court of competent jurisdiction or an industrial tribunal.

27. The employment of (a) any person connected with any of the Managers or Directors or Employees, or (b) any person whose emoluments and pension benefits shall cost the Company in excess of £100,000 per annum (other than a person recruited as a replacement on substantially similar terms as the former employee being replaced).

28. The commencement of any litigation or other legal proceedings (other than actions to recover debts in the ordinary course of business).

29. The making of any gifts or donations in excess of £5,000 in aggregate in any financial year

30. Any alteration of the accounting reference date of the Company or of the accounting policies and practices of the Company (other than to comply with applicable generally accepted accounting principles).

31. Any increase, reduction, repayment, purchase or re-purchase, sub-division, consolidation, Company buy-back, transfer or other variation of the share capital (or the rights attaching to it) of the Company or the creation of any options or other rights to subscribe for or to convert into shares.

32. The declaration, making or payment of any dividend or other distribution to the holders of shares of the Company.

33. The appointment of any person as a director of the Company, including non-executive and independent directors.

34. These schedule of matters will be discussed and reviewed as appropriate on its first anniversary and subsequent anniversaries and will be adjusted by agreement

**SCHEDULE 1**

**Directors:**

David Breith –Director & salaried Group CEO
Winand Staring
Gareth Baldwin
Clive Cowdery -Paula Ward to be appointed to act as CC's proxy and take board seat.

C-4

4858-0683-0605, v.4

Peter Coyle as Company Secretary

For the avoidance of doubt it is agreed the above will be the position after issuance of the First Tranche Shares

**Employees:**

Georgia Hargreaves – Graphic Designer
Jack Breith – UK Sales Manager
Natalia Misko – IT Senior Manager
Nicki Stewart – MD UK & Ireland
Tom Baldwin – Operations Manager

**Consultants/Contractors:**

Gareth Baldwin – Head of Group Operations
Winand Staring – Group Chairman
Peter Coyle – Group General Counsel
Claire Breith- Group Coordinator
David Scott – Global Head of Compliance
Dr A Miller – Group Chemist
Rob Parish – Group Finance Manager
Shane Nienaber – Country Manager – South Africa
Jim Mergenthaler – Country Coordinator - USA
Maurizio Nascimbene – Country Manager – Italy

**SCHEDULE 2**

**The list below lists all items that** will constitute shareholder approval vs board approval under US company law. Below are the items that need shareholder approval which are 50% or more: -

- Sell all its shares
- Merger
- Creation of New shares
- Creation of New Preferred shares * (See below)
- Dissolve
- Elect a Director
- Create an Incentive Stock Options Scheme

It is noted the Company has what is called "Blank Cheque Preferred"  and also has 10m Preferred Shares, so the Company can issue these with board approval only. *

It is further noted the company does not have any what is called "Super Majority" which will require 75% of shareholders to approve so only 50% exists----- as above.

C-5

4858-0683-0605, v.4