IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Firexo, Inc., | Case No. 3:21 CV 2336 |
| Plaintiff, | ORDER JOINING DEFENDANT |
| -vs- | JUDGE JACK ZOUHARY |
| Firexo Group Limited, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Firexo Inc. ("Firexo") moves to join Firexo Corporation ("Corp") as a Defendant under Federal Civil Rule 25(c), and for the appointment of a receiver under Federal Civil Rule 66, 69(a)(1), and Ohio Revised Code ("R.C.") § 2735.01 (Doc. 55). This Court heard argument on the Motion, and the matter is fully briefed (Docs. 68, 70).

### BACKGROUND

**Underlying Litigation**

Firexo is the North American distributor of fire-extinguishing products developed by Defendant Firexo Group Limited ("FGL"), a Delaware company. The parties' relationship was structured through a Joint Venture Agreement and related arrangements described in this Court's prior Order (Doc. 19).

In October 2021, after disputes arose between the parties, Firexo filed suit. FGL originally appeared and answered, representing that it "manufactures fire extinguishers and fire extinguishing products and that these products are sometimes sold in the United States" (Doc. 11 at 2). In September 2024, FGL's counsel withdrew from the case (Doc. 31). In October, Firexo moved to

amend its Complaint in order to add Corp as a Defendant (Doc. 33). This Court denied that request without prejudice, to allow FGL time to secure new counsel (Doc. 35).

FGL opted not to secure new counsel. During this time, this Court continued to communicate with David Breith, a director and chief executive of FGL and Corp, and warned him "that failure to have legal counsel enter an appearance may have consequences without the opportunity for Defendant to be heard" (Doc. 34). (Curiously, during this time, Brieth contacted Chambers to question the status of the case) (*see* Doc. 35). In December, after three months of FGL declining to hire an attorney, this Court allowed Firexo to move for Default (Doc. 36).

This Court then held a Hearing, entered default against FGL, and awarded approximately $4 million in breach-of-contract and punitive damages, as well as attorney fees (Docs. 51, 54). This Court found that FGL engaged in fraudulent conduct, made knowing misrepresentations about its products, and acted with conscious disregard for safety. Plaintiff then renewed its request to add Corp to this case (Doc. 55).

**Corporate Restructuring and Asset Transfer**

When Firexo filed its original state-court complaint on October 29, 2021, FGL was still the "top-level company within which all Firexo business was conducted" (*id.* at 2). On September 1, 2021, Breith emailed FGL shareholders explaining intended structural changes (Doc. 14-7). The email described a share-for-share "flip" transaction into a new Delaware entity, Corp, assuring shareholders that the transaction "will not alter, in any way, your current rights as a shareholder" and that their percentage holdings and the "TopCo" entity for the Firexo group would remain the same (*id.* at 3).

On November 5, FGL transferred all its stock and intellectual property to Corp through a "drag-along" provision (Doc. 14-11). At that time, Corp became the "top-level company for the Firexo group companies" (Doc. 55 at 3). Breith assured shareholders that if the IPO became "abortive,"

2

their stake would be "'reversed' out of the temporary vehicle back into the UK" (Doc. 14-7 at 3). But the IPO was put "on hold" in early 2022, and the shareholding and assets were never returned to FGL (Doc. 55 at 3). Instead, they remained with Corp.

Fast forward to 2024. On October 10, FGL's board transferred 8,600 shares of FGL subsidiary Firexo Motorsport Limited out of FGL and into Firexo Holdings Limited, an entity owned by Corp. That same day, the board transferred 9,500 shares of Firexo Limited Stock, held by FGL, to Firexo Holdings Limited, also owned by Corp (Docs. 55 at 5–6, 55-1 at 14–18). These transfers effectively stripped FGL of all remaining assets. Six days later, Breith advised shareholders that FGL would be placed into voluntary liquidation -- a formal insolvency proceeding in the U.K. (Doc. 55-1 at 2).

**Dormancy and Voluntary Liquidation**

On October 16, 2024, after the asset and share transfers but before this Motion, Breith emailed Corp's shareholders to advise that FGL would be placed into creditors' voluntary liquidation. In that email, Breith revealed that (*id.*):

- FGL had "effectively been dormant since the share exchange" in November 2021;

- FGL's "only function has been to defend legal proceedings" brought by joint venture partners;

- Corp's board placed FGL into voluntary liquidation; and

- Corp, rather than FGL, had become "the ultimate Firexo holding entity" of all Firexo related entities.

