UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


FIREXO, INC.,                          Case No. 21-cv-02336-JZ
                                       Court of Appeals No. 25-3972
          Plaintiff,
                                       Toledo, Ohio

     vs.

                                       **WEDNESDAY, OCTOBER 22, 2025**
FIREXO GROUP LIMITED, et al.,

          Defendants.


                         - - - - -


                TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE JACK ZOUHARY
             SENIOR UNITED STATES DISTRICT JUDGE


                         - - - - -


Official Court Reporter:   Diana M. Ziegelhofer, RPR, RCR
                           United States District Court
                           1716 Spielbusch Avenue, Suite 380
                           Toledo, Ohio  43604
                           (419) 213-5538

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.


                         - - -

APPEARANCES:

For the Plaintiff:          **Paul T. Belazis,** *Esquire*
                            MALONE, AULT & FARELL
                            7654 West Bancroft Street
                            Toledo, Ohio 43617
                            419-843-1333

(via Zoom):                 **Adam S. Nightingale,** *Esquire*
                            EASTMAN & SMITH
                            One Seagate, 27th Floor
                            Toledo, Ohio 43604
                            419-247-1728


For the Defendant:          **James P. Silk, Jr.,** *Esquire*
                            **Teresa L. Grigsby,** *Esquire*
                            SPENGLER NATHANSON
                            900 Adams Street
                            Toledo, Ohio 43604
                            419-241-8599


                                - - -

**I N D E X**

**WITNESS**                                                                **PAGE**


**PETER JAMES COYLE**
          DIRECT EXAMINATION BY MR. MR. SILK:                    8


- - -

- - -

**WEDNESDAY, OCTOBER 22, 2025**

(Proceedings commenced in open court at 10:08 a.m.)

THE COURT: Good morning. We are here on case number 21-cv-2336, captioned Firexo, Inc. versus Firexo Group.

And we have present on behalf of plaintiff Paul Belazis and Adam Nightingale. On behalf of defendant, James Silk and Teresa Grigsby.

This is a follow-up hearing to our recent hearing, and I want to do a very brief intro for today.

We had a record hearing on October 17 at which time I reviewed with counsel several motions that were pending. Two of those motions were Motions to Strike, documents 60 and 62, and those motions were respectively denied.

Argument was then heard on plaintiff's Motion to Join Firexo Corporation. That's reflected as document 55, and that is a motion that is still pending. It has been fully briefed at this juncture with briefs from both sides. I believe those additional briefs are documents 68 and 70. I took the matter under advisement and scheduled this hearing today to hear testimony from a representative of the defendant.

First, I want to do a little background. In

September, 2024, defendants' counsel withdrew from this case; that's document 31.

MR. SILK: Your Honor, if I may, just for clarification, as I think you referred to Corp. as defendant and then just referred to I believe what would have been FGL as defendant, so I think just to clarify the record.

THE COURT: I'm just going to call everybody Firexo, how is that? And then you can put a tag on that as you wish. That's fine.

Back to my summary. In October, following September, 2024, the plaintiff moved to amend its complaint in order to add Firexo Corporation as a defendant. That's document 33. This Court denied that request without prejudice to allow defendant time to secure new counsel, document 35.

In November, this Court warned defendant, quote, that failure to have legal counsel enter an appearance may have consequences without the opportunity for defendant to be heard, end quote. That's document 34.

In December, after three months of defendant declining to hire an attorney, this Court allowed plaintiff to move for default, document 36.

This Court then held a hearing, entered default against defendant and awarded attorney fees, documents 51 and 54.

Plaintiff then renewed its request to add Firexo to this case.  That's document 55.

And today, it's my understanding that defense counsel is going to have a witness to testify by Zoom.

And I assume there are no objections to this testimony being taken by Zoom; is that correct?

MR. BELAZIS:  No objection, Judge.

THE COURT:  Pause.  I'm going to make you do this.  I'm sorry.  You are going to take that microphone and you are going to slide it towards you.  Just take it from the base.  It moves, so you don't have to bob and weave.  And to the extent, the other side, too.  That way, it may serve to remind you that we need you to use the mic.

MR. BELAZIS:  Okay.

THE COURT:  Are you okay?

MR. BELAZIS:  I think so.

THE COURT:  Oh, did he get unplugged?

MR. BELAZIS:  Oh, I see what's going on.  I got it.

THE COURT:  It's tangled.  Too many wires.

(Pause in the proceedings.)

THE COURT:  Should we get your witness in so we can swear him in --

MR. SILK:  Yes.

THE COURT:  -- and get going?

MR. SILK:  Yeah.

THE COURT:  While we are preparing for the testimony, I did talk with counsel just prior to beginning this hearing.  Each side has presented exhibits for this hearing, and there are generally no objections.  I, of course, let counsel reserve the right later to object, but there are some duplicates apparently with these exhibits to ones that have been introduced earlier in the case.

