**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| FIREXO INC., | Case No. 3:21-cv-02336 |
| Plaintiff, | Hon. Jack Zouhary |
| v. | |
| FIREXO GROUP LIMITED, | |
| Defendant. | |

---

### DECLARATION OF DAVID BREITH

---

I, David Breith, swear and attest that I have personal knowledge of the matters contained in this Declaration and am competent to testify to the matters stated herein.

1.      I was the CEO of Firexo Corp. ("Corp.").

2.      In response to the Order Appointing Receiver (the "Order"), given my extensive travelling on behalf of Firexo, I requested that Peter Coyle, the former company secretary and general counsel of Corp. address the requirements set forth in the Order as Mr. Coyle was familiar with Corp.'s history.  In response, Mr. Coyle drafted and signed a witness statement dated March 13, 2026, and attached hereto as Exhibit A. Mr. Coyle does not have any decision-making authority for Corp. His involvement in responding to requests from the Receiver has been at my direction.

3.      The facts set forth in Mr. Coyle's witness statement are accurate.  Corp. does not have any assets other than an interest in Firexo Holdings Limited.  There were no responsive documents to Paragraph 10 of the Order.

*no pl4a*

**EXHIBIT**

tabbies'

_1_

4. On March 25, 2026, the Receiver emailed a spreadsheet to Corp.'s counsel asking for further information pursuant to the terms of the Order, additional questions regarding Corp., and further questions regarding Mr. Coyle's testimony. (Attached as Exhibit B).

5. I again requested that Mr. Coyle respond given his knowledge of the requests and my travel schedule.

6. On April 16, 2026, Mr. Coyle drafted a spreadsheet which responded to each of the questions raised by the Receiver. Attached hereto as Exhibit C. The responses provided by Mr. Coyle are accurate.

7. At my direction, counsel for Corp. has repeatedly offered to schedule a TEAMS or ZOOM meeting between myself, the Receiver, and the Receiver's attorney to address any questions they may have regarding our responses or any other questions regarding Corp. This offer has **never** been accepted.

8. Perhaps if the offer had been accepted, some of the Receiver's misconceptions could have been clarified. Particularly frustrating was the Receiver's claim that Mr. Coyle lied to this Court. (Receiver's Motion to Compel p. 6-7). The Receiver is wrong. Mr. Coyle's testimony and sworn statement are accurate. Firexo Group Limited borrowed significant amounts of money from Corp. to fund the litigation with Plaintiff. Mr. Coyle correctly stated that Corp. had no employees, did not have a bank account, and had no assets in the United States. Despite the Receiver's belief that "the assertions are obviously inconsistent," they are accurate and consistent. The funds were wired to Firexo Group Limited through an account at Mr. Coyle's law firm. The funds were transferred to the law firm's account from the funds loaned by one of the Companies main



2

shareholders/investors to Corp. There are not, and have never been, Corp. bank accounts. This loan is why Corp. is a creditor of Firexo Group Limited.

9. The Receiver also claims that the September 24, 2025, share allotment was a fraudulent transaction. (Motion to Compel p. 7). This is false. Again, a conference with the Receiver could have clarified any misunderstandings. Investors were advised in 2021 that if the IPO did not occur, the top company would return to the UK. The only reason Corp. was formed was for a potential IPO in the United States. It was a holding company for Firexo Group Limited and Firexo Holding Ltd, UK companies.

10. Further, the September share allotment transaction was planned prior to the default judgment entered against Firexo Group Limited, the process started with the first engagement being, September 27, 2024, long before the default judgment being entered against Firexo Group Limited and prior to the filing by Plaintiff of the Motion to Join Corp. Attached as Exhibit D is the minutes of the board meeting at which the determination to bring the business back to the UK if the IPO was not successful was discussed. Prior to this September meeting, guidance was sought from international tax advisory services and international attorneys regarding the logistics and propriety of such a transaction.

11. This transaction was timely and correctly filed pursuant to UK law.

12. This transaction was not consummated to avoid any potential obligations to creditors as the timeline clearly demonstrates.

13. As set forth in the documents, this transaction was planned well before Plaintiff moved to join Corp.



3



14.    Further, as the Court is aware, Corp. did not believe that it was properly joined as a defendant in this case.  The determinations that Corp., as a void company can be sued and whether Corp. was a successor corporation, are being appealed.

15.    As noted above, Firexo Holdings Limited received significant professional guidance regarding the share allotment transaction.  In May 2025 Firexo Holdings Limited retained RSM UK Tax and Advisory Services LLP. The engagement letter is attached as Exhibit E. Appendix 1, on page 5 of the letter states the scope of work to be performed by RSM. The scope is as follows: "We would undertake a review of the current group structure and necessary considerations in order to implement a proposed US restructuring to return the group to a UK-parented Group, via a share for share exchange and ultimate liquidation of the US TopCo, Firexo Corporation."

16.    In response to being engaged, RSM prepared a Legal Entity Restructuring Report dated September 2, 2025. (Attached as Exhibit F).

17.    We have been advised by professionals that because Corp. is a void company, it cannot hold shares in Firexo Holdings Limited.  This advice, along with the above-noted plan to return the business to the UK if the IPO did not occur, were the factors in returning Firexo to the UK and necessitated the share for share exchange. Firexo Holdings Limited, based on the advice, determined that a void company under Delaware law could not own shares in it.

18.    Corp. has no control over Firexo Holdings Limited.  Corp. also has no control over the liquidation of Firexo Group Limited.  The decision to liquidate Firexo Group Limited has been fully discussed in this litigation. Although neither Corp. nor Firexo Holdings Limited have any control over the liquidation process, Corp. would be willing to assist the Receiver in obtaining requested documents.

4

19.    Neither Corp. nor I had any intent to violate the Order. The reality is that Corp. has no assets, accounts, or employees.  It was a holding company. Since September 2025, it has owned one share of Firexo Holdings Limited.  As noted above, I have been willing to discuss any of the Receiver's concerns directly with the Receiver.  I am still willing to do so.

_____
**David Breith**

That on 10 June 2026 before me, Lizel van Deventer, a Notary Public with practice number 42726, a duly sworn and admitted Notary practicing at Randburg, Gauteng South Africa, and in my presence executed this document before me.

**Lizel van Deventer**
**NOTARY PUBLIC**
E-mail: lizel@gebersohn.co.za
Tel : +27 11 791-1104
Lifestyle Riverfront Office Park
Office 5,7&8 21 Bosbok Road
Randpark Ridge, Randburg,
South Africa







**EXHIBIT**

**A**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FIREXO INC.,

      Plaintiff,

    v.

FIREXO GROUP LIMITED, *et al.*,

      Defendants.

Case No. 3:21-cv-02336

Hon. Jack Zouhary

---

### WITNESS STATEMENT OF PETER JAMES COYLE

---

I, Peter James Coyle, Solicitor, of Coyle White Devine Limited of Boughton Business Park, Bell Lane, Amersham, Bucks, HP6 6FA will state as follows:

1.    I was formerly the company secretary and general counsel appointed to both Defendants in this action. Firexo Group Limited is now in Creditors Voluntary Liquidation in the UK whilst Firexo Corporation became "void" in or around March 2025. Despite my retirement from office, I remain the person with the requisite knowledge to give this witness statement pursuant to Part III of the Order of District Judge Zouhary dated 9th February 2026.

2.    I am a solicitor qualified in the United Kingdom, so I do not have any expertise in "void" Delaware corporations. To the best of my understanding, a void Delaware corporation lacks the legal capacity to own assets. However, for the purpose of this witness statement, I have been asked by the attorney on record for Firexo Corporation to present the asset position of that corporation <u>before</u> it became a void legal entity.

3.    Even before Firexo Corporation became void, the corporation did not trade. As I explained to this honourable Court when giving evidence on 22nd October 2025, the

effect of share exchange agreements made between Firexo Corporation, Firexo Group Limited, and Firexo Group Limited's shareholders (on 5th November 2021) was <u>not</u> to transfer assets from Firexo Group Limited to Firexo Corporation. The effect of that transaction was simply to transfer shareholders from one entity to the other, but not any assets. Firexo Corporation has no trade anywhere in the world. It has no employees. It has no bank account. It has no assets at all in the United States of America.

4.      The <u>only</u> asset owned by Firexo Corporation prior to it becoming void was a single ordinary share in Firexo Holdings Limited. Firexo Holdings Limited is a UK company registered at Companies House with company registration number 13592954. There is now produced and shown to me marked "PJC1" a true copy of the public record recording this share ownership. The share was acquired on 3rd November 2021, immediately before the said share exchange agreements.

5.      So, with specific reference to paragraph 10 of the said Order, I confirm as follows:

A.      There is no "Receivership Property" to disclose other than the said shareholding in Firexo Holdings Limited.

B.      Firexo Corporation has never had a bank account. However, I confirm that Firexo Holdings Limited (its subsidiary) keeps one bank account at HSBC in the UK.

C.      There are no credit, bank, charge, debit, or other deferred payment cards to disclose.

D.      There is nothing here to disclose.

E.      There is nothing here to disclose.

F.      There is nothing here to disclose.

G.      There is no accounting software used by Firexo Corporation to disclose/access.

### STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes

2

to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

_____
PETER JAMES COYLE

Date: 13 March 2026

794153

3

Firexo, Inc. vs. Firexo Group Limited and Firexo Corporation
The Skutch Arlow Group, LLC Receiver
From the Receivership Order, Items the Receivership Defendant is to Provide
From the Receiver, Additional Items requested
DRAFT: For Review and Discussion Purposes Only
UNAUDITED

**From The Receivership Order**

| Page # | Item # | Detail | Due Date |
|---|---|---|---|
| 5 | 9 | Within ten (10) days of the entry of this Order, the Receivership Defendant shall file with the Court and serve upon the Receiver and Firexo Inc. a sworn statement, listing: (a) the identity, location and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any other agents or contractors of the Receivership Defendant; and, (c) the names, addresses and amounts of claims of all known creditors of the Receivership Defendant. | 02/19/26 |
| 5 | 10 | Within twenty (20) days of the entry of this Order, the Receivership Defendant shall file with the Court and serve upon the Receiver and Firexo Inc. a sworn statement and accounting, that shall include complete documentation as set forth herein, covering the period from January 1, 2025 to the present: | 03/01/26 |
| 6 | 10 A. | Of all Receivership Property, wherever located, held by or in the name of the Receivership Defendant and its subsidiaries, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution; | 03/01/26 |
| 6 | 10 B. | Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendant or any of its subsidiaries has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendant or any of its subsidiaries | 03/01/26 |
| 6 | 10 C. | Identifying all credit, bank, charge, debit or other deferred payment cards issued to or used by the Receivership Defendant or any of its subsidiaries, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months; | 03/01/26 |
| 6 | 10 D. | Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received | 03/01/26 |
| 6 | 10 E. | Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity | 03/01/26 |
| 6 | 10 F. | Of all transfers of assets made by any of them | 03/01/26 |
| 6 | 10 G. | Full and unfettered access to any accounting software used by the Receivership Defendant, along with login scrip and password access to any online accounting service. | 03/01/26 |