FGL then entered voluntary liquidation on November 7, 2024 (Doc. 68 at 1). Corp emphasizes that, since that date, FGL has been under the control of joint liquidators under U.K. law (*id.* at 1–3). Additionally, Firexo has filed a claim as a creditor, and the liquidators are reviewing any alleged wrongful transfers of FGL assets (*id.*). Corp also contends that it "is a holding company that has never traded or carried out business operations" and that "FGL has transferred no assets to Corp" (*id.* at 1–2).

3

**Motion to Join**

Firexo now moves to join Corp as successor to FGL under Rule 25(c) and to appoint a receiver over Corp's assets under Rule 66, Rule 69, and R.C. § 2735.01, to aid collection of the Default Judgment (Doc. 55 at 1).  Plaintiff advances three theories of successor liability: (1) de facto merger; (2) mere continuation; and (3) alter ego (*id.* at 11–15).

Corp opposes on several grounds, including: (1) this Court lacks personal jurisdiction; (2) international comity requires deference to the U.K. liquidation proceeding; and (3) it is a mere holding company with no operations and no receipt of FGL assets (Doc. 68 at 1–5, 8–12).  In its Reply, Firexo responds that: (1) international comity does not bar this Court from recognizing Corp as FGL's successor, especially where the transfer of FGL's business occurred years before the liquidation; and (2) the undisputed structural continuity between FGL and Corp satisfies Ohio's successor-liability exceptions (Doc. 70 at 1–4).

L<small>AW</small>

**Rule 25(c) and Successor Liability**

Federal Civil Rule 25(c) provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  The rule is procedural and designed to ensure that a judgment follows the interest; it does not itself determine substantive liability.

Under Ohio law, the general rule is that a corporation purchasing another's assets is not liable for the seller's debts.  But Ohio recognizes four well-established exceptions: (1) express or implied assumption of liability; (2) transactions amounting to a de facto merger; (3) a mere continuation of the seller; and (4) transactions entered into to escape liability for the seller's obligations.  *See Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St. 3d 60, 62 (Ohio 1987).  (discussing these exceptions under Ohio law).  Federal courts applying Ohio law have recognized that whether these

4

exceptions apply is a fact-intensive inquiry. *See, e.g.*, *Ragen v. Hancor, Inc.*, 920 F. Supp. 2d 810, 823–26 (N.D. Ohio 2013) (applying the successor-liability to the record evidence to determine whether genuine issues of material fact precluded summary judgment).

If granted, a Rule 25(c) motion "does not change the substantive rights and obligations of the parties or of the transferee." *United States v. Harold*, 423 F. Supp. 3d 410, 415 (E.D. Mich. 2019). Rather, "the judgment will be binding on the successor even if the successor is not named in the lawsuit." *Jackson v. Corizon Health, Inc.*, 2025 WL 546365, at *2 (E.D. Mich. 2025) (quoting *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir. 1993)).

### DISCUSSION

**Jurisdiction**

Corp first argues this Court lacks jursidiction, and that because it did not have a chance to defend the merits before Default was entered, it should not now be saddled with FGL's judgment (Doc. 68 at 2–3, 7–8). This argument is frivolous.

Breith received notice -- on multiple occasions from prior counsel as well as this Court -- that failure to defend this suit would result in default. More important, Rule 25(c) is expressly designed to address changes in interest or corporate structure while litigation is pending or after judgment is entered. Courts have consistently held "that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of" an entity subject to the court's jurisdiction. *Est. of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (citation ommitted)). *See also Sys. Div., Inc. v. Teknek Elecs., Ltd.*, 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of jurisdiction over an alter ego is compatible with due process because a corporation and its alter ego are the *same entity* -- thus, the jurisdictional

5

contacts of one are the jurisdictional contacts of the other for purposes of the *International Shoe* due process analysis.").