Nonetheless, for today's purposes, we have Defendants' Exhibits A, B, and C, and we have Plaintiff's Exhibits 1 through 10.  And to the extent there is not an objection to that exhibit being discussed, counsel can quickly move into that exhibit, and then at the end, we'll confirm whether there are any formal objections to the admission of any of those exhibits.

And with that, Jim, you may call your witness, please.

MR. SILK:  Thank you.

I call Peter Coyle.

THE COURT:  Mr. Coyle, I'm going to ask you to please raise your right hand and our courtroom deputy will administer the oath to you.

- - -

Thereupon, the Defendant, in order to maintain the issues on their part to be maintained, called as a witness,

PETER J. COYLE,

who, having been duly sworn as provided by law, testified, *via Zoom*, and said as follows:

- - -

THE COURT: And with that, counsel, you may inquire.

MR. SILK: Thank you.

- - -

DIRECT EXAMINATION

BY MR. SILK:

Q     Mr. Coyle, can you state your name for the record, please.

A     Yes, it's Peter James Coyle.

Q     And what is your address?

A     Hootings Old Farm Lane, London Road East, Amersham, Buckinghamshire, in England.

Q     And what is your occupation?

A     I'm a solicitor.

Q     And could you describe for the Court what type of solicitor you are.

A     I own my own legal practice and we are a boutique commercial investigation firm, so we do litigation.

Q     Could you please describe your relationship with Firexo Group Limited.

A     Yes. I was the company secretary and general

counsel for Firexo Group Limited from around August of 2018 until July of 2024.

Q       And you understand that they are a defendant in this case?

A       I do.

Q       And can we call them FGL?  Is that common?

A       That's fine.

Q       And what business was FGL engaged in before it went into voluntary liquidation?

A       It was involved in the sale of fire extinguishing products.

Q       And where was it located?

A       It was located in Oxfordshire in England, about an hour north of London.

Q       And you are familiar with Firexo Corporation?

A       I am.

Q       And what was your relationship with Firexo Corporation?

A       I believe I was also appointed as company secretary to that company, but I need to check, but I was certainly appointed as general counsel for the Firexo Corp.

Q       And why was Firexo Corp. formed?

A       It was formed for the purpose of an IPO that was planned on the Nasdaq Exchange in New York.

Q       And, at some point in time, was an agreement

entered into between FGL and Firexo Corporation?

A        Yes.  For -- are you talking about the share exchange agreement?

Q        Correct.  And when was that --

A        Correct.

Q        When was that entered into?

A        That was in November, 5th of November, 2021.  -- (unclear Zoom transmission) in December of 2021.  It was just prior.

Q        And why was it entered into?

A        It was entered into on the advice of our IPO lawyers in California that thought that we would have a better chance of raising the money that the company needed from the U.S. investment market if we were floating a U.S. corporation as opposed to a U.K.

Q        And did Firexo Corp. have advisors in The United States in regards to the IPO?

A        Yes.

Q        And who was that?

A        I can't remember the name of the firm.  I'm trying to think.  That was in California.  I'm sorry, the names escape me.  We have IPO specialists in California.

Q        And what did that agreement between FGL and Firexo Corp. entail?

A        So it was an agreement actually between -- there

were three parties to the agreement, and there were about 460 separate agreements.  So every shareholder in FGL entered into an agreement with FGL and with Firexo Corp. whereby the shares that they held in FGL became shares in Firexo Corp.  So they all transferred their own shares in the U.K. company into exactly the same number of shares in the Delaware company.

Q        And so there was shareholders -- I'm sorry?

A        Yeah, so then they would effectively become shareholders.  They would own the equity in the company that was flexing on the New York Exchange.

Q        So there was a shareholder approval required for this agreement?

A        Yes.  Yeah, it needed 75 percent of approval from all the shareholders in FGL for this transaction to occur, yes.

Q        And do they have the agreement and plan of exchange in front of you?

A        I do.

Q        And is that dated November 5th, 2021?

A        It is.

Q        And this is the agreement that we've been discussing the last several questions, correct?

A        It is.

                THE COURT:  Is this one of your exhibits?

MR. SILK:  Yes, Your Honor.

THE COURT:  Which one?

MR. SILK:  This is Exhibit A, Your Honor.

THE COURT:  Thank you.

Q    (By Mr. Silk) And, again, Mr. Coyle, this is the agreement that we discussed which was the share swap between Firexo Corp. and FGL, correct?

A       Correct, this was a replication about 460 times for each individual shareholder in non-technical terms.

Q       Did this agreement involve any transfer of assets from FGL to Firexo Corporation?

A       No, it didn't.

Q       How did business operations change for FGL prior to share swap to after this share swap?

A       It didn't change at all.  No change whatsoever.