**OTHER RECEIVER REQUEST'S**

| | | | |
|---|---|---|---|
| | A. | Copies of all loan documents for Firexo Corporation and Firexo Group Limited, where either entity was the borrower or lender. | 04/03/26 |
| | B. | All contact information for all past and present Firexo Corporation and Firexo Group Limited: Directors, Officers, Employees, Attorneys, Accountants, Liquidators, and Consultants. If the person or entity is no longer affiliated with the Receivership Defendant, please provide date of last employment or engagement. | 04/03/26 |
| | C. | A list of all Firexo Corporation and Firexo Group Limited credit card accounts past and present. Who had use of the card, copies from 01/01/2025 - present of all credit card statements, and if the account is closed, the last statement for each account. | 04/10/26 |
| | D. | Passwords and login information to all accounting systems are required. **Provide login credentials to the Firexo and Firexo Group Limited accounting systems** | 04/01/26 |
| | E. | A copy of the Firexo Corp and Firexo Group Limited tax returns for 2023, 2024, & 2025 | 04/03/26 |
| | F. | A copy of the Firexo Corporation IPO documents | 03/03/26 |
| | G. | A copy of all notices Firexo Corporation's Statutory Agent Received from the State of Delaware | 04/03/26 |
| | H. | Have the FGL liquidators filed any information with any Court? If so, please provide a copy of the reports, and information on how the case can be followed. | 04/03/26 |
| | I. | If the FGL liquidators have not filed any documents with any Court, I need a copy of all information the liquidators provided to FGL and/or the FGL creditors. | 04/03/26 |

**Questions from Coyle's Testimony October 22, 2025**

| Page # | Line #s | Testimony & Questions | |
|---|---|---|---|
| 14 | 11-14 | "Firexo Corp, owned shares in the other group entities" - | |
| | | Provide a schedule of what entities Firexo Corp owned shares in, include total shares outstanding as of time of Coyle's testimony, and total shares outstanding today. | 04/07/26 |
| 14 | 24 | "but there was a huge claim in London as well" | |
| | | Who filed the claim in London? What is the status of the claim? Has it been adjudicated? Case #, the progress of the case, and can the case be followed on | 04/07/26 |
| 14-15 | 25-1 | "FGL was defending three or four court cases..." | |
| | | Need a schedule of all cases filed against FGL and **any entity Firexo Group that hold shares. What is the status of the claim? Has it been adjudicated? Case #, the progress of the case, and can the case be followed online?** | 04/07/26 |
| 17 | 17-18 | "It (FGL) borrowed quite significant amounts from Firexo Corporation ..." | |
| | | Where did Firexo Corp get the money to lend to FGL? Provide a schedule of each loan FGL received from Firexo Group, the amount of the loan, the date the loan was made, a copy of the loan agreement, the status of the loan, where the money cane from for the loan, and how the money was transferred from Corp to FGL, and copies of the transfer documents. **Are there any loan agreements between Firexo Corp and investors, if so, please provide a copy of those agreements.** | # # # # |



Firexo, Inc. vs. Firexo Group Limited and Firexo Corporation
The Skutch Arlow Group, LLC Receiver
From the Receivership Order, Items the Receivership Defendant is to Provide
From the Receiver, Additional Items requested
DRAFT: For Review and Discussion Purposes Only
UNAUDITED

**From The Receivership Order**

| Page # | Item # | Detail | Due Date | Response | |
|---|---|---|---|---|---|
| 5 | 9 | Within ten (10) days of the entry of this Order, the Receivership Defendant shall file with the Court and serve upon the Receiver and Firexo Inc. a sworn statement, listing: (a) the identity, location and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any other agents or contractors of the Receivership Defendant; and, (c) the names, addresses and amounts of claims of all known creditors of the Receivership Defendant. | 02/19/26 | A sworn statement from Dave Breith will confirm that (a) the only property of Firexo Corp is a single ordinary share in Firexo Holdings Limited, a company registered in England and Wales; (b) the Receivership Defendant is void and does not have any employees, other personnel, accountants or agents.  It was the corporations failure to pay franchise taxes in Delaware which led to its void status in March 2025 (c) its only creditors are the State of Delaware and Firexo Inc. | |
| 5 | 10 | Within twenty (20) days of the entry of this Order, the Receivership Defendant shall file with the Court and serve upon the Receiver and Firexo Inc. a sworn statement and accounting, that shall include complete documentation as set forth herein, covering the period from January 1, 2025 to the present: | 03/01/26 | From January, 1 2025 to the present, Firexo Corp has not had any Receivership Property within the jurisdiction of this court. The accounting will show Zero as a void company cannot hold assets or liabilities. | |
| 6 | 10 A. | Of all Receivership Property, wherever located, held by or in the name of the Receivership Defendant and its subsidiaries, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution; | 03/01/26 | As above, since the 1st March, Firexo Corporation has had no control over the assets of the Group and only a fractional share, holding 1 share in 110,000,000 | |
| 6 | 10 B. | Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendant or any of its subsidiaries has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendant or any of its subsidiaries | 03/01/26 | Firexo Corp has never had any banking facilities within the jurisdiction of this Court. | |
| 6 | 10 C. | Identifying all credit, bank, charge, debit or other deferred payment cards issued to or used by the Receivership Defendant or any of its subsidiaries, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months; | 03/01/26 | As above | |
| 6 | 10 D. | Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received | 03/01/26 | Firexo Corp has never received any assets | |
| 6 | 10 E. | Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity | 03/01/26 | Firexo Corp has never expended more than $1,000 | |
| 6 | 10 F. | Of all transfers of assets made by any of them | 03/01/26 | Firexo Corp has never transferred any assets | |
| 6 | 10 G. | Full and unfettered access to any accounting software used by the Receivership Defendant, along with login scrip and password access to any online accounting service. | 03/01/26 | Firexo Corp has never used any accounting software as it is a non trading entity. | |

**OTHER RECEIVER REQUEST'S**

| | | | | | |
|---|---|---|---|---|---|
| | A | Copies of all loan documents for Firexo Corporation and Firexo Group Limited, where either entity was the borrower or lender. | 04/03/26 | There are loan documents as between Sir Clive Cowdery and Firexo Corp which can be disclosed (subject to Sir Clive Cowdery's consent).  We no longer have control over any documents of Firexo Group Limited following its liquidation. | |
| | B. | All contact information for all past and present Firexo Corporation and Firexo Group Limited: Directors, Officers, Employees, Attorneys, Accountants, Liquidators, and Consultants. If the person or entity is no longer affiliated with the Receivership Defendant, please provide date of last employment or engagement. | 04/03/26 | Subject to consents (under GDPR) contact information can be provided for directors and office holders of Firexo Corp, but please note that it never employed anybody nor did it retain professional advisors, beyond the aborted IPO transaction. We no longer have control over any documents of Firexo Group Limited following its liquidation. | |
| | C. | A list of all Firexo Corporation and Firexo Group Limited credit card accounts past and present. Who had use of the card, copies from 01/01/2025 - present of all credit card statements, and if the account is closed, the last statement for each account. | 04/10/26 | Firexo Corp has never had any credit cards, or credit facilities; only the private loan (and share subscription) from Sir Clive Cowdery referenced above. We no longer have control over any documents of Firexo Group Limited following its liquidation | |
| | D. | Passwords and login information to all accounting systems are required. Provide login credentials to the Firexo and Firexo Group Limited accounting systems | 04/01/26 | Firexo Corp has never operated any such accounting system so there are no logins to provide. We no longer have control over any documents of Firexo Group Limited following its liquidation | |
| | E. | A copy of the Firexo Corp and Firexo Group Limited tax returns for 2023, 2024, & 2025 | 04/03/26 | Firexo Corp has never filed tax returns. We no longer have control over any documents of Firexo Group Limited following its liquidation | |
| | F. | A copy of the Firexo Corporation IPO documents | 03/03/26 | The draft Registartion Statement was only draft on a proposed IPO that was aborted and never completed.. | |
| | G. | A copy of all notices Firexo Corporation's Statutory Agent Received from the State of Delaware | 04/03/26 | Firexo Corporation received no such notices. | |
| | H. | Have the FGL liquidators filed any information with any Court? If so, please provide a copy of the reports, and information on how the case can be followed. | 04/03/26 | We no longer have control over any documents of Firexo Group Limited following its liquidation. Please refer to the liquidators directly. | |
| | I. | If the FGL liquidators have not filed any documents with any Court, I need a copy of all information the liquidators provided to FGL and/or the FGL creditors. | 04/03/26 | Please above and refer to the liquidators directly. | |

**Questions from Coyle's Testimony October 22, 2025**

| Page # | Line #s | Testimony & Questions | | | |
|---|---|---|---|---|---|
| 14 | 11-14 | "Firexo Corp, owned shares in the other group entities" - | | | |
| | | Provide a schedule of what entities Firexo Corp owned shares in, include total shares outstanding as of time of Coyle's testimony, and total shares outstanding today. | 04/07/26 | Firexo Corp owns one share in Firexo Holdings Limited | |
| 14 | 24 | "but there was a huge claim in London as well" | | | |
| | | Who filed the claim in London? What is the status of the claim? Has it been adjudicated? Case #, the progress of the case, and can the case be followed | 04/07/26 | Scot Smith and Rafax Invest AB filed the claim in London.  The claim against Firexo Group Limited was stayed following the company's liquidation.  The claim is porceeding as against David Breith only. | |
| 14-15 | 25-1 | "FGL was defending three or four court cases..." | | | |
| | | Need a schedule of all cases filed against FGL, and any entity Firexo Group that hold shares. What is the status of the claim? Has it been adjudicated? Case #, the progress of the case, and can the case be followed online? | 04/07/26 | The only live claim against Firexo Group Limited is the one pursuant to which the receivers have been appointed.  Everything else has come to an end. | |
| 17 | 17-18 | "It (FGL) borrowed quite significant amounts from Firexo Corporation ..." | | | |
| | | Where did Firexo Corp get the money to lend to FGL? Provide a schedule of each loan FGL received from Firexo Group, the amount of the loan, the date the loan was made, a copy of the loan agreement, the status of the loan, where the money came from for the loan, and how the money was transferred from Corp to FGL, and copies of the transfer documents. Are there any loan agreements between Firexo Corp and investors, if so, please provide a copy of those agreements. | # # # # | Subject to obtaining prior consent from Sir Clive Cowdery, diclosure can be given in relation to his loan and subsciption agreement with Firexo Corp in 2022. | |





tabbies®

EXHIBIT



**FIREXO HOLDINGS LIMITED**

**Company registration number 13592954**

**Minutes of Board meeting**

| | |
|---|---|
| **Date**: | 24 September 2025 |
| **Time**: | 10am |
| **At**: | By Telephone |

| | |
|---|---|
| **Directors Present:** | David Breith (statutory director) - DB |
| | Winand Staring (statutory director) - WS |
| **And by invitation:** | Luke Gemici-Haggett (Group CEO) – LG-H |
| | Peter Coyle (by invitation – legal advisor) - PC |

1. **Opening and Chairman**

   DB was appointed as Chairman of the meeting and acknowledged the persons on the call.

   DB reported that due notice has been given and that a quorum was present and declared the meeting open.