And for this reason, the timing of the substitution makes no difference. "Although substitution is usually effected during the course of litigation, substitution has been upheld even after litigation has ended as long as the transfer of interest occurred during the pendency of the case." *Blachy v. Butcher*, 221 F.3d 896, 911 (6th Cir. 2000) (citation omitted). Therefore, a successor corporation formed and controlled by the same principals may be joined post-judgment and held bound by a default judgment against its predecessor. *See, e.g.*, *Rodríguez-Miranda v. Benin*, 829 F.3d 29, 40–41 (1st Cir. 2016) ("Rule 25(c) applies to actions that are 'pending,' but this does not preclude substitution during subsequent proceedings brought to enforce a judgment."); *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 23 (7th Cir. 1977) ("Rule 25 has application only to actions pending in the district courts. But this should not preclude substitution after judgment has been rendered in the district court . . . for the purpose of subsequent proceedings to enforce . . . a judgment") (citation omitted); *Minn. Min. & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1262–64 (Fed. Cir. 1985) (holding that the district court had in jurisdiction over the successor by virtue of its joinder under Rule 25(c), even though the successor had no independent contacts with the forum state).

Were this not the case, debtors subject to a judgment "could merely transfer legal ownership of the assets from one shell corporation to another in a different jurisdiction, putting a party whose initial suit satisfied the jurisdictional requirements to the immense burden of chasing the involved assets from courtroom to courtroom." *Minn. Mining*, 757 F.2d at 1263.

**International Comity and Abstention**

6

Corp argues that international comity requires this Court to defer to the U.K. creditors' voluntary liquidation of FGL and abstain from granting relief under Rule 25(c) (Doc. 68 at 8–9). But abstention based on international comity is a narrow exception that is not appropriate here (Doc. 70 at 2–4). The relief sought here is procedural -- to join Corp as FGL's successor under Rule 25(c) and to appoint a limited receiver over Corp's assets to aid enforcement of this Court's judgment. This is not an attempt to administer FGL's estate in the U.K. liquidation, nor to interfere with the liquidators' duties.

The Supreme Court has held that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," and that abstention is warranted only in "extraordinary and narrow" circumstances. *Col. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813–18 (1976). Corp has not shown "extraordinary" circumstances warranting abstention. The operative transfer of FGL's business to Corp occurred on November 5, 2021, more than three years before FGL entered voluntary liquidation on November 7, 2024 (Docs. 55 at 2–4; 68 at 1–2). The U.K. process focuses on FGL's remaining estate; it does not examine whether Corp is FGL's successor under Ohio law or whether the Default Judgment in this case may be enforced against Corp. *See Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 466–69 (6th Cir. 2009) (declining to adopt a broad doctrine of "international comity abstention," and emphasizing that the existence of a foreign proceeding does not, by itself, relieve a federal court of its obligation to decide cases properly before it).

Respecting comity does not require this Court to blind itself to the reality of the corporate restructuring, or to decline to enforce the Default Judgment against the entity that now holds the Firexo business and assets.

**Transfer of Interest**

The threshold requirement under Rule 25(c) is that an "interest" of FGL has been transferred. "To determine whether a transfer of interest has occurred, the Court applies state substantive law." *Simplifi Health Benefit Mgmt., LLC v. Cayman Islands Nat'l Ins. Co.*, 2015 WL 5251234, at *3 (S.D. Ohio 2015).  The record here clearly demonstrates that FGL's core business, assets, and ownership interests were transferred to and continued through Corp.

On November 5, 2021, after Firexo filed suit, FGL transferred its remaining stock and intellectual property to Corp (Docs. 55 at 2–3, 14-11).  This transaction elevated Corp to the position of "top-level company for the Firexo group companies" (Doc. 55 at 2–3).  Breith assured shareholders that their percentage holdings and rights would remain unchanged, and that Corp would stand as the "TopCo" for Firexo group entities (Doc. 14-7 at 3).  And though Breith later abandoned the IPO justification for the flip, the assets and shareholdings were never returned to FGL (*id.*).

In October 2024, Breith informed Corp's shareholders that FGL had been "effectively dormant since the share exchange," that its "only function" was to defend legal proceedings, and that Corp had become "the ultimate Firexo holding entity" of all Firexo-related entities (Doc. 55-1 at 2).  Corp's contention that it is merely a non-operating holding company and that "FGL has transferred no assets to Corp" (Doc. 68 at 2) is inconsistent with the November 2021 share and IP transfer, and with Breith's own description of the post-transfer structure.  On these facts, this Court finds that FGL's interests in the Firexo business, including ownership of group companies and IP, were transferred to and continued through Corp.  That transfer of interest is sufficient to implicate Rule 25(c).