Q       Did FGL have employees at the time?

A       Yes, it had a mixture of paid employees through our payroll, which is where you are deducting tax of behalf of the government, and it also had the more senior staff were self-employed consultants, but, yes, it employed a mixture of employees and consultants, about 12 to 15 people.

Q       And they remained employees of FGL after the stock swap, correct?

A       Correct.  Employees or consultants and nothing changed at all.

Q        Could you describe to the -- for the Court what assets FGL had before the share swap?

A        In terms of assets, it didn't have a great deal. It had been the owner of intellectual property in the fire extinguishing products until earlier of that year in about June, but in November, it didn't really have assets.  It was sort of the administration hub for the business, so it -- it was the organization that bought the stock from a manufacturer in China, it then distributed that stock through to joint venture partners, one of which is the plaintiff to this action.  There was another one in Europe. It provided stock to another subsidiary called Firexo Unlimited, which was the sales arm for the U.K. and Ireland, and it administered the whole of the business, you know, across the globe.

So in terms of assets, it didn't really own a lot, if I'm perfectly honest.  Whatever stock it had at any point in time before moving in through the other subsidiaries was effectively the assets which it owned.  We rented a building, so we had a lease.  There was money, there was cash, a bank, but that's effectively what FGL owned on the 5th of November, 2021.

Q        For the assets that it did possess before the share swap, did it possess those exact same assets after the share swap?

A       It did.  Actually, I should answer it was -- it did have subsidiaries that held assets so its -- it owned our operating arm in Italy.  In Holland, it owned a company called -- it owned all of the shares in a company called Firexo Motorsports Limited and Firexo Unlimited and I think the Hong Kong entity within the group was also owned by FGL, yeah.

Q       And they still maintain those ownership interest in other companies after the share swap?

A       Exactly the same, no change at all.

Q       Has Firexo Corp. owned assets?

A       Other than shares in other group entities, no.  It was the holding company at the top that was going to be the vehicle that went on to the Nasdaq.

Q       What happened to the IPO plans after the share swap?

A       The transaction was aborted for a number of reasons, but some investment market was changing and going down, downhill.  Principally, it was the underwriting bank, the investment bank that was underwriting the transaction, effectively advised us that they weren't confident that they would be able to raise very much or any capital because the company was so embroiled in litigation with, you know, this action, but there was a huge claim in London as well.

FGL was -- was defending three or four court

cases, so our data room that we had to create for the purpose of the IPO was effectively riddled with litigation and poison, and it just became absolutely impossible for us to raise money so that the transaction was aborted effectively in December, 2021, so we don't, I think -- we had done the preliminary filing with the Securities and Exchange Commission. We were debating with them before the sort of formal IPO was put in place, and it didn't happen. We couldn't raise the money that we needed to raise because of the litigation that the company faced.

Q        Were you aware of the business operations of FGL after this share swap through its voluntary liquidation in 2024?

A        Yes. I mean, I resigned from office in July, 2024, so before the liquidation, because I wasn't being paid and my law firm was owed -- owed a significant amount of money as well, so we -- so my firm is a creditor in the liquidation of FGL, so I didn't have intimate knowledge of what was going on from July until the liquidation in October I think 2024, but I was still abreast of things, you know. Even though I'd resigned from my office, I was still in touch with the business in terms, I mean, I found them, for example, the liquidations that the company ended up appointing, so I had less, but some knowledge of events from July until the liquidation of last year. But I had an

intimate knowledge of everything that was going on until July of last year.

Q        And during that time period, did FGL transfer any assets to Firexo Corp.?

MR. BELAZIS:  Objection.

THE COURT:  During which time period?

MR. SILK:  During the time period following the share swap to the liquidation of FGL.

MR. BELAZIS:  Objection, Judge, with respect to any testimony --

THE COURT:  Is your mic on?  Hit the button, please.

MR. BELAZIS:  I'm sorry, Judge.

THE COURT:  Thank you.

MR. BELAZIS:  Objection with respect to any testimony following his resignation.  The fact that he was, as he put it, in touch doesn't establish a sufficient foundation to testify about matters related to the corporation, particularly with the kind of complexity that we are talking about here.

THE COURT:  I'll sustain the objection.  He can talk about the time period when he was with the company, but the other time period may well be hearsay.

Q    (By Mr. Silk) When did you resign from FGL as secretary?

THE COURT:  July, 2024, right?

A        Correct, the 31st of July.

Q        Okay.  And during that time period, before you resigned, after the share swap, were you aware of FGL transferring any assets to Firexo Corporation?

A        No, there was no -- there were no asset of transfers at all in that period.

Q        And, again, you are not aware of any transfers of assets to Firexo Corporation by any entity; is that fair to say?

A        Correct.

Q        Are you aware whether FGL needed a loan from Firexo Corporation?