2. **Declaration of interests**

   The Board noted that directors are required to disclose any conflicts of interest in relation to proposed transactions or arrangements with the Company.

   It was acknowledged that both directors are proposed allottees of the new ordinary shares and therefore have a direct interest in the transaction.

   Having considered the Company's articles of association and the provisions of the Companies Act 2006, the Board agreed that the directors' interests do not preclude them from participating in discussions or voting on the allotment.

   Both directors accordingly participated in the discussion and voted on the resolutions relating to the allotment of shares.

3. **Business of the Meeting:**

   DB placed on record that when the Company was considering a potential IPO in the USA, it was always the intention to bring the business back to a UK Topco if the IPO did not complete.  This was clearly notified to shareholders in a shareholder circular in September 2021.

   DB reported that the Company has been speaking to RSM Tax and Advisory since October 2024 regarding the restructuring steps needed to bring Firexo back to being a UK HQ business.

   This advisory process was unable to commence until funding was secured and following receipt of initial investment funds from new investors at the end of April 2025, An engagement letter was signed with RSM in May 2025 to agree a formal step process to bring Firexo back to being a UK HQ business.  RSM presented the options paper to the business in September 2025.

The board received notification of a development in the USA litigation during August 2025, Firexo Inc filed a Motion on 13 August 2025 to join Firexo Corporation as a Defendant the proceedings, in place of Firexo Group Limited (in liquidation).  Within the Motion it was revealed that Firexo Corporation "*is no longer in existence and good standing under the laws of the State of Delaware having become inoperative and void the first day of March A.D 2025 for non-payment of taxes.*"The Company had not received any notification of this action and until this point was not aware of the status change or the implications.

On investigation, this 'void' status was declared due to non-payment of State franchise taxes.  The business was unable to pay these taxes of circa $450,000 (estimated by US tax authorities) as a result of previously minuted liquidity issues, arising because Firexo Corporation's main investor had withdrawn his financial support for the business, leading to alternative investment being secured.

Further legal advice was taken in the USA and the UK. In summary:

Delaware Counsel (Mr Bruce McCulloch) had advised that "*all powers conferred by law upon the corporation are declared inoperative,*" *8 Del. C. § 510.* Mr McCulloch states the corporation cannot sue; it cannot be sued; it cannot trade; it has no legal capacity to receive or make payments; it has no legal capacity to own assets.  As such, the position is that Firexo Holdings Limited does not have a shareholder which needs to be remedied urgently.

PC advised that:

- **Section 550 Companies Act – Power to allot shares**
  Where a private company has only one class of shares, the directors may exercise any power of the company—
  (a)to allot shares of that class, or
  (b)to grant rights to subscribe for or to convert any security into such shares, except to the extent that they are prohibited from doing so by the company's articles.

- The allotment of shares must be for proper purposes.

- **Usual fiduciary duties apply including Section 171 – Duty to act within powers** - directors must: "act in accordance with the company's constitution and only exercise powers for the purposes for which they are conferred."

- Howard Smith Ltd v Ampol Petroleum Ltd remains a leading authority in company law, establishing that directors' powers must only be exercised for proper purposes, with the genuine motive aligned with lawful company objectives.

- A 'void' company cannot own shares in another company.

- Firexo Holdings Limited is currently existing unlawfully, without any legal owners.

- Further research is needed in relation to Firexo Corporation's single share in the Company – and whether it should/can be cancelled.  The board's current view is that a Void company almost certainly cannot own shares in a UK company as it  has no legal existence, so the board may be forced to cancel the Firexo Corporation in due course.

In PC's opinion the directors should exercise the power conferred by S550(a) to allot shares on a like for like basis in favour of all 'former' shareholders in Firexo Corporation – that Corporation no longer being in existence.  This has to be viewed as being in the best interests of those shareholders (and the company as a whole) since without this action, their investment in Firexo's business will be lost to each shareholder's financial prejudice.

LG-H then explained that Benchmark International (formally engaged since 3rd October 2024 to market the sale of Firexo group's business for the benefit of its investor shareholders) had advised that a sale from a UK entity is likely to realise better value for shareholders than a sale conducted by a US entity – citing UK PE preference as well as market scepticism in US transactions following the re-election of President Trump and all of the market and international trade turbulence which has followed.

The recent investment into the Company from new investors was made on the understanding that the UK Company would become the group's TopCo (hence the RSM engagement).  To ensure continued receipt of funds and ongoing liquidity through a sale process it is imperative for both creditors and shareholders that we can demonstrate that the shareholdings are being allocated appropriately into a UK legal entity.

Taking all these issues together, it seemed to LG-H imperative that the Company be re-constituted by exactly the same investor shareholders (with exactly the same shares) which had a shareholding in the now defunct and Void Delaware 'non-entity' formerly known as Firexo Corporation,

In light of these explanations, the Chair explained that the purpose of the meeting was to consider and, if thought fit, approve the allotment and issue of new ordinary shares in the Company (a) to all shareholders of the Company's defunct parent company, Firexo Corporation, under the authority granted to the directors by section 550 of the Companies Act 2006 and (b) to facilitate the subscription agreement with Fireless and (c) to incentivise and retain key members of staff (the specifics of such allotment to be reserved for discussion at the next board meeting).

## 4. **Authority to Allot Shares**

It was noted that the Company is a private company with only one class of shares and that the directors are authorised under section 550 of the Companies Act 2006 to allot shares of that class without the need for a specific shareholder resolution.

The directors reviewed the proposed allotments and confirmed that the Company's articles of association do not restrict such allotments.

## 5. **Allotment of Shares to Parent Company Shareholders**

The Board considered a proposal to allot and issue new ordinary shares to individuals who were shareholders of the now defunct parent company, Firexo Corporation, in proportions reflecting their shareholdings in that former corporation.

The Chair presented a schedule (attached as Annex 1) detailing:
- The names of the proposed allottees;
- The number of ordinary shares to be allotted to each; and
- The nature of the consideration, if any.

It was confirmed that:
- The shares will be allotted as fully paid, and the Company will receive the full nominal value for each share allotted.

- The consideration will be settled through a capital contribution from or on behalf of the investor share allottees such that the Company receives value equivalent to the nominal amount.
- The shareholders receiving the shares have no liability to pay further amounts, and the Company will record the shares as fully paid.
- The new shares will rank pari passu with existing ordinary shares.

The Board is satisfied following US professional advice that the proposed arrangements comply with all applicable legal requirements.

## 6. <u>Board Resolutions:</u>

After due and careful consideration, IT WAS UNANIMOUSLY RESOLVED THAT:

Pursuant to the authority under section 550 of the Companies Act 2006, the Company shall allot and issue the number of ordinary shares set out in Annex 1 to the persons named therein for the consideration stated.

The Company's solicitor be authorised and instructed to:

- Update the Company's register of members and register of allotments accordingly;
- Issue share certificates to the new shareholders in accordance with the Company's articles and applicable law;
- File Form SH01 at Companies House within the prescribed time limit; and
- Take any other steps necessary or desirable to give effect to the allotments.

## 7. <u>Close:</u>

There being no other business, David Breith declared the meeting closed.

..................................
**David Breith (CEO)**





Our ref: PJM/JW/1162113/clp

**Strictly Private & Confidential**

Firexo Holdings Limited
3 The Courtyard
Furlong Road
Bourne End
United Kingdom
SL8 5AU

RSM UK Tax and Advisory Services LLP
1st Floor, Platinum Building
St John's Innovation Park
Cowley Road
Cambridge
CB4 0DS
United Kingdom
T +44 (0)1223 455710
rsmuk.com

28 May 2025

To the Directors of Firexo Holdings Limited

## INTRODUCTION

This Engagement Letter sets out the basis on which we are to provide tax advisory services (the Services) to you and our respective areas of responsibility. The scope of the Services to be provided is detailed in Appendix 1.

The attached Terms and Conditions of Business dated October 2024 form part of this Engagement Letter and apply to all our work, save as expressly amended in this Engagement Letter. Please read them carefully, as they include various exclusions and limitations on our liability. They also include certain definitions used in this letter.

## CONTACT POINTS

The core RSM team will be:

| Name | Grade | Service |
|---|---|---|
| Phil Melia | Partner | Corporate Tax |
| Jen Winchester | Associate Director | Corporate Tax |

The above team will handle key aspects of providing the Services. However, we will utilise other professionals if required.

## NOMINATED PERSONS

You have told us that the following individuals act as Nominated Persons:

- **Luke Gemici-Haggett**
- **Rob Parish**
- **David Breith**

You confirm that the Nominated Persons are authorised to give instructions and information to us on your behalf and to receive our advice and deliverables on your behalf.

**THE POWER OF BEING UNDERSTOOD**
AUDIT | TAX | CONSULTING

RSM UK Corporate Finance LLP, RSM UK Legal LLP, RSM UK Restructuring Advisory LLP, RSM UK Risk Assurance Services LLP, RSM UK Tax and Advisory Services LLP, RSM UK Audit LLP, RSM UK Consulting LLP and RSM UK Creditor Solutions LLP are limited liability partnerships registered in England and Wales, with registered numbers OC325347, OC402439, OC325349, OC389499, OC325348, OC325350, DOC397475 and OC390886 respectively. RSM UK Employer Services Limited, RSM UK Tax and Accounting Limited and RSM UK Management Limited are registered in England and Wales with numbers 6463594, 6677561 and 3077999 respectively. All limited companies and limited liability partnerships are registered at 6th Floor, 25 Farringdon Street, London, EC4A 4AB. The UK group of companies and LLPs trading as RSM is a member of the RSM network. RSM is the trading name used by the members of the RSM network. Each member of the RSM network is an independent accounting and consulting firm which practises in its own right. The RSM network is not itself a separate legal entity in any jurisdiction.

RSM UK Legal LLP is authorised and regulated by the Solicitors Regulation Authority, reference number 626317.



**FIREXO HOLDINGS LIMITED**
**Engagement Letter**

Any change to the Nominated Persons should be notified to us by an existing Nominated Person or a Director and will not be effective until acknowledged by us in writing.

Notwithstanding the above, you authorise us to rely on any instructions, notices or requests (whether in writing or not and however communicated to us) from any other person authorised, or reasonably believed by us to be authorised, by you to give such instructions, notices or requests.

## YOUR RESPONSIBILITIES

You are responsible for making available all relevant information to us promptly, and for providing us with explanations relevant to the matter(s) in question. Any information to be provided to HMRC in the course of this engagement will be made on the basis of full disclosure.

You authorise us to approach such third parties as may be appropriate for information that we consider necessary in dealing with this engagement. It is expressly agreed between us that in all dealings with third parties we will be acting as agent on your behalf and not as principal, and that we shall be entitled to make this clear in all communications with such third parties.

Our Services are provided solely on the basis of the information provided by you (and, if applicable, third parties). We will rely on the information and documents being correct and complete and will not verify the accuracy of the information provided or those documents. We accept no responsibility for any tax, interest or penalties arising due to inaccuracies or omissions in the information provided to us.

You will keep us informed of all material changes in your circumstances and any proposed transactions that could affect the Services. If you are unsure whether the change or transaction is material or not, please let us know so we can assess the significance.