Next, under Ohio law, this Court must determine whether one of the successor-liability exceptions applies.  *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 348 (1993).

8

**De Facto Merger**

"A de facto merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Id.* at 349. Courts consider: "(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations." *Id.*

Here, continuity of ownership is undisputed. The September 2021 email from Breith assured FGL shareholders that the share-for-share flip into Corp would not alter their rights and that they would "at all times retain the same percentage holding" (Doc. 14-7 at 3). Corp simply stepped into FGL's shoes as the "TopCo" for the Firexo group. And continuity of management is likewise evident -- Breith served as FGL's CEO and director and then became CEO of Corp, while also continuing to direct the group's strategy (Docs. 55 at 1–4; 68 at 1–2).

Finally, FGL ceased its ordinary business operations and exists now only as a shell, whose purpose, by Breith's own admission, was reduced to defending litigation (Doc. 55-1 at 2). As Firexo notes, the record reveals: "Corp undertook the identical trade of FGL; that the like-for-like commonality existed in shareholders, directors and officers; and, unknown to Firexo Inc. until October 16, 2024, that FGL's 'only function has been to defend legal proceedings . . . .'" (Doc. 55 at 18). This is precisely the pattern that courts have treated as a de facto merger -- the original operating entity is stripped of its business and assets, which reappear in a new corporation owned and controlled by the same individuals. *See Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 658 (S.D. Ohio 2002) (noting that "transaction[s] that result[ ] in the dissolution of the predecessor corporation

and [that] [are] in the nature of a total absorption of the previous business into the successor" indicate a de facto merger) (quoting *Welco*, 67 Ohio St. 3d at 349).

Corp emphasizes that, as part of the U.K. liquidation, the liquidators performed an independent valuation and have treated certain interests, including FGL's 30% stake in Firexo, as having no value (Doc. 68 at 1–3). That may affect distribution among creditors in the U.K. proceeding, but it does not undercut the reality that the operating Firexo business migrated from FGL to Corp in late 2021 and has continued there ever since. Considering the continuity of ownership and management, along with the cessation of FGL's business, this Court concludes that a de facto merger took place. Corp is therefore bound by the Default Judgment as FGL's successor.

**Mere Continuation**

Mere continuation occurs when "one corporation sells its assets to another corporation with the same people owning both corporations." *Welco*, 67 Ohio St. 3d at 350 (citation omitted). "Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation." *Id.* "[I]t is not enough to show that the purported successor has the same physical plant, officers, employees and product line as the purported predecessor." *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 510 (6th Cir. 2005) (citation omitted). Rather, "the basis of this theory is the continuation of the corporate entity, not the business operation, after the transaction." *Welco*, 67 Ohio St. 3d at 350 (citation omitted).

As outlined above, FGL did not engage in an arm's-length sale of assets to an unrelated buyer. Instead, FGL effected a share-for-share transaction in which its existing shareholders exchanged their FGL shares for shares in Corp, while retaining the same percentage interests, and Corp was installed as the new "TopCo" for the Firexo group. At the same time, FGL transferred its intellectual property and group company shareholdings to Corp. The transaction did not introduce new ownership, new

capital, or a new controlling constituency. Rather, it simply moved the same equity and assets from one corporate wrapper into another. That is exactly the "new hat" scenario described in *Welco*.

Importantly, the Sixth Circuit has held that "the key element in establishing continuation is a common identity of stockholders, directors, and stock." *Mickowski*, 415 F.3d at 510. Here, the identity of directors and officers further confirms that Corp is a mere continuation of FGL. At the time of the underlying misconduct, Breith served as FGL's CEO and director; after the flip, he became CEO of Corp, while remaining a director of both entities. Further, Corp's board made the decision to place FGL into voluntary liquidation. The same individuals thus controlled both corporations before and after the transfer.

Finally, FGL ceased its ordinary business while Corp carried on the Firexo enterprise using the very assets and corporate group that had previously sat under FGL. FGL ceased to manufacture or sell Firexo products and existed only as a litigation shell in U.K. liquidation, while Corp stood atop the Firexo group and marketed the business and its intellectual property to potential investors.