        MR. BELAZIS:  I'm sorry, I didn't hear that. Could you repeat it, please?

Q        Are you aware that FGL needed a loan from Firexo Corporation?

A        Yes, it did.  It borrowed quite significant amounts from Firexo Corporation to help fund the litigation that I've talked about.

Q        And is Firexo Corp. a creditor of FGL?

A        Yes, it is in relation to that inter-company loan, yes.

Q        Were you involved in the decision regarding FGL voluntarily entering liquidation?

A        No.  Although I was aware that that was the plan.

I know the board was planning to do that. That was a board resolution, and I was never on the board of directors of FGL. I was just the company's secretary.

Q    Mr. Coyle, do you have with you a letter, an email from Mr. Breith to shareholders?

THE COURT: Exhibit number, please? One moment. Do we have an --

MR. SILK: Exhibit B, Your Honor.

THE COURT: B as in boy?

MR. SILK: Yes.

THE COURT: Thank you.

A    Sorry, that isn't in front of me, but I am aware of the circular you are referring to.

Q    In the second paragraph of that letter, it states: As you know, FGL is the entity in which we all used to hold our shares prior to the share exchange agreements with Firexo Corporation on 5 November, 2021.

Is that accurate?

MR. BELAZIS: We are talking about Exhibit B?

MR. SILK: Right.

MR. BELAZIS: Yeah.

A    I'm sorry. Can you just repeat that wording? I'm unclear what I'm confirming.

Q    As you know, FGL is the entity in which we all used to hold our shares prior to the share exchange agreements

with Firexo Corporation on 5 November, 2021.

THE COURT:  First full paragraph -- I'm sorry -- second full paragraph, second sentence is what was just read.

MR. SILK:  Yes.

THE COURT:  Go ahead.

Q    (By Mr. Silk) And is that an accurate statement?

A        It is.

MR. BELAZIS:  Objection.

THE COURT:  I'll allow it.

Go ahead.  Was your answer "yes"?

A        Yes, it -- yes.  Yes, Your Honor.

THE COURT:  Thank you.

Q    (By Mr. Silk) And the next sentence states:  FGL has effectively been dormant since the share exchange.

Is that statement accurate?

A        No, it's not.

Q        Why not?

A        Because FGL had continued to operate exactly in the same way.

MR. BELAZIS:  Again, Judge, if he's talking about if the question relates to the period up to the point that he resigned, that's fine.  After that, again, I would just like to offer an objection --

THE COURT:  This letter is dated October 16.

It's not a letter, it's maybe an email dated October 16, 2024. Witness indicated he resigned in July, 2024, before the liquidation, which took place in October of 2024. I'm not sure having this witness testify about the accuracy of this letter, which is one that he did not prepare, but was prepared by David Breith, B-R-E-I-T-H. He's not the author of the letter.

Was this letter presented to you for approval before it was sent to shareholders?

A        No.

MR. SILK:  I'm asking him about a statement and whether it's accurate. That's it.

THE COURT:  Well, take it out of the letter then and ask the question:

In October, if you can answer the question, are you aware of what time period, if any, that --

MR. SILK:  Yes, I can do that.

Q    (By Mr. Silk) Mr. Coyle, from the time of the share swap to the time that you resigned as secretary, was FGL effectively dormant during that time period?

A        No, it wasn't.

Q        Was it engaging in business operations that it had engaged in prior to the share exchange?

A        Yes.

Q        And do you have any knowledge as to FGL's

operations after you resigned as secretary in July of 2024?

A        Not very much, but I have a very good knowledge of its trading position up to my resignation in July, 2024, so I know what it was doing or what periods.  And as things, as business operations moved around the group, I can help the Court with that, if that assists.  But only up until I resigned in July, 2024.

Q        And then the fourth paragraph, there is a statement that the legal proceedings have been a huge cash drain for the business, but that drain on cash is about to accelerate. Do you have an understanding as to what that statement and whether that is accurate?

A        Yeah, I do.

MR. BELAZIS:  Judge, again.

THE COURT:  We are having a problem here. What I want the witness to do is testify on his firsthand knowledge.  Forget about the letter.  And since you were not involved and had resigned in July of 2024, my fear is that any information he provides this Court today is not firsthand knowledge, could be hearsay.  Could be limited knowledge, but I'm looking for accurate and complete knowledge of whatever time period counsel wants to address.

And so I'll ask counsel to rephrase the question.

MR. SILK: Fair enough.

Q (By Mr. Silk) So I want your testimony to be limited to the time that you were the secretary. So that was through July, 2024. Through that time period, did the legal proceedings -- were they a huge cash drain for FGL?