You should be aware that, when undertaking any tax planning, there may be commercial or reputational impacts that result from that planning.

You are required by law to retain the books and records in support of your tax affairs. It is your responsibility to preserve these records for the period set by law. We are able to advise you, if requested, about the type and form of such records and the duration for which they must be preserved.

It is important that you forward to us any correspondence you receive from HMRC that is relevant to the Services in adequate time to enable us to deal with it within the necessary timeframe. Examples of such correspondence include statements of account, copies of notices of assessment, acknowledgements, determinations and letters.

## LIABILITY FOR WORK UNDERTAKEN

There are a number of key dates by which returns and tax payments must be made. Failure to meet these deadlines will result in penalties and interest charges. Some penalties are automatic. If information is not provided to us within the timescale we request, so that the preparation and submission of returns or advice are delayed, we will accept no responsibility for any penalties or interest that may arise as a result.

In the event that HMRC successfully disputes the filing position adopted in any return and subsequently impose a penalty in respect of that return you are reminded that the responsibility for any such penalty is yours.

Our advice will be provided solely for your confidential use and (save as required by law or by a competent regulatory authority) should not be made available to any other party without our prior written consent. We will accept no responsibility, and will deny any liability, to any other party that is shown or gains access to our advice.

For the avoidance of doubt, please note that the Services relate to Firexo Holdings Limited's affairs and should not be interpreted as constituting advice to individual employees, or their individual circumstances. RSM UK Tax and Advisory Services LLP is not liable in any way to your employees or others to whom the request for information or advice may relate. We will not make direct contact with your employees in connection with the Services provided under this Engagement Letter without your prior consent.



**FIREXO HOLDINGS LIMITED**
Engagement Letter

## OUR RESPONSIBILITIES

We will provide you with written confirmation of our final advice in relation to the Services. The provision of that written confirmation will constitute the end of the assignment for that part of the Services. We will not update the final advice unless specifically agreed between us, and where appropriate, this work may be subject to a separate engagement letter and additional fee.

For removal of doubt, to avoid potential misunderstandings, you should not rely upon anything said in the course of a telephone conversation which has not been confirmed by way of a formal letter or in an e-mail.

Should any other factors come to our attention during the course of our work which we consider may be relevant to our Services as set out in Appendix 1, we will bring these to your attention. Should you wish to extend the scope of our work beyond that identified in Appendix 1 we will be pleased to discuss such additional work with you.

Where agreed between us, we will deal with compliance checks from HMRC in connection with the Services and this work may be subject to a separate engagement letter and additional fee.

We have a professional responsibility not to allow our name to be associated with the submission of information to HMRC which may be misleading. Therefore, although we are not required to carry out work to search for such matters, should we become aware, for any reason, that information submitted to HMRC may be misleading, we will discuss the matter with you. If you will not agree to make such adjustments and/or disclosures as we believe necessary, we will withdraw from the engagement.

## GENERAL TAX WORK AND ADVICE

We will be glad to assist you generally in tax matters and where it is agreed between us, we will also provide taxation advisory services and other ad hoc advisory work to the extent this is not covered by separate letter of engagement. However, in most cases, we will ask you to sign a separate letter of engagement before undertaking any major assignment and will discuss and agree an additional fee for this work. We will, however, only provide such advisory services if the advice that is sought is requested in good time such that we are able to issue our advice before any proposed transactions. Your attention is drawn to our Terms and Conditions of Business, in particular Clause 2 'Changes in Scope'.

## EXCLUDED MATTERS

The provision of tax compliance services is not included within the scope of this Engagement Letter but may be covered by a separate letter of engagement.

Although on occasion we may advise you on other tax planning issues we are not, under the terms of this agreement, required to identify such opportunities. However, if requested by you, and subject to our mutual agreement to do so, we will carry out any such tax planning exercise on your behalf. This work will be the subject of a separate engagement letter and additional fee.

## CHANGES IN LAW

The provision of our advice is based on our interpretation of current law and practice at the time the advice is given. We have no obligation to update our opinion (unless otherwise agreed as a new engagement), or to accept liability for any losses resulting from subsequent unforeseen or unanticipated changes to law or practice.

We would warn you that tax law changes frequently. If a transaction is delayed following provision of the Services, or an apparently similar transaction is to be undertaken at a later date, we recommend that you ask us to review any advice already given.

**FIREXO HOLDINGS LIMITED**
**Engagement Letter**



## TERMS AND CONDITIONS OF BUSINESS AND ADDITIONAL TERMS

Please carefully read the attached Terms and Conditions of Business dated October 2024 which apply to all our work, **save** where amended below.

(a)     It is agreed that, in connection with this engagement, Clause 23.1 shall be deleted and the following wording is substituted in its place 'We will not provide custody of title documents belonging to you.'

(b)     It is agreed that, in connection with this engagement, Clause 24 shall be deleted and the following wording is substituted in its place 'We will not hold monies on your behalf.'

## AGREEMENT OF TERMS

Please confirm in writing your agreement to these terms by signing and returning the enclosed copy of this Engagement Letter. Where Adobe Sign or similar is not used to countersign, please return a signed copy of this Engagement Letter to us by another means.

The terms covered by the Engagement Letter shall take effect when we receive your written agreement, or upon commencement of the work to which they relate, whichever is the sooner.

Yours faithfully

*RSM UK Tax and Advisory Services LLP*

**RSM UK Tax and Advisory Services LLP**                                            28 May 2025

Encs.   Terms and Conditions of Business dated October 2024


Contents noted and agreed for and on behalf of the Board of Directors

Firexo Holdings Limited

Signed    *David Breith*                         Date  03/06/25

          David Breith



**FIREXO HOLDINGS LIMITED**
Engagement Letter

## APPENDIX 1

## TAX ADVISORY SERVICES

## SCOPE OF OUR WORK

We would undertake a review of the current group structure and necessary considerations in order to implement a proposed US restructuring to return the group to a UK-parented Group, via a share for share exchange and ultimate liquidation of the US TopCo, Firexo Corporation. With this, along with correspondent additional fees, we would consider the tax implications involved with the option of filing for chapter 7 bankruptcy for the TopCo.

### PHASE 1 – ASSESSMENT AND FEASIBILITY

Proposed scope:

- Review the proposed steps to achieve the migration of ownership of Firexo Corporation, a US corporation, under the UK in a share exchange.

- Provide a general overview of the relevant inversion rules under IRC Section 7874, including applicable exceptions, and analyse the expected application to the proposed transaction steps based on our understanding of the facts.

- Evaluate the US federal income tax impacts related to non-U.S. ownership of Firexo Corporation, including impacts of any deemed distributions or outbound transfers resulting from the proposed transaction and application of the Foreign Investment in Real Property Tax Act ("FIRPTA").

- Identify expected US federal income tax impacts, if any, to Net Operating Loss utilization (i.e. tax losses).

Our fees in respect of RSM US for Phase 1 are estimated to be $20,000 - $25,000, excluding VAT and disbursements. RSM UK fees in respect of project co-ordination and any UK tax input at an aggregated hourly rate of £500 (exc. VAT), estimated to be £2,000 - £3,000.

To the extent there are any remedial US tax filings to be completed, fees for this work would be quoted separately.

### PHASE 2 – IMPLEMENTATION

- RSM US fees are based on an aggregate hourly rate of $650. This Phase will be scoped upon the completion of Phase 1 but depending on the complexity and whether required or not, could range from $50,000 - $100,000.

- RSM UK fees in respect of this phase would be at an aggregated hourly rate of £500 (exc VAT). We would provide an estimate of UK costs at the end of Phase 1.

- This would not involve input from any other RSM office in countries where Firexo is situated apart from UK and US. To the extent this may be required we would seek separate fee quotes where applicable.

### OUT OF SCOPE CONSIDERATIONS

- Subject to the results of Phase 1, some further consideration will need to be given for tax purposes between bankruptcy filing under chapter 7 (Title 11, United States Code) for Firexo Corporation and the intercompany balance analysis. Additionally, as foreign subsidiaries are moving "out from under" under the US, there may be a requirement to understand how bankruptcy may plan into any potential gain which may be recognised on getting everything out from under the US. Fees for this work would be quoted separately and agreed in advance of commencement either in writing or via email.

## EXCLUDED MATTERS

Our advice in respect of this part of the Service will solely deal with the matters set out above. For the avoidance of doubt, in addition to any limitations arising from the access constraints, we accept no



**FIREXO HOLDINGS LIMITED**
**Engagement Letter**

responsibility for the following matters and we shall not advise on them as part of our advice on the matters set out above:

- valuation considerations;

- legal and accounting services, particularly any assessment of distributable reserves;

- issues of law, other than tax law; and

- property transaction taxes (stamp duty land tax, land and buildings transactions tax, land transaction tax), VAT or other indirect taxes, personal taxation of directors, inheritance tax, capital gains tax.

You should consider obtaining expert advice in relation to these areas. We will be glad to assist you in the tax matters included above, but we will require you to sign a separate letter of engagement before undertaking any such assignment.

## GROUP

For the avoidance of doubt, the matters set out above will be provided in concern of only the following existing Group entities.

- Firexo Corporation (US)

- Firexo Holdings Corporation (US)

- Firexo Holdings Limited (UK)

- Firexo Group Limited (UK)

- Firexo Inc (US)

Our advice will be provided solely for the confidential use of the above entities and (save as required by law or by a competent regulatory authority) should not be made available to any other party without our prior written consent. We will accept no responsibility, and will deny any liability, to any other party that is shown or gains access to our advice.





# Agenda

| 01 | Background, Facts and Key Assumptions | 4 |
|----|--------------------------------------|-----|
| 02 | Steps plan | 11 |
| 03 | Next Steps | 16 |
| 04 | Appendices | 18 |



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Transmittal letter

**Contacts**

**Phil Melia**
Partner

M: +44 1223 455715
E: Phil.Melia@rsmuk.com

**Jen Winchester**
Associate Director

M: +44 1223 455715
E: Jen.Winchester@rsmuk.com

**Crystal Golob Lindholm**
Partner

M: 612 376 9220
E: crystal.golob.lindhom@rsmus.com

**Anna Yegorov McElwain**
Senior Manager

M: 312 634 3312
E: anna.yegorov@rsmus.com

**RSM UK Tax and Advisory Services LLP**
25 Farringdon Street
London
EC4A 4AB
United Kingdom
T  +44 (0)20 3201 8000
rsmuk.com

September 2, 2025

**Firexo Holdings Limited**
3 The Courtyard
Furlong Road
Bourne End
United Kingdom, SL8 5AU

**Feasibility Paper**

Dear Sir / Madam

In accordance with your instructions and in line with the terms of our engagement letter dated May 28, 2025 (the 'Engagement Letter'), we enclose our feasibility paper (the 'Report') discussing the proposed restructuring transaction ('the Transaction') involving the migration of ownership of Firexo Corp and related tax implications.

This Report sets our analysis of the current practice and our interpretation of the applicable laws and regulations. The tax legislation is circumscribed by anti-avoidance rules and jurisprudence, and sometimes such legislation can be introduced with retrospective effect. Consequently, our views are not binding on any of the tax authorities and there can be no assurance that they will not take a position contrary to our comments and analysis. No inference beyond their normal meaning should be drawn from the use of the words "will", "would" or "should" etc. in this Report as they relate to the relative strengths of a particular position outlined herein.