On these facts, Corp is properly treated as a mere continuation of FGL and liable for FGL's obligations, including the Default Judgment. Nothing presented by Corp at the Hearing undercuts this conclusion.

**Alter Ego**

Even if the structural changes could not be characterized as a de facto merger, the same facts establish that Corp is the alter ego of FGL. The Ohio Supreme Court articulated the modern standard for piercing the corporate veil of an alter ego entity in *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274 (Ohio 1993). Under Ohio law, the veil may be pierced where:

(1) Control over the corporation by those to be held liable was so complete that the corporation had no separate mind, will, or existence of its own;

(2) Control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and

11

(3) Injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 289. Courts apply this alter-ego framework when determining whether a successor entity is so intertwined with its predecessor that formal corporate separateness should be disregarded to prevent injustice. *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005).

Courts have long recognized that where a judgment debtor's assets and business are shifted to a new corporation under common control, leaving the original entity judgment-proof, the recipient entity may be treated as a successor in interest or alter ego for purposes of enforcing the judgment. *See Hitachi Med. Sys. Am., Inc. v. Branch*, 2010 WL 816344, at *14 (N.D. Ohio 2010) (holding that, if a debtor corporation transfers "all of [its] assets" to an affiliated entity while litigation is pending, leaving the judgment entity without assets, there may be fraudulent-transfer and alter-ego liability).

For instance, in *Panther Pumps*, a corporate officer arranged to transfer substantially all of a judgment debtor's inventory to a new corporation he solely owned, using those assets to manufacture a substantially identical product. 566 F.2d at 22. The Seventh Circuit held that the officer was a successor in interest to the original corporate defendant and could be substituted, particularly where the transfer rendered the original corporation judgment-proof. *Id.* at 23–24. Likewise, *Minnesota Mining* involved efforts to avoid a default judgment by dissolving the original corporation and forming a new entity, owned and controlled by the same individuals, to carry on the same business. 757 F.2d at 1259–65. The Federal Circuit affirmed the district court rejection of those efforts and its exercise of jurisdiction over the successor and its principals. *Id.*

First, as noted above, control is not meaningfully disputed. The record shows that control over FGL and Corp by Breith and the common ownership group was so complete that the entities lacked truly separate "mind[s], will[s], or existence[s]" with respect to the Firexo business. *Belvedere*, 67 Ohio St. 3d at 289. Breith orchestrated the asset transfer, reassured shareholders that their ownership and "TopCo" status would be unchanged. And later, in his capacity as CEO of Corp

12

and director of FGL, decided -- through Corp's board -- to place FGL into liquidation (Docs. 55 at 2–4; 68 at 1–2). This group operated as a unified enterprise, with Corp and FGL functioning as essentially the same business, under the same leaders.

Second, control was exercised in a manner that, on this record, constituted at least a fraudulent or inequitable use of the corporate form. The November 2021 transfer of FGL's shares and IP to Corp occurred days after Firexo filed its initial Complaint (Doc. 55 at 2–3). When the IPO later failed, the assets were not returned to FGL (*id.* at 3). Instead, FGL was rendered dormant and then placed into liquidation, while Corp continued as the "ultimate Firexo holding entity" (Docs. 55 at 3–4, 55-1 at 2).

Further, the November 2021 flip and subsequent treatment of FGL support piercing the corporate veil, as Corp received fraudulent transfers designed to "hinder, delay, or defraud" creditors in violation of Ohio's Fraudulent Transfer Act. R.C. § 1336.04. The timeline is telling:

1. Firexo filed its original state-court complaint on October 29, 2021 (Docs. 55 at 2, 1-1);

2. On November 5, 2021, FGL transferred all of its stock and IP to Corp (Docs. 55 at 2–3, 14-7, 14-11);

3. The IPO rationale for the flip was later abandoned, but the assets were not returned to FGL (Doc. 55 at 3);

4. By October 16, 2024, FGL had been "effectively dormant" and served only to defend legal proceedings, while Corp was the "ultimate Firexo holding entity" (Docs. 55 at 3–4, 55-1); and

5. On November 7, 2024, FGL entered voluntary liquidation in the U.K. (Docs. 55 at 3–4, 68 at 1–2).

In short, Corp transferred FGL's assets immediately after Firexo filed suit, left FGL dormant, and then placed FGL into liquidation while the business continued under Corp. This pattern resembles a judgment-evasion scheme, where principals shifted business and assets into new

corporations under their control, leaving the original entities unable to satisfy judgments. *See, e.g.*, *Minn. Mining*, 757 F.2d at 1259–65.