A Yes, they were, and it became unmanageable by the time I had resigned. Yeah, that had become a serious, serious problem for the company. We are talking over a million pounds in litigation fees, and before I resigned, we had London exterior lawyers Mishcon de Reya effectively give us a cost estimate to go to trial, which was due to be in February, 2026, of another million and-a-half pounds to move forward with the litigation, and the company just couldn't afford to do it and the funding that was available through Corp. to help defend, to help FGL defend the proceedings at that time had been spent, and our pester that supported with funding through Corp. had effectively decided not to support the business anymore or to support the litigation. So there were no funds to meet the ongoing requirements of Mishcon de Reya, which I know was the biggest reason why the directors decided to approach and consult these practitioners about what best to do --

MR. BELAZIS: Objection. Again, the insolvency process, based on the record, the declaration of Mr. Breith, began in November of 2024. That's when the

insolvency people were retained for a pre-insolvency evaluation. So again, we are getting far afield of this witness' direct knowledge.

THE COURT: I'm going to add this for whatever it may be worth -- excuse me. We have a lengthy declaration that counsel has indicated he is going to supplement with appropriate signatures and dates. That is in the record before me. I don't know whether that's the best evidence of the points that counsel's trying to make, but to the extent it's going to be duplicative, I'm not sure that's very helpful to the Court. But I'll leave it to counsel to decide, obviously, what questions he wishes to ask, but I would also request that, keep in mind, you already have a lengthy declaration that has been filed. And if you want to make some points with this witness, please do, but I don't know that you need to repeat what may be in that lengthy declaration.

MR. SILK: Understood, Your Honor. Thank you.

Q (By Mr. Silk) Your firm is a creditor of FGL, correct?

A Yes, it is.

Q And you are aware of the liquidation process at least through the fact that your firm is a creditor; is that fair to say?

A Yes, and I was instrumental in advising the board about which insolvency practice to approach, and it was

actually a lot earlier than November.  That was during my time as company secretary.

Q       During your time as company secretary, was there a determination made to retain a company to value FGL's assets?

A       Yes.

Q       And why was that done?

MR. BELAZIS:  Judge, if I may.  Again, the declaration indicates that the determination to retain was made in February of 2024.

MR. SILK:  Okay.  And he was secretary until July of 2024, and he just testified that he was involved in the process to retain evaluation.

MR. BELAZIS:  That's right.  I withdraw.  I withdraw that objection.

Q    (By Mr. Silk) So, I'm sorry, Mr. Coyle.  I think you were describing what the motivation was to retain a company to value the assets of FGL?

A       Yes.  So that was done at the direction of, at that stage, the proposed liquidators who were giving the company insolvency advice and what the company needed to do in the best interest of the creditors of the company.  And so it did -- it looked into the affairs of FGL and a transaction that had occurred in September of 2021.

And again, this was part of the IPO process

and on the advice of the attorneys that we had retained in California that an entity called Firexo COTM Limited was incorporated to hold all of the intellectual property assets of the group. So there had been an assignment of IP from FGL to Firexo COTM Limited in September, 2021, but the terms -- so there had been a legal assignment with a consideration for that transaction was deferred over a very lengthy period of time, 20 years, from memory. And in the prospective liquidator's report to the company, they said that, on appointment, they would be duty-bound to seek to set aside that assignment or attack it, because it wasn't in the best interests of the creditors of the company.

So to remedy that problem, the company was advised to get all of that intellectual property independently valued so that that value could then be brought into FGL, paid for, and then distributed to the creditors of FGL. So that was the reason why that valuation report was commissioned.

Q      Mr. Coyle, did you have an opportunity to review Firexo, Inc., the plaintiff's, Reply in Support of Motion to Substitute Successor in Interest?

A      I did, but it's not in front of me, I'm afraid.

Q      And do you recall that, in that reply, they put a table of financial performance and position as far as --

A      Yes.

Q        Could you describe for the Court what that represents as far as Firexo Corporation?

MR. BELAZIS:  Judge, before the witness answers, that report was prepared and issued September 30th, 2024.

MR. SILK:  And, Your Honor, for the record, it's Exhibit C.

THE COURT:  Did you have a role in preparing this exhibit?

A        No, I had a role in commissioning the valuation, but then the, yeah, the value was to go along with their job, so I can't really answer to anything that's in that report.

MR. SILK:  Back to me?

THE COURT:  Yes.

Q    (By Mr. Silk) So the statement is made:  Of course, revenue was generated through sales of Firexo fire extinguishers containing the FX51 All Fires liquid both on Amazon and through distributors.

THE COURT:  Are you reading from that report?

MR. SILK:  Your Honor --

THE COURT:  He just testified that he can't respond to that report.  That's what I thought I heard.

MR. SILK:  So --

THE COURT:  "I can't really answer to anything

that's in that report" is what he said.

MR. SILK:  Right.  And I apologize, I'm not reading from the report.  I'm reading from the reply.

THE COURT:  The brief, the legal brief?

MR. SILK:  The legal brief.