Upon provision of our final advice, unless agreed otherwise, we have no obligation to update our opinion, or to accept liability for any losses resulting from subsequent unforeseen or unanticipated changes to law or practice.

This Report is solely addressed to and for the benefit of those persons to whom our Engagement Letter is addressed and who have agreed in writing to the terms and scope set out in our Engagement Letter. It may not be relied upon by any other person or entity without our prior written consent. Such other persons or entities should seek their own independent advice.

Yours faithfully,

**RSM UK Tax and Advisory Services LLP**

RSM UK Corporate Finance LLP, RSM UK Legal LLP, RSM UK Restructuring Advisory LLP, RSM UK Risk Assurance Services LLP, RSM UK Tax and Advisory Services LLP, RSM UK Audit LLP, RSM UK Consulting LLP and RSM UK Creditor Solutions LLP are limited liability partnerships registered in England and Wales, with registered numbers OC325347, OC402439, OC325349, OC389499, OC325348, OC325350, OC397475 and OC390886 respectively. RSM UK Employer Services Limited, RSM UK Tax and Accounting Limited and RSM UK Management Limited are registered in England and Wales with numbers 6463594, 6677561 and 3077999 respectively. All limited companies and limited liability partnerships are registered at 6th Floor, 25 Farringdon Street, London, EC4A 4AB. The UK group of companies and LLPs trading as RSM is a member of the RSM network. RSM is the trading name used by the members of the RSM network. Each member of the RSM network is an independent accounting and consulting firm which practises in its own right. The RSM network is not itself a separate legal entity in any jurisdiction. RSM UK Legal LLP is authorised and regulated by the Solicitors Regulation Authority, reference number 626317.







# Glossary of Terms

| Term | Definition |
| --- | --- |
| CFC | Controlled foreign corporation |
| CT | UK Corporation Tax |
| CTB | Check-The-Box |
| FDE | Foreign Disregarded Entity |
| FMV | Fair Market Value |
| GILTI | Global Intangible Low-Taxed Income |
| HMRC | His Majesty's Revenue and Customs |
| IRC | Internal Revenue Code |
| SSE | Substantial Shareholding Exemption |
| U.S. | United States |
| USD | U.S. Dollar |
| USFIT | U.S. Federal Income Tax |



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Glossary of Terms

| Term | Definition | Activity of the Entity |
|---|---|---|
| Firexo Corp (US) | Firexo Corporation | US Holding Company |
| Firexo Holdings (UK) | Firexo Holdings Limited | UK Holding Company |
| Firexo Group (UK) | Firexo Group Limited | In liquidation – Outside of the scope of this report |
| Firexo Nordic (SE) | Firexo Nordic AB | Outside of the scope of this report |
| Firexo Inc (US) | Firexo Inc. | Outside of the scope of this report |
| Firexo Distribution (UK) | Firexo Distribution Limited | Dormant; intermediary holding company |
| Firexo COTM (UK) | Firexo COTM Limited | IP owner; purchased from Firexo Group (UK) |
| Firexo SCM (UK) | Firexo SCM Limited | Dormant |
| Firexo Ltd (UK) | Firexo Limited | Active - Fire extinguisher sales |
| Firexo Motorsport (UK) | Firexo Motorsport Limited | Dormant |
| Firexo Srl (IT) | Firexo S.r.l. | Dormant |
| Firexo Zoo (PL) | Firexo SP Zoo | Active – Fire extinguisher sales and support services |
| Firexo Holdings Corp (US) | Firexo Holdings Corporation | Recently became non-trading due to tariff announcements within the US market |
| Firexo Ltd (HK) | Firexo Limited | Dormant and in the process of being liquidated |
| Firexo BV (NL) | Firexo B.V. | Dormant and in the process of being liquidated |
| New UK Topco (UK) | TBD | UK Topco to be established |
| Firexo Holdings Group | Firexo Holdings and all subsidiary undertakings | N/A |
| Group | Firexo Corporation and all subsidiary undertakings | N/A |



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Background, facts and key assumptions (1 of 3)

**Commercial background and objectives**

The Firexo Group, launched in 2018 in the U.K., offers a groundbreaking all-in-one fire extinguishing solution designed to tackle all fire types with a single product. Their patented formula has been rigorously tested to international standards, ensuring effectiveness in residential, commercial, and industrial settings. The Group's mission is to save lives and protect property by eliminating confusion during fire emergencies. Available in over 20 countries, Firexo extinguishers are fast, powerful, and easy to use, providing crucial time to control fires and ensure safe evacuation.

The group aims to achieve the migration of ownership of Firexo Corp, a US corporation, under a new UK entity in a share for share exchange.

**Scope and limitations**

In accordance with our letter of engagement dated May 28, 2025, we have reviewed the current group structure and necessary considerations in order to implement a proposed US restructuring to return the group to a UK-parented Group, via a share for share exchange and ultimate liquidation of the US TopCo, Firexo Corporation.

*Phase 1 – Assessment and Feasibility*

Our work is structured into phases and this report focuses on Phase 1 only and covers the following:

- Review and development of 'Steps' to achieve the migration of ownership of Firexo Corporation, a US corporation, under the UK in a share exchange. This is to achieve the "Phase 1 Proposed Structure" (see page 11).

- A general overview of the relevant inversion rules under IRC Section 7874, including applicable exceptions, and analysis of the application of these rules to the Steps based on our understanding of the facts.

- Evaluation of the US federal income tax impacts related to non-U.S. ownership of Firexo Corporation, including impacts of any deemed distributions or outbound transfers resulting from the proposed transaction and application of the Foreign Investment in Real Property Tax Act ("FIRPTA").

- Identification of any US federal income tax impacts (e.g. impact on Net Operating Loss utilization).

*Subsequent Phases*

For the avoidance of doubt, the following subsequent phases are not covered by this report, albeit where applicable we have made reference to certain aspects.

- Further consideration will need to be given for tax purposes between bankruptcy filing under chapter 7 (Title 11, United States Code) for Firexo Corporation and the intercompany balances currently in place between the US and the wider group.

- As non-US subsidiaries are moved "out from under" under Firexo Corporation, which is required to get to the "Final Proposed Structure" (see page 12), the bankruptcy rules will need to be factored in to any potential gain which may be recognised on getting everything out from under the US. Subject to more detailed analysis of the bankruptcy filings the distribution of the non-US subsidiaries to the new UK top company may be coordinated as part of the bankruptcy process.

- Implementation of the proposed structure and review of any legal documentation will be the subject of future phases.

*Limitations*

Our advice set out in this report will solely deal with the Phase 1 matters set out above. For the avoidance of doubt, in addition to any limitations arising from the access constraints, we accept no responsibility for the following matters and we shall not advise on them as part of our advice on the matters set out above:

- valuation considerations;

- legal and accounting services, particularly any assessment of distributable reserves;

- Firexo's current global transfer pricing methodology;

- issues of law, other than tax law; and

- property transaction taxes (stamp duty land tax, land and buildings transactions tax, land transaction tax), VAT or other indirect taxes, personal taxation of directors, inheritance tax, capital gains tax.





# Background, facts and key assumptions (2 of 3)

**Facts and assumptions**

We have based our advice on the following facts and assumptions gathered based on the information provided by you and our discussions with you. Please inform us as soon as possible if our understanding of any item is incorrect, or changes prior to implementation as this may impact our conclusions.

- All companies party to the Steps laid out in this Report are opaque entities for UK, US, and local tax purposes, and local tax purposes if incorporated overseas, prior to the implementation of the proposed Steps. Broadly, this means they are taxable in their own right, compared to transparent, where the parent company may be taxable on the underlying profits of the subsidiary.

- We have also assumed that all companies party to the Steps are solely tax resident in their place of incorporation / formation.

- All positions taken within this slide deck are subject to review by local tax authorities – because the transactions within are all intercompany transactions, they may analyze the transaction with increased scrutiny and there is risk they may reach a different conclusion than that outlined in this slide deck. Our recommendations within are made in good faith that they may be supportable in each jurisdiction.

- Figures quoted are for illustrative purposes only and may need to be revisited prior to implementation.

- All U.S. tax code references refer to sections of the Internal Revenue Code (IRC) and Treasury Regulations.

- Internal Revenue Code sections 986, 987 and 988 are outside of the scope of the analysis contained within this slide deck. Broadly, these provisions address the taxation of foreign currency transactions and the translation of foreign branch operations.

- No entity is classified as a US real property holding company (USRPHC) as defined in Internal Revenue Code section 897.

- Management is to confirm that there are no legal, accounting or commercial reasons why the steps set out in this Report cannot be implemented.

- For the purposes of the reorganisation steps, we have assumed that the opening financial balances have been properly measured under the accounting standards including the measurement of any impairment on financial and non-financial assets.

- The value of any off-balance sheet intangibles are to be confirmed by management. The appropriateness of said values is not to be determined by RSM. A formal valuation is recommended.

- The purpose of the group restructuring is driven by robust commercial reasons, which reflect the group's economic reality. The group had originally established Firexo Corp with the intention of pursuing a US IPO. However, due to changed trading conditions, the listing is no longer planned. Firexo Corp is now redundant, no longer aligns with the group's strategic direction, and creates more administrative burden than benefit.

- In 2021, the Group underwent a restructuring under which the shareholders of Firexo Group transferred all interests in Firexo Group to Firexo Corp in a share-for-share exchange, effectively inserting the U.S. company as the Group's holding company. Prior restructuring is outside the scope of this engagement.

- Our understanding is that, prior to the transfer of Firexo Group to Firexo Corp in 2021, Firexo Group was not classified as a CFC for USFIT purposes.

- Firexo Group is in liquidation. As a result, Firexo Corp no longer holds legal rights over this group of entities. Therefore, the three entities (Firexo Group, Firexo Nordic, and Firexo Inc) fall outside the scope of this slide deck.

- Firexo Holdings Corp has suspended all operations and become a non-trading entity with no staff, due to new US tariffs and the inability to achieve full US certification needed for profitability.





# Background, facts and key assumptions (3 of 3)

## Facts and assumptions (continued)

- The current shareholders of Firexo Corp and future shareholders of New UK TopCo will be the same and will hold shares in the same proportions prior to and following the steps outlined in this Report.
- Each entity conducts sales with customers located in its respective country.
- All foreign entities owned by Firexo Corp are treated as controlled foreign corporations (CFCs) for USFIT purposes.
- Firexo Corp is owned by US, UK, and other minority foreign shareholders with no U.S. shareholders owning 10% or more.
- Our understanding is that all relevant entities were formed by Firexo Holdings rather than being acquired through M&A activity. We have not reviewed entity formation documentation.
- The U.S. tax returns for Firexo Corp and Firexo US Holdings Corp have not been provided to RSM. Our understanding is that these filings have not yet been completed. As such, this is outside the scope of this report.