Corp's reliance on the U.K. liquidators' ongoing review of transfers (Doc. 68 at 1–3) does not negate this Court's authority to recognize those transfers as fraudulent in substance for purposes of enforcing its own judgment against the successor entity. That process concerns FGL's estate -- it does not preclude this Court from recognizing that the November 2021 transfers were, as a matter of substance, fraudulent, and warrant treating Corp as a successor liable for FGL's judgment obligations. *See Hitachi*, 2010 WL 816344, at *6 (noting that a violation of the Fraudulent Transfer Act suffices as conduct "in such a manner as to commit fraud, an illegal act, or a similarly unlawful act" under the *Belvedere* test) (quoting *Dombroski v. Wellpoint, Inc.*, 119 Ohio St. 3d 506, 513 (Ohio 2008)).

Third, Firexo has suffered injury and unjust loss. Firexo obtained a $4 million judgment based on FGL's fraud and conscious disregard for safety (Doc. 55 at 1–2). Yet FGL, now an empty shell in liquidation, cannot satisfy that judgment, while the Firexo business continues under Corp's umbrella. Corp argues that it has "never traded or carried out business operations" and that any value lies within the U.K. liquidation (Doc. 68 at 1). But a holding company that serves as the "TopCo" for the same business can still be an alter ego where it was created and used to absorb the predecessor's business, while leaving liabilities behind. And the functional separation between the entity that committed the wrongful acts and the entity that now holds the enterprise is a product of deliberate restructuring -- not an arm's-length sale to a bona fide purchaser.

Under *Belvedere*'s three-part test, Corp is properly treated as FGL's alter ego and continuation for purposes of the Default Judgment. 67 Ohio St. 3d at 289. Thus, setting aside the de facto merger doctrine, the Court would independently conclude that Corp is liable as FGL's alter ego based on fraudulent transfers designed to hinder, delay, or defraud a significant creditor. And, again, nothing presented by Corp at the Hearing undercuts this conclusion.

**Appointment Of Receiver**

This Court next turns to Firexo's request for appointment of a receiver over Corp's assets (Doc. 55 at 21–29).  A "district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).  Under Federal Civil Rule 66, the receivership process "must accord with the historical practice in federal courts or with a local rule."  The determination of whether to appoint a receiver "appears to be a question properly determined on the basis of federal law."  12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2983 (3d ed.).  *See also Grayiel v. AIO Holdings, LLC*, 2023 WL 5281933, at *22 (W.D. Ky. 2023) ("Although the Sixth Circuit itself has not addressed the issue, the weight of authority suggests that appointment of a receiver in a diversity action is controlled by federal law, not state law.") (quoting *Fed. Nat'l Mortg. Ass'n v. Mapletree Invs. Ltd. P'ship*, 2010 WL 1753112, at *2 (E.D. Mich. 2010)).

Under federal law, "[t]here is no precise formula for determining when appointment is warranted."  *Mae v. Hatz One LLC*, 2025 WL 660158, at *2 (N.D. Ohio 2025) (citation omitted).  This Court looks to several factors:

> (1) the adequacy of the security; (2) the financial position of the borrower; (3) any fraudulent conduct on the defendant's part; (4) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (5) inadequacy of legal remedies; (6) the probability that harm to the plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (7) the plaintiff's probable success in the action and the possibility of irreparable injury to the plaintiff's interest in the property; and (8) whether the plaintiff's interests sought to be protected will in fact be well-served by a receivership.

*Id.* (quoting *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014)).  *See also Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015) (outlining several factors, including: "whether the property at issue is in 'imminent danger of . . . being lost, concealed, injured, diminished in value, or squandered,' whether the defendant engaged in fraudulent conduct, 'the inadequacy of the available legal remedies,' the lack of less

15

drastic equitable remedies, and the likelihood that the appointment will do more good than harm") (quoting 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2983 (3d ed.)).