THE COURT:  What document number is that, by the way --

MR. SILK:  It is --

THE COURT:  -- for the record?

MR. SILK:  It is document -- thank you -- 70.

THE COURT:  Thank you.

MR. SILK:  And it's page 6 of 10.

Q    (By Mr. Silk) So did the Corp. generate revenue through the sale of fire extinguishers?

A       No.

Q       And why not?

MR. BELAZIS:  Could I just have the question read back?  I'm sorry, I'm just having trouble hearing.

THE COURT:  The question was:

Did the Corp. generate revenue through the sale of fire extinguishers.

And the answer was:  No.

And I don't think that's a revelation in the case.

Go ahead.  What's your next question?  I need

to push you along a bit, because I have a commitment in less than an hour, and I want to hopefully give you a chance to get everything in that both sides want. If we have to reconvene this afternoon, we will.

Go ahead.

Q   (By Mr. Silk) And why do you know that that's not accurate?

A      Because all of the sales of those two products you've just referenced were made through trading subsidiaries of Firexo Corp. and the various jurisdictions that we sold the products. Firexo Corp. never sold anything. Firexo Corp., for all the time that I was there, didn't even have a bank account. It couldn't receive, it couldn't receive income.

MR. SILK:  Your Honor, that's all the questions I have.  Thank you.

See, moving it along.

THE COURT:  If you are happy where you are, that's fine by me.  I want to make sure you have an opportunity with this witness, who's, again, making himself available.

What time is it where you are?  Mid-afternoon?

THE WITNESS:  Yes, ten to 4:00, Your Honor, but I can be here for as long as you want or later.

THE COURT:  Please don't volunteer that.

Okay.  Are you ready?  Are you or Adam going to cross here?

Mic.  Mic.  Sit.  Sit.

MR. BELAZIS:  Judge, may I just have a --

THE COURT:  Yes.

MR. BELAZIS:  Just five minutes to confer with Adam by phone outside the courtroom since he couldn't be here today?

THE COURT:  Sure you can.

Five-minute recess off the record.

(Whereupon, a break is taken.)

- - -

THE COURT:  Any questions?

MR. BELAZIS:  Judge, we have no questions for this witness.

THE COURT:  What about your exhibits?

MR. BELAZIS:  Right, the caveat is that there is a couple of ways to deal with those.  One is to give Jim and Teresa an opportunity to confirm with Mr. Breith as to authenticity so we can stipulate to their authenticity and admissibility.  I don't think there's going to be any question because they all came from Dave Breith.

Is that how you pronounce it, Mr. Coyle?

MR. SILK:  I believe Breith.

MR. BELAZIS:  Breith.  Breith is the correct

pronunciation?

THE COURT: Counsel, how do you want to do this? Do you want to spend a little time with looking at the notebook with exhibits? Do you want to do it with the witness -- not on the record -- but between you and the witness? Or are you okay with what you've seen and will admit all of the exhibits that have been presented today by both sides?

MR. SILK: How about if -- I don't anticipate there's going to be any issues, but I would like to talk to my client regarding that. So maybe if there are issues, I can discuss that with Paul.

THE COURT: You can do that off the record. Let me talk to our folks about how you might effectively do that.

Why don't you two talk right now off the record. If you find you have questions, I mean, I think this won't take you long to flip through. These, I don't think, are going to be shocking documents to you. But in any event, take whatever time you need while the witness is still here, so to speak. So take five minutes or ten minutes. Talk to each other off the record and then let us know. How is that?

MR. SILK: Okay. That makes sense.

THE COURT: Okay.

I'm going to ask you to -- you can turn your screen off, Mr. Coyle, while the lawyers talk for a moment, and then I think you are going to be done or close to being done, but you can turn your screen off, do something productive.

MR. BELAZIS:  Judge, we can go outside.  It might be easier.

THE COURT:  I don't care whether you go outside or not.  You can, but he doesn't need to be full-blown on the screen waiting for you.  We can do something else in his privacy.  I'm doing this for his convenience.

(Whereupon, a discussion is held off record.)

- - -

MR. SILK:  So, Your Honor, we don't have any objections to the authenticity of plaintiff's --

THE COURT:  Go ahead.  We are back on the record with counsel.

Go ahead.

MR. SILK:  So we don't have any objections to the authenticity of any of these exhibits, but preserve our rights as to their admissibility if and when they are used.

THE COURT:  Well, they are going to be used right now.

MR. BELAZIS:  Yeah, that doesn't -- that's

right.  I want to offer them into evidence.

MR. SILK:  Right, but I mean, if, I mean, some of these involve hearsay and maybe other issues of relevancy or I don't know yet.  I mean, I'm not sure what they are being offered for other than offered, right?

THE COURT:  Well, these are all Firexo or Firexo Corp. or any of the entities involved in the matter.