### Mandatory disclosure rules and disclosure of tax avoidance schemes

There are certain circumstances in which UK intermediaries, such as RSM, may be required to supply details of tax arrangements to HMRC. A disclosure requirement may arise where, broadly, advice is given in relation to:

- certain hallmarked arrangements with a main purpose of obtaining a tax advantage;
- arrangements that circumvent the automatic exchange of information between tax authorities; or
- arrangements that have the effect of obscuring the beneficial ownership of assets.

Intermediaries in other jurisdictions, particularly those in the EU, may be subject to more wide-ranging disclosure rules.

Where a disclosure is required, this may include confidential information and such information may be shared with other tax authorities. We will inform you if we are required to disclose such details and advise you of your further obligations, but do not accept responsibility for any liabilities which may arise as a result.

### UK General Anti Abuse Rule ("GAAR")

In addition to specific anti-avoidance provisions in existing legislation, the Finance Act 2013 introduced a UK General Anti-Abuse Rule ("GAAR").

The GAAR enables HMRC to counteract a tax advantage obtained by "tax arrangements" that are "abusive". Abusive arrangements include those which have, as one of the main purposes, "the obtaining of a tax advantage", and exploit tax legislation in a way that is inconsistent with the "policy objectives of those provisions".

This firms long standing policy is not to engage in tax planning that we regard as aggressive or abusive and we therefore believe the risk of HMRC challenge to our tax planning advice should be low. However, the GAAR involves an element of subjectivity and in some circumstances, it is conceivable HMRC might challenge our view.

Based on the advice in this Report, we do not consider that a disclosure will be required under the above rules or under the GAAR.



 Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices

 **RSM**

# Current Group Structure

Legend:
- Corporate entity
- Partnership
- Disregarded entity
- Individual/Others
- ---▶ Transaction step
- Shareholding, 100% unless otherwise stated
- U.S. Entity
- Foreign Entity
- Outside of scope of report

Firexo Corp (US)
- Firexo Holdings (UK)
  - Firexo Distribution (UK)
    - Firexo SP Zoo Corp (PL)
    - Firexo Holdings Corp (USA)
    - Firexo Ltd (HK)
    - Firexo BV (NL)
    - Firexo Ltd (UK) — 95%
    - Firexo Motorsport (UK) — 93.5%
    - Firexo Srl (IT)
  - Firexo COTM (UK)
  - Firexo SCM (UK)
- Firexo Group (UK)
  - Firexo Nordic (SE) — 30%
  - Firexo Inc (US) — 30%

10 | Firexo Holdings Limited





# Proposed Phase 1 Group Structure



11

| Firexo Holdings Limited





# Proposed Final Group Structure



Legend:
- ☐ Corporate entity
- △ Partnership
- ◻ Disregarded entity
- ◯ Individual/Others
- ---▶ Transaction step
- ─── Shareholding, 100% unless otherwise stated
- 🟦 U.S. Entity
- 🟩 Foreign Entity
- ☐ Outside of scope of report

*Please note the 'subsequent phases' section of the scope of this engagement and the fact that the transfer of Firexo Holdings (UK) "out from under" Firexo Corp is not within the scope of this report. We have, however, provided some initial commentary in slide 22 in order that the issues involved are understood, but this will need to be worked through in conjunction with the Chapter 11 consideration in due course.*

12

| Firexo Holdings Limited



Steps plan



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



**RSM**

# Step 1 – Incorporate New UK Topco

**Summary structure**



**Step summary**

- On [X] date, the shareholders (or, alternatively, a shareholder) of Firexo Corp form a new UK private limited company ("New UK Topco").

**USFIT commentary**

- No adverse USFIT considerations are expected.

**UK commentary**

- No adverse UK considerations are expected.





Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



**RSM**

# Step 2 – Transfer of shares in Firexo Corp (1 of 4)

**Summary structure**



**Step summary**

- The shareholders of Firexo Corp will transfer all interests in Firexo Corp to the newly formed New UK Topco in exchange for the exact share ownership of New UK Topco (i.e. share for share exchange).

- Note: no cash or property will be exchange as part of the transfer.

**USFIT commentary**

*Application of U.S. Inversion Rules under IRC Sec. 7874*

- Generally, a share for share exchange may result in the shareholders swapping shares of Firexo Corp for shares of New UK Topco in a tax-free transaction under IRC Section 351. In certain outbound transactions, Section 367 needs to be considered, which may convert an otherwise tax-free transaction into a taxable transaction.

- In addition, the transfer will need to be tested under the Section 7874 inversion rules. Generally, an inversion occurs if all three tests are met:

  1. A foreign corporation directly or indirectly acquires substantially all of the assets of a US corporation.

  2. After the acquisition at least 60% vote or value of the foreign acquiring corporation stock is owned by former shareholders of the US corporation.

  3. The foreign acquiring corporation doesn't have substantial business activities in its country of organization.

     a. In this context, a foreign acquiring corporation is considered to have substantial business activities if it meets all four of the following requirements: (1) 25% of group employees/compensation, (2) 25% of group assets, (3) 25% of group revenues, and (4) the foreign corporation is tax resident in its place of incorporation.



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices


**RSM**

# Step 2 – Transfer of shares in Firexo Corp (2 of 4)

**USFIT commentary (continued)**

*Application of U.S. Inversion Rules under IRC Sec. 7874 (continued)*

- If the ownership is at least 60% but less than 80%, a restrictive tax regimes applies. If the ownership is 80% or more, the foreign acquiring corporation will be treated as US corporation. See USFIT Appendix for additional detail on inversions under Sec. 7874.

- Based on our observations and assumptions, there are not expected to be substantial business activities in UK primarily due to the lack of employees located in the UK. As a result, all of the three inversion tests are anticipated to be met and the transaction is expected to constitute an 80% or more inversion under Section 7874 based on current shareholding. See USFIT Appendix for additional detail on inversions and high-level computations with respect to the substantial business activities test.

- Management has indicated that there are proposed changes to the current shareholding of Firexo Corp, with certain investors exiting by converting their shares to shareholders loans and new investors at the New UK TopCo level. The inversion ratio calculation is complex and additional analysis would need to be completed to determine if the changes to the current shareholdings may result in a 60% inversion or may fall outside of the inversion rules (i.e., less than 60% inversion). To the extent Step 3 – CTB Election is effectuated, additional analysis may not be required.

*Application of U.S. Sec. 382 NOL Limitation*

- Firexo Corp's net operating loss (NOL) may be subject to Sec. 382 limitations to the extent an ownership change occurs. Because the ultimate beneficial ownership of Firexo Corp remains unchanged before and after the proposed transaction, it is not anticipated to qualify as an ownership change. Consequently, there are no expected limitations on the Firexo Corp. See USFIT Appendix for additional detail on Section 382.

*Application of U.S. FIRPTA Rules*

- The deemed disposal of shares in a U.S. C corporation (Firexo Corp) by a foreign person is covered under the FIRPTA rules and regulations. Based on our assumption that Firexo Corp is not a USRPHC, a FIRPTA certificate (dated no earlier than 30 days prior to the deemed disposal) will need to be provided and an IRS FIRPTA Notice will need to be submitted to the IRS (within 20 days of the deemed disposal), as prescribed in the regulations, to avoid 15% withholding tax on a gross basis of the deemed disposal. See USFIT Appendix for additional detail on FIRPTA.

**UK commentary**

*Capital Gains Tax and Advance Clearance*

- Where UK  shareholders disposing of their shares in Firexo Corp receive newly issued shares in New UK Top Co, capital gains tax ("CGT") can be deferred until the new shares are disposed of, provided the following conditions are met:

  i.   the acquiring company (i.e. New UK Top Co) receives more than 25 per cent of the target company's share capital (Firexo Corp); and

  ii.  the transaction is considered by HMRC to be for commercial reasons and the avoidance of CGT or corporation tax is not the main purpose of the transaction.

- The effect is that the shares received in the acquiring company inherit the tax base cost and acquisition date of the original shares.

- The first condition noted above will be satisfied when implementing this step because New UK Top Co will acquire 100 per cent of the share capital in Firexo Corp.

- The second condition should also be met on the basis that the holding company structure is being implemented for commercial reasons (see page 8 for our understanding of the key aspect of the commercial rationale behind the transaction).

- Advanced clearance from HMRC should be sought in respect of the second condition to confirm that the transaction is being affected for bona fide commercial reasons and does not form part of a scheme or arrangement of which the main purpose, or one of the main purposes, is avoidance of tax.



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Step 2 – Transfer of shares in Firexo Corp (3 of 4)

**UK commentary**

*Income Tax – share reclassification and transactions in securities*

- The Transactions in Securities ("TiS") rules are anti-avoidance measures aimed at situations where shareholders of a close company engineer a capital gain in order to avoid a charge to income tax. These rules do not apply exclusively to UK shares and if a transaction has a UK tax consequence these should be considered.

- Broadly a non-UK company may be within these rules if it were to be considered a 'close company' if it were UK tax resident (i.e. controlled by 5 or fewer participators). Firexo Corp is likely to fall within these considerations.

- However, on the basis that 100% of the shareholding in Firexo Corp is being exchanged in the same proportions for shares in New UK Top Co, no income tax advantage arises.

- Advanced clearance should be sought from HMRC to confirm that they will not seek to apply the TiS legislation to the proposed transaction. This clearance would be combined with the CGT clearance noted above.

*Income tax - employment related securities rules*

- Shares issued by a company to an individual (or to a third party if operating through a personal services company) by reason of that individual's employment are subject to the "employment related securities" ("ERS") rules. Shares issued by a company of which the individual is an employee or director are always regarded as being issued by reason of that person's employment.

- The ERS rules are complex, but very broadly can give rise to an income tax charge when shares are issued or sold. The rules are particularly complex where the shares are subject to certain restrictions, as is almost always the case in relation to shares in privately held companies.

- In some cases, it may be possible for an employee and employer to jointly elect out of the restricted securities rules by entering into a Section 431 election within 14 days of acquiring the shares. The effect of the election is to subject the employee to income tax at the time of acquisition on the difference between the unrestricted market value and the price paid. Where the shares are eventually sold or the restrictions lift, no further restricted securities income tax charges arise, and the gain is fully charged to capital gains tax.

- Where shares are subject to restrictions, income tax charges can arise on the difference between the actual value of the shares (i.e. the value of the shares subject to their restrictions) and the value that the shares would have if they were not subject to any restrictions (their 'unrestricted market value'), when either the restrictions are lifted, or the shares are sold.

- It is anticipated the proposed share for share exchange will be a neutral transaction for the purposes of the ERS rules. A tax charge, as described above, should not arise as the price being paid for the shares is the value of the shares being transferred, which should be equal to the unrestricted value of the shares being issued. There are specific provisions in the legislation regarding the tax neutrality of transactions of this nature.

- On a share for share exchange which satisfies the conditions of section 430A ITEPA 2003, it is not possible to enter into a Section 431 election in respect of the new shares acquired in New UK Topco. The new shares are taken to have the election status of the old shares (i.e. if a Section 431 election was entered into in respect of the original holding , this election will pass to the new shares).

- The issue of shares in New UK Topco to employees/office holders as part of the share for share exchange must be reported to HMRC on an annual return due 6 July following the tax year in which the employment related securities are acquired (i.e. by 6 July 2026 if the shares are acquired on or before 5 April 2026).