Applying the above factors, this Court finds that Firexo has carried "the heavy burden of justifying the need for a receiver." *Mae*, 2025 WL 660158, at *3 (quoting *Citizens Bank, N.A. v. Nostrum Lab'ys, Inc.*, 2024 WL 3199951, at *6 (D.N.J. 2024)).

First, as to the adequacy of security and the financial position of the judgment debtor. Firexo holds a nearly $4 million judgment based on findings of fraud and punitive damages (Doc. 55 at 1–2), yet FGL has been rendered an insolvent shell in a U.K. liquidation and Corp -- now found to be FGL's successor -- has been voided under Delaware law for failure to pay franchise taxes while continuing to sit as the "TopCo" of the Firexo group (Doc. 55 at 2–4, 6–8; Doc. 68 at 6). There is no meaningful collateral securing the judgment as FGL is no longer a going concern; the only realistic source of recovery lies in Corp's interests in the Firexo business and related entities.

Second, the record demonstrates both past fraudulent conduct and an imminent danger that property will be lost, concealed, or diminished. The underlying judgment rests on findings of fraud and conscious disregard for safety. After this litigation was filed, FGL transferred its shares and intellectual property to Corp, became "effectively dormant," and served only to defend legal proceedings. Corporate filings reflect subsequent transfers of subsidiary shares and ongoing efforts by Corp's leadership to market and sell the business and its IP through an international M&A firm, even as Corp was void in Delaware (Doc. 55-1 at 23). This pattern of post-suit asset shifting and continued marketing of the business creates a substantial risk that assets will be further dissipated or moved beyond the reach of this Court.

Third, legal remedies are inadequate, and the balance of harms favors Firexo. Ordinary execution against FGL is futile, as any residual assets are administered in the U.K. liquidation, and FGL no longer operates the business that generated the judgment. Execution against Corp is

complicated by its posture as a holding company at the top of a corporate group, and by the opaqueness of its assets and intercompany relationships. By contrast, a narrowly drawn receivership places Corp's assets under the control of a neutral officer of the Court, minimizes the risk of further dissipation, and allows an orderly, transparent process. Any injury to Corp or other stakeholders from the appointment of a receiver is mitigated by the limited scope of the receivership and is outweighed by the concrete risk that Firexo's judgment will otherwise go unsatisfied. *See Pension Ben. Guar. Corp.*, 630 F. App'x at 414 (noting that receiverships are appropriate where there is a "clear necessity to protect plaintiff's interest in the property") (citation omitted).

Fourth, Firexo's success on the merits is not speculative; it already has a final judgment and, in this Order, a determination that Corp is FGL's successor and mere continuation. If a receiver is not appointed and Corp is permitted to continue transferring or encumbering assets, Firexo faces irreparable injury to its interest in the only property realistically available to satisfy that judgment. A receivership directly addresses that risk by centralizing control of Corp's assets in a neutral fiduciary who is obligated to act for the benefit of the judgment creditor. In these circumstances, Firexo's interests will be well served by a receivership, and the federal receivership factors collectively support appointment of a limited receiver.

A narrowly tailored receiver is therefore appropriate to:

1. Identify and marshal Corp's assets, particularly those associated with the Firexo business;

2. Preserve those assets from further dissipation or transfer; and

3. Apply those assets, consistent with applicable law, to satisfy the Default Judgment in this case.

This approach mirrors the limited receivership approved in *Gibbs* and avoids unnecessary interference with the U.K. liquidation, which addresses FGL's remaining estate, rather than Corp's assets as successor.

17

## CONCLUSION

Corp is liable as FGL's successor under three independent doctrines. The Motion to Join (Doc. 55) is therefore granted. Corp is joined as a Defendant in this action and is bound by the Default Judgment to the same extent as FGL.

Firexo's request for appointment of a receiver is also granted. This Court will appoint a receiver over Corp's assets for the limited purpose of identifying, preserving, and applying those assets toward satisfaction of the Default Judgment entered against FGL (and now Corp). Firexo shall file a proposed Receivership Order, along with the name and qualifications of its proposed Receiver.

IT IS SO ORDERED.

                                          s/ *Jack Zouhary*
                                          JACK ZOUHARY
                                          U. S. DISTRICT JUDGE

                                          December 3, 2025