I'm going to admit all of the exhibits today from both sides for whatever value they may have, which may be little to none, maybe a lot, I don't know.  But I don't think there really is any objection.

If you have, I mean, we could take the time to show these to this witness, although I don't know the dates of all of these documents and whether they were before or after his resignation or if he's even familiar with them, but you are not contesting authenticity.

MR. SILK:  Right.

THE COURT:  So there is no need to bother the witness with them.

I'll admit all the exhibits from both sides today.  And to the extent if you've had some time to reflect on them, you have some time, anyway, to file an updated declaration, you can raise it in a filing if you want with me, and then the other side can decide how they want to respond to it.

MR. SILK: Thank you, Your Honor.

THE COURT: I think that's the most efficient way, which is what I'm trying to do.

MR. BELAZIS: That's fine.

THE COURT: Should we let the witness go? He is off screen, but I think he's on standby.

Since there are no more questions from I think either side, Mr. Coyle, we are going to excuse you and thank you for your time today.

THE WITNESS: Thank you very much.

MR. BELAZIS: Nice to meet you in person, Mr. Coyle.

MR. SILK: Thanks, Peter. I appreciate it.

THE WITNESS: Thank you.

THE COURT: So is there anything else that either side wants to present by way of argument since I don't think there's any more evidence to take?

I have the briefs of everyone. To the extent someone wants to argue anything, I'm giving you the opportunity to do that.

MR. BELAZIS: I think we are okay, Judge, for plaintiff.

MR. SILK: Your Honor, I will be brief.

THE COURT: Okay.

MR. SILK: So plaintiff has argued that Firexo

Corp. is a mere continuation of FGL.  And based on the testimony you have heard today, there were no transfer of assets as a result of that share swap.

Under *Welco*, there is four exceptions to situations where there is a sale of assets.  Before you even get to those exceptions, though, there has to be a transfer or sale of assets.  In this case, there was no transfer or sale of assets.  FGL maintained all of its assets.  Therefore, none of the exceptions under *Welco* could apply.

Further case law, you know, repeatedly says that if a corporation is still ongoing, then there can't be, you know, a wrongful transfer of assets.  In this case, the testimony was FGL maintained the same business operations before the share swap as after the share swap.  The whole point of *Welco* is to protect creditors from improper sale or transfer of assets.  That did not occur here.  There was no sale or transfer of assets.  Corp. is a holding company.  It did not receive assets from FGL or from other entity.  And there's simply no evidence in the record to contradict the witness' testimony today that there was no transfer of assets from FGL to Corp., and without that transfer of assets, there can't be any theory of mere continuation, de facto merger, or fraudulent transfer of assets.

Thank you.

THE COURT:  Response?

MR. BELAZIS:  Well, Judge, as we pointed out during the argument last week --

THE COURT:  Wait.

(Whereupon, a discussion is held off record.)

THE COURT:  Back on the record.

Go ahead.

MR. BELAZIS:  Judge, as we pointed out during oral argument last week, the judgment -- the Court can decide this case based on the mere continuation theory of successor -- of bringing in Corp. as a successor in interest.  There isn't any question that there was a one-for-one exchange of shareholders, so the shareholders were the same.  As we pointed out before, the directors were the same.  And those are really the fundamental aspects of it.

THE COURT:  I'm going to cut a bit to the chase.  You just heard opposing counsel argue that without a transfer of assets, you lose.

MR. BELAZIS:  Well, that's not part of the -- that's not part of the mere continuation analysis and it's not required.

But the reality is that Corp. controls all of the assets of the entire entity because of their control of the shares of stock in every single one of these subsidiaries.  It goes from Corp. to Firexo Holding, and

then Firexo Holding controls the shares of all of the other subsidiaries including Firexo Steel MT, which owns the IP.

And one interesting thing in the documents that were just introduced and admitted into evidence, for example, is that during this analysis of the IP, which was conducted by the liquidation company that was retained prior to the liquidation, it was hired and paid for by Corp.  They relied on the information provided by Mr. Breith.  They say so right in their report.  It's in the declaration.  And they gave -- there were two different kinds of patents.  One of them was for the canisters of fire extinguishing fluid that you see hanging on the wall, and then there was a second patent for wildfires from bulk fluid.  So they gave that based on what Mr. Breith and the other directors told them they value as zero because they had not been commercialized and would not make any money.  Four months later, they are telling shareholders that that same bulk supply has the largest potential sales pipeline the company has ever seen.  And they go on to talk about millions of dollars in pending sales.

So, and all of that, of course, is now controlled by Corp. because they have control of all of the corporations, including the IP.

And I'll leave it at that.  Thank you.

THE COURT:  Thank you.

I'll give you a chance to have the last word, but before you do, one of the arguments in the briefing is that this Court should defer to, quote, principles of international comity, end quote, with respect to what was going on in Britain.  That's not your best argument, is it?