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Step 2 – Transfer of shares in Firexo Corp (4 of 4)

**UK commentary (continued)**

*Stamp Duty*

- Stamp duty is a tax on documents (e.g. a stock transfer form where shares of a UK company are being transferred). The scope of UK stamp duty extends only to matters that have some connection with the UK and where the consideration is £1,000 or more.

- As the Stamp Act 1891 is widely drafted to include "any matter or thing done or to be done in any part of the UK", the transfer of Firexo Corp shares to New UK Topco could potentially be subject to stamp duty at 0.5% on the market value of the Firexo Corp shares. The market value rule would apply by virtue of the Firexo Corp shares being acquired in return for an issue of the New UK Topco shares.

- Although there is no legal obligation to pay stamp duty, the absence of a stamp on a stampable document (or, from 25 March 2020, confirmation from HMRC that stamp duty has been paid) limits its practical use. For example, a company secretary is required to refuse to register a stock transfer form that is not duly stamped, and if the share register of Firexo Corp is located in the UK this could not therefore be legally updated in the absence of a stamped document.

- However, if the Firexo Corp shares are not in the UK, the transfer can be registered without payment of stamp duty. That said, documents chargeable with duty which are not duly stamped are inadmissible as evidence in a civil case in the UK and a judge has a duty not to admit them. If you later require the transfer documents to be stamped then it is likely that you will be able to do so, subject to paying the stamp duty, late penalties and interest. Ultimately, whether stamp duty is paid on completion will therefore be a commercial decision.

- Alternatively, stamp duty relief may be available under section 77 of the Stamp Act 1986, and we can review the availability of the relief if required, i.e. if the preference is for the documents to be stamped. To claim the relief would require applying to HMRC for adjudication, and RSM would be happy to review the availability of the relief and, if available, apply to HMRC for adjudication if required.

- While VAT was outside the scope of this report as set out in the letter of engagement and noted in the limitation section above, consideration will need to be give as part of any future implementation to the registration of New UK Topco for VAT, particularly if it will be providing management services, for example, to other group companies. Alternatively, it may seek to join a VAT group with other UK entities in the group.

 | Firexo Holdings Limited

 Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices

 **RSM**

# Step 3 – CTB on New UK Topco (Optional but recommended)

**Summary structure**



**Step summary - Optional**

- Upon formation, New UK Topco makes the check-the-box election to be treated as a partnership for U.S. tax purposes.

  - Note: New UK Topco must be an eligible entity in order to make the check-the-box election.

**USFIT commentary**

*US Inversion Risk and Check-the-box Election*

- New UK Topco will be treated as a foreign partnership for USFIT purposes and the shareholders of Firexo Corp will be treated as if they transferred all interests in Firexo Corp to the newly formed New UK Topco partnership.

- Because New UK Topco is treated as a foreign partnership for USFIT purposes rather than a foreign corporation, it is expected that the transfer will fall outside the Section 7874 inversion rules.

- A check-the-box (CTB) election may be considered as an alternative means to effectuate the proposed ownership restructuring. However, an analysis of the potential tax implications to shareholders has not been performed, as such matters are outside the parameters of our current scope. Broadly, however, US investors in New UK TopCo going forward, will be treated as being taxable on their share of the income/loss of New UK TopCo. US investor's share of the taxable profits/losses will be provided to them by New UK TopCo and such investors are subject to US tax on their share of taxable profits or may be entitled to offset their share of taxable losses against their other US taxable income. A US investor's ability to offset their share of taxable losses will depend on the type of investor and their own tax affairs and circumstances. As a pure holding company (i.e. no active trading profits) this may not be an issue for these minority US shareholders if the company does not really have any substantial income or loss. Consideration would need to be given if there was a disposal by New UK TopCo in the future of an underlying subsidiary as any gain may be taxable directly in the US shareholders hands which may not have been the intended consequence.

 Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Step 3 – CTB on New UK Topco (Optional but recommended)

**UK commentary**

- As noted above under the US commentary, where a company makes a CTB election for US tax purposes to be treated as a partnership and the US investors received their proportionate share of New UK Topco's taxable profits/losses arising in the accounting period.
- Accordingly, there is the potential for a double deduction to arise on any tax losses attributed to the US investors.
- Any UK trading losses the company generates in an accounting period will be utilised in the UK (e.g. surrendered for group relief or carried forward for offset against future taxable profits).
- However, those same losses may also be offset against the US investors taxable income, reducing the taxes payable in the US.
- Accordingly, New UK Topco falls within the UK hybrid mis-match rules which seek to counteract this double deduction by adjusting the UK company's tax losses and equally on taxable profits.
- This adjustment is something that will have to be factored into the New UK Topco's UK tax computation on an annual basis.



# Next Steps

**RSM**



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



**RSM**

# Potential Next Steps

1.  Employee vs. independent contractor analysis to determine if UK independent contractors can be treated as employees for purposes of the substantial business activities test.

2.  Inversion ratio calculation for future changes to shareholdings and investor makeup.

3.  Consider making a CTB election on New UK TopCo (removes the need for Next Step #1 or #2).

4.  Consider making an advance clearance to HMRC to ensure that the transaction is viewed as carried out for bona fide commercial reasons and is not for the avoidance of tax.

5.  A FIRPTA certificate (dated no earlier than 30 days prior to the deemed disposal) will need to be provided and an IRS FIRPTA Notice will need to be submitted to the IRS (within 20 days of the deemed disposal). See USFIT Appendix for additional detail on FIRPTA.

22 | Firexo Holdings Limited



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Phase 2 – "Out from under" planning and bankruptcy filings

While this is not within the scope of phase 1, we have included some high-level considerations below such that you can better understand the work that will be required. Once the implementation of Phase 1 is agreed, the below work can be started and worked through in detail. As set out in the letter of engagement, this will be subject to a separate fee quote.

Generally, when a US corporations sells or distributes shares of a lower tier subsidiary, gain will be recognized to the extent that fair market value exceeds US tax basis. As such, any movement of the lower tier shares of Firexo Corporation "out from under" the US entity will need to be further analysed to determine any potential gain impacts. This analysis should be done concurrently with the bankruptcy analysis as to determine how the intricacies of bankruptcy filings may impact the final tax return reporting.

In addition, it is recommended that Firexo Corporation file all post-due and current tax returns prior to implementing any out from under planning or as part of the bankruptcy process.

Consideration will need to be given to the specific facts of each entity, as developments in the potential bankruptcy process may impact the final US tax outcome. As such, this step has been deferred to the bankruptcy phase.



23 | Firexo Holdings Limited



 Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices

# Appendix 1: USFIT Considerations

**Inversion Overview Under Sec. 7874**

Generally, a transaction will be characterized as an inversion with the foreign acquiring corporation treated as a surrogate foreign corporation if each of the following three tests are met:

1) A foreign corporation "completes...the direct or indirect acquisition of substantially all of the properties held directly or indirectly by a domestic corporation or substantially all of the properties constituting a trade or business of a domestic partnership." [IRC §7874(a)(2)(B)(i)]

- "Substantially all" generally means 70% of FMV of the target corporation's gross assets and 90% of FMV of its net assets. [Rev. Rul. 77-37]

- Step 2 - RSM US observation: This test is expected to be met because New UK Topco, a foreign corporation, will acquire 100% of Firexo Corp (US). However, if the optional Step 3 CTB election is made this test will not be met.

2) "After the acquisition at least 60 percent of the stock (by vote or value) of the [foreign acquiring corporation] is held...by former shareholders of the domestic corporation by reason of holding stock in the domestic corporation, or...by former partners of the domestic partnership by reason of holding a capital or profits interest in the domestic partnership." [IRC §7874(a)(2)(B)(ii)]

- "By reason of stock "refers to stock of the foreign acquiring corporation held by former shareholders (or partners) of the domestic entity by reason of their having held stock in the domestic entity (if it is a corporation) or a capital or profits interest in the domestic entity (if it is a partnership).

- Step 2 - RSM US Observation: This test is expected to be met because the former shareholders of Firexo Corp will continue to hold more than 80% of New UK Topco, the foreign acquiring corporation. Management has indicated that certain existing shareholders may convert their shares to shareholder loans – further analysis is required in respect to this conversion and its impact on the inversion ratio.

3) "After the acquisition, the expanded affiliated group (EAG) which includes the [foreign acquiring corporation] does not have substantial business activities in the foreign country in which, or under the law of which, the [foreign acquiring corporation] is created or organized, when compared to the total business activities of such expanded affiliated group." [IRC §7874(a)(2)(B)(iii)]

- "Expanded affiliated group" generally includes chains of corporations (including foreign corporations) connected through stock ownership with a common parent, assuming there is more than 50% ownership of either the total voting power of the stock or the total value of the stock. [IRC §7874(c)(1)]

25 | Firexo Holdings Limited

- The EAG will be considered to have "substantial business activities" in the relevant foreign country on the completion date if the four-part Substantial Business Activities Test (SBAT) is met. SBAT is discussed in detail on the next slide.

- Step 2 - RSM US Observation: This is expected to be met as New UK Topco does not have substantial business activities UK as reflected in Scenario 2 on page 27.

**Inversion Consequences Under Sec. 7874**

If all three tests are met, one of two consequences will occur:

1) The domestic entity will be subject to a special tax regime if its former shareholders or partners own at least 60%, but less than 80%, of the foreign acquiring corporation. [IRC §7874(a)]

- The domestic entity must recognize the full amount of the inversion gain, without access to NOLS or other tax attributes that may reduce income.

- "Inversion gain" is income or gain recognized by reason of the transfer, plus any income received or accrued by reason of certain licenses, during the 10-year period following the inversion. [IRC §7874(d)(2)]

- In the case of a partnership, the inversion gain is applicable to the partner rather than the partnership.[IRC §7874(e)(2)]

2) The foreign acquiring corporation will be treated as a U.S. corporation if the domestic entity's former shareholders or partners own 80% or more of the foreign acquiring corporation. [IRC §7874(b)]



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Appendix 1: USFIT Considerations

**Substantial Business Activities Test Detail**

The group will be considered to have substantial business activities in the relevant foreign country on the completion date when compared to the total business activities of the expanded affiliated group only if it satisfies each of the four tests.

### 1. Group Employees

The number of group employees based in the relevant foreign country is at least 25% of the total number of group employees on the applicable date. Further, the employee compensation incurred with respect to group employees based in the relevant foreign country is at least 25% of the total employee compensation incurred with respect to all group employees during the testing period (the one-year period ending on the applicable date). See Treas. Reg. §1.7874-3(b)(1).

- "Relevant foreign country" means the foreign country in which, or under the law of which, the foreign acquiring corporation was created or organized. See Treas. Reg. §1.7874-3(d).

- "Applicable date" is either the completion date or the last day of the month immediately preceding the month that includes the completion date. See Treas. Reg. §1.7874-3(d).

- To be based in a relevant country, group employees must spend more time providing services in such country than in any other single country. See Treas. Reg. §1.7874-3(d).

Note that the Regulations generally emphasize "employees" as defined under U.S. tax law and not independent contractors. See Treas. Reg. §1.7874-3(d).

### 2. Group Assets

The value of the group assets located in the relevant foreign country is at least 25% of the total value of all group assets on the applicable date. See Treas. Reg. §1.7874-3(b)(1).

Group assets are tangible personal property or real property used or held for use in the active conduct of a trade or business (includes some rental property). See Treas. Reg. §1.7874-3(d).

- Group assets are located in the relevant foreign country only if the assets were physically present in such country at the close of the acquisition date and for more time than in any other country during the testing period (the one-year period ending on the applicable date). See Treas. Reg. §1.7874-3(d).

- All group assets must be valued on a gross basis (not reduced by liabilities) using either the adjusted tax basis or fair market value determined in U.S. dollars. See Treas. Reg. §1.7874-3(d).

- Group assets include rental property used in active trade or business and are valued at 8x annual rent. See Treas. Reg. §1.7874-3(d).

### 3. Group Income

The group income derived in the relevant foreign country is at least 25% of the total group income during the testing period (the one-year period ending on the applicable date). See Treas. Reg. §1.7874-3(b)(1).

- Group income is based on gross income of members of the expanded affiliate group from transactions occurring in the ordinary course of business with customers that are not related persons. See Treas. Reg. §1.7874-3(d).

- Group income must be determined consistently for all members of the expanded affiliated group either under U.S. federal income tax principles or as reflected in the relevant financial statements. See Treas. Reg. §1.7874-3(d).

- Group income is translated into U.S. dollars, if necessary, using the weighted average exchange rate (as defined in §1.989(b)-1) for the testing period. See Treas. Reg. §1.7874-3(d).

- Group income is derived in the relevant foreign country only if it is derived from a transaction with a customer located in such country. See Treas. Reg. §1.7874-3(d).

### 4. Tax Residency

- The Substantial Business Activities Test cannot be satisfied unless the foreign acquiring corporation is subject to tax as a resident in the country in which it is created or organized. See Treas. Reg. §1.7874-3(b)(4).



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Appendix 1: USFIT Considerations

**Substantial Business Activities Analysis under Sec. 7874**

| | Employees - Scenario 1* | Employees - Scenario 2* |
|---|---|---|
| UK Based Employees | 27.05% | 0.00% |
| UK Based Assets | 83.19% | 83.19% |
| UK Based Revenue | 53.67% | 53.67% |

| | Country | Total Assets | Revenue |
|---|---|---|---|
| Firexo Corp | US | - | - |
| Firexo Holdings | UK | - | - |
| Firexo Srl | Italy | - | - |
| Firexo Motorsport | UK | - | - |
| Firexo Ltd (HK) | Hong Kong | - | - |
| Firexo BV | Netherlands | - | - |
| Firexo Zoo | Poland | £2,997 | £994,494 |
| Firexo Ltd (UK) | UK | £14,834 | £1,459,639 |
| Firexo Holdings Corp | US | - | £265,540 |
| Firexo SCM | UK | - | - |
| Firexo COTM | UK | - | - |
| Firexo Distribution | UK | - | - |
| Total | | £17,831 | £2,719,674 |

- All figures are in GBP.

- Employees - Scenario 1 includes the independent contractors who allocated more than 80% of their time. Employees - Scenario 2 only considers the individual who are employees and does not consider the independent contractors. For the purposes of this analysis, contractors are not considered employees absent a detailed analysis of the employee/contractor US and UK tax rules.

- Total assets include tangible personal property or real property (i.e., fixed assets as applicable to Firexo).

- Figures are based on the trial balances provided by management as of December 31, 2024.

27 | Firexo Holdings Limited



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Appendix 1: USFIT Considerations

**FIRPTA**

In general, FIRPTA is a tax law that imposes U.S. withholding on foreign persons selling a U.S. real property interest (USRPI). The disposition of a USRPI by a foreign person (the transferor) is subject to the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA) income tax withholding. FIRPTA authorized the U.S. to tax foreign persons on dispositions of USRPIs.

If a nonresident alien individual (NRA) or foreign corporation disposes of a USRPI pursuant to IRC section 897, the NRA or foreign corporation is treated as if it were engaged in a U.S. trade or business and gain or loss from the disposition of the USRPI is deemed to be effectively connected with the U.S. trade or business (ECI). The ECI is taxed on a net basis under IRC section 871(b) (NRAs) or section 882 (foreign corporations).

A 15% withholding tax may be imposed on the gross amount realized by an NRA or foreign corporation on a transfer of an interest in USRPI. Withholding under IRC section 1445 is based on the amount realized, not gain on the disposition. Therefore, withholding may be required under section 1445 even if the seller recognizes a loss on the disposition of the USRPI.

For purposes of applying IRC sections 897 and 1445, a USRPI is defined generally as an interest in real property located in the U.S. or the Virgin Islands, and any interest other than solely as a creditor in any U.S. corporation, unless the taxpayer can establish that it was not a U.S. real property holding corporation (USRPHC) during the shorter of the taxpayer's holding period in the corporation or the five-year period ending on the date of disposition. A foreign or domestic corporation is a USRPHC if the FMV of its USRPI is at least 50% of the sum of the FMV of 1) its total USRPIs, 2) its total interest in real property located outside the United States, and 3) any other assets used in a trade or business.

Treas. Reg. section 1.897-1(b)(1) defines "real property" as including 1) land and unsevered natural products on the land; 2) improvements on the land (inherently permanent structures, such as buildings, and their components), and 3) certain classes of tangible personal property associated with the use of real property. In some cases, certain types of intangible property may qualify as real property; for example, an interest in real property may include an intangible right to use the real property.

It is our understanding that each relevant U.S. entity is not classified as a USRPHC as defined in IRC section 897.

To the extent none of the relevant U.S. entities are classified as USRPHCs, the necessary FIRPTA notices and certifications will need to be filed concurrently with the reorganizations outlined in this slide deck to avoid the 15% withholding tax.

**Sec. 382 Limitation**

Section 382 limits a corporation's ability to use its pre-change net operating losses (NOLs), built-in losses, and certain tax attributes to offset post-change income following an ownership change.

- Ownership Change Defined: A 50-percent or greater change in ownership of five-percent shareholders over a rolling three-year period..

- Annual Limitation Calculation: The allowable NOL deduction is capped at the fair market value of the corporation immediately before the ownership change, multiplied by the long-term tax-exempt rate.

- Impact of Limitation: Unused NOLs beyond the annual limit may be carried forward but could expire if not utilized within the carryforward period.

- Special Considerations:

  - Built-In Gains and Losses: If a corporation has a net unrealized built-in gain or loss (NUBIG or NUBIL) at the time of the ownership change, Section 382 may affect the treatment of these gains or losses.

  - Special Subgroup Rules: Certain rules apply to consolidated groups to allocate limitations among members.



Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices



# Appendix 1: USFIT Considerations

**Sec. 351**

A Section 351 transfer occurs when: one or more persons transfer property to a corporation, solely in exchange for the corporation's stock, and immediately after the exchange, the transferor, or the transferors as a group, control the corporation.  To qualify as a Section 351 transfer, a transfer of property to a corporation must meet certain statutory requirements and must have a valid business purpose.

Generally, neither the transferor nor the corporation recognizes gain or loss in a Section 351 transfer. The transferor may recognize gain if it receives other property or cash (boot) in addition to the corporation's stock. The transferor's basis in the transferred property becomes its basis in the stock received, adjusted for any boot and gain recognized. The corporation's basis in the transferred property equals the transferor's basis, increased for any gain recognized by the transferor. The corporation and certain transferors must file information statements for the transfer with their returns.

A corporation can receive tax-free contributions to capital by shareholders and non-shareholders. If the contribution is made by a shareholder, the corporation takes the shareholder's basis in the property. The corporation's basis in property contributed by non-shareholder is zero. If the person making the contribution can expect to receive goods or services from the corporation, the transfer is not a capital contribution.



 Background, Facts and Key Assumptions  |  Steps plan  |  Next Steps  |  Appendices

 **RSM**

# Appendix 1: USFIT Considerations

**Sec. 367**

Section 367 of the Internal Revenue Code deals with the tax treatment of certain transfers of property by U.S. persons to foreign corporations. The section is designed to prevent tax avoidance through the use of foreign entities and includes several specific rules and exceptions:

General Rule (Section 367(a)): Generally, when a U.S. person transfers property to a foreign corporation in certain exchanges (e.g., under sections 332, 351, 354, 356, or 361), the foreign corporation is not considered a corporation for purposes of determining gain recognition. This means that the transfer is treated as a taxable event, and the U.S. person must recognize gain on the transfer.

Exceptions and Special Rules:

1. Stock or Securities of a Foreign Corporation: Transfers of stock or securities of a foreign corporation that is a party to the exchange or reorganization may be exempt from the general rule, subject to regulations.

2. Partnership Interests: Transfers of partnership interests to a foreign corporation are treated as transfers of the transferor's pro rata share of the partnership's assets.

3. Controlled Corporations: Certain transactions involving controlled corporations may be exempt from the general rule, provided specific conditions are met.

4. Transfers of Intangibles (Section 367(d)): When a U.S. person transfers intangible property to a foreign corporation, the transfer is treated as a sale in exchange for contingent payments. The U.S. person must include in income amounts that reflect what would have been received in a contingent sale, either over the useful life of the property or at the time of disposition.

5. Regulations and Authority: The Secretary of the Treasury has the authority to issue regulations to prevent tax avoidance and to specify the treatment of various transactions under Section 367. This includes the ability to exempt certain transactions from the general rule and to provide detailed rules for the treatment of stock or securities exchanges.

6. Distributions and Liquidations (Section 367(e)): Special rules apply to distributions described in Section 355 and liquidations under Section 332, particularly when the distributee is a foreign corporation. These rules are designed to ensure that gain is recognized in situations where it might otherwise be deferred or avoided.

Overall, Section 367 is a complex provision aimed at ensuring that U.S. tax is not avoided through the use of foreign corporations in certain types of transactions. The section includes numerous exceptions and special rules, and its application often requires careful analysis of the specific facts and circumstances of each transaction.

30 | Firexo Holdings Limited



**THE POWER OF BEING UNDERSTOOD**
ASSURANCE | TAX | CONSULTING

This document contains general information, may be based on authorities that are subject to change, and is not a substitute for professional advice or services. This document does not constitute assurance, tax, consulting, business, financial, investment, legal or other professional advice, and you should consult a qualified professional advisor before taking any action based on the information herein. RSM US LLP, its affiliates and related entities are not responsible for any loss resulting from or relating to reliance on this document by any person. Internal Revenue Service rules require us to inform you that this communication may be deemed a solicitation to provide tax services.  This communication is being sent to individuals who have subscribed to receive it or who we believe would have an interest in the topics discussed.

RSM US LLP is a limited liability partnership and the U.S. member firm of RSM International, a global network of independent assurance, tax and consulting firms. The member firms of RSM International collaborate to provide services to global clients, but are separate and distinct legal entities that cannot obligate each other. Each member firm is responsible only for its own acts and omissions, and not those of any other party. Visit rsmus.com/aboutus for more information regarding RSM US LLP and RSM International.

RSM, the RSM logo and *the power of being understood* are registered trademarks of RSM International Association.

© 2024 RSM US LLP. All Rights Reserved.