MR. SILK:  I don't know --

THE COURT:  I have the ability to rule on this with all the evidence that I have.  There is no deference I owe to anyone, is there?

MR. SILK:  I think it's discretionary on your part, Your Honor, so, no, that's not our best argument.

THE COURT:  Go ahead.

MR. SILK:  So --

THE COURT:  I just wanted to make that clear in my mind.

MR. SILK:  So our best argument is no transfer of assets occurred.  I can show, just like any case that talks about *Welco* or mere continuation, it starts off by saying "transfer of assets," which makes sense, because that's where a creditor could be defrauded if there was an improper transfer of assets.

THE COURT:  What about a transfer of stock?

MR. SILK:  That's not an asset.  That's, again, transfer -- FGL continued exactly as is, as an entity.  Assets, business operations, employees, everything

the same before the share swap and after.  The only reason Corp. was formed was because they wanted to do an IPO in the U.S.  That did not materialize for some of the reasons you heard today.  And again, that was the purpose of Corp.  It wasn't to start doing business as FGL.  Not only was that not the intent, that was not what actually occurred.

THE COURT:  Is a patent or a trademark an asset?

MR. SILK:  Absolutely.  Absolutely.  And again, no patents or trademarks or anything went from FGL to Corp.

Now Mr. Coyle testified today that when they were contemplating putting FGL in the liquidation, they wanted to make sure they did everything the right way.  The liquidators said get a valuation of FGL assets.  They did get a valuation, and they said that the patents that FGL had reached an agreement with with another entity were not fairly valued.  And they said that entity should pay FGL 225,000 pounds, which it did.  So as part of that process in England, they are analyzing what are appropriate assets for FGL, and there are assets as part of the liquidation for FGL.

So, yes, patents definitely are an asset and have been, you know, evaluated and returned money to FGL.

THE COURT:  And what were the employees doing?

He testified that after he left, there were employees there, they were working. What were they doing if the company was not functioning?

MR. SILK: It was functioning.

THE COURT: And was getting prepared to be absorbed by either a separate offering on the New York Stock Exchange or another entity?

MR. SILK: The intent was for FGL to fully continue its business before, during, and after the IPO. There was no reason to change that. It had distribution agreements with plaintiff and other entities. It had an agreement with a China company to actually do the manufacturing of the fire extinguishers, so.

THE COURT: And it had a number of lawsuits, apparently, not just this one that was drowning the company in legal fees from what I heard.

MR. SILK: Yeah, this one and they had another one that plaintiff's majority shareholder was involved in over in London, which was even a different level of expense than this one.

THE COURT: Plus other lawsuits, from what I heard. I didn't get a full number, but he used a plural when he described other lawsuits besides this one.

MR. SILK: So I'm not aware of any other lawsuits involving FGL other than this one and another one

involving plaintiff. Those are the two that I'm aware of that caused the enormous drain on the resources. In fact, you heard testimony, Corp., for a period of time, loaned money to FGL so that it could continue as an entity. So ironically, the only transfer of assets was from Corp. to FGL, not the other way around. And Corp. is a creditor of FGL I think to the tune of $1.7 million. So I will leave it at that. Thank you.

THE COURT: How does Revised Code 1336.04 apply to this case in any way in your view? That's the transfer made or obligation incurred fraudulent as to creditor. That's the caption of that chapter.

MR. SILK: So it does not apply in any respect here for two reasons.

One, there was no transfer of assets. I guess that's really the critical reason, but there was no evidence that anything was done fraudulently.

But again, that doesn't apply because there was no transfer of assets. End of story.

THE COURT: Okay.

Any comment?

MR. BELAZIS: Well, Judge, I mean, the principle argument that we've been making and that I think is correct is that the fraudulent transfer of asset is one way in which the Court can determine that it's appropriate

to join a successor in interest, but it doesn't have to make that determination.  There may certainly be plenty of indication in the record that -- that some of the transfers were fraudulent, but that's not -- you don't have to go there in order to determine that Corp. should be joined as a successor in interest, because the transfer, the fraudulent transfer of assets is separate and apart from the mere continuation basis for finding successorship.

THE COURT:  Thank you both very much.  I appreciate your time.

We are adjourned.

MR. SILK:  Thank you.

(Proceedings adjourned at 11:17 a.m.)

- - -

**C E R T I F I C A T E**

I, the undersigned, hereby certify that the above and foregoing is a true and accurate record of the proceedings held in the above-entitled matter prepared from my stenotype notes.

*/s/ Diana M. Ziegelhofer*_____1/6/2026__
Diana M. Ziegelhofer, RPR, RCR
Official Court Reporter
United States District Court
1716 Spielbusch Avenue, Suite 380
Toledo, Ohio 43604
419-213-